# EXHIBIT A

HAYNES AND BOONE, LLP
1221 Avenue of the Americas, 26th Floor
New York, NY 10020
Telephone: (212) 659-7300
Facsimile: (212) 918-8989
Lenard M. Parkins (NY Bar #4579124)
John D. Penn (NY Bar # 4847208, admitted *pro hac vice*)
Mark Elmore (admitted *pro hac vice*)

*Attorneys for Midland Loan Services, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INNKEEPERS USA TRUST, *et al.*, | ) | Case No. 10-13800 (SCC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## MIDLAND LOAN SERVICES, INC.'S MOTION TO TERMINATE EXCLUSIVITY

Midland Loan Services, Inc. ("Midland")[1] hereby files its Motion to Terminate

Exclusivity (the "Motion") and respectfully represents:

---

[1]     Midland is the special servicer pursuant to the Pooling and Servicing Agreement dated as of August 13, 2007 (the "Special Servicing Agreement") for that certain secured loan in the amount of not less than $825,402,542 plus interest, costs and fees (the "Fixed Rate Mortgage Loan") owed by certain of the above referenced Debtors. The Fixed Rate Mortgage Loan was made pursuant to that certain loan agreement dated as of June 29, 2007 (as amended, the "Fixed Rate Mortgage Loan Agreement"), and is evidenced by (i) a certain Replacement Note A-1 and (ii) a certain Replacement Note A-2, each dated as of August 9, 2007, and each in the original principal amount of $412,701,271. Replacement Note A-1 was assigned to LaSalle Bank National Association as trustee for the holders of the LB-UBS Commercial Mortgage Trust 2007-C6. Bank of America, N.A. is the successor-in-interest to LaSalle Bank National Association (the "Fixed Rate Trustee"). Replacement Note A-2 is currently held by the trustee for the holders of the LB-UBS Commercial Mortgage Trust 2007-C7.

**PRELIMINARY STATEMENT**

The Honorable Mary F. Walrath, Bankruptcy Judge in Wilmington, Delaware, once noted on the record during a contested confirmation hearing:

> "This is not a situation where the shareholders, the old equity holders, are being given all the equity in the case, but I think that the case is sufficiently similar to that because all of the equity is being given to one Creditor group. That creditor group professes that it would prefer to have all the equity rather than have some $89 million in cash and $236 million in secured notes. That gives the Court some pause because I know in the marketplace, secured debt and cash is better than stock unless the value of the entity has an upside. And if that is the case, if there is an upside there, then I think that the other Creditor constituents have a right to test that and to see whether or not there is a plan that can give them some value without eliminating or otherwise violating the rights of the first-lien holders. But I think the best way to test that is under Section 1129 and to allow the Creditors a choice of pressing two plans."

*In re Pliant Corp.*, Case no. 09-10443, Bankr.DE.2009 (Transcript attached as Exhibit "B", beginning on p. 229.). The Pliant Court succinctly stated exactly why the Debtors' plan exclusivity should be terminated in these cases and why the Motion should be granted.

1.      Midland requests that this Court, pursuant to 11 U.S.C. § 1121(d), terminate the Debtors' exclusive right to file a plan and to solicit acceptances of any such plan in order to allow Midland to file a plan of reorganization and disclosure statement in these cases and to solicit acceptances of any such plan. To date, the Debtors have embarked upon a chapter 11 process whereby they seek approval of a Lock-Up Agreement with one secured creditor — Lehman, providing for a plan of reorganization that favors only Lehman and Apollo, the out of the money equity owner of the Debtors. Due to the pursuit of the Lock-Up Agreement, a consensus has emerged in these cases. The Debtors have quickly generated an overwhelming consensus against themselves, their Lock-Up Agreement and the plan described therein. These

cases are primed for an alternative direction. Plan exclusivity should be terminated and this Motion granted.

2.     The Debtors are owned and controlled by Apollo. The Debtors' CRO was picked by Apollo first to be a director of Innkeepers and then hired as their CRO at the direction of the Apollo-controlled board. Can there be any doubt why Apollo remains in the picture as a 50% owner of the reorganized debtors to the detriment of almost all other creditors and preferred shareholders? There is no doubt why this has happened nor any surprise that the Lock-Up Agreement has been rejected by the overwhelming consensus of creditors and preferred equity holders in these cases.

3.     The Debtors, with Lehman and Apollo joined at the hip, devised a scheme to allow Apollo to emerge with 50% of the reorganized Debtors with no money flowing to the estates and no market test of the new equity Apollo would receive. Before and after these cases began, the Debtors' investment banker – Moelis – was not instructed to find the optimum deal in the market as the basis to reorganize. The Debtors refused to market the Lock-Up Agreement or the Lehman/Apollo Plan embedded therein. Yet, at least one alternative exists to the plan embedded in the Lock-Up Agreement. That alternative would likely lead to an easily confirmable plan because (a) no secured creditor is forced to accept a cramdown note, (b) a market test of value is mandated to allow for higher and better bids for the Debtors or their assets, and (c) secured creditors can take their collateral in satisfaction of their claims if they decline to accept a restructured debt.

4.     The Debtors' plan process is an integrated transaction to favor Lehman and Apollo. The Debtors' process imposes an involuntary write-down of hundreds of millions of dollars in debts while allowing the current owner to emerge owning half of the reorganized

companies without either paying the estates or exposing the process to the market.[2]   The Debtors' skewed view  of Chapter 11 cries out for the alternatives that terminating exclusivity would provide.   Terminating plan exclusivity would give these cases a legitimacy that the Debtors lack and would allow creditors the chance to increase their returns.   It would also neutralize the Debtors' attempt to use exclusivity as a weapon to file and prosecute a plan that is supported only by Lehman and Apollo and is doomed to failure as matter of  law

5.      While in typical cases, courts might permit debtors time to propose a confirmable, consensual plan, doing so in this case would serve no purpose.   The Lock-Up Agreement describes a plan structure that will fail.   The Lock-Up Agreement has been opposed by $1.2 billion of secured lenders, all of the mezzanine lenders and the preferred equity.   Each filed a substantial objection opposing the Lock-Up Agreement that, among other things, precludes the Debtors from discussing or negotiating for a different plan that might otherwise increase returns to the creditors.   If that were not enough, it also includes draconian sanctions if the Debtors take actions inconsistent with that strategy.   By tying the Debtors' hands and preventing them from acting to maximize the estates' assets for the benefit of all stakeholders, the Lehman/Apollo Plan and Lock-Up Agreement represents a surrender and abdication of the Debtors' fiduciary duties.

6.      The plan contemplated by the Lock-Up Agreement reduces secured debt, eliminates deficiency claims and transfers all of the upside in the assets for the exclusive benefit of  Lehman and Apollo.   There is something wrong with this picture – it shows that bankruptcy

---

[2]      The size of the write-down, which would be the largest CMBS write-down of which Midland is aware, emphasizes the need for an open and market-tested process.

court jurisdiction has been invoked for the wrong purpose – to allow the Debtors to control the process for Apollo's benefit to the exclusion of creditors with very large and senior claims.

7.     Midland requests that this Court level the playing field and terminate exclusivity. There is no time – or need – for delay.  The solution to this problem is a simple one – terminate exclusivity and allow for the filing of a different, market-driven plan.

8.     Five Mile Capital II Pooling REIT LLC, an affiliate of Five Mile Capital Partners LLC (collectively "Five Mile") (one of the proposed DIP lenders in these cases) approached Midland with a Commitment to fund $236 million of new money as a basis for a proposed plan of reorganization that could increase the Debtors' enterprise value over the enterprise value implicit in the Lehman/Apollo Plan, while providing the other creditor constituencies a higher recovery more reflective of the intrinsic value of their collateral.  The Commitment would also give the Debtors' secured creditors the freedom to take their collateral if they do not wish to go along with the proposal.  Finally, unlike the Lehman/Apollo Plan, the Commitment is subject to higher and better offers, and  mandates the commencement of a fair marketing process approved by the Court through competing plans of reorganization or otherwise for the Debtors and their assets.

9.     Termination of exclusivity is mandated, especially here, where a debtor is running its case for the benefit of its controlling owner – to ensure that Apollo emerges owning equity through a process that should only occur via a "new value plan" done in compliance with *LaSalle*.  Terminating exclusivity provides for a market test of value and would allow the creditors whose recoveries are at risk to choose their fate.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408. The predicates for relief requested herein are sections 105 and 1121 of the Bankruptcy Code.

## FACTUAL BACKGROUND

11.     In 2007, Apollo acquired Innkeepers primarily with debt. Lehman, now in its own Chapter 11 case, assisted Apollo in arranging for over $1 billion of debt, including debt that it ultimately sold on the public markets.

12.     As a condition to approving Apollo's acquisition, Marriott (the company that franchised over half of the Debtors' hotels) required that many of the Debtors execute Property Improvement Plans ("PIPs") to assure that the hotels were brought up to the then current standards. As part of the financing, over $40 million was set aside for capital improvements to hotels included in the Midland Collateral and Apollo executed a Required Improvements Guaranty that guaranteed the payment and performance of the obligation for improvements.

13.     In 2007, Marc Beilinson ("Beilinson") was selected by Apollo to join the Innkeepers' board of directors. Barely one year later, Beilinson was hired by that same Apollo-controlled board to be the CRO and has continued in that role thereafter. In April, he received an additional $1 million payment.[3]

14.     The Midland Debtors began making improvements to their facilities in 2008, the reserve funds were expended before the PIPs were completed. Work was stopped (or slowed to the point that it became unnoticeable) and Marriott's displeasure mounted. In late 2008, the

---

[3]     The additional $1 million payment is potentially avoidable – a type of claim that the Apollo/Lehman Plan would release.

Debtors employed one of their directors as a Chief Restructuring Officer. Apollo did not perform under its Required Improvements Guaranty or otherwise provide any additional capital to advance the work on the PIPs.

15. On March 16, 2010, Marriott's patience had worn thin and it sent notifications that it would terminate the franchises of a number of the Debtors' hotels if the PIPs were not completed in ninety (90) days. During March and April, the Debtors wrongfully diverted the revenues from Midland's Collateral and paid millions of dollars to their professionals and CRO. In April, the Debtors launched their strategy with negotiations involving both Lehman and Apollo that resulted in the Lock-Up Agreement.

16. On July 19, 2010, (the "Petition Date"), the Debtors filed their Chapter 11 cases and sought to assume the Lock-Up Agreement.

17. The evidence will show that the Debtors, Lehman and Apollo intended from the outset of their discussions to secure Court approval of the Lock-Up Agreement. Their goal is to use the bankruptcy process to allow Apollo to emerge as owning at least part of the Debtors[4] while also creating a punitive deterrent to discourage the Court or other parties from interfering with that strategy.[5] A blatant consequence of taking this course of action is the Debtors'

---

[4] Marriott's Limited Objection to the Motion to Assume the Plan Support Agreement (Docket No. 246), ¶ 9 refers to a June 25, 2010 "Side Letter" that shows the Debtors' expectation that that Apollo would emerge with at least 50% of the equity was cemented well before the Lock-Up Agreement was signed. Well before the Petition Date, the Debtors and Marriott apparently agreed that the 50:50 sharing of equity would not trigger "change of control" provisions under the various franchise agreements. It apparently provides that Marriott "will not unreasonably withhold its consent to a "change of control" . . . , if upon the conclusion of the reorganization contemplated by this Agreement, Apollo Investment Corporation or its affiliates ("Apollo") or Lehman Brothers Holdings, Inc., LAMCO, LLC, Lehman ALI, Inc. or its or their affiliates ("Lehman") obtains, individually, or collectively, a controlling interest in the Company (Apollo and Lehman, individually or collectively own at least fifty percent (50%) of the Company)."

[5] The fact that the Apollo – Lehman agreement was signed on the Petition Date and the Plan Term Sheet attached to the Lock-Up Agreement provides that an acceptable plan must include §§ 1145 and 1146 exemptions for both "the issuance of the New Equity **and any subsequent transfer of New Equity**

abrogation of their fiduciary duties to all constituents in favor of Lehman and its partner to be Apollo. The Lock-Up Agreement includes an enforcement mechanism designed to thwart attempts at debtor independence because it includes an extensive list of ways for Lehman to terminate the Debtors' use of its cash collateral. It also includes provisions that require that the Lehman/Apollo Plan be confirmed and implemented on certain deadlines or else Lehman is allowed to liquidate its collateral.

18.     The Lock-Up Agreement even dictates that the Debtors are not permitted to file any significant pleading that Lehman had not approved. It also compels the Debtors to object to certain pleadings and exposes the Debtors to the loss of the use of Lehman's cash collateral if certain events outside of their control occurred. Finally, the Lock-Up Agreement includes an illusory "fiduciary out" that would effectively permit Lehman to decide whether to allow a belated exercise of fiduciary independence by the Debtors or risk the loss of Lehman's cash collateral use or perhaps even the loss or liquidation of Lehman's collateral.[6]

19.     The Lock-Up Agreement includes defined "Milestones" for the plan process, including when the Motion to approve the Lock-Up Agreement was to be filed, when it was to be approved, when the Lehman/Apollo Plan was to be filed, confirmed and implemented. The Lock-Up Agreement, if implemented, would require that each Milestone be achieved. Failing to do so would create great risk to the Debtors since it could trigger the liquidation of Lehman's collateral and the loss of Lehman's cash collateral.

---

**by Lehman prior to the Effective Date**" (emphasis added) makes the strategy and intent abundantly clear.

[6]     The Debtors might argue that the "Fiduciary Out" allows them to exercise their fiduciary duties. However, that exercise would come at a high price the Debtors are unwilling to pay – the immediate loss of use of Lehman's cash collateral and the ultimate loss of the Lehman collateral when a "Plan Milestone" is not achieved. The real teeth – loss of the Lehman Pool hotels – occurs when the deadline passes for a Lehman favored plan to be confirmed and the Debtors have agreed that such right (should the Lock-Up Agreement be approved) remains inviolate. Lock-Up Agreement, ¶ 25(c).

20.     The evidence will show that neither the Debtors, Lehman nor Apollo ever had any intention to explore alternative transactions or plans that would provide a greater return to any creditor than was contemplated by the Lehman/Apollo Plan.  The Debtors' investment banker was never empowered to search for higher or better options.  It is beyond doubt that neither the Debtors nor Apollo ever "shopped" the proposal for one that would benefit others at the expense of Apollo.  They apparently view their duties as flowing to themselves instead of to their creditors who are owed over $1.2 billion dollars.

21.     On August 20, 2010, Five Mile provide a draft of a  Binding Commitment for the Acquisition of Innkeepers USA Trust that was subsequently updated (the "Commitment") to Midland.  Negotiations  on the Commitment have taken place since August 20 between Midland and Five Mile.  Agreement on the  final terms of the Commitment has been reached and on August 29, 2010, and Midland executed the Commitment after completing its approval process.  A copy of the updated Five Mile Commitment is attached hereto as Exhibit "A".

22.     The Commitment is not a  plan or a disclosure statement.  It is a financing commitment by Five Mile to fund a chapter 11 plan of reorganization to be filed  by Midland if certain conditions are satisfied: (i) the Court must first terminate exclusivity by October 15, 2010 to permit Midland to file a plan and disclosure statement; (ii) Five Mile must be given access to the Debtors books and properties in order for Five Mile to complete confirmatory due diligence to its satisfaction; and (iii) this Court must approve an open transparent marketing process for competing plans and standard bid protections in favor of Five Mile.  Absent the satisfaction of these conditions, no plan can be filed by Midland predicated on the Commitment.

23.     Some key points in the Commitment[7] provide for:

---

[7]     These are illustrative and terms of the Commitment are binding in the event of an inconsistency.

(a) a new capital structure of $803.4 million in aggregate indebtedness and $236.6 in new equity capital (cash) to be invested by Five Mile.

(b) approximately $89.1 million in additional recovery value for the non-Lehman Pre-Petition creditors and $187.2 million in cash pay downs of indebtedness, including retirement of $67.75 of DIP financing, the purchase of the B-Notes for $6.6 million and payments on the C-Note of $12.1 million."

(c) a proposed treatment of the Lehman Floating Rate Mortgage Loan that better reflects the value of the collateral supporting the Lehman obligation.

(d) an increase in enterprise value of the Debtors by approximately $125 million over the valuation contemplated in the Lock-Up Agreement.

(e) committed exit financing necessary for the success and emergence of Innkeepers from bankruptcy.

(f) a court approved open marketing process for competing plans to seek higher and better recoveries for the Debtors and their creditors versus the Lock-Up and reasonable bid protections for Five Mile.[8]

(g) no secured creditor to have its debt reduced through cramdown. Instead, it contemplates that each secured creditor retains the right to take ownership of its collateral in full satisfaction, settlement, release and exchange for its claim

24.     Unlike the plan embedded in the Lock-Up Agreement, no secured creditor will be forced to take a cramdown secured note unsatisfactory to that secured creditor and without recovery on the balance of its deficiency clams. Rather, the flexibility provided by the Commitment allows parties unhappy with their treatment to simply take their collateral in full satisfaction of their claims.

## ARGUMENT

## I.     THE COURT SHOULD TERMINATE EXCLUSIVITY

25.     As discussed above, the Lock-Up Agreement calls for a plan in favor of Lehman and Apollo which is a "new value plan" that results in Apollo emerging with equity in the

---

[8]     The refusal to provide for a market test to seek higher and better bids has been a fundamental objection by Midland from the onset. Allowing higher and better bids would make the Commitment the floor as compared with the Lock-Up Agreement which created caps on returns to secured creditors.

reorganized entities in violation of *LaSalle*. The Lock-Up Agreement defines a Lehman/Apollo Plan that forces, via cramdown, substantial reductions in the claims of secured creditors and pays nothing to mezzanine lenders and deficiency claims. The Lock-Up Agreement effectively surrenders control of these bankruptcy cases to Lehman and Apollo, and is tangible evidence that the Debtors have abandoned their fiduciary duties to maximize recoveries for all constituents.

26.    In contrast, based on the Commitment, and only if permitted to do so by the Court, Midland is capable of proposing a fair and procedurally appropriate plan that also allows for higher and better offers to maximize creditor recovery. A plan based on the Commitment vastly improves the return to creditors (other than Lehman) and allows for higher and better offers to improve the treatment even more.

27.    To allow Midland to propose a plan based on the Commitment, the Court should exercise its discretion to (i) terminate exclusivity and (ii) enter a scheduling order that makes the relief meaningful by giving Midland a reasonable opportunity to file and solicit confirmation of such plan, if permitted to do so by the Court.

A.    **Overview of Exclusivity; Cause to Terminate**

28.    Section 1121 of the Bankruptcy Code is intended to promote and protect the debtor's ability to develop a consensual plan of reorganization, not to encourage abuse of the Bankruptcy Code's protections. Section 1121 grants debtors the exclusive right to file a plan of reorganization during the first 120 days of a Chapter 11 case, and to solicit votes for such a plan during the first 180 days, unless the court finds "cause," pursuant to section 1121(d), to extend or reduce those exclusive periods.

29.    The Bankruptcy Code does not define "cause" for extending or shortening the exclusive periods, but relevant factors include:

(a)    whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands;

(b)    the existence of good faith progress towards reorganization;

(c)    whether the debtor has made progress in negotiations with its creditors;

(d)    whether the debtor has demonstrated reasonable prospects for filing a viable plan;

(e)    the amount of time which has elapsed in the case;

(f)    the size and complexity of the case;

(g)    the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information to allow a creditor to determine whether to accept such plan;

(h)    the fact that the debtor is paying its bills as they become due; and

(i)    whether an unresolved contingency exists.

*In re Adelphia,* 336 B.R. 610, 674 (Bankr. S.D.N.Y. 2006). The party seeking to reduce or extend the exclusivity period has the burden of establishing "cause." *E.g. In re Texaco, Inc.,* 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987).

30.    The facts of this case overwhelmingly support a finding of "cause" to terminate exclusivity under factors (b)-(g), above. Here, the Debtors have not demonstrated good faith in proposing the Lock-Up Agreement to prosecute the Lehman/Apollo Plan and effectively violate (a) above. Rather, the Debtors seek the Court's blessing for a process that would benefit only one secured creditor and the Debtors' ultimate parent. The totality of their doing so is contrary to (b) above. Indeed, the Lehman/Apollo Plan has the hallmarks of a "new value plan" by wiping out unsecured and deficiency claims, allowing the current parent to emerge with equity without compliance with the fundamental requirements for "new value plans". The ultimate parent benefits from exclusivity while the Lock-Up Agreement would create the "*in terrorem*" effect to force the Court and creditors to approve the process or risk losing 20 of the Debtors' over 70 hotels.

31.    Under the proposed Lock-Up Agreement, the Debtors effectively surrendered substantial control over this case to Lehman. The Lock-Up Agreement includes a myriad of

ways for Lehman to terminate the Debtors' use of Lehman's cash collateral if the Debtors do anything Lehman opposes. Instead of Debtors exercising their fiduciary duty to maximize recoveries for *all* constituencies, it supplicates itself to Lehman, not surprisingly, the party that contracted with Apollo. The proposed Lock-Up Agreement, however, prevents the Debtors from deviating from Lehman/Apollo Plan, and even prohibits the Debtors from discussing any alternative arrangements without Lehman's consent. Any effort toward an alternative plan or restructuring risks the loss of operating funds (the Lehman cash collateral) for twenty of the Debtors' hotels.

32. Midland is prepared to file and prosecute a reasonable, fair, confirmable plan for the Debtors that provides for a better recovery than the Lehman/Apollo Plan while leaving the door open to even higher and better recoveries to all creditors. Under the circumstances, there is compelling cause to grant leave to file and pursue confirmation of a competing plan in this case.

**B.  The Court Should Terminate the Debtors' Exclusivity to Permit Midland to Propose an Alternative to the Lehman/Apollo**

33. As discussed above, the Lehman/Apollo Plan would be a "new value" plan, which proposes to provide new equity to Apollo while wiping out unsecured creditors (*i.e.*, deficiency claims, mezzanine lenders and other unsecured creditors).[9] The Debtors have affirmatively rejected overtures of interested parties who have the financial capability to propose and implement alternative plans to conduct due diligence. Under a well-established body of case-law, the filing of a plan that favors equity to the detriment of creditors constitutes "cause" under section 1121(d) to terminate plan exclusivity and open the process to competitive (*i.e.*, real, comparable) proposals. *See Bank of Am. Nat'l Trust & Savings Ass'n v. 203 North LaSalle*

---

[9]  The Debtors' contemplated Plan Term Sheet would include exemptions in favor of Apollo under 11 U.S.C. §§ 1145 & 1146 – exemptions only available for transfers contemplated by plans of reorganization.

*St. P'ship*, 526 U.S. 434, 119 S.Ct. 1411 (1999) (holding that absolute priority rule was violated where debtor's plan only permitted its shareholder to invest new capital to obtain all the equity in the new company).

34. As explained by the Supreme Court in *LaSalle*, the problem with granting old equity the exclusive right to the property

> is that **the exclusiveness of the opportunity, with its protection against the market's scrutiny** of the purchase price by means of competing bids or even competing plan proposals, renders the partners' right a property interest extended 'on account of' the old equity position and therefore subject to an unpaid senior creditor class's objection. (Emphasis added)
>
> 526 U.S. 434, 456

Exclusivity to propose a plan that benefits insiders is the interest in property that would be improperly retained under the Lock-Up Agreement. It is exclusivity itself, that Apollo enjoys vicariously through its complete ownership of the Debtors, that is a property interest "on account of the old equity position" proscribed by *LaSalle*. Terminating exclusivity will not necessarily derail the Debtors' plan because the Debtors can propose the Lehman/Apollo Plan without the need for exclusivity. *See In re R.G. Pharm., Inc.*, 374 B.R. 484 (Bankr. D. Conn. 2007) ("The fact that the debtor no longer has the *exclusive* right to file a plan does not affect its concurrent right to file a plan.") (citation omitted).

35. Courts frequently terminate exclusivity where a debtor's proposed plan leaves a creditor constituency out of the money even though a viable alternative plan could provide a greater recovery to more creditors.[10] The "potential benefit to the estate of . . . producing some return to a very large group of creditors, who . . . would be wiped out completely" by a debtor's plan "is a significant basis for termination." *In re TCI2 Holdings, LLC*, 09-13654 (JHW) (Bankr.

---

[10] The Lock-Up Agreement would leave secured creditors' deficiency claims and the mezzanine lenders with no recovery.

D.N.J. August 27, 2009) (relevant transcript excerpts attached hereto as Exhibit "C"), (granting motion to terminate exclusivity to permit unsecured noteholders to file a competing plan where debtor's plan proposed to wipe out everyone but the first lien lender while giving another constituency – including possibly to Donald Trump, an equity holder of the debtor – the opportunity to exchange $100 million for all the equity in the reorganized debtor).

36.     Similarly, in *Pliant Corp.*, where only one creditor group was given equity under the Plan, with no opportunity for others to bid on that equity, the Court found that it was sufficiently similar to the facts under *LaSalle* to warrant terminating exclusivity.  The Court determined that "**if there is an upside there . . . that the other creditor constituents have a right to test that and to see whether or not there is a plan that can give them some value**." (Emphasis added)  *See Exhibit "B"; see also In re Seitel, Inc.*, Case No. 03-12227 (PJW) (Bankr. D. Del. Nov. 3, 2003) (relevant transcript excerpts attached hereto as Exhibit "D") (approving motion to terminate exclusivity in order to provide equity holders with information regarding alternative plan with a potentially higher recovery for all creditors); *In re Haw. Telecom Commucn's, Inc., et al.*, Case No. 08-02005 (LK) (Bankr. D. Haw. July 1, 2009) (relevant transcript excerpts attached hereto as Exhibit "E") (denying debtor's motion to extend exclusive periods to allow other parties in interest, including a potential acquirer of the debtor, to file a competing plan where public interest was best served by terminating exclusivity); *In re Fremont Gen. Corp.*, Case No. 08-13421 (ES) (Bankr. C.C. Cal. July 16, 2009) (order terminating exclusivity attached hereto as Exhibit "F") (terminating exclusivity where debtor's plan allowed equity holders to retain certain interests without providing full recovery to unsecured creditors); *In re FX Luxury Las Vegas I, LLC*, Case No. 10-17015 (BAM) (Bankr. D. Nev. June 16, 2010) (relevant transcript excerpts attached hereto as Exhibit G) (terminating debtor's exclusivity

within the first 60 days of the case, explaining that once the debtor "commences a bankruptcy case, the bankruptcy code requires me to take into account the interests of the entire estate, . . . not to approve processes that unduly favor one party or the other, but to try . . . to open up a transparent process."); *In re Bosque Power Company, LLC,* Case No. 10-60348 (RBK) (Bankr. W.D. Tex. July 22, 2010), (order and findings of fact and conclusions of law attached hereto as Exhibit H), (terminating debtors' exclusive period to solicit acceptances of "new value" plan and allowing parties in interest to file competing plans where doing so would "promote the maximum recovery to creditors" and "promote an environment in which a consensual plan may be negotiated"); *In re Situation Mgmt. Sys., Inc.*, 252 B.R. 859 (Bankr. Mass. 2000) (terminating exclusivity to permit competing plans in context of "new value" plan).

37.     In *In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 49 (Bankr. D. Del. 2000), the Delaware Bankruptcy Court followed *203 North LaSalle* where the debtors' controlling equity holder sought, through his control of the debtor, to sell the equity to a "non-shareholder" – his daughter – holding that the plan violated the absolute priority rule. As a result, the Bankruptcy Court ruled that "[t]o avoid this result the Debtors must subject the 'exclusive opportunity' to determine who will own [the Debtors] to the market place test. . . . This can be achieved by either terminating exclusivity and allowing others to file a competing plan or allowing others to bid for the equity . . ."; *see In re Davis*, 262 B.R. 791 (Bankr. D. Az. 2001) (refusing to extend exclusivity where proposed plan would violate absolute priority rule by permitting individual debtors to retain equity); *Situation Mgmt. Sys.*, 252 B.R. 859 (finding cause to terminate exclusivity to permit competitive bidding).

38.     As in the above cases, the Lehman/Apollo Plan would violate Bankruptcy Code section 1129(b)(2)(B)(ii) (*i.e.,* the absolute priority rule) by ensuring that the ultimate parent

would emerge with equity while hundreds of millions of dollars in unsecured claims are wiped out without providing a market test for the equity interest. As with *LaSalle* and the other cases cited above, cause therefore exists to terminate exclusivity and to open the process to a competitive plan. The Debtors' exclusivity should therefore be terminated to permit Midland to file a competing plan and level the playing field.

      C.      **It Is In The Best Interests of the Unsecured Creditors, Including Deficiency Claimants, to Permit Midland to File a Plan**

      39.      Ultimately, it is in the best interest of the Debtors' estates, including creditors with unsecured deficiency claims and non-Insider equity holders, to permit Midland to propose a plan that, unlike the Lehman/Apollo Plan, will provide Lehman with its legal entitlement under the Bankruptcy Code (but not *more* than such entitlement) and provide recoveries/potential upside to all unsecured creditors (including deficiency claims). Competing plans may even motivate the Debtors and Lehman to engage in expedited *meaningful* negotiations resulting in confirmation of one joint consensual plan. "It may well be, as has been the experience in cases not only in this Court but in other courts, that while the process starts out after termination of exclusivity with competing plans**,** the ongoing process of the case results in compromises and negotiations whereby one joint plan goes forward." *See In re EUA Power Corp.*, 130 B.R. 118, 119 (Bankr. D.N.H. 1991). Indeed, the existence of competing plans is likely to encourage negotiations between the competing parties, a result the Debtor has been unable or unwilling to engage in to date. *See In re Mother Hubbard, Inc.*, 152 B.R. 189, 195 (Bankr. W.D. Mich. 1993) ("In some instances, authority to file a competing plan may additionally motivate the debtor to more earnestly negotiate an acceptable consensual plan.").

      40.      Moreover, the filing of a competing plan will not prejudice the Debtors; they can propose the Lehman/Apollo Plan to see if creditors vote to support it. *See In re All Seasons*

*Indus., Inc.*, 121 B.R. 1002, 1005 (Bankr. N.D. Ind. 1990) (decision to terminate exclusivity "does not sound a death knell for debtor's reorganization," rather it simply affords creditors the right to file plans as well; these rights coexist with the debtor's ongoing right to file a plan).

41.     Because the Debtors have locked up with Lehman (and Apollo) to provide them with recoveries to which they are not entitled under the Bankruptcy Code, Midland should be free to propose and solicit acceptances of an alternative plan, even if in competition with the Lehman/Apollo Plan described by the Debtors on the first day of this case. In essence, the only way a plan could be confirmed in these cases is to terminate exclusivity since the Lehman/Apollo plan cannot be confirmed. Since exclusivity must be terminated for a confirmable plan to be proposed, termination should occur sooner rather than later.

### D.     The Court Should Establish a Schedule Prohibiting Any Party To Solicit Acceptances of the Debtors' Plan or Any Other Plan Spawned by the Lock-Up Agreement Until Has Filed a Plan and Disclosure Statement

42.     If the Court terminates plan exclusivity, it is necessary to assure that Midland is given a fair chance to file a plan and disclosure statement so that its plan can proceed to confirmation without undue delay. To accomplish this, the Court should provide that a plan filed by Midland shall be scheduled for confirmation on a basis no less favorable than any competing plan, including the Lehman/Apollo Plan. While the Lock-Up Agreement was filed on the first day of the cases, the Lehman/Apollo Plan has yet to be filed (although it is due to be filed within a matter of days). Placing competing plans on a level playing field will allow fairness to all creditors and equity holders of these estates. Absent such relief, it would be necessary to engage in litigation concerning the many substantive defects in the Debtors' anticipated Plan. Such litigation is not only unnecessary (in light of the extremity of the facts set forth in this Motion), but would also force all concerned to incur needless delay and expense.

## II.    SUMMARY

43.    Midland requests that this Court terminate the Debtors' exclusive right to file a plan and allow a plan of reorganization and disclosure statement to be filed by Midland that can thereafter proceed expeditiously toward confirmation in these cases.

44.    The Debtors, under the direction of their CRO, filed these cases to implement a doomed strategy to the prejudice of $1.2 billion of the $1.4 billion of secured creditors, and all of mezzanine lenders and preferred shareholders.  The Debtors are  pursuing a plan to favor one creditor, Lehman, whose claims are dwarfed by the other creditors.  Lehman is also the only creditor with an agreement with Apollo, the "out of the money" equity owner, to share its ill-gotten gains.

45.    The Debtors' CRO apparently believes that he has no duty as a fiduciary to test the market to determine the highest and best deal for the constituencies of these estates. The Debtors' CRO instead believes that it is his duty as a fiduciary for all of the constituencies to exhaust the first 8 months of these bankruptcy cases with litigation pursuing a fatally flawed insider plan conceived as an attempt to circumvent the *LaSalle* decision, to the detriment of all of the other Creditors.  Lehman stands as the lone creditor in support of the strategy.  Continuing exclusivity to allow the Debtors to pursue the insider plan is a colossal waste of precious judicial time and the money of constituencies who soundly and resolutely reject the Lock-Up Agreement and its consequences.

46.    To the contrary, success in these cases is in sight.  If exclusivity is terminated, Midland could file a plan to be financed by Five Mile that is substantially better for all of the secured lenders and other constituencies (except Lehman).  The plan envisioned by Midland would improve the returns for all constituents (other than Lehman and Apollo) and embrace at its core a process that seeks out higher and better offers.  This is a distinct contrast to the Debtors'

desire to try to ramrod a plan on 85% of the creditors to force those creditors to accept depressed recoveries so value can go to Apollo and Lehman. Apollo and Lehman have absolutely no right to that value under any legitimate theory of law, logic or common sense.

47.     The Debtors' rhetoric in these cases rings hollow and is unsupportable. They deny doing Apollo's bidding yet everything seems to fall in favor of Apollo and Lehman. Unfortunately, because the Debtors have demonstrated time and again that they intend to abuse their exclusivity, unless it is terminated, all of the other constituencies must first spend enormous amounts of time and money to deal with the Debtors strategy embodied in the Lock-Up Agreement which manifests the CRO's tortured view of fiduciary duty which favors only Apollo and Lehman.

48.     This Court has the power to fix the problem. The request is not complicated: terminate plan exclusivity, allow Midland to file a plan and quickly allow the market to set the final price for a restructure to be implemented through a confirmed plan of reorganization. If Lehman wants to bid with a better plan for all constituents, it is free to do so. If Apollo wants to bid, it must first comply with *LaSalle* and proceed accordingly.

49.     Most debtors would applaud this outcome – a quick chapter 11 process that tests the market and that yields the best deal for all constituents. Midland assumes that the Debtors will strenuously oppose moving in this direction because it would set in play a fair and open process that does not include a locked-in benefit for Apollo or Lehman. An open and market-based process runs contrary to Apollo's goals. However, it is the right thing to do and the Court should grant this Motion and terminate the Debtors' exclusivity.

**Local Rule 9013-1(a)**

50.     This pleading includes citations to the applicable rules and statutory authorities upon which the relief requested herein in predicated and a discussion of their application to this pleading.  Accordingly Midland submits that this pleading satisfies Local Bankruptcy Rule 9013-1(a).

## CONCLUSION

WHEREFORE, Premises Considered, Midland respectfully requests that this Court enter an order (i) terminating exclusivity to permit Midland to propose and file a plan of reorganization (ii) terminating exclusivity to allow Midland to solicit acceptance a plan (after the approval of a disclosure statement), (iii) prohibiting the filing and solicitation of acceptances of the Lehman/Apollo Plan (or any other plan contemplated under the Lock-Up Agreement) until Midland has filed its plan and related disclosure statement, and (iii) granting such other relief as is necessary or appropriate.

Dated: August 30, 2010
New York, New York

HAYNES AND BOONE, LLP

_____/s/ Lenard M. Parkins_____
Lenard M. Parkins (NY Bar #4579124)
Mark Elmore (admitted *pro hac vice*)
1221 Avenue of the Americas, 26th Floor
New York, NY 10020-1007
Telephone No.: (212) 659-7300
Facsimile No.: (212) 884-8211

- and –

John D. Penn, Esq. (NY Bar # 4847208, admitted *pro hac*)
Haynes and Boone, LLP
201 Main Street, Suite 2200
Fort Worth, Texas 76102
Telephone No.: (817) 347-6610
Facsimile No.: (817) 348-2300

*ATTORNEYS FOR MIDLAND*
*LOAN SERVICES, INC.*

Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| INNKEEPERS USA TRUST, *et al.*, | ) Case No. 10-13800 (SCC) |
|  | ) |
| Debtors. | ) Jointly Administered |
|  | ) |

### ORDER GRANTING MIDLAND LOAN SERVICES, INC.'S
### MOTION TO TERMINATE EXCLUSIVITY

Upon the motion (the "Motion)[11] of Midland Loan Services, Inc. ("Midland") in connection with the above-captioned debtors (collectively, the "Debtors") for entry of an order terminating exclusivity and it appearing that (i) the relief requested in the Motion is appropriate; (ii) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (iii) this proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iv) venue of this proceeding and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and (v) notice of this Motion was appropriate under the particular circumstances and that no other or further notice need be given; and after due deliberation and sufficient cause appearing therefore, it is hereby:

**ORDERED** that the Motion is GRANTED; and its is further

**ORDERED** that exclusivity is terminated and Midland is now permitted to propose and file a plan of reorganization; and it is further

**ORDERED** that exclusivity is terminated and Midland is now permitted to solicit acceptance of a plan (after the approval of a disclosure statement); and it is further

---

[11] Capitalized terms used, but not otherwise defined herein, shall have the meanings set forth in the Motion.

**ORDERED** that the filing and solicitation of acceptances of the Lehman/Apollo Plan (or any other plan contemplated under the Lock-Up Agreement) is prohibited until Midland has filed its plan and related disclosure statement; and it is further

**ORDERED** that this Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated: _____ \_\_\_, 2010
New York, New York

_____
HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

FIVE MILE CAPITAL PARTNERS

**FIVE**
_____
**MILE**

THREE STAMFORD PLAZA, 9TH FLOOR
STAMFORD, CONNECTICUT 06901
TELEPHONE 203-905-0950
FACSIMILE 203-905-0954

August 29, 2010

Midland Loan Services, Inc.
10851 Mastin, 6th Floor, Overland Park, KS 66210
Attention: Kevin S. Semon
                Vice President, Special Servicing Manager

**Binding Commitment for the
Acquisition of Innkeepers USA Trust**

Five Mile Capital II Pooling REIT LLC ("Five MilePooling"), through its investment advisor Five Mile Capital Partners LLC (collectively, "Five Mile"), is pleased to submit this letter (this "Commitment Letter") to Midland Loan Services, Inc., as special servicer for the $825.4 million Fixed Rate CMBS Mortgage Loan (together with any successor special servicer, "Special Servicer"), which sets forth, among other things, our binding commitment (the "Commitment") to provide equity capital for the restructuring of the debt and equity of Innkeepers USA Trust ("Innkeepers") and its subsidiaries (collectively with Innkeepers, the "Company"), resulting in Five Mile indirectly owning 100% of the equity interests in the reorganized Company (the "Transaction"). The funding from our Commitment will be used to finance and otherwise implement a confirmed plan of reorganization to be filed by Special Servicer (the "Plan") acceptable to us in our reasonable discretion, which will provide for the treatment of claims and other terms outlined below and will otherwise contain terms and treatment of claims consistent with the applicable provisions of the Bankruptcy Code.

Five Mile is uniquely qualified to consummate the Transaction, given our substantial investment and the rights we have in certain indebtedness in Innkeepers. As you know, we have made available, subject to Court approval, debtor-in-possession financing to the Company in excess of $50 million. As a result, we are familiar with the Company's assets and operating performance, gleaned from our review of public filings and our own unassisted due diligence. We also have general expertise in the hospitality market and the extended stay lodging sector.

I.      **Value & Proposed Capital Structure**

Innkeepers is a leading owner of upscale and extended stay hotel properties throughout the United States with interests in 73 hotels and approximately 10,000 rooms across 19 states. As with many other lodging assets, the Company experienced adverse asset performance as a result of the economic downturn and became unable to perform under its existing debt obligations leading to the Company's bankruptcy filing on July 19, 2010.



EXHIBIT
**A**

PENGAD 800-631-6989

Given the economic environment's adverse impact on operating performance, reduced valuations within the lodging sector, required capital investments, and pending or existing franchise expirations, we believe the Company must resize its existing capital structure.

Our Commitment is based on a valuation of the Company of $1.04 billion and results in a final capital structure of $803.4 million in aggregate indebtedness and $236.6 million in new equity capital to be invested by us. The details of the reorganized capital structure for the Company are provided in Section IV below.

## II.     Capital Commitments; Guaranties

Subject to the conditions set forth above, we hereby submit this binding and irrevocable offer to provide $236.6 million of cash to fund the Transaction to be effectuated in accordance with the terms of this Commitment Letter on the effective date of the Plan. Five Mile's investment will be used to recapitalize the Company, and more specifically, will be used to pay down existing debt and provide funds for future property improvement work ("PIP"), furniture, fixtures, and equipment investments ("FF&E"), cash reserves and potential growth opportunities. We will provide the cash investment required to consummate the Transactions from our existing investment vehicles.

In addition, in connection with the contemplated restructured debt, Five Mile Pooling will enter into "bad boy" guaranties reasonably customary and otherwise reasonably standard for transactions of this type; provided, that Five Mile Pooling's maximum liability under each such guaranty shall not exceed 10% of the outstanding principal balance of the restructured loan from time to time for which such guaranty is provided.

In connection with the foregoing, we hereby confirm that we have available, and will have available at all times prior to consummation of the Transaction or the termination of the Commitment, investor commitments that exceed, in the aggregate, $240 million.

## III.    Plan Subject to Higher and Better Offers; Five Mile Free to Pursue Other Transactions

Subject to Court approval of the bid protections for Five Mile described in Section VI herein, Five Mile acknowledges that the Plan will be subject to higher and better offers for creditor treatment as may be reflected in competing reorganization plans filed with the Court. For avoidance of doubt, our providing this Commitment does not preclude us in any way from discussing alternate transactions, including competing plans of reorganization, or engaging in any discussions regarding providing financing or participating in any such alternate transactions (each, an "Alternate Transaction"); provided however, that we will not enter into a binding commitment with respect to, or otherwise consummate, any Alternate Transaction prior to the occurrence of a Termination Event (as defined in Section IX hereof).

## IV.    Restructuring of Debt and Equity of the Company – New Equity, Debt Forgiveness, & Cash Pay Downs

Based on our analysis of the Company's filings we believe that as of July 2010, the Company has approximately $1.482 billion in outstanding debt obligations of which approximately $1.055 billion is pre-petition obligations not related to Lehman ALI, Inc. ("Lehman") (i.e., exclusive of Lehman's

Floating Rate Mortgage Loan & Floating Rate Mezzanine Loan). Our Commitment contemplates a restructuring whereby the current debt is reduced through debt forgiveness and cash pay downs to approximately $803.4 million allowing non-Lehman pre-petition creditors to realize value for 73.023% of their outstanding obligations ($770.4 million of value realization on $1.055 billion of current indebtedness), calculated after giving consideration to the B-Notes to be purchased by us as proposed in this Commitment Letter and the C-Note to be issued to the lender under the Fixed Rate CMBS Mortgage Loan.[1] This recovery is materially better than the 66.3% maximum of value recovery for those same creditors described in the Plan Support Agreement advanced by Lehman (the "Lehman Plan"), with the potential for less (there is a ceiling but no floor on the creditor recovery and the Lehman Plan sponsor(s) benefits dollar-for-dollar to the extent recovery by the secured creditors is reduced). We believe that the amount realized on the Lehman's Floating Rate Mortgage Loan under our Commitment better reflects the value of the collateral supporting that obligation versus the premium value contemplated in the Lehman Plan which provides for a 90% recovery on Lehman's secured claim and appropriates the entirety of any residual value of the enterprise to Lehman. The higher value going to Lehman under its plan is realizable by Lehman only because there is a transfer of value from the non-Lehman prepetition creditors to Lehman (and Apollo Investment Corporation ("Apollo")) under the Lehman Plan.

---

[1] Any proceeds recovered from the Apollo Guaranty Litigation (as hereinafter defined) after reimbursement of all of the costs and expenses incurred by Special Servicer and Five Mile in connection therewith, will be shared equally by Five Mile and the holder of the C-Note (as a repayment in full of the C-Note). The "Apollo Guaranty Litigation" means Special Servicer's action against Apollo which is currently pending in the Supreme Court of the State of New York, which alleges, among other things that Apollo failed to honor its guaranty of certain property improvements relative to Innkeepers.

From and after the effective date of the Plan, Special Servicer shall continue to prosecute the Apollo Guaranty Litigation. Special Servicer and Five Mile shall select a law firm reasonably acceptable to each of them to prosecute the Apollo Guaranty Litigation. All decisions regarding the prosecution, settlement or other disposition of such litigation shall be made only with the consent of each of Five Mile and Special Servicer, which consent shall not be unreasonably withheld or delayed by either party.

For the avoidance of doubt, neither Special Servicer nor Five Mile will release Apollo from its guaranty either before confirmation of or as part of the Plan.

An illustration and an explanation of the debt restructuring portion of our Commitment are detailed below:

($ in millions)

| | Today | Debt Forgiveness | Adjusted Balance | Pay Down | Final Balance |
|---|---|---|---|---|---|
| Five Mile DIP | $50.8 | $0.0 | $50.8 | -$50.8 | $0.0 |
| Lehman DIP | $17.0 | $0.0 | $17.0 | -$17.0 | $0.0 |
| Fixed Rate CMBS Mortgage Loan | $825.4 | -$225.4 | $600.0 | -$66.4 | $533.6 |
| Floating Rate Mortgage Loan | $238.5 | -$86.8 | $151.7 | -$16.8 | $134.9 |
| Floating Rate Mezzanine Loan | $121.0 | -$121.0 | $0.0 | -$0.6 | $0.0 |
| Anaheim Mortgage Loan | $13.7 | -$3.7 | $10.0 | -$1.1 | $8.9 |
| Anaheim Mezzanine Loan | $21.3 | -$21.3 | $0.0 | -$0.1 | $0.0 |
| Capmark Mission Valley CMBS Mortgage Loan | $47.4 | -$12.9 | $34.5 | -$3.8 | $30.7 |
| Capmark Garden Grove CMBS Mortgage Loan | $37.6 | -$10.3 | $27.3 | -$3.0 | $24.3 |
| Capmark Ontario CMBS Mortgage Loan | $35.0 | -$9.6 | $25.4 | -$2.8 | $22.6 |
| Merrill Lynch Washington D.C. CMBS Mortgage Loan | $25.6 | -$7.0 | $18.6 | -$2.1 | $16.5 |
| Merrill Lynch Tysons Corner CMBS Mortgage Loan | $25.2 | -$6.9 | $18.3 | -$2.0 | $16.3 |
| Merrill Lynch San Antonio CMBS Mortgage Loan | $24.2 | -$6.6 | $17.6 | -$2.0 | $15.6 |
| Allocated Value of B-Notes[1] | $0.0 | $0.0 | $6.6 | -$6.6 | $0.0 |
| Allocated Value of C-Note[1] | $0.0 | $0.0 | $12.1 | -$12.1 | $0.0 |
| **Total Debt** | **$1,482.7** | **-$511.5** | **$989.9** | **-$187.2** | **$803.4** |
| | | | | | |
| DIP Retirement | | | | $67.8 | $67.8 |
| Pre-Petition Creditor Pay downs | | | | $100.7 | $100.7 |
| Fixed Rate CMBS Mortgage Special Servicer Fee | | | | $4.0 | $4.0 |
| Funding of FF&E Reserve | | | $13.8 | | $13.8 |
| Pre-funding of Future PIP Work | | | $15.0 | | $15.0 |
| Additional Cash on Balance Sheet[2] | | | $16.6 | | $16.6 |
| Purchase of B-Notes[1] | | | | $6.6 | $6.6 |
| Payments on C-Note[1] | | | | $12.1 | $12.1 |
| **New Cash Equity** | **$0.0** | **$0.0** | **$45.4** | **$191.2** | **$236.6** |
| | | | | | |
| **Total Capital Structure** | **$1,482.7** | **-$511.5** | **$1,035.3** | **$4.0** | **$1,040.0** |

(1) The B-notes represent an interest in the equity waterfall of the new capital structure that is subordinate to a 2.0x multiple on the Investor's Investment. Other than the $12.1 million payment on the C-Note, the C-Note will not receive any payments unless there is a recovery on the Apollo Guaranty Litigation, in which event the holder of the C-Note will receive 50% of the net proceeds recovered from such litigation.

(2) Includes amount allocated to pay unsecured creditors (other than holders of deficiency claims) their pro rata share of $500,000.

### Cash Proceeds & Uses

Our Commitment contemplates that the cash investment of $236.6 million will be used as follows:

o   Repayment of the Five Mile and Lehman DIP in the amount of $67.75 million
o   Pay down of Pre-Petition Mortgage lenders, after debt forgiveness, by $100 million
o   Funding of $28.8 million of FF&E and PIP reserves to cover 2011 FF&E and future PIP work
o   Funding of $16.6 million of additional cash on the post-confirmation balance sheet
o   $6.6 million for us to purchase the B-Notes issued to holders of deficiency claims based upon a percentage of $256.5 million in B-Notes[2] subordinate to a 2.0x multiple on our investment

---

[2] $112.7 of deficiency on the Fixed Rate CMBS Mortgage Loan is allocated to C-Note.

- o $12.1 million to make the following payments on the C-Note issued to the lender under the Fixed Rate CMBS Mortgage Loan: (i) $2.9 million based upon a percentage of the $112.7 million C-Note and (ii) $9.2 million as additional consideration for Five Mile's receipt of 50% of the net proceeds, if any, from the Apollo Guaranty Litigation (as defined in Footnote 1 hereto)
- o Payment on non-deficiency unsecured claims in the amounts of: $605,000 to Floating Rate Mezzanine Loan lenders; $106,500 to Anaheim Mezzanine Loan lenders; and $500,000 to trade unsecured creditors
- o Payment of fees to the Special Servicer of the Fixed Rate CMBS Mortgage equal to $4,000,000 as complete consideration for effecting the restructuring transactions

### *Debt Forgiveness & Pay Downs*

- Fixed Rate CMBS Mortgage Loan: Reduction to $600.0 million and a cash pay down of $66.4 million to reduce the outstanding balance to $533.6 million. Company's issuance of B-Note to lender, in an original principal amount of $112.7 million, which note we agree to purchase immediately for $2.90 million in cash. Company's issuance of C-Note to the lender, in an original principal amount of $112.7 million, on which we agree to make the following payments (collectively, the "Initial C-Note Payments"): (i) a payment of $2.9 million and (ii) a payment of $9.2 million as consideration for receipt by Five Mile of fifty percent (50%) of any net proceeds of the Apollo Guaranty Litigation, if any. The C-Note shall not receive any payments other than the Initial C-Note Payments and fifty percent (50%) of any net proceeds of the Apollo Guaranty Litigation, if any.
- Floating Rate Mortgage Loan: Reduction to $151.7 million and a cash pay down of $16.8 million to reduce the outstanding balance to $134.9 million. Company's issuance of B-Notes to lender, which notes we agree to purchase immediately for $2,831,438 in cash, of which $605,000 shall be subordinated and paid over to the Floating Rate Mezzanine Loan. Please note our estimates for this mortgage pool are based on *de minimis* information as compared with some of the other properties and therefore will require extra diligence.
- Floating Rate Mezzanine Loan: Payment of $605,000 as described above. Debt cancelled.
- Anaheim Mortgage Loan: Reduction to $10.0 million and a cash pay down of $1.1 million to reduce the outstanding balance to $8.9 million. Company's issuance of B-Notes to lender, which notes we agree to purchase immediately for $201,406 in cash, of which $106,500 shall be subordinated and paid over to the Anaheim Mezzanine Loan.
- Anaheim Mezzanine Loan: Payment of $106,500 as described above. Debt cancelled.
- Capmark Mission Valley CMBS Mortgage Loan: Reduction to $34.5 million and a cash pay down of $3.8 million to reduce the outstanding balance to $30.7 million. Company's issuance of B-Notes to lender, which notes we agree to purchase immediately for $0.3 million in cash.
- Capmark Garden Grove CMBS Mortgage Loan: Reduction to $27.3 million and a cash pay down of $3.0 million to reduce the outstanding balance to $24.3 million. Company's issuance of B-Notes to lender, which notes we agree to purchase immediately for $0.3 million in cash.
- Capmark Ontario CMBS Mortgage Loan: Reduction to $25.4 million and a cash pay down of $2.8 million to reduce the outstanding balance to $22.6 million. Company's issuance of B-Notes to lender, which notes we agree to purchase immediately for $0.2 million in cash.
- Merrill Lynch Washington D.C. CMBS Mortgage Loan: Reduction to $18.6 million and a cash pay down of $2.1 million to reduce the outstanding balance to $16.5 million.

Company's issuance of B-Notes to lender, which notes we agree to purchase immediately for $0.2 million in cash.

- <u>Merrill Lynch Tysons Corner CMBS Mortgage Loan:</u> Reduction to $18.3 million and a cash pay down of $2.0 million to reduce the outstanding balance to $16.3 million. Company's issuance of B-Notes to lender, which notes we agree to purchase immediately for $0.2 million in cash.

- <u>Merrill Lynch San Antonio CMBS Mortgage Loan:</u> Reduction to $17.6 million and a cash pay down of $2.0 million to reduce the outstanding balance to $15.6 million. Company's issuance of B-Notes to lender, which notes we agree to purchase immediately for $0.2 million in cash.

- Unsecured trade creditors (not including holders of deficiency claims) that are not otherwise paid pursuant to a "first day" order, will receive a share of a cash allocation of $500,000.

- All equity interests in the Company, including common and preferred stock, will be cancelled, and no distributions will be made on account of such interests. The Plan will provide for an equity incentive program for management of the reorganized Company.

## V.   Proposed Debt Rates, Maturities, Extensions, Amortization, & Release Prices

The Commitment includes the following terms for the restructured debt:

- <u>Fixed Rate CMBS Mortgage Loan:</u> A proposed interest rate of 6.71% on the A-Note and no change to the existing maturity date of July 9, 2017. During the first 48 months after the confirmation of the Plan, interest only will be payable monthly and amortization will begin 48 months after the confirmation of the Plan and will be based on a 30 year amortization schedule. Release prices will be established and properties can be released at 115% of the allocated loan amount based on the face amount of the A-Note, so long as the debt service coverage ratio thereunder, after giving effect to such release, is no worse than such ratio prior to such release. The loan is subject to prepayment at par without penalty. Allocated FF&E of $7,840,067.

- <u>Floating Rate CMBS Mortgage Loan:</u> A proposed interest rate of Libor + 2.05%, with an initial maturity date of July 9, 2015, two one-year extension options, at the borrower's option, and not subject to any financial covenants. Release prices will be established and properties can be released at 115% of the allocated loan amount, so long as the debt service coverage ratio thereunder, after giving effect to such release, is no worse than such ratio prior to such release. The loan is subject to prepayment at par without penalty. Allocated FF&E of $3,510,782.

- <u>Anaheim Mortgage Loan:</u> A proposed interest rate of 5.41% and a maturity date of July 9, 2017. Amortization will begin 48 months after the confirmation of the Plan and will be based on a 30 year amortization schedule. The loan is subject to prepayment at par without penalty. Allocated FF&E of $407,400.

- <u>Capmark Mission Valley CMBS Mortgage Loan:</u> A proposed interest rate of 5.98% and a maturity date of July 9, 2017 as compared to the original maturity date of November 11, 2016. The loan is subject to prepayment at par without penalty. Allocated FF&E of $446,681.

- <u>Capmark Garden Grove CMBS Mortgage Loan:</u> A proposed interest rate of 5.98% and a maturity date of July 9, 2017 as compared to the original maturity date of November 11,

2016. The loan is subject to prepayment at par without penalty. Allocated FF&E of $357,674.

- **Capmark Ontario CMBS Mortgage Loan:** A proposed interest rate of 5.98% and a maturity date of July 9, 2017 as compared to the original maturity date of November 11, 2016. The loan is subject to prepayment at par without penalty. Allocated FF&E of $456,855.

- **Merrill Lynch Washington D.C. CMBS Mortgage Loan:** A proposed interest rate of 6.03% and a maturity date of July 9, 2017 as compared to the original maturity date of October 1, 2016. The loan is subject to prepayment at par without penalty. Allocated FF&E of $266,428.

- **Merrill Lynch Tysons Corner CMBS Mortgage Loan:** A proposed interest rate of 5.98% and a maturity date of July 9, 2017 as compared to the original maturity date of October 1, 2016. The loan is subject to prepayment at par without penalty. Allocated FF&E of $235,718.

- **Merrill Lynch San Antonio CMBS Mortgage Loan:** A proposed interest rate of 6.03% and a maturity date of July 9, 2017 as compared to the original maturity date of October 1, 2016. The loan is subject to prepayment at par without penalty. Allocated FF&E of $278,395.

## VI.  Offer Structure and Protections

As stated, the Transaction will be implemented by a recapitalization of the Company through the Plan. Since the Company has rejected our request to perform due diligence and has expressed no real interest in engaging us in meaningful discussions regarding a potential transaction in lieu of continuing on with the Lehman Plan, it will be necessary for Special Servicer or another party in interest to seek and obtain a bankruptcy court order terminating the Company's plan exclusivity period in order for Special Servicer to file the Plan. Assuming exclusivity is so terminated, we require that stalking horse protection be immediately sought by Special Servicer from the Court, including the following: (i) a break-up fee of $10 million in favor of Five Mile (the "Break-Up Fee") if an alternative Chapter 11 plan financed by a different party is confirmed by the Court and consummated; (ii) a first over-bid in the competing plan in the form of additional capital into the Company in the minimum amount of $25 million cash (inclusive of amount allocable to pay the Break-Up Fee, which shall only be payable from the cash realized from the first overbid), with subsequent over-bids in the form of additional capital into the Company in minimum $10 million increments of additional cash (or additional debt on identical terms as described in our Commitment), and (iii) a reimbursement of all of our legal fees and expenses incurred in connection with this offer and its confirmation and consummation (including due diligence fees and expenses) in an amount not to exceed $2,000,000. Special Servicer confirms its agreement with such terms.

Special Servicer confirms that, other than the sale of equity interests in the reorganized Company, the Plan will not contemplate or provide for a sale of the Company or any of its assets pursuant to section 1129(b)(2)(a)(ii) or (iii) or section 363 of the Bankruptcy Code. As such, no holder of a lien on any asset of the Company shall be permitted to credit bid its claim as part of the Plan. The confirmation of the best plan of reorganization providing for the highest and best return to creditors is contemplated, subject to the protections being granted to Five Mile as set forth above in this Section VI. In lieu of participating in the recapitalization provided in the Plan, the Plan should provide that each secured creditor shall have the option to take ownership of its collateral in full satisfaction, settlement, release and exchange for its claim(s) against the Company, in which case there shall be an attendant adjustment to the consideration hereunder.

## VII.    Strength of the Plan

We believe the Plan (consistent with the terms of this Commitment Letter) is (i) superior to the Lehman Plan, (ii) beneficial to all creditors, not just Lehman, and (iii) in the best interests of the Company and its bankruptcy estates. The Plan values the Company at $1.04 billion, which is higher than the valuation of $915 million in the Lehman Plan. The Plan provides for approximately $89.1 million in additional recovery value for the Non-Lehman Pre-Petition creditors and $187.2 million in cash pay downs of indebtedness, including retirement of $67.75 million of DIP financing, the purchase of the B-Notes for $6.6 million and payments on the C-Note of $12.1 million. Further, there is substantially higher certainty and less execution risk with the Plan, financed by our Commitment, as it will provide for the exit financing component critical to the success and emergence of Innkeepers from bankruptcy. The Lehman Plan does not include a commitment for $75 million of exit financing, which is required for Innkeepers to successfully emerge from bankruptcy.

We believe the Plan also provides additional stability for the Company as compared to the Lehman Plan by providing approximately $28.8 million in cash reserves to fund future FF&E (which reserves shall be held by the Master Servicer of the Fixed Rate CMBS Mortgage Loan) and PIP investments and an additional $16.6 million in general cash liquidity (includes amount allocated to pay the unsecured creditors – other than holders of deficiency claims) to manage seasonality within the business, cover operating or interest shortfalls should they occur, and provide funds to pay administrative and priority expenses upon emergence. Our Commitment's suggested amortization of the Fixed Rate and Anaheim Mortgage Loans, after a 48 month period will allow the Company to reach a more normalized level of operating performance. We are ready to move forward and have all the resources, including available funds, to conclude the transactions outlined in this Commitment Letter.

## VIII.    Special Servicer Covenants

In consideration for our Commitment, Special Servicer hereby covenants and agrees to (a) perform its undertakings set forth in the second paragraph of Section VI above, (b) use its best efforts to seek a bankruptcy court order to terminate the Company's plan exclusivity period, and (c) upon termination of the Company's plan exclusivity period, to (i) immediately thereafter file a motion seeking approval of the bid protections identified above and file the Plan consistent with the terms of this Commitment Letter, (ii) take all necessary steps to obtain an order approving a disclosure statement in respect of the Plan, (iii) thereafter solicit votes for the Plan, and (iv) thereafter take all necessary steps to seek confirmation and effectiveness of the Plan. All orders and filings by Special Servicer relating to the Plan shall be subject to our prior review and approval, which approval shall not be unreasonably withheld or delayed.

## IX.    Termination of Commitment

This Commitment Letter outlines only some of the essential terms regarding the proposed Transaction, is not all-inclusive and does not purport to summarize or contain all of the conditions, covenants, representations, warranties and other provisions which would be contained in definitive documentation for the Transaction.

In addition, this Commitment Letter shall terminate and be of no further force or effect, and we and you shall no longer be obligated with respect to our Commitment (and, in such event, we shall not be entitled to any of the bid protections in favor of us, including, without limitation, those set forth in Section VI herein) and other agreements set forth herein (including, without limitation, our agreement with respect to Alternate Transactions set forth in Section III hereof), upon the earliest to occur of the following (each, a "Termination Event"):

- the occurrence of any material adverse condition, change in or material disruption of conditions in the financial, banking, capital or hospitality markets and extended stay lodging sector that, in our reasonable judgment, would impair the viability or success of the Transaction;

- the occurrence of any condition, change or development that could reasonably be expected to have a material adverse effect on the business, assets, liabilities (actual or contingent), operations, condition (financial or otherwise) or prospects of the Company;

- the Company fails to provides us with unfettered and reasonable access to its properties, books and records, subject to a non-disclosure agreement for a period of thirty (30) days ("Due Diligence Access Period"), such period to commence by September 15, 2010;

- our determination, on or prior to the last day of the Due Diligence Access Period, that the results of our due diligence investigation with respect to mortgage pools (and underlying properties) are not satisfactory to us in our sole discretion;

- our inability to negotiate and execute all related documents (including customary representations, warranties, covenants, conditions, and indemnities) necessary to effectuate the Transaction, in each case in form and substance satisfactory to us in our reasonable discretion;

- any breach by you of, or non-compliance with, the covenants set forth in Section VIII herein;

- your failure, by October 15, 2010 (or such later date to which we shall agree in writing), to (a) obtain a bankruptcy court order terminating the Company's plan exclusivity period, (b) file a motion to approve bid protections in favor of us (including, without limitation, those set forth in Section VI herein) with respect to the Plan, or (c) file the Disclosure Statement and Plan;

- the Court's failure to (a) approve your motion to approve protections in favor of us (including, without limitation, those set forth in Section VI herein) before October 27, 2010 (or such later date to which we shall agree in writing), (b) approve the Disclosure Statement for the Plan on or before November 15, 2010 (or such later date to which we shall agree in writing), or (c) enter a final order approving the Plan (acceptable to us in our reasonable discretion) by December 15, 2010 (or such later date to which we shall agree in writing);

- the Court's confirmation of the Lehman Plan; or

- mutual agreement of Special Servicer and Five Mile.

Time is of the essence with respect to the Termination Events.

## X.    Miscellaneous

All notices, requests, claims, demands and other communications hereunder shall be given (and shall be deemed to have been duly received if given) by hand delivery in writing or by facsimile transmission with confirmation of receipt, as follows:

if to Five Mile:

Three Stamford Plaza
301 Tresser Boulevard, Ninth Floor
Stamford, CT 06901
Attention: James G. Glasgow, Jr.
Email: jglasgow@fivemilecapital.com
Facsimile: (203) 905-0954

if to Special Servicer:

Midland Loan Services, Inc.
10851 Mastin, 6th Floor
Overland Park, KS 66210
Attention: Kevin S. Semon
Email: kevin.semon@midlandls.com
Facsimile: (913) 253-9723

This Commitment Letter, the rights of the parties, and all actions arising in whole or part under or in connection herewith will be governed by and construed in accordance with the laws of the State of New York.

This Commitment Letter constitutes the entire agreement between the parties and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, between you (or the Company), on the one hand, and us, on the other hand. No modification or waiver of any provision hereof shall be enforceable unless approved by you and us in writing. Neither you, on the one hand, nor us, on the other hand, is relying upon any statement or representation made by or on behalf of the other, except as expressly provided in the Commitment Letter.

We are prepared to enter into a transaction on the terms set forth herein. Upon receipt of a fully executed counterpart to this Commitment Letter, both parties agree to negotiate in good faith regarding the implementation of the Transaction contemplated in this Commitment Letter, including engaging in the preparation and negotiation of definitive documents, and Special Servicer agrees to move forward with its undertakings described in Section VIII herein.

This Commitment Letter shall be considered withdrawn and can no longer be accepted if we have not received from you, in accordance with the notice provisions herein, a fully-executed counterpart to this Commitment Letter on or before **August 30, 2010, at 5:00 PM (Eastern time)**, unless we extend such deadline in writing.

Remainder of Page Intentionally Blank
Signature Pages to Follow

Should you have any questions regarding this Commitment Letter, please do not hesitate to contact James Glasgow (jglasgow@fmcp.com) or Al Nickerson (anickerson@fmcp.com) at (203) 905-0950.

Sincerely yours,

**Five Mile Capital II Pooling REIT LLC,**

By:    Five Mile Capital Partners LLC,
      its manager

      By:    _____
           James G. Glasgow
           Portfolio Manager and Managing Director

FIVE MILE CAPITAL PARTNERS LLC

Acknowledged and Agreed:

**Midland Loan Services, Inc.,**
as Special Servicer for Bank of America, N.A., as Trustee for the Registered
Holders of LB-UBS Commercial Mortgage Trust 2007-C6,
Commercial Mortgage Pass-Through Certificates, Series
2007-C6

By: _____

    Name:     **Kevin C. Donahue**
    Title:      **Senior Vice President**
              **Servicing Officer**

12

```
 1              IN THE UNITED STATES BANKRUPTCY COURT

 2                  FOR THE DISTRICT OF DELAWARE

 3   IN RE:                       :
                                  : Chapter 11
 4   PLIANT CORPORATION, et al.,  :
                                  : Case No. 09-10443 (MFW)
 5        Debtor.                 :
     . . . . . . . . . . . . . . .

 6
                         Wilmington, Delaware
 7                         June 30, 2009
                             9:36 a.m.
 8
                       TRANSCRIPT OF HEARING
 9          BEFORE THE HONORABLE MARY F. WALRATH
                 UNITED STATES BANKRUPTCY JUDGE
10
     APPEARANCES:
11
     For the Debtors':         James Bendernagel, Jr., Esquire
12                             Ronald Flagg, Esquire
                               Larry Nyhan, Esquire
13                             Sidley, Austin, LLP

14   For Apollo:               John Lynch, Esquire
                               Phil Mindlin, Esquire
15                             Doug Mayer, Esquire
                               Wachtell, Lipton, Rosen & Katz
16
                               Derek Abbott, Esquire
17                             Morris, Nichols, Arsht & Tunnell, LLP

18   For the Committee:        Sharon L. Levine, Esquire
                               Thomas A. Pitta, Esquire
19                             Alison Kowalski, Esquire
                               Lowenstein, Sandler, P.C.
20
     For the First Lien
21   Committee:                Curtis Mechling, Esquire
                               Kristopher Hansen, Esquire
22                             Strook & Strook & Lavan, LLP

23   For Wells Fargo:          Heike Vogel, Esquire
                               Arent, Fox, LLP
24

25
```

             Perfect Pages Transcription & Reporting, Inc.
                          (609) 654-8880


EXHIBIT B

```
 1   For Merrill Lynch Bank:   John Strock, Esquire
                               Womble, Carlyle, Sandridge & Rice,
 2                             PLLC

 3   For ACE:                  Dana Monzo, Esquire
                               White & Williams, LLP
 4
     For First Line
 5   Committee:                Mike Romanczuk, Esquire
                               Richards, Layton & Finger, P.A.
 6
     VIA TELEPHONE:
 7
     For the Debtors':         D'Lisia Bergeron, Esquire
 8   .                         Sidley, Austin, LLP

 9   For Wilmington Trust:
     Company:                  Susan Johnston, Esquire
10                             Covington & Burling, LLP

11   For Barclays:             Stephen Pedone
                               Stephen Pedone (Client)
12

13   Court Recorder:           Laurie Capp

14   Transcription Service:    Perfect Pages Transcription, Inc.
                               18 Tuckerton Road
15                             Shamong, NJ 08088
                               www.perfecttranscripts.com
16                             (609) 654-8880

17   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.
18

19

20

21

22

23

24

25
```

1  and say, Judge, there's really a question of suppressed value

2  here.  We don't know where the values are and, therefore, we

3  ought to have some kind of a process.  That's just not

4  consistent with the record, Your Honor.

5      With that -- unless Your Honor has questions, I'll yield.

6          THE COURT:  No, thank you.

7          MR. NYHAN:  Thank you.

8          THE COURT:  Let's take five minutes and then I'll

9  render my ruling.

10          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

11      (Recess from 5:02 p.m. to 5:09 p.m.)

12          THE CLERK:  All rise.

13          THE COURT:  All right.  Before me is the Creditors'

14  Committee Motion to Terminate Exclusivity to permit the Court

15  and Creditors to consider an alternative plan.  The Court has

16  the ability to terminate exclusivity for cause.  I don't have

17  to find a breach of fiduciary duty, and based on the testimony

18  here I find that the Debtor has not breached its fiduciary

19  duty.  The Debtor and its management and advisors followed an

20  appropriate process of evaluating the deal and plan that they

21  had negotiated with the first-lien holders in comparison with

22  the Apollo Plan and believed that their Plan is better.  That

23  is not a breach of fiduciary duty.  They did everything that

24  was required of them, however, we're in bankruptcy, we're not

25  in a proxy fight or other fight under Delaware State law.  The

1  Court's discretion to terminate exclusivity is broad, but I
2  take that as very, very important.  The Debtors right to
3  propose a plan to run its case is a very important right in
4  bankruptcy.  It should not be cut off at the knees except in
5  extreme circumstances or in unique circumstances at least.
6  The typical situation where a Creditors' Committee is simply
7  seeking leverage or another Creditor group is simply seeking
8  leverage to negotiate a plan that is not an appropriate case
9  to terminate exclusivity.  I am fully familiar both in
10 practice and as a Judge with the various dynamics that are
11 going on behind the scenes and except in hearings like this,
12 don't come to the fore.

13      I need to find a cause.  I need to find a reason to
14 eliminate the Debtors right to run its case.  I agree that the
15 Global Ocean and LaSalle cases are not applicable.  This is
16 not a situation where the shareholders, the old equity
17 holders, are being given all the equity in the case, but I
18 think that the case is sufficiently similar to that because
19 all of the equity is being given to one Creditor group.  That
20 Creditor group professes that it would prefer to have all the
21 equity rather than have some $89 million in cash and $236
22 million in secured notes, that gives the Court some pause
23 because I know in the marketplace, secured debt and cash is
24 better than stock unless the value of the entity has an
25 upside.  And if that is the case, if there is an upside there,

1  then I think that the other Creditor constituents have a right
2  to test that and to see whether or not there is a plan that
3  can give them some value without eliminating or otherwise
4  violating the rights of the first-lien holders. But I think
5  the best way to test that is under Section 1129 and to allow
6  the Creditors a choice of pressing two plans. This is not a
7  situation where there's a hostile takeover nor a situation
8  where a Creditor group is just simply trying to get leverage.
9  The Committee has come in with a, I hate the term, but a fully
10 baked plan to use their argument. There are some serious
11 concerns the Court has about the feasability of that, but I
12 think in the first instance it is up to the Creditors to
13 evaluate that and to determine whether or not they are willing
14 to take the risk of proceeding with that, but that can be
15 tested both by the Creditors and by the Court in a
16 confirmation process. I do rely in large part on the
17 Creditors' Committee's evaluation in this situation, while
18 recognizing that they really are representing only one
19 constituency and that is Unsecured Creditors, and that the
20 Debtor has a fiduciary duty to all constituents, And, again,
21 I do not fault the Debtor in the manner in which they have
22 approached this. I just think that under the unique
23 circumstances of this case, we should let those people with a
24 stake in this case make their decision. And I fully recognize
25 that when we come down to confirmation, only one of these

1  Plans be confirmable, but both of them may be confirmable.
2  And in that instance, I will, again, look to the Creditors to
3  decide which is the best place.  So I will grant the
4  Committee's Motion and terminate exclusivity.

5      Now, I know that we had some dates the parties were
6  looking to.  Do you need to review that again or do we need to
7  speak with Ms. Capp about what dates?  I think we had
8  tentatively scheduled some dates.

9      MR. NYHAN:  Your Honor, I didn't know of a date.  I
10 know that -- I think July 24th had been --

11     MR. ABBOTT:  Your Honor, Derek Abbott, for Apollo.
12 My recollection was that there was an omnibus hearing on the
13 20th but the Court had indicated that there was time on the 24th
14 and the parties would agree to a couple of days of shortening
15 notice of a disclosure statement hearing to be able to do it
16 on the 24th.  We had --

17     THE COURT:  Can you shorten that?  I just had
18 another e-mail today about that.  Can we shorten that notice?

19     UNIDENTIFIED SPEAKER:  I believe you can, Your
20 Honor.

21     MR. ABBOTT:  Let's check, Your Honor.

22     THE COURT:  I know it has to be 25 days.  I guess
23 it's 9,006 I have to look to read that --

24     UNIDENTIFIED SPEAKER:  It is, Your Honor.  I'm at
25 (indiscernible) C.

1            THE COURT:  2003(a), I think this notice is

2  under 2002(b) so I think it can be shortened.

3            MR. ABBOTT:  I believe that's correct, Your Honor.

4            THE COURT: Okay.

5            MR. ABBOTT:  And I think the 24th, although I must

6  admit I forget exactly the time that Ms. Capp suggested would

7  be available.

8            THE COURT:  She's got us down for the 24th at 11:30.

9  So that would be for both disclosures statements?

10           MR. NYHAN:  Yes.  And, Your Honor, just with some

11 silence.  We need to talk to our client about whether we're

12 going to seek an appeal of this.  And I just don't -- that

13 date will work for us, but I don't want to surprise the Court

14 if we --

15           THE COURT:  Understood.

16           MR. NYHAN:  -- weren't to come in.

17           THE COURT:  Understood.

18           MR. ABBOTT:  Your Honor, I think that's all we have

19 from our side for today.

20           THE COURT:  Okay.  All right.  You'll get me a Form

21 of Order, somebody?

22           UNIDENTIFIED SPEAKER:  Yes, Your Honor.

23           MR. ABBOTT:  We will, Your Honor.  We'll circulate

24 it and submit it under certificate.

25           THE COURT:  All right.

1          MR. NYHAN:  Your Honor, we also have, although I

2     suppose it would be best to pick this up tomorrow, but I think

3     we also had a Lease Motion.  The Solicitation Motion and

4     disclosure statement we'll obviously go over with the -- to

5     the 24th.

6          THE COURT:  Well, let me see what our last matter

7     is.  We handled item 7.  You're talking about item 8, the

8     Debtors' new headquarters lease.

9          MR. NYHAN:  Yes, Your Honor.

10          THE COURT:  Well, do we want to postpone that given

11     the -- my decision on the Exclusivity Motion?

12          MR. NYHAN:  I think, Your Honor, the Debtors would

13     like to proceed.  We think we need the space regardless, but I

14     know that we had time tomorrow.  We're happy to come in

15     tomorrow morning.

16          THE COURT:  Well, do the parties want to talk or --

17          MR. MAYER:  We can certainly talk, Your Honor.  I

18     believe Your Honor's aware that Apollo opposed a limited

19     objection with respect to that move.

20          THE COURT:  Yes.

21          MR. MAYER:  And I'm a bit surprised that the

22     Debtors' want to pursue it, but if we can consult with them

23     and they want to pursue it, they'll pursue it.  Then Your

24     Honor will decide.

25          THE COURT:  All right.  Why don't you talk and we

1    can come back --

2          MS. LEVINE:  Your Honor, the other issue is we

3    submitted a Proposed Form of Order with the Motion.  We'll

4    circulate that among the parties right now also and see if

5    there are comments to it as well.

6          THE COURT:  Okay.

7          MS. LEVINE:  Thanks.

8          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

9          THE COURT:  Tomorrow we're starting at -- we can

10   start 9:30 if you like.

11         UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

12         THE COURT:  All right.  We'll stand adjourned then.

13      (Court adjourned at 5:20 p.m.)

14                      CERTIFICATE

15         I certify that the foregoing is a correct transcript

16   from the electronic sound recording of the proceedings in the

17   above-entitled matter.

18

19    /s/April J. Foga                    July 7, 2009
     April J. Foga, CET, CCR, CRCR
20

21

22

23

24

25

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN THE MATTER OF | ) |
| | ) Case No.: 09-13654 |
| TCI2 HOLDINGS, LLC, | ) |
| | ) Camden, New Jersey |
| Debtor. | ) August 27, 2009 |
| | ) |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JUDITH H. WIZMUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:
CHARLES A. STANZIALE, JR., ESQ.
LISA S. BONSALL, ESQUIRE
McCarter & English
Four Gateway Center
100 Mulberry Street
Newark, New Jersey  07102

For the Trustee:
JEFFREY M. SPONDER, ESQUIRE
Office of the U.S. Trustee
One Newark Center
Suite 2100
Newark, New Jersey  07102

For the Ad Hoc Committee:
KRISTOPHER HANSEN, ESQUIRE
EREZ GILAD, ESQUIRE
CURTIS MECHLING, ESQUIRE
JENNIFER ARNETT, ESQUIRE
Stroock & Stroock & Lavan, LLP
180 Maiden Lane
New York, New York   10038

KENNETH A. ROSEN, ESQUIRE
JASON C. DIBATTISTA, ESQUIRE
Lowenstein Sandler, P.C.
65 Livingston Avenue
Roseland, New Jersey 07068

For TER:
MICHAEL WALSH, ESQUIRE
Weil, Gotshal & Manges
767 Fifth Avenue
New York, New York   10153



EXHIBIT
C

APPEARANCES (continued):

For TER:                           ANGELA ZAMBRANO, ESQUIRE
Weil, Gotshal & Manges
200 Crescent Court
Suite 300
Dallas, Texas   75201

For Donald Trump:              DAVID M. FRIEDMAN, ESQUIRE
PAUL MAINARDI, ESQUIRE
Kasowitz, Benson, Torres
& Friedman, LLP
1633 Broadway
New York, New York   10001

For Beal Bank:                  BRIAN W. HOFMEISTER, ESQUIRE
Teich Groh
691 State Highway 33
Trenton, New Jersey   08619

CHARLES R. GIBBS, ESQUIRE
SCOTT L. ALBERINO, ESQUIRE
Akin, Gump, Strauss, Hauer
& Feld, LLP
Two Commerce Square
2001 Market Street
Suite 4100
Philadelphia, Pennsylvania 19103

For U.S. Bank:                  JAMES FARRAH, ESQUIRE
Kelley, Drye & Warren, LLP
333 West Wacker Drive
Chicago, Illinois   60606

For the Former
Shareholders:                  JERROLD S. KULBACK, ESQUIRE
Archer Greiner, P.C.
One Centennial Square
Haddonfield, New Jersey   08033

For New Century
Investment Partners, LLP:   MALANI J. CADEMARTORI, ESQUIRE
Sheppard, Mullin, Richter
& Hampton
30 Rockefeller Plaza
New York, New York   10112

APPEARANCES (continued):

For Coastal Marina and
Coastal Development, LLC:

VINCENT F. PAPALIA, ESQUIRE
Saiber, LLC
One Gateway Center
13th Floor
Newark, New Jersey   07102

BRUCE R. ZIRINSKY, ESQUIRE
Greenburg Traurig, LLC
200 Park Avenue
New York, New York   10166

Audio Operator:                    NORMA SADER

Transcribed by:                    DIANA DOMAN TRANSCRIBING
P. O. Box 129
Gibbsboro, New Jersey   08026
Off: (856) 435-7172
Fax: (856) 435-7124
Email:  dianadoman@comcast.net

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

The Court - Ruling                                    85

1    in opposition to the motion to terminate exclusivity?  Brief

2    reply, if you choose.

3              MR. HANSEN:  I couldn't be brief, Your Honor, because

4    there's an awful lot to say.  So if you have questions, I'm

5    happy to answer them, but rather than -- there's -- there's a

6    lot to respond to.  But I think Your Honor's questions were

7    very germane.  I think you get it.  And if you have questions,

8    I'm happy to respond to them.  But otherwise, I won't take --

9    burden the Court.

10             THE COURT:  That's fine.  Appreciate it.  Let me take

11   five minutes, and I will issue a decision on the motion, and

12   then we'll go right to the examiner issue.

13             (Recess)

14             COURTROOM DEPUTY:  All rise.

15             THE COURT:  Please be seated.  Let me thank all

16   parties for a very thorough presentation of the issues.  Let

17   me, for the record, reflect the basic facts upon which I rely.

18   We understand, of course, that these cases were filed on

19   February 17, 2009.  The basic capital structure of the debtors

20   includes a $486 million first lien position held by Beal Bank

21   and secured noteholders of upwards of $1.25 billion.  The

22   debtors claim in their disclosure statement that the entire

23   enterprise value of these debtors is about $456 million.

24             At some point after the filing of the petitions, the

25   debtors determined to ask two main constituencies, Beal Bank

The Court - Ruling                                      86

1    and the second lienholders -- I don't know if they directed an
2    inquiry to Mr. Trump himself, the record's not clear on that --
3    to submit offers.  Indeed their financial advisor Lizard
4    shopped the assets, as well, without result.  The process of
5    each of those sides, the Beal/Trump side and the second
6    lienholders -- the noteholders, we'll call them -- went
7    forward.  And when the debtors extended exclusivity expired on
8    August 3rd -- the first exclusivity period expired June 17th --
9    and was extended by 45 days, there was a plan submitted by the
10   debtors, the Beal/Trump, the debtors, had apparently considered
11   the two options and chose that plan.

12         That plan, the so-called Beal/Trump plan, envisions a
13   restated credit agreement for Beal Bank, extending maturity by
14   Beal Bank's consent to 2020.  That's an eight-year extension,
15   with a reduced interest rate, presumably below market, unknown
16   in this record, in any event, as well to infuse the debtor with
17   $100 million, in exchange for the issuance of all of the equity
18   in the debtors -- in the reorganized debtors, with no recovery
19   to the noteholders or unsecured creditors.

20         The noteholders, the Ad Hoc Committee of noteholders,
21   filed this motion seeking to terminate exclusivity.  With that
22   motion, they filed under seal, appropriately so.  And we
23   understand that that filing, obviously, is not in violation of
24   the exclusivity rights of the debtor in the form that it was
25   filed.  But it does -- no one has contested the opportunity to

The Court - Ruling                                                    87

discuss the provisions of that plan, notwithstanding the

exclusivity of the debtors still in place.  Their plan

contemplates the sale of the marina to Coastal Development for

$75 million.

There is a history of a contract between the debtors

and Coastal Development to sell to -- to Coastal Development

the marina.  We need not detain the record on this, but the

deal contemplates a dismissal of the Florida litigation as

well, to provide $175 million into the debtor, with portions of

that amount going to Beal Bank.  I'm not absolutely clear on

how that would work, but, in any event, through a rights

offering.

To accredited investors who are noteholders, that

rights offering would be backstopped by a group of noteholders

with a 5 percent carve out, if you will, of the equity in the

debtors to the pool of unsecured creditors small cash pool, and

payment of the Beal Bank debt in cash and by re-modified terms

of the contractual arrangement.  One could quibble with the way

that I have characterized those plans, but, hopefully, I've

conveyed the general outline of them.

Let me start with the basic proposition, of course,

that -- and I think both sides would agree that the debtors

exclusive right under 1121 to propose a plan during the

exclusivity period is certainly important and must be

safeguarded; cannot be disturbed by creditors.  And we've seen

The Court - Ruling                               88

1    lots of cases like this who seek to gain leverage, to -- who

2    offer hypothetical plans, or who seek to disrupt the debtors

3    plan.  And the burden is clearly on the movant to establish the

4    requisite cause under 1121(d) for termination of exclusivity.

5         While the concept of enlargement and termination is

6    flexible, indeed, there is a prospect that the termination of

7    exclusivity could disrupt the so-called, quote, delicate

8    balance, unquote, created by Congress between the debtors'

9    right to have a first shot at submitting a plan, and the

10   creditors' opportunities to prepare a plan.  Indeed, as counsel

11   for Beal Bank has pointed out, there is opportunity to -- or

12   perhaps, Mr. Friedman, I'm not sure who -- to inject a level of

13   uncertainty in the process of negotiating a plan during the

14   exclusivity period.  And clearly, as well, many cases reflect

15   that just because there is a, quote, better plan, unquote, out

16   there, that is not a basis for terminating the exclusivity

17   period.

18        But having recognized all of that, it is my firm

19   belief that there has been met the burden, as high as it might

20   be, to terminate the exclusivity period in this case.  Indeed,

21   I am impressed with the impact of 203 North LaSalle in this

22   context.  It is not the only factor, it is an important factor

23   in this decision.  There is a real issue here.  I don't resolve

24   the issue, but there is a real issue about whether this is a

25   new value plan.  And we understand that issue because of Mr.

The Court - Ruling                              89

1    Trump's previous association with the debtors.  Not because

2    there is any assumption on my part that there is anything

3    untoward that happened, any undue influence, any exertion of

4    improper forces in connection with the submission of this plan,

5    but rather with the recognition that the plan that Mr. Trump

6    was chairman of the board and held the most substantial portion

7    of shares of this company up until four days before the filing.

8            And the serious questions, which I don't resolve

9    either, about whether those interests were actually abandoned

10   -- I mean, he intended to abandon them, apparently, when he

11   made his announcement on February 13th.  Whether he could have

12   accomplished that abandonment is unclear, and is left for

13   further resolution.  If it is a new valued plan and there is --

14   and we also understand that he continues to hold some interest.

15   For instance, in the Ace (phonetic) -- I don't have the exact

16   name of the company but -- and it is a small -- as low as .01

17   percent interest held by Ace, but in any event, it seems to be

18   recognized that Mr. Trump continues to be an equity security

19   holder of some portion of the debtors' shares.  If it is a new

20   valued plan, it certainly might run afoul of 203 North LaSalle.

21           We all understand that in that case, all -- old

22   equity submitted a plan to purchase new equity within the

23   exclusivity period of the debtors, and that that plan was

24   rejected by the United States Supreme Court, who underscored

25   the -- the significance and the requirement of market exposure

The Court - Ruling                                    90

1     to such a new valued plan.  Indeed, there was no specific

2     expression or decision made about the form of that market

3     exposure.  The statement made reflected that it -- presumably,

4     it could be a competing plan, or it could be a bidding process.

5     It did not address whether that bidding process could be held

6     before the plan was submitted.

7               But, frankly, I think Mr. Hansen's arguments in that

8     regard are well founded.  It -- it doesn't make much sense to

9     require market exposure of a plan to reject a plan that

10    presents a new value contribution, and to underscore the

11    importance of testing such a plan in the marketplace at the

12    same time that you have a -- that you approve a process, that

13    you can reconcile that process with a pre-planned marketing

14    procedure.

15              The Court focused on the need to extend an

16    opportunity -- and here I'm quoting -- to anyone else, either

17    to compete for that equity, or to propose a competing

18    reorganization plan, unquote.  Indeed, the debtors argue that

19    the noteholders did compete for that equity and lost.  But I

20    think the competition that was envisioned by the Supreme Court

21    was in a more open process.

22              Indeed, I do not contradict, I -- I don't think, by

23    this concept that the PWS Holdings Court case at 228 F. 3rd.

24    224, from the Third Circuit in 2000, which declined to broaden

25    the interpretation of the LaSalle case to accept the argument

The Court - Ruling                                        91

1    that a new valued plan would per se require the rejection of

2    exclusivity, because we're talking about terminating

3    exclusivity here, a subject that was not taken up by the Third

4    Circuit in that decision.

5            There are significant factors here, aside from,

6    frankly, the LaSalle case, that require this process to be

7    opened.  And I specifically reject the consideration of the

8    actual process of negotiation by which the debtors reached the

9    decision that they did.  It's certainly the definitive

10   proposal, albeit, questioned by the debtors and others offered

11   by the noteholders with committed financing, committed

12   sufficiently for this purpose, along with the possibility of

13   other offers.

14           And I don't know how seriously to take them.  I don't

15   give particular evidential weight to them, but I simply note

16   that we have a definitive offer on the table.  I don't even

17   make any judgment about whether that plan is better or -- or is

18   as good as the debtors' proposal.  But in any event, there is a

19   real proposal out there, and that is significant in this

20   scheme.

21           I note that there is no formal Creditors Committee

22   appointed in this case.  I saw that the -- the noteholders

23   requested a Committee.  I -- I'm not sure if it was an

24   unsecured Creditors Committee or a bondholders -- a noteholders

25   Committee that was requested.  I didn't know, although I heard

The Court - Ruling                                    92

1    mention of a request for an unsecured Creditors Committee that

2    was rejected.  Frankly, I'm puzzled by that, since there --

3    there is a very large segment of unsecured debt in this case by

4    certainly the debtors' valuation.  So I leave that open.  But I

5    -- it's not a major factor in this context, but it -- it counts

6    to underscore the difficulty with retaining the exclusivity

7    period and the -- the kinds of considerations that point to

8    terminating it.

9              Indeed, the potential benefit to the estate cannot be

10   overstated.  This is not, I certainly agree -- perhaps Mr.

11   Walsh made the point -- a balancing act.  There is a burden to

12   be met, and that -- it's not a question necessarily of gauging

13   harm against benefit.  But the so-called harm of a short period

14   of time for this process of competing plans to unfold is -- is

15   not the kind of harm that would prevent this from -- this,

16   meaning the termination of exclusivity, from happening.

17   Rather, the potential benefit to the estate of -- of producing

18   some return to a very large group of creditors, who are --

19   would be wiped out completely by the plan that is presently

20   offered by the debtors, is a significant basis for termination.

21             Indeed, I note that the debtors were on an extension,

22   although a 45-day one.  I do not accuse the debtors of any

23   delay.  This has gone forward fairly expeditiously.  But there

24   is authority for the proposition that as you depart from the

25   12-day exclusivity period, there is a lesser burden down the

The Court - Ruling                                    93

1    road.

2          Indeed, it's difficult for me to comment about the

3    confirmability, or lack of it, of the debtors' plan.  I was not

4    able to review the disclosure statement objections that

5    apparently were filed yesterday.  And I don't know whether --

6    certainly the -- the LaSalle concerns will be discussed and

7    resolved in the context of the confirmability of the debtors

8    plan, and that certainly is a critical component of this

9    decision.  As well, Mr. Trump apparently is, or purports to be,

10   a substantial creditor of the debtors.

11         It -- I wonder whether the plan could be found to

12   discriminate unfairly in his favor if he is afforded this

13   exclusivity right, which, of course, has substantial value.  I

14   will reject the questions raised about the noteholder's plan in

15   terms of concerns with it.  Of course, those concerns, I take

16   it, are real and need to be addressed.  But they are not the

17   basis for rejecting the termination motion, nor are the so-

18   called bad-faith allegations, including the 2019 deficiencies,

19   which may be addressed at any time by any party, or the

20   conflicts of interest that are asserted.  They've been

21   responded to.  I don't rule on those issues.  And any party is

22   free to bring those forward.

23         I stand by the February 2, 2005 transcript in terms

24   of the basic principles regarding termination of exclusivity.

25   But, indeed, as we've discussed in the context of this

The Court - Ruling                                    94

1    dialogue, that was a vastly different circumstance than this.

2    Here, there is a need to have a fair and open process.  I am

3    not convinced that it will harm the debtors.  I'm more

4    convinced that it will be a substantial benefit to the debtors.

5    Indeed, uncertainty is always problematic, but uncertainty that

6    has the -- only the upside, if you will, for the debtors'

7    estates is less detrimental than it otherwise might be.

8         I share concerns about the ongoing operations of the

9    debtors.  And those kinds of concerns, of course, will be

10   considered in determining what is the best plan when we decide

11   among competing plans.  So those kinds of considerations are

12   not lost.  But in -- in terms of a process that cries out, and,

13   indeed, it is the extraordinary circumstance, it is the very

14   unusual case that this comes up in, and is not easily

15   transferable, even to, perhaps, a more run-of-the-mill new

16   value kind of case.  But here we are.  And I am willing and

17   able to enter an order to terminate exclusivity on this record.

18        So we proceed to the -- well, let's discuss time

19   frames and circumstances for implementing this decision.

20   Indeed, we do not want extensive delay.  The noteholders have

21   indicated ability to immediately file their plan.  Frankly, in

22   light of prospects of discussion, possibilities of other

23   offers, perhaps, a small window of time frame would be

24   appropriate before those plans are filed, before the

25   noteholder's plan is filed, to allow that to go forward in a

1    more deliberate way.  I'm thinking about, say, a 30-day period

2    for that process to unfold.  I'll gladly hear from reactions to

3    that.

4             MR. HANSEN:  Your Honor, for the noteholders, we --

5    certainly, as we've said to you in our argument, would -- we

6    hope that your decision results in a consensual process before

7    you.  I think what we would prefer would be to file the plan,

8    have those negotiations, so that you can establish hearing

9    dates for a disclosure statement, confirmation, et cetera, so

10   that we have those all calendared, and then we'd negotiate.

11            If we wind up, during the course of those

12   negotiations -- and you can just push those dates out by a

13   month to let this happen.  If negotiations are fruitful and

14   result in a plan that everyone agrees on, we can, of course,

15   then move very quickly to keep those dates and put on a -- on a

16   joint plan.  But I -- I think on behalf of the ad hoc

17   noteholders, Your Honor, it would be better to permit us to

18   file the plan, and then to have negotiations amongst all the

19   parties, so that we can actually keep the track.  Because if we

20   wait a month to have a negotiation, I don't know where this --

21   and if nothing happens and we wind up -- we've then got to

22   spend another 25 days to get ourselves out to hearings, et

23   cetera.  So I think it would be our preference to file it.

24            Your comments on the record today, in reading the

25   opinion, have clearly stated to us, to the debtors, and to

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          )    Case No. 03-12227(PJW)
                                )
SEITEL, INC., et al.,           )
                                )    Courtroom No. 2
                                )    824 Market Street
                   Debtors.     )    Wilmington, Delaware 19801
                                )
                                )
                                )    November 3, 2003
                                )    1:31 P.M.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE PETER J. WALSH
UNITED STATES CHIEF BANKRUPTCY JUDGE

APPEARANCES:
For the Debtors:              Greenberg Traurig, LLP
                              By:  SCOTT COUSINS, ESQ.
                              The Brandywine Building
                              1000 West Street, Suite 1540
                              Wilmington, Delaware 19801

                              Greenberg Traurig, LLP
                              By:  GARY GREENBERG, ESQ.
                              One International Place, 3rd Floor
                              Boston, Massachusetts 02110

                              Greenberg Traurig, LLP,
                              By:  ALLEN KADISH, ESQ.
                              MetLife Building
                              200 Park Avenue
                              New York, New York 10166,

ECRO:                         Sherry Scaruzzi

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**TRANSCRIPTS PLUS**
435 Riverview Circle, New Hope, Pennsylvania 18938
e-mail courttranscripts@aol.com

**215-862-1115    (FAX) 215-862-6639**





EXHIBIT

D

Appearances:
(Continued)

For Berkshire Hathaway,    Young Conaway Stargatt & Taylor, LLP
Ranch Capital:             By:  MICHAEL R. NESTOR, ESQ.
                           The Brandywine Building
                           1000 West Street, 17th Floor
                           Wilmington, Delaware 19899-0391

                           Stutman Treister & Glatt
                           By:  JEFFREY C. KRAUSE, ESQ.
                           1901 Avenue of the Stars, 12th Floor
                           Los Angeles, California 90067

For Equity Committee:      The Bayard Firm
                           By:  GIANCLAUDIO FINIZIO, ESQ.
                           222 Delaware Avenue, Suite 900
                           P.O. Box 25130
                           Wilmington, Delaware 19899-5130

                           Kronish Lieb Weiner & Hellman LLP
                           By:  JOHN MORRIS, ESQ.
                                ERIC HALLER, ESQ.
                           1114 Avenue of the Americas
                           New York, New York 10036-7798,

The U.S. Trustee:          Office of the U.S. Trustee
                           By:  DAVID L. BUCHBINDER, ESQ.
                           844 King Street
                           Wilmington, Delaware 19899

For Board of Directors:    Patton Boggs, LLP
                           By:  BRUCE H. WHITE, ESQ.
                           2001 Ross Avenue, Suite 3000
                           Dallas, Texas 75201-2774

For Erich Riesenberg:      ERICH RIESENBERG, Pro Se

equity that did not put up any new money at all would retain 20 percent of the company.

Our financial advisors believe that 20 percent of the company that is left for old equity is worth anywhere between 24 and $36 million. And they get that value plus they have the upside as anyone would have of holding the stock.

To refresh your recollection on the debtors' plan, Berkshire Ranch's plan, that plan says to old equity, vote for the plan and you get a piece of $10 million. Vote against the plan and you get nothing. Their plan -- their disclosure statement says that, in fact, equity has no value. That's their position, equity has no value. And the $10 million they're giving to old equity is a gift.

Now, Your Honor, that equals 40 cents a share. And, of course, we had great debate last time that old equity, unless there's a new development that I haven't heard as of right now, that old equity is not necessarily getting the $10 million, even if they vote in favor of the plan. Because if you recall, the old equity also shares as a matter of law under 510(b) with the class claimants, who have a class action lawsuit for the purchase and sale of securities.

They also share in that $10 million. The interesting point is that if the debtor says that old equity has no value and the class claimants have value. I don't know if we get -- if old equity gets anything for that matter. But the truth of

1 with us.

2          The -- Berkshire and Ranch never talked to us about a
3 plan. When we told them we had a plan, they never sat down
4 with us to see if it was something better for the other side.
5 They knew it, that was their plan from the beginning, that's
6 what they're saying to Your Honor today, look, Your Honor,
7 let's have a vote and then we'll see what happens. And they're
8 banking on that vote being positive because equity doesn't
9 know.

10          We have a plan that's confirmable. We have some
11 impaired classes that will vote for the plan. And we think we
12 can proceed. And all we're asking is a dual track. I don't
13 even know the delay is that long. The dual track, let the
14 equity vote, we'll have a valuation hearing at confirmation and
15 it's resolved and it's fair. And ultimately, I would think
16 that's where Your Honor would want to be.

17          THE COURT: I think it's important for the equity
18 holders to know what the alternative is. And so I'm going to
19 terminate the exclusivity.

20          However, we're going to stay on the same schedule so
21 that we will have the debtors' plan up for confirmation hearing
22 -- and I suspect that the November 17 hearing is not going to
23 do much if this is going to be contested until the real hearing
24 will spill over to December 3. And we'll determine on December
25 3 whether the debtors' plan is confirmable. And if it's not,

1 then obviously the Equity Committee can then tee up its plan.

2 But I think in the interest of giving to the equity
3 holders a full picture of all that is in the cards here, that
4 they should be able to see what the Equity Committee is
5 offering.

6 And, quite frankly, the numbers that Mr. Gottlieb has
7 thrown out, it's pretty obvious that the parties are polls
8 apart in terms of the enterprise value here and we'll see at
9 confirmation hearing on the debtors' plan who's right in that
10 regard.

11 MR. GOTTLIEB: Your Honor, may I ask you -- one
12 technical problem. We can file our plan and disclosure
13 statement right away. The problem we have is that the ballots
14 actually have to be received by November 7th, which is this
15 Friday.

16 The other motion we filed may be slightly -- may be
17 no help, but it may be slightly helpful. We ask for another
18 week. That would enable some shareholders out there to have at
19 least a chance to have heard about our plan before they send
20 back the ballot. Otherwise, anyone who hears about it tomorrow
21 probably doesn't have a chance to get a ballot and get it back.

22 So, if we could have an extra week, Your Honor, and
23 if Your Honor could ask that the balloting agent make sure that
24 if people called and asked for ballots, that they could get a
25 ballot, it would be slightly helpful, I think.

1　　　　　　　　UNITED STATES BANKRUPTCY COURT
　　　　　　　　　FOR THE DISTRICT OF HAWAII
2
　　In re　　　　　　　　　　)　　Case No.　08-02005
3　　　　　　　　　　　　　　　)　　(Chapter 11)
　　HAWAIIAN TELCOM　　　　　　)
4　　COMMUNICATIONS, INC., et al., )　　July 1, 2009
　　　　　　　　　　　　　　　)　　9:43 a.m.
5　　　　　　　　Debtors.　　　)
　　_____)
6

7
　　　TRANSCRIPT OF MOTION TO EXTEND EXCLUSIVITY PERIOD TO FILE PLAN
8　　　　　　　　BEFORE THE HONORABLE LLOYD KING
　　　　　　　　UNITED STATES BANKRUPTCY JUDGE
9

10

11

12

13

14

15

16

17

18　　Transcriber:　　　　　　　Jessica B. Cahill
　　　　　　　　　　　　　　　P.O. Box 1652
19　　　　　　　　　　　　　　Wailuku, Maui, Hawaii 96793
　　　　　　　　　　　　　　　Telephone: (808)244-0776
20

21

22

23　　Proceedings recorded by electronic sound recording, transcript
　　produced by transcription service
24

25
26



EXHIBIT

E

```
 1  APPEARANCES:

 2  For LEHMAN COMMERCIAL          WEIL GOTSHAL & MANGES LLP
    PAPER, INC., ET AL.:          By:  BRIAN S. ROSEN, ESQ.
 3  Appearing telephonically      767 Fifth Avenue
                                  New York, New York 10153
 4
    For HYP MEDIA FINANCE LLC:     HOGAN & HARTSON L.L.P.
 5  Appearing telephonically      By:  EDWARD C. DOLAN, ESQ.
                                  Columbia Square
 6                                555 Thirteenth Street, N.W.
                                  Washington, D.C. 20004
 7
    For DEBTORS-IN-POSSESSION:     KIRKLAND & ELLIS LLP
 8                                By:  CHRISTOPHER J. MARCUS, ESQ.
    Appearing telephonically           MARK MCKANE, ESQ.
 9                                Citigroup Center
                                  153 53rd Street
10                                New York, New York 10022-4611

11                                CADES SCHUTTE LLP
                                  By:  NICHOLAS C. DREHER, ESQ.
12                                     THEODORE D.C. YOUNG, ESQ.
                                  1000 Bishop Street, Suite 1200
13                                Honolulu, Hawaii 96813

14  For UNITED STATES OF AMERICA: U.S. DEPARTMENT OF JUSTICE
    Appearing telephonically      By:  MATTHEW J. TROY, ESQ.
15                                P.O. Box 875
                                  Ben Franklin Station
16                                Washington, D.C. 20044

17  For SANDWICH ISLES            MILBANK TWEED HADLEY & MCCLOY LLP
    COMMUNICATIONS, INC:          By:  GREGORY A. BRAY, ESQ.
18                                     SUSAN DAKIN-GRIMM, ESQ.
                                  601 S. Figueroa Street, 30th Floor
19                                Los Angeles, California 90017

20                                KOBAYASHI SUGITA & GODA
                                  By:  LEX R. SMITH, ESQ.
21                                999 Bishop Street, 26th Floor
                                  Honolulu, Hawaii 96813
22
    For the STATE OF HAWAII:       O'CONNOR PLAYDON & GUBEN LLLP
23                                By:  JERROLD K. GUBEN, ESQ.
                                  Special Deputy Attorney General
24                                Makai Tower, 24th Floor
                                  733 Bishop Street
25                                Honolulu, Hawaii 96813
26
```

```
 1  APPEARANCES CONTINUED:

 2  For OFFICIAL COMMITTEE OF     MORRISON & FOERSTER LLP
    UNSECURED CREDITORS:          By:  TODD M. GORAN, ESQ.
 3                                1290 Avenue of the Americas
                                  New York, New York 10104
 4
                                  MOSELEY BIEHL TSUGAWA LAU & MUZZI
 5                                By:  CHRISTOPHER J. MUZZI, ESQ.
                                  Alakea Corporate Tower
 6                                1100 Alakea Street, 23rd Floor
                                  Honolulu, Hawaii 96813
 7
    For HYP MEDIA FINANCE LLC:    ALSTON HUNT FLOYD & ING
 8                                By:  TINA L. COLMAN, ESQ.
                                  American Savings Bank Tower
 9                                1001 Bishop Street, 18th Floor
                                  Honolulu, Hawaii 96813
10
    For LEHMAN COMMERCIAL         WEIL GOTSHAL & MANGES LLP
11  PAPER, INC., ET AL.:         By:  MICHAEL T. MALETIC, ES.
                                  201 Redwood Shores Parkway
12                                Redwood Shores, California 94065

13                                LYONS BRANDT COOK & HIRAMATSU
                                  By:  JAMES N. DUCA, ESQ.
14                                Davies Pacific Center, Suite 1800
                                  841 Bishop Street
15                                Honolulu, Hawaii 96813

16  For GOLDEN SACHS              KLEVANSKY PIPER VAN ETTEN, LLP
    BANKS USA:                    By:  SIMON KLEVANSKY, ESQ.
17                                Pauahi Tower, Suite 770
                                  1003 Bishop Street
18                                Honolulu, Hawaii 96813

19

20

21

22

23

24

25
26
```

1    for a certain amount of time, then I'd like to make an official

2    request for a one day PUC approval process, but -- but if it's

3    not up to us that's just our estimate of how long it might take,

4    that's all. We're happy for it to go as fast as possible.

5    MR. BRAY: Several quick observations, Your Honor, in

6    the comments from the Secured Lenders about Chanin and the PUC I

7    suspect may be indicative of the type of ownership that one

8    could expect if the plan is confirmed.

9    Secondly, it's hard or it's disingenuous to say that

10    the Sandwich Isles proposal was in fact seriously vetted by the

11    professionals when they never gave us a chance to do any

12    diligence to really make a serious proposal to them, very much a

13    self fulfilling prophecy, Your Honor.

14    THE COURT: Thank you. Is the matter submitted?

15    MR. MARCUS: Yes, Your Honor.

16    THE COURT: All right. The matter is submitted. The

17    motion will be denied.

18    Now, in denying the motion to extend exclusivity this

19    is not to be taken as a criticism of the Debtors, the Debtors'

20    proposed plan, the Secured Creditors. It's not an endorsement

21    of Sandwich Isles. It's merely a reflection that the dominant

22    factor in this case is the public interest. This is Hawaii's

23    telephone company. At our first hearing the Chair of the Public

24    Utilities Commission explained why -- that the failure of this

25    reorganization was not an option.

1      Necessarily regulatory uncertainties abound at this
2  moment.  State and Federal necessarily there will be delays to
3  give the regulatory entities an opportunity to consider whatever
4  they must consider.

5      Cause has already been extended once in this case, and
6  it's now time to give others an opportunity.  Now, this is not
7  merely providing an opportunity to -- to Sandwich Isles.
8  There's no limitation.  If the Creditors' Committee comes up
9  with a plan -- come up with plan that has to be qualified.  You
10 don't just come up with a plan.  You have to do a disclosure
11 statement and that's usually the -- the barrier.

12     As I said, if -- if -- this motion being denied it
13 does not guarantee to Sandwich Isles a dual track plan, and we
14 may or may not be back here over the desire of Sandwich Isles to
15 have access to whether we call it the diligence room or the data
16 room, but I think we're talking about the same thing.

17     The Public Utilities Commission is neutral on this
18 motion.  It has not endorsed the -- the plan that's been filed
19 by the Debtors and supported by the Secured Lenders.

20     I'm not satisfied that there's any harm in allowing
21 the possibility of a competing plan to be filed.  I'm sorry that
22 no one was here from the Union, but I -- I don't feel that this
23 possibility of a proposed plan necessarily destabilizes the
24 Debtor or the Debtors' operations.

25     A lot of the fight, the dispute has been over the

1   qualifications of Sandwich Isles to file a competing plan. If

2   it's qualified or unqualified that will be apparent when the

3   Sandwich Isles files a disclosure statement, if it files a

4   disclosure statement. If -- if everything that the Debtors and

5   their advisers have suggested about Sandwich Isles is -- is

6   accurate, I doubt that Sandwich Isles will be able to file a

7   disclosure statement at least one that -- that has any hope.

8   But, again, because of the public interest, Sandwich Isles

9   should not be denied an opportunity to see if it can present a

10   serious alternative to the plan that has been filed.

11         There's always the possibility that the termination of

12   exclusivity may speed things along towards a consensual plan. A

13   consensual plan can mean different things. It may mean the

14   inclusion of Sandwich Isles or it may just mean that the -- the

15   Debtor, the Secured Lenders and the -- the constituency of the

16   Creditors' Committee may get together. If those three come

17   together that's a pretty powerful alliance as far as the

18   confirmation of plan of reorganization is concerned.

19         I'm aware of the nine factors in the Dow Corning case,

20   and I'm not going to go over them one by one, but I have

21   considered all of those. Some of those don't necessarily favor

22   extension of confirmation, they're just things to think about,

23   and I think that my thought process has addressed them, but it's

24   apparent that Sandwich Isles, I say, has been shut out from

25   diligence efforts and those diligence efforts -- the inability

1  of Sandwich Isles to get information, as I said, makes a lot of
2  the criticisms just a self fulfilling prophecy because how can
3  they go to lenders, how can they get commitments that they may
4  need if they don't have information as to what it is that they
5  wish to acquire.

6         The Debtors are encountering staggering professional
7  fees which may be increased if the motion of the State is
8  granted and, unfortunately, because of the regulatory situation
9  there's no immediate end in sight.  This is going to continue.
10 So if there's going to be the possibility of a competing plan
11 let's get it under way now so that it can be -- it -- possibly
12 even more than one competing plan may be considered.

13        The Debtors' customer base is shrinking because the
14 competitors are unregulated.  They don't have to supply the
15 public services that this Debtor is required to do.  This Debtor
16 has lots of serious issues that arise because of its regulation.
17 As it has pointed out, its pricing and everything necessarily is
18 made public so that the competitors can -- can see that.

19        So to the extent we can move this along let's move it
20 along, let's see if there is the possibility of a competing
21 plan.

22        There necessarily will be confidentiality concerns if
23 Sandwich Isles is given access to the data room or the diligence
24 room.  That's something that is dealt with frequently in
25 reorganization cases, and we should be able to deal with here.

1          So for all those reasons I'm satisfied that the
2   Debtors have not demonstrated cause to continue the situation
3   where only the Debtor plan may be considered and an order will
4   be entered simply -- the Court will generate the order simply
5   stating that for the reasons stated in open court the motion is
6   denied.  Is there anything else that requires attention today?
7   Mr. Guben.

8          MR. GUBEN:  Yes, Jerrold Guben on behalf of the State
9   of Hawaii.  Your Honor --

10         THE COURT:  Please speak into the microphone, Mr.
11  Guben.

12         MR. GUBEN:  -- I was informed this morning that the
13  Governor has exercised her right to extend the June 30th, 2009
14  deadline on Senate Bill 603 to sign or veto it to July 15th.
15  That does address the issue of their regulatory regime possibly
16  coming out of each plan.

17         THE COURT:  Maybe you should tell -- tell everyone
18  what that -- what that bill is.

19         MR. GUBEN:  That was a bill introduced this Spring in
20  the Legislature, Senate Bill 603, with respect to a partial
21  deregulation of the consumer telephone rates and giving greater
22  flexibility to Hawaiian Telephone Company and obviously the
23  reorganized Debtor with respect to the regulation of consumer
24  rates primarily.  One of the reasons being that they were facing
25  not only wireless competition, but competition from the other

103

1   LEE R. BOGDANOFF (State Bar No. 119542)
    JONATHAN S. SHENSON (State Bar No. 184250)
2   BRIAN M. METCALF (State Bar No. 205809)
    KLEE, TUCHIN, BOGDANOFF & STERN LLP
3   1999 Avenue of the Stars, 39th Floor
    Los Angeles, California 90067-6049
4   Telephone:   (310) 407-4000
    Facsimile:    (310) 407-9090
5
6   Counsel for the Official Committee of
    Unsecured Creditors
7

FILED
JUL 16 2009
CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:                      Deputy Clerk

ENTERED
JUL 20 2009
CLERK U S BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:                      Deputy Clerk

8   **UNITED STATES BANKRUPTCY COURT**

9   **CENTRAL DISTRICT OF CALIFORNIA**

10  **SANTA ANA DIVISION**

11

12  In re

13  FREMONT GENERAL CORPORATION, a
    Nevada Corporation
14
                                  Debtor.
15
16  Tax I.D. 95-2815260
17
18
19
20
21
22
23
24

Case No. 8:08-13421-ES

Chapter 11

**ORDER GRANTING MOTION OF
OFFICIAL COMMITTEE OF
UNSECURED CREDITORS FOR
ORDER TERMINATING THE
EXCLUSIVE PERIODS IN WHICH
ONLY THE DEBTOR MAY FILE A
PLAN AND SOLICIT ACCEPTANCES
THERETO**

Hearing

Date:   July 14, 2009
Time:   10:30 a.m.
Place:  Courtroom 5A
        411 West Fourth St.
        Santa Ana, California

25
26
27
28

*KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-1698
(310) 407-4000*



EXHIBIT
**F**

PENGAD 800-631-6989

1       On June 8, 2009, the Official Committee of Unsecured Creditors appointed in the above-

2   captioned chapter 11 bankruptcy case (the "Creditors' Committee") filed and served that certain

3   *Motion Of Official Committee Of Unsecured Creditors For Order Terminating The Exclusive*

4   *Periods In Which Only The Debtor May File A Plan And Solicit Acceptances Thereto;*

5   *Memorandum Of Points And Authorities In Support Thereof* [Docket # 728] (the "Motion")[1] and,

6   in support thereof, the Creditors' Committee filed and served that certain *Declaration Of Hugh*

7   *Steven Wilson In Support Of (I) Motion For Order Pursuant To Local Bankruptcy Rule 9075-1*

8   *Shortening Time And (II) Motion Of Official Committee Of Unsecured Creditors For Order*

9   *Terminating The Exclusive Periods In Which Only The Debtor May File A Plan And Solicit*

10  *Acceptances Thereto* [Docket # 731] (the "Wilson Declaration"), *Declaration Of Deborah Hicks*

11  *Midanek In Support Of Motion Of Official Committee Of Unsecured Creditors For Order*

12  *Terminating The Exclusive Periods In Which Only The Debtor May File A Plan And Solicit*

13  *Acceptances Thereto* [Docket # 732] (the "Midanek Declaration"), and *Declaration Of Jonathan*

14  *S. Shenson In Support Of Motion Of Official Committee Of Unsecured Creditors For Order*

15  *Terminating The Exclusive Periods In Which Only The Debtor May File A Plan And Solicit*

16  *Acceptances Thereto* [Docket # 730] (the "Shenson Declaration", and together with the Motion,

17  the Midanek Declaration and the Wilson Declaration collectively, the "Moving Papers").

18      On June 18, 2009, John Mlynick and Andrey Muthcnik objected to the Motion by and

19  through that certain *Objection To The Motion Of Official Committee Of Unsecured Creditors*

20  *For Order Terminating The Exclusive Periods In Which Only The Debtor May File A Plan And*

21  *Solicit Acceptances Thereto [Docket 728]; And Declaration Of John Mlynick In Support Thereof*

22  [Docket # 755] (the "Mlynick Objection").

23      On June 30, 2009, the Official Committee of Equity Holders joined in the Motion by and

24  through the filing of that certain *Joinder and Support of Relief Requested in Motion of Official*

25  *Committee of Unsecured Creditors for Order Terminating the Exclusive Periods Which Only the*

26  *Debtor May File a Plan and Solicit Acceptances Thereto; Declaration of Philip E Strok in*

27

28  [1]   Capitalized terms not otherwise defined in this Order shall have the meaning ascribed to them in the Motion.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA, 90067-1698
(310) 407-4000

1

1   *Support Thereof; Filed by Interested Party Official Committee of Equity Security Holders*

2   *[Docket # 779]* (the "Joinder").

3          On July 6, 2009, the above-captioned debtor and debtor in possession (the "Debtor")

4   objected to the Motion by and through that certain *Fremont General Corporation's Response To*

5   *The Motion Of Official Committee Of Unsecured Creditors For Order Terminating The*

6   *Exclusive Periods In Which Only The Debtor May File A Plan And Solicit Acceptances Thereto;*

7   *Declarations of Donald E. Royer, Ricardo S. Chance, And Theodore B. Stolman In Support*

8   *Thereof [Docket # 776]* (the "Debtor's Objection").

9          On July 10, 2009, the Creditors' Committee objected to certain evidence contained in the

10  declarations submitted by the Debtor in support of the Debtor's Objection by and through that

11  certain *Official Committee of Unsecured Creditors' Evidentiary Objections To Declarations Of*

12  *Donald E. Royer, Ricardo S. Chance And Theodore B. Stolman In Support Of Fremont General*

13  *Corporation's Response To The Motion Of Official Committee Of Unsecured Creditors For*

14  *Order Terminating The Exclusive Periods In Which Only The Debtor May File A Plan And*

15  *Solicit Acceptances Thereto [Docket # 789]* (the "Evidentiary Objection to the Debtor's

16  Objection").

17         On July 10, 2009, the Creditors' Committee also filed and served that certain *Reply Of*

18  *Official Committee Of Unsecured Creditors To Debtors' Response To The Committee's Motion*

19  *For Order Terminating The Exclusive Periods In Which Only The Debtor May File A Plan And*

20  *Solicit Acceptances Thereto [Docket # 787]* (the "Reply") and, in support thereof, that certain

21  *Supplemental Declaration Of Hugh Steven Wilson In Support Of Reply Of Official Committee Of*

22  *Unsecured Creditors To Debtor's Response To The Creditors' Committee's Motion For Order*

23  *Terminating The Exclusive Periods In Which Only The Debtor May File A Plan And Solicit*

24  *Acceptances Thereto [Docket # 788]* (the "Supplemental Wilson Declaration" and together with

25  the Reply, the "Reply Papers").

26         On July 14, 2009 at or about 10:30 a.m., the Court held a hearing (the "Hearing") to

27  consider the Motion.  Jonathan S. Shenson appeared at the Hearing on behalf of the Creditors'

28  Committee and other appearances were as noted on the record.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-1058
(310) 407-4000

2

1    The Court has reviewed and considered the Moving Papers, the Joinder, the Mlynick

2    Objection, the Debtor's Objection, Evidentiary Objection to the Debtor's Objection, and the

3    Reply Papers and all other pleadings, exhibits, documents and evidence submitted in conjunction

4    with the Hearing on the Motion; the arguments and representations of counsel at the Hearing;

5    and the record in this case; and based on the foregoing review and consideration, the Court finds

6    that:

7        A.    The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and

8    1334; venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the matter is a core

9    proceeding pursuant to 28 U.S.C. § 157(b)(2);

10       B.    Notice of the Motion and the Hearing was adequate and appropriate under the

11   particular circumstances and complies with the applicable provisions of Title 11 of the United

12   States Code (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure, and the Local

13   Bankruptcy Rules for the Central District of California, and this Court has determined that no

14   other or further notice need be given; and

15       C.    The legal and factual bases set forth in the Motion establish good and sufficient

16   "cause" for the Court to enter an order, pursuant to section 1121(d) of the Bankruptcy Code,

17   terminating the period under section 1121(c)(3) of the Bankruptcy Code in which the Debtor has

18   the exclusive right to solicit and obtain acceptances of a plan and during which time competing

19   plans may not be filed ("Solicitation Exclusivity Period").

20   **THEREFORE, IT HEREBY IS ORDERED THAT**:

21       1.    All objections to the Motion are overruled in their entirety, including, the Debtor's

22   Objection and the Mlynick Objection.

23       2.    The Motion is **GRANTED**, and Solicitation Exclusivity Period shall be, and is

24   hereby, terminated effective as of July 14, 2009.    17

25

26   DATED: _July 16_, 2009

27                                              _____
                                               HONORABLE ERITHE A. SMITH
28                                             UNITED STATES BANKRUPTCY JUDGE

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
(310) 407-4000

3

1                 UNITED STATES BANKRUPTCY COURT

2                    DISTRICT OF NEVADA

3                    LAS VEGAS, NEVADA

4   In re:  FX LUXURY LAS VEGAS I,  )  E-Filed:  06/16/10
     LLC,                       )

5

            Debtor.         )  Case No.

6                         )  BK-S-10-17015-BAM

7   ————————————————————————————)  Chapter 11

8

9

10

11               TRANSCRIPT OF PROCEEDINGS
                      OF

12              HEARING RE: MOTIONS
                  VOLUME 1

13     BEFORE THE HONORABLE BRUCE A. MARKELL
        UNITED STATES BANKRUPTCY JUDGE

14

               Friday, June 11, 2010

15

                 9:30 a.m.

16

17

18

19

20

21

22

23   Court Recorder:      Helen C. Smith and Liberty Ringor

24

   Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.

EXHIBIT
6
PENGAD 800-631-6989

```
1    APPEARANCES:

2    For the Debtor:         HAL L. BAUME, ESQ.
                             Fox Rothschild, LLP
3                            100 Park Avenue
                             Suite 1500
4                            New York, New York 10017

5                            SAMUEL H. ISRAEL, ESQ.
                             Fox Rothschild, LLP
6                            2000 Market Street
                             Twentieth Floor
7                            Philadelphia, Pennsylvania 19103

8                            BRETT A. AXELROD, ESQ.
                             Fox Rothschild, LLP
9                            3800 Howard Hughes Parkway
                             Suite 500
10                           Las Vegas, Nevada 89169

11   For the Second Lien     NILE LEATHAM, ESQ.
     Lenders:                Kolesar & Leatham, Chtd.
12                           3320 West Sahara Avenue
                             Suite 380
13                           Las Vegas, Nevada 89102

14                           LENARD M. PARKINS, ESQ.
                             Haynes & Boone, LLP
15                           1221 Avenue of the Stars
                             Twenty-Sixth Floor
16                           New York, New York 10020

17                           HENRY FLORES, ESQ.
                             Haynes & Boone, LLP
18                           1 Houston Center
                             1221 McKinney Street
19                           Suite 2100
                             Houston, Texas 77010
20
     For Landesbank          RODNEY M. JEAN, ESQ.
21   Baden-Wurttemberg:      Lionel, Sawyer & Collins
                             300 South Fourth Street
22                           Suite 1700
                             Las Vegas, Nevada 89101
23

24

25
```

```
 1    APPEARANCES (Cont.):

 2                          ANDREW V. TENZER, ESQ.
                            RANDALL MARTIN, ESQ.
 3                          FRASER HARTLEY, ESQ.
                            (Telephonic)
 4                          Shearman & Sterling, LLP
                            599 Lexington Avenue
 5                          New York, New York 10022

 6    For The Huff         FREDERICK E. SCHMIDT, ESQ.
      Alternative Fund, LP, ANDREW C. GOLD, ESQ.
 7    and The Huff         Herrick, Feinstein, LLP
      Alternative Parallel 2 Park Avenue
 8    Fund, LP:            New York, New York 10016

 9                          LEE I. IGLODY, ESQ.
                            9555 South Eastern Avenue
10                          Suite 280
                            Las Vegas, Nevada 89123
11
      For LIRA, LLC:        BRADFORD B. LAVENDER, ESQ.
12                          Bryan Cave, LLP
                            1290 Avenue of the Americas
13                          New York, New York 10104
                            (Telephonic)
14
      Also Present:         MITCHELL J. NELSON, ESQ.
15                          President
                            FX Luxury Las Vegas I, LLC
16

17

18

19

20

21

22

23

24

25
```

1  Let's get it done.

2      They have a window of August.  We'll be ready by August to

3  have that.

4         THE COURT:  What's your position with respect to the

5  debtor's request for a third party neutral to come in and see

6  if -- not necessarily knock heads together but get people to

7  come together?

8         MR. PARKINS:  I have no position.  I haven't been

9  able to talk to a number of constituencies at all, that I have

10  no position.

11         THE COURT:  Thank you.

12      Anything else?

13         MR. PARKINS:  No.  Thank you.

14         THE COURT:  All right.  Thank you.

15      Anyone else wish to speak?  All right.

16      The matter will be submitted as of now.  I will take a

17  lunch break.  We will come back at 1:30.  I fully expect at

18  1:30 to announce my decision on this motion, and then we can

19  take up the rest of the calendar.

20      So we'll adjourn 'til 1:30.

21         THE CLERK:  All rise.

22      (Recess at 12:22:36 p.m.)

23      (Court reconvened at 01:36:35 p.m.)

24         THE CLERK:  All rise.

25      Court is back in session.

1            THE COURT:  Please be seated.  All right.

2        Back on the record with respect to FX Luxury Las Vegas.

3        Anything from the parties before I give my decision?  All

4    right.

5        Before me is the motion to terminate exclusivity filed by

6    various second lienholders.  As you all know, it's been

7    adequately briefed.  I've heard testimony.  These will

8    constitute my findings of facts and conclusions of law under

9    Rule 7052 incorporated and applicable in a contested matter

10   under 9014(c).

11       I'm going to grant the motion.  I'm going to grant the

12   motion for the following reasons and upon the following logic.

13       First, we start with the proposition that the debtor has

14   at least 120 days by statute, initially, to propose and file a

15   plan.  I acknowledge what the first lien lenders have indicated

16   may be 180 days here since they filed a plan with the case, but

17   that matters not since we're actually only about 45 days into

18   the case.

19       In that 45 days I have observed a lot, learned a lot, and

20   heard a lot of argument.  Under 1121(d), that period of time

21   given to the debtor -- and strangely the debtor, not the debtor

22   in possession.  But that time given to the debtor can be

23   terminated for cause.

24       Parties haven't really focused so much on cause or the

25   cases, but I think it appropriate to give a little history of

1   exclusivity because I think my decision today to terminate is

2   supported by that history and then some reference to what

3   little case law there is with respect to this.

4       First, 1121 is the product of a compromise when congress

5   in 1978 fused the old Chapter XI -- excuse me -- yeah, XI and

6   Chapter X, Chapter XI which could not affect either

7   shareholders or secured creditors.

8       The debtor was given the exclusive right to file a plan

9   during the entire case much like happens currently in

10   Chapter 13.

11       In public-company cases in which the debt was more than

12   250,000 in Chapter X there was no exclusivity.  The compromise

13   was to give exclusivity because there was some acknowledgement

14   that in most cases it was important for the debtor to have the

15   exclusivity at least to the initial phase of the case but with

16   the understanding that there were substantial abuses under the

17   old Chapter XI cases when the debtor had exclusivity for too

18   long, that is to say the life of the case.

19       That's, if you will, the rough generalization of a rough

20   history of the provision for cause.

21       Congress isn't particularly helpful in H.R. Report 595.

22   The only thing that they tell us is that, quote, "Cause might

23   include an unusually large or unusually small case delay by the

24   debtor or recalcitrants among creditors."

25       From that, the little case law has attempted to figure out

what would constitute cause to terminate. For that I'll adopt
as my decisional guide today Adelphia Communications cited by
second lien lenders and responded to in part by the first lien
lenders.

In particular, the Bankruptcy Court Decision,
336 Bankruptcy Reporter at 674 which was ultimately affirmed by
the district court at 342 Bankruptcy Reporter 122, that case
laid out a factor test to assess whether or not cause to
terminate exclusivity.

Noting -- I mean, I'll note that the Court there found
there was no cause to terminate exclusivity but said that the
following factors ought to be considered, and I paraphrase.

The size and complexity of the case, the necessity of
sufficient time to prevent the debtor to negotiate a plan and
prepare adequate information, the existence of good-faith
progress towards reorganization, the fact the debtor is paying
their bills as they become due, whether the debtor's
demonstrated reasonable prospects for filing a viable plan,
whether the debtor has made progress and negotiations with its
creditors, the amount of time which has elapsed in the case,
whether the debtor is seeking extension of exclusivity in order
to pressure creditors to submit to the debtor's reorganization
demands, and whether an unresolved contingency exists.

Now, I appreciate especially the first lien lenders
responding to that point by point, but I disagree with their

1  application of the facts to that standard.

2     First, again, let me recount what I've been able to glean

3  of the history of this property over the last several years.

4  And I say property instead of debtor because as we get to it, I

5  think the debtor in this case is in the somewhat unusual

6  situation of really not being in control of its property or its

7  cash flow.

8     We know that in starting in January 2009 the lenders

9  exercised their rights under the various lockbox arrangements

10 to take control of the cash flow from this property and have

11 more or less through various means and devices controlled that

12 cash flow since that time.

13    Moreover, we have the testimony of the president of the

14 debtor submitted in paragraph 18 of his declaration here that

15 at least since the time of the appointment of the receiver,

16 state court receiver, which occurred nine months prior to the

17 filing of this case, debtor has not been in physical control of

18 its property since that time.

19    What that tells me is that this is not, if you will, what

20 is generically referred to as an operating case.  This isn't

21 like Adelphia where you have hundreds of thousands of

22 subscribers and employees and the like.

23    Indeed, the debtor testified here today that there were

24 three employees.  Also testified that were the lenders to take

25 over, probably the external casual observer would not see any

Cline Transcription Services, Inc.  (702) 644-1123

1　change.

2　　　In short, the debtor are holding a group of assets, but

3　they are not managing them.  They are not operating them.  That

4　is done by Cushfield & Wakeman (sic).

5　　　And during all this, the real issue is -- which is the

6　issue, to be frank, in any financial reorganization -- who

7　controls the cash flow, and that is I guess first and foremost

8　here along with the value of the property.

9　　　Now, the debtor opened up the case by filing a plan that

10　crammed down all unsecured creditors, crammed down the second

11　lienholders, purported to dispense with the 341 meeting, and,

12　in essence, accomplished what you could have accomplished in a

13　state court receivership proceeding had there been a

14　foreclosure.

15　　　And that's why I thought it was both odd and telling that

16　in the debtor's reply filed last night they said again at page

17　8, lines 15 through 16, that if the debtor did not file this

18　bankruptcy then creditors would have been wiped out by

19　foreclosure.

20　　　I guess that's as true as it goes, but I'm not exactly

21　sure what creditors other than the first lienholders would have

22　obtained under the plan as filed by the debtor, initially.

23　　　It seems to me that everyone else at least under their

24　plan, with the possible exception of some priority creditors,

25　would have received nothing.

1   Add to the fact that at most the unsecured trade claims

2 here are about $275,000.  I get that from schedule 2 of the bid

3 procedures and from the debtor's schedules.  And both the

4 proposed plan by the second lienholders and at least the oral

5 indications from the debtor is that those will be paid in full.

6   If I look at that and I look at the requirements of 1129

7 with respect to the necessity of paying administrative

8 creditors including priority creditors in full, really this

9 case gets down to the first lienholders versus the second

10 lienholders.  There's really not too many other constituencies

11 that have to be -- to use the vernacular -- have a dog in this

12 fight.

13   That all leads to, you know, as was pointed out by

14 Mr. Baume and pointed out accurately, that this is a changing

15 picture.  This is a moving picture.  This is not a still

16 picture.

17   New things keep coming up including the debtor's stated

18 intention of withdrawing the plan that it filed when it

19 commenced this case, and changing it -- although the parties

20 will disagree as to whether it's been radically different or

21 just different ways, but changing it in ways that they believe

22 respond to this Court's concerns, and this Court's concerns are

23 simply the concerns that the law be enforced as it is written.

24   So with respect to all of that, we come down to a debtor

25 that's not in physical control of its property, not really in

1    control of its cash flow, is having it managed by another
2    person, is producing more cash than it consumes, was in a
3    receivership and in a distressed position for at least nine
4    months prior to filing of this case during which period I can't
5    believe that the relevant parties weren't trying to find buyers
6    for the property because I take it that with the possible
7    exception of the second lienholders, the first lienholders are
8    certainly not in the business of running and managing property.

9        We come down then back to the factors in terms of the size
10   and complexity of the case.  Although this case is large in
11   terms of dollars, I think it's relatively simple in terms of
12   the players.

13       Part of the reasons I think that the fighting has been so
14   intense is that the issues are relatively small.  That is to
15   say first lienholders and the debtor believe that there's only
16   enough value to cover, at most, part of the first lienholders.
17   Second lienholders tend to disagree and may see more value
18   there.

19       The necessity of sufficient time to prevent the debtor to
20   negotiate a plan, well, debtor had time.  Debtor had the nine
21   months prior to filing the case and file the prepackage plan
22   which (indiscernible) since withdrawn.

23       I'm not exactly sure that exclusivity would allow the
24   debtor to file something that didn't fly and then reset the
25   clock.

1       The existence of good-faith progress toward

2 reorganization, I want to reemphasize what Mr. Baume said

3 opening up the proceeding. I do not in any way question the

4 good faith of any participant here.

5       I know some of the lawyers. I know some of the lawyers

6 involved, and I think nothing but the best of them with respect

7 to their intentions and sincere devotion to their clients.

8       I may disagree with their tactics, and I may disagree with

9 the way in which they lay out their positions, but nothing that

10 I have seen in this case calls into question the good faith of

11 the debtor or any other participant.

12       The fact the debtor is paying their bills as they become

13 due, it's almost a nullity here because the debtor is not

14 really paying the bills, Cushman & Wakefield is. They're

15 paying the bills, the rents that are being produced by the

16 property.

17       Whether the debtor has demonstrated reasonable prospects

18 for filing a viable plan, well, again, debtor has changed its

19 course. It has indicated it will withdraw the prepackage plan

20 that it has filed.

21       And, I mean, I'll get into it in a second in terms of the

22 debtors defenses, but I do not remain -- well, let's put -- I

23 remain unconvinced that the procedures put forth by the debtor

24 were reasonably calculated to produce a confirmable plan in a

25 short period of time.

1    And, in essence, that was their second bite at the apple,

2    and I'm not convinced that it was -- or that it ultimately

3    would lead to the result that they desire.

4    Whether the debtor has made progress in negotiations with

5    its creditors, I'll admit that it may be that the jury, so to

6    speak, is still out on that.

7    Although the amount of litigation and the amount of time

8    that the parties have been together would suggest to me that

9    although hope springs eternal, I don't hope much for a

10   consensual resolution here unless one side or another or both

11   parties significantly retract some of their positions or stated

12   positions up to this point which is fine.  That's what

13   ultimately a Court is for is to resolve disputes when put

14   before them.

15   The amount time which has elapsed in the case, clearly

16   this favors the debtor.  I mean, it's been only 45 days, but

17   that's somewhat misleading as well.  It's not as though the

18   bankruptcy was just filed 45 days ago.  It's been in

19   contemplation since at least last fall.

20   The process and procedures that lead up to the economic

21   results contemplated by the plan have been in place longer, and

22   to put it bluntly, if the best they can come up with is what

23   they have put forward thus far, I have some doubts as to

24   whether keeping exclusivity in place is in the best interest of

25   the estate.

1     Whether the debtor is seeking an extension of exclusivity

2     in order to pressure creditors to submit to the debtor's

3     reorganization demands, well, of course you use exclusivity to

4     do that.  That's what it's for.

5     But I read this factor to be unduly seeking to impose the

6     will upon another, and I don't think that's really occurred

7     here.

8     But I'm not exactly sure -- to hearken back to the history

9     -- this is the type of case in which exclusivity serves any

10    particular function for the estate, again, given the relatively

11    small universe of the parties who have an interest in what's

12    going forward.

13    And whether there's an unresolved contingency.  The only

14    unresolved contingency I see from the parties' perspective is

15    what I would rule with respect to a cash-collateral motion with

16    respect to gross or net rents, and I'm certainly not going to

17    decide that now if it's not squarely before me.

18    Adding all of those up on balance, I believe that

19    termination of exclusivity is warranted simply because I think

20    the parties have engaged in good-faith litigation efforts and

21    good-faith negotiation.

22    Again, I'm mindful that they have been in negotiation

23    since last year, and they have yet to find a common ground for

24    which they can go forward.

25    At some point one has to step back from saying a common

1  ground can be resolved or can be found in a reasonable period

2  of time and simply say if you can't find a common ground, the

3  provisions of the code have a response to that, and the

4  response to that is it will pick clear winners and clear losers

5  with respect to a plan, and as stated by Mr. Parkins, that's

6  1129(c).

7       The debtors -- or the debtor says, well, listen, we've

8  terminated the lockup agreement.  We've revised the auction

9  procedures.  This is no longer a new-value plan.  All of which

10 are interesting arguments, but all of which ultimately I

11 reject.

12      First, I understand the lockup termination, and I

13 appreciate what that has done to opening up, but an auction

14 only works to return to creditors the highest value if it's a

15 true auction.  That is to say if, in fact, the barriers to

16 entry, the entry cost forbidding a relatively evenly spread,

17 and, in fact, the potential bidders have equal access to

18 information.

19      I'm not exactly sure that the bid procedures and the

20 restructuring of the proposed cash-collateral order accomplish

21 that end.

22      I mean, as was pointed out by the second lienholders, the

23 lockup termination was followed by a transfer of some of the

24 more odious provisions of that as to third-party participation

25 simply to the cash-collateral order with respect to going

1 forward.

2 And so though the provision -- the lockup agreement may be

3 gone, but its melody, if you will, lingers on in terms of the

4 provisions as was pointed out this morning in the cash

5 collateral.

6 The open-auction provisions or the provisions with respect

7 to the bid procedures, again, not technically directly before

8 me but put up by the debtor as a reason not to terminate

9 exclusivity because they have loosened up, if you will, the

10 access to the process by which the economics of this debtor

11 will be obtained.

12 I'm afraid I just don't buy it. I think most telling was

13 the colloquy with Mr. Tenzer on his argument that it's fairly

14 clear that those managing the bidding process reserve the right

15 to reject bids that don't pay the lenders in full.

16 Although, I was told -- these aren't Mr. Tenzer's words --

17 but, effectively, get real, that's not the way the world works.

18 I understand that, but I also understand that the reservation

19 of that kind of discretion to the debtor and to those

20 controlling the assets of the debtor is exactly the type of

21 pressure that exclusivity was thought to bestow upon Chapter XI

22 debtors.

23 If you're going to have an open and free auction, it's

24 clear the first lien lenders are going to have to be dealt

25 with, but they should be dealt with in ways that don't affect

1 or infect the auction process in terms of getting bidders to
2 appear.

3 Moreover, although not raised this morning but raised in
4 the papers, there is some concern in terms of the open, the --
5 I don't want to say -- it's not really the fairness of the
6 process but the structure of the process when one bidder is
7 automatically prequalified, that is to say the insider group
8 that is no longer the stalking-horse bidder.

9 Plus, the first lien lenders in addition to the provision
10 saying that they can reject bidders if they don't propose to
11 pay them in full, also reserved their entire rights to credit
12 bid. That doesn't produce an auction that in theory or in
13 practice will yield the highest results to the estate.

14 I'm torn on that somewhat because as I have said before I
15 really haven't seen anything that would indicate the value of
16 this property is anything close to the outstanding debt of the
17 first lienholders.

18 And, thus, one might fairly well say, well, if the first
19 lien lenders want to do it, it's really their ball, let them
20 call the rules.

21 To that I would respond, well, perhaps, you could have
22 done that were you in a state court receivership where the
23 receiver acts on behalf of the secured party, but once that
24 action dissolves and the debtor commences a bankruptcy case,
25 bankruptcy code requires me to take into account the interests

1    of the entire estate, not just the first lienholders, not to

2    approve processes that unduly favor one party or the other, but

3    to try -- to steal the words of the second lienholders -- to

4    open up a transparent process.

5        Although I understand and acknowledge that it is the

6    second lienholders' burden to demonstrate cause, and though I

7    understand and acknowledge that it is rare that exclusivity is

8    terminated -- as I said earlier, this would be the -- this is

9    the first time I've done it since I have been on the bench.

10       And also understanding and acknowledging that it's a heavy

11   burden at least under the case law, I think that burden has

12   been met here for the reasons that I have stated.

13       I would ask Mr. Parkins to submit an order to that effect.

14           MR. PARKINS:  Thank you, your Honor.

15           THE COURT:  Mr. Baume, do you want a few minutes to

16   discuss my decision with the first lien lenders before we move

17   on?

18           MR. BAUME:  Yes, your Honor.  In fact, you were

19   reading my mind.  I was going to ask you if we could have a

20   continuance for a little while to --

21           THE COURT:  We can call it an adjournment while we're

22   here.  A continuance means we actually move the date.

23           MR. BAUME:  You know, your Honor, I just had -- I

24   feel compelled to tell you I started out practicing in Illinois

25   where we used the word continuance.



The relief described hereinbelow is SO ORDERED.

Signed July 22, 2010.

_Ronald B. King_
Ronald B. King
United States Chief Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| BOSQUE POWER COMPANY, LLC, | § | CASE NO. 10-60348-RBK |
| ET AL., | § | |
| | § | JOINTLY ADMINISTERED |
| | § | |
| DEBTORS | § | CHAPTER 11 |

### ORDER REDUCING DEBTORS' EXCLUSIVE
### PERIOD FOR ACCEPTANCES OF PLAN

On July 20, 2010, came on to be heard the "Joint Motion of Prepetition Agent and Working Group for Entry of Order Pursuant to Section 1121(d) of the Bankruptcy Code Limiting the Debtors' Exclusive Period for the Filing of a Chapter 11 Plan and Solicitation of Acceptances Thereof to the Initial 120-Day Period Specified under Section 1121(b) of the Bankruptcy Code" filed by the **_Prepetition Agent and the Working Group_** (Court document #327) (the "Motion"), and the Court is of the opinion that cause exists under section 1121(d)(1) of the Bankruptcy Code to reduce the time for acceptances of a plan.

**EXHIBIT**

H

PENGAD 800-631-6989

It is, therefore, **ORDERED, ADJUDGED, AND DECREED** that:

1. Debtors' exclusive period for acceptances of a plan terminates on July 22, 2010.

2. Any party in interest may file a proposed plan of reorganization, seek approval of a disclosure statement, and, if approved, solicit acceptances of its proposed plan.

3. All other requested relief is denied.

# # #

2



Signed July 22, 2010.

_Ronald B. King_

Ronald B. King
United States Chief Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| BOSQUE POWER COMPANY, LLC, | § | CASE NO. 10-60348-RBK |
| ET AL., | § | |
| | § | JOINTLY ADMINISTERED |
| | § | |
| DEBTORS | § | CHAPTER 11 |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

In connection with the Order Reducing Debtors' Exclusive Period for Acceptances of Plan, the Court hereby makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1.     Debtors filed these Chapter 11 cases on March 24, 2010, and the cases are jointly administered. Debtors own and operate an electric generating plant in Bosque County, Texas.

2.     The claims of the Prepetition Agent and the Working Group are secured by a first lien on the Debtors' assets with a debt of approximately $410 million.

3. In addition to the secured debt, the Debtors invested approximately $400 million in capital to acquire and maintain the Debtors' assets.

4. The Debtors filed a proposed plan prior to the expiration of exclusivity under section 1121(b). The Prepetition Agent and the Working Group seek to shorten the Debtors' 180 day exclusive period for acceptances of the Debtors' plan so that, as secured creditors, they may file a competing plan.

## CONCLUSIONS OF LAW

1. This is a core proceeding over which this Court has jurisdiction and venue under 28 U.S.C. §§ 157, 1334 & 1408.

2. This Chapter 11 case involves the bankruptcy nuances of the "new value exception" and credit bidding by secured creditors. Because this is an unusually large case, and in order to give creditors the best chance of being paid in whole or in part, cause exists under section 1121(d)(1) of the Bankruptcy Code to reduce the time for acceptances of the Debtors' proposed plan so that other parties in interest may file a proposed plan. This could allow creditors a choice between competing plans and would promote the maximum recovery to creditors. It is also intended to promote an environment in which a consensual plan may be negotiated. *See In re Situation Mgmt. Sys.*, 252 B.R. 859, 865-66 (Bankr. D. Mass. 2000); *In re Lehigh Valley Prof'l Sports Club, Inc.*, 2000 WL 290187 at *3 (Bankr. E.D. Pa. 2000); *In re Crescent Beach Inn, Inc.*, 22 B.R. 155, 161 (Bankr. D. Me. 1982); *cf. In re Dow Corning Corp.*, 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997) ("the primary consideration should be whether . . . doing so would facilitate moving the case forward").

2

3.    Any Finding of Fact which should more appropriately be characterized as a Conclusion of Law shall be considered a Conclusion of Law herein. Similarly, any Conclusion of Law which should more appropriately be characterized as a Finding of Fact shall be considered a Finding of Fact herein.

# # #