# EXHIBIT B
# (Part 1)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LNR PARTNERS, LLC and LNR
SECURITIES HOLDINGS, LLC,

        Plaintiffs,

- against -

CRES INVESTMENT NO. II, LP,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Index No.
Date Purchased: October 27, 2010

Plaintiff designates New York County as
the place of trial.

Venue is based on CPLR § 503

**SUMMONS**

TO THE ABOVE-NAMED DEFENDANTS:

    YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the plaintiffs' attorneys within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York). In case of failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:  New York, New York
    October 27, 2010

          HERRICK, FEINSTEIN LLP

          By: _____
            Scott T. Tross
            Lauren K. Podesta
          Attorneys for Plaintiffs
          2 Park Avenue
          New York, New York 10016
          (212) 592-1400

Defendant's Address:

CRES Investment No. II, LP
8350 North Central Expressway
Suite 1275
Dallas, Texas 75206

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LNR PARTNERS, LLC and LNR
SECURITIES HOLDINGS, LLC,

                                    Plaintiffs,

- against -

CRES INVESTMENT NO. II, LP,

                                    Defendant.

Index No.

**COMPLAINT**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       Plaintiffs LNR Partners, LLC ("LNR") and LNR Securities Holdings, LLC ("LNRSH") (collectively, "Plaintiffs"), by and through their attorneys, Herrick, Feinstein LLP, as and for their Complaint in this action, respectfully allege as follows:

### The Parties

    1.    Plaintiff LNR is, and at all times hereinafter mentioned was, a Florida limited liability company, having a mailing address at 1601 Washington Avenue, Suite 700, Miami Beach, Florida 33139.

    2.    Plaintiff LNRSH is, and at all times hereinafter mentioned was, a Delaware limited liability company, having a mailing address at 1601 Washington Avenue, Suite 700, Miami Beach, Florida 33139.

    3.    Upon information and belief, defendant CRES Investment No. II, LP ("CRES" or "Defendant") is, and at all times hereinafter mentioned was, a Delaware limited partnership, having a mailing address at 8350 N. Central Expressway, Suite 1275, Dallas, Texas 75206.

4.      This action arises from the purchase by JP Morgan Capital Corporation ("JPMCC"), CRES and LNRSH on or about November 30, 2007 of certain mortgage-backed securities certificates ("Certificates") issued by a New York trust known as LB-UBS Commercial Mortgage Trust 2007-C7 (the "C7 Trust").

5.      At the time JPMCC, CRES and LNRSH purchased Certificates in the C7 Trust, they entered into a Servicer Designation Agreement that provides as follows: "JPMCC and CRES agree that so long as either owns Certificates of the Controlling Class, it shall vote such Certificates in such manner as is necessary to select, and retain, LNR, as Special Servicer."

6.      Although CRES currently owns the majority of the Certificates of the Controlling Class, it has failed and refused to appoint LNR as Special Servicer of an $825 million loan known as the Innkeepers Portfolio Mortgage Loan (the "Innkeepers Loan").

7.      Plaintiffs seek specific performance of CRES's obligation to appoint LNR as Special Servicer of the Innkeepers Loan. Alternatively, plaintiffs seek a declaratory judgment and damages.

## Factual Background

8.      The Innkeepers Loan is evidenced by two promissory notes ("Innkeepers Note A-1" and "Innkeepers Note A-2"), each in the amount of $412,701,271. The Notes are secured by mortgages on approximately 45 hotels in 16 states across the United States, including New York. Copies of Innkeepers Note A-1 and Innkeepers Note A-2 are attached hereto as Exhibits A and B, respectively.

9.      The Innkeepers Loan is governed by a Co-Lender Agreement dated as of August 13, 2007 (the "Co-Lender Agreement"), by and between Lehman Brothers Holdings, Inc., acting as initial Innkeepers Note A-1 lender, and Lehman Brothers Holdings, Inc., acting as

initial Innkeepers A-2 lender.  A copy of the Co-Lender Agreement is attached hereto as Exhibit C.

10.     Innkeepers Note A-1 was included in LB-UBS Commercial Mortgage Trust 2007-C6 (the "C6 Trust"), a New York trust created and governed by a Pooling and Servicing Agreement dated as of August 13, 2007 (the "C6 PSA"), by and among Structured Asset Securities Corporation II, as Depositor (the "Depositor"), Wachovia Bank, National Association (now Wells Fargo, N.A.), as Master Servicer (the "Master Servicer"), Midland Loan Services, Inc., as Special Servicer ("Midland"), and LaSalle Bank National Association, as Trustee (the "Trustee").  A copy of the relevant portions of the C6 PSA is attached hereto as Exhibit D.

11.     Innkeepers Note A-2 was included in the C7 Trust, a New York trust created and governed by a Pooling and Servicing Agreement dated as of November 12, 2007 (the "C7 PSA"), by and among the Depositor, the Master Servicer, LNR, as Special Servicer, and the Trustee.  A copy of the relevant portions of the C7 PSA is attached hereto as Exhibit E.

12.     A Prospectus Supplement for the C7 Trust dated November 20, 2007 (the "C7 Prospectus Supplement") stated that Midland was to be the initial special servicer for the Innkeepers Loan and that Midland could be replaced pursuant to the terms of the C6 PSA: "[Midland] is the special servicer under the [C6 PSA] and will, in that capacity, be the initial special servicer for the entire [Innkeepers Loan], subject to resignation or replacement pursuant to the terms of the [C6 PSA], including replacement, without cause, by the holders of a majority interest in the controlling class of series 2007-C6 certificates or the series 2007-C7 controlling class representative."  A copy of the relevant portions of the C7 Prospectus Supplement is attached hereto as Exhibit F.

13.     Pursuant to the terms and conditions of Section 3.02(a) of the Co-Lender Agreement, Section 6.09(d) of the C6 PSA and Section 6.11(d) of the C7 PSA, the Controlling

3

Class Representative of the C7 Trust has the right to remove and replace the Special Servicer of the Innkeepers Loan:

(a)     Section 3.02 (a) of the Co-Lender Agreement provides, in pertinent part, that "the Note A-2 Lender [the C7 Trust] may terminate the existing Special Servicer [Midland], with respect to the Mortgage Loans [Innkeepers Loan], with or without cause, and appoint a successor to any Special Servicer with respect to and solely with respect to the Mortgage Loans [Innkeepers Loan], that has resigned or been terminated. . . ." The Note A-2 Lender's rights under the Co-Lender Agreement were assigned to the C7 Trust.

(b)     Section 6.09(d) of the C6 PSA provides, in pertinent part, that "[the C7 Trust] shall be entitled, solely with respect to such Loan Combination [Innkeepers Loan], to exercise any and all rights to terminate, appoint and/or replace the Special Servicer that are granted to the Majority Controlling Class Certificateholder(s) pursuant to the first paragraph of Section 6.09(a) [of the C6 PSA] . . . ."

(c)     Section 6.11(d) of the C7 PSA provides, in pertinent part, that "the Controlling Class Representative [CRES] is hereby authorized to exercise the rights and powers of the Trustee, as holder of the [Innkeepers Loan], . . . including . . . rights to direct servicing and rights to replace the related Outside Special Servicer [Midland] . . . ."

14.     The Special Servicer for the Innkeepers Loan is responsible for maximizing recovery of the amounts due under that loan. LNR has developed unique (and superior) strategies and procedures for working with borrowers on defaulted loans designed to maximize recovery on those loans.

## The Servicer Designation Agreement

15. On or about November 30, 2007, JPMCC, LNRSH and CRES purchased Certificates in several different classes of the C7 Trust. Among the Certificates purchased by JPMCC, LNRSH and CRES were those of the Controlling Class.

16. At the time JPMCC, LNRSH and CRES purchased Certificates in the C7 Trust, they entered into the Servicer Designation Agreement. A copy of the Servicer Designation Agreement is attached hereto as Exhibit G.

17. LNRSH entered into the Servicer Designation Agreement for the purpose of ensuring that it would control -- through its special servicer affiliate, LNR -- the workout and resolution of defaulted loans held by the C7 Trust.

18. The Servicer Designation Agreement thus provides at paragraph 2 thereof as follows:

> JPMCC and CRES agree that so long as either owns Certificates of the Controlling Class, it shall vote such Certificates in such manner as is necessary to select, and retain, LNR, as Special Servicer. . . .

19. CRES is currently the Controlling Class Representative of the C7 Trust and, thus, has the power to appoint the Special Servicer of loans held by the C7 Trust. The Servicer Designation Agreement obligates CRES to select and retain LNR as Special Servicer.

20. The appointment of LNR as Special Servicer for loans held by the C7 Trust, including the Innkeepers Loan, was of vital significance to Plaintiffs. LNRSH made its investment in the C7 Trust in reliance on the fact that LNR would serve as Special Servicer.

## Plaintiffs' Accommodation to CRES

21.     In or around July 2008, Plaintiffs were advised that JPMCC intended to sell its interests in a number of classes of Certificates for the C7 Trust, including those in the Controlling Class of the C7 Trust.

22.     LNRSH decided to purchase all of JPMCC's interests in these Certificates, which would have made LNRSH the Controlling Class Representative of the C7 Trust.

23.     Prior to effectuating this purchase, LNRSH was contacted by CRES, which lacked the funds to purchase all of JPMCC's Certificates.

24.     CRES specifically requested that it be allowed to purchase enough of JPMCC's Certificates so that CRES would retain its role as Controlling Class Representative of the C7 Trust.

25.     As an accommodation to CRES, LNRSH allowed CRES to purchase enough of JPMCC's Certificates to retain its role as Controlling Class Representative of the C7 Trust. LNRSH purchased the remainder of JPMCC's Certificates.

26.     Plaintiffs' accommodation to CRES allowed it to remain as Controlling Class Representative and thus to control the removal and retention of the Special Servicer for the Innkeepers Loan.

## CRES's Subsequent Refusal to Perform

27.     The Innkeepers Loan has since gone into default and, in or about April 2010, it was transferred to Midland for special servicing. On or about July 19, 2010, the borrowers under the Innkeepers Loan commenced a Chapter 11 bankruptcy proceeding.

28.     On or about April 23, 2010, Plaintiffs contacted CRES and requested that CRES execute the documentation necessary to terminate Midland and appoint LNR as Special Servicer of the Innkeepers Loan.

29.     In violation of the Servicer Designation Agreement, CRES has failed and refused to execute the documentation necessary to terminate Midland and appoint LNR as Special Servicer of the Innkeepers Loan.

30.     Plaintiffs believe that the prompt and expeditious designation of LNR as Special Servicer of the Innkeepers Loan is of critical importance in light of the pending Chapter 11 bankruptcy proceeding.

## First Cause of Action
### (Specific Performance/Injunctive Relief)

31.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs of the Complaint, as if fully set forth herein.

32.     In the Servicer Designation Agreement, CRES agreed that so long as it owned Certificates of the Controlling Class of the C7 Trust, it would vote such Certificates in such manner as was necessary to select and retain LNR as Special Servicer.

33.     CRES currently owns a majority of the Certificates of the Controlling Class and serves as Controlling Class Representative of the C7 Trust.

34.     The Innkeepers Loan went into default and, in or about April 2010, was transferred to Midland as Special Servicer.

35.     Beginning on or about April 23, 2010 and continuing to the present, LNR has demanded that CRES execute the documentation necessary to terminate Midland and appoint LNR as Special Servicer of the Innkeepers Loan.  To date, CRES has failed and refused to comply with this demand.

36.     CRES's failure to comply with its contractual obligations is depriving LNR of its bargained-for right to control workout and resolution of the Innkeepers Loan.

37.     Plaintiffs have no adequate remedy at law.

## Second Cause of Action
### (Declaratory Relief)

38.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs of the Complaint, as if fully set forth herein.

39.     Plaintiffs believe that the terms of the Servicer Designation Agreement, in conjunction with the Co-Lender Agreement, the C6 PSA and the C7 PSA, require CRES to perform all actions necessary to appoint LNR as Special Servicer of the Innkeepers Loan.

40.     CRES has taken the unfounded position that it is not required to appoint LNR as Special Servicer with respect to the Innkeepers Loan.

41.     Accordingly, there exists a real and actual controversy between Plaintiffs and Defendant with respect to whether CRES is obligated to perform all actions necessary to appoint LNR as Special Servicer of the Innkeepers Loan.

42.     Plaintiffs are entitled to a judgment declaring that CRES is required to perform all actions necessary to appoint LNR as Special Servicer with respect to the Innkeepers Loan.

## Third Cause of Action
### (Breach of Contract)

43.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs of the Complaint, as if fully set forth herein.

44.     The Servicer Designation Agreement constitutes a valid contract and the parties agreed to be bound by the provisions contained therein.

45.     Despite repeated requests, CRES has failed and refused to comply with its obligation under the Servicer Designation Agreement to terminate Midland and appoint LNR as Special Servicer of the Innkeepers Loan.

46.     Such failure constitutes a breach of the Servicer Designation Agreement.

8

47.     By reason of Defendant's breach, Plaintiffs have suffered damages and will continue to suffer damages for so long as LNR is not appointed Special Servicer of the Innkeepers Loan.

**WHEREFORE,** Plaintiffs respectfully request judgment in their favor and against Defendant as follows:

a.     on their First Cause of Action, directing CRES to comply with the terms of the Servicer Designation Agreement and to take all steps necessary to appoint LNR as Special Servicer of the Innkeepers Loan;

b.     on their Second Cause of Action, declaring that CRES is required to perform all actions necessary to appoint LNR as Special Servicer with respect to the Innkeepers Loan;

c.     on their Third Cause of Action, awarding Plaintiffs money damages in an amount to be determined at trial, together with pre-judgment interest;

d.     awarding Plaintiffs the attorneys' fees, costs and expenses they incur in prosecuting this action; and

e.     granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
     October 27, 2010

HERRICK, FEINSTEIN LLP

By: _____
    Scott T. Tross, Esq.
    Lauren K. Podesta, Esq.
Attorneys For Plaintiffs
2 Park Avenue
New York, New York 10016
212.592.1400

# EXHIBIT A



(Fixed Portfolio)

## REPLACEMENT PROMISSORY NOTE A-1

$412,701,271                                                    New York, New York
                                                                 August 9, 2007

**FOR VALUE RECEIVED, EACH OF THE PERSONS SET FORTH ON
SCHEDULE I ATTACHED HERETO,** each a Delaware limited liability company, each
having its principal place of business at c/o Apollo Investment Corporation, 9 West 57th Street,
New York, New York 10019, jointly and severally as maker (each individually and collectively,
as the context requires, "**Borrower**"), hereby unconditionally promise to pay to the order of
**LEHMAN ALI INC.**, a Delaware corporation, having an address at 399 Park Avenue, New
York, New York 10022, as payee, individually as Lender and as Agent for one or more Co-
Lenders, ("**Lender**") or at such other place as the holder hereof may from time to time designate
in writing, the principal sum of Four Hundred Twelve Million Seven Hundred One Thousand
Two Hundred Seventy One and 00/100 Dollars ($412,701,271), in lawful money of the United
States of America with interest thereon to be computed from the date of this Note at the
Applicable Interest Rate and to be paid in accordance with the terms of this Note and that certain
Loan Agreement, dated as of June 29, 2007, between Borrower and Lender, as modified by that
certain First Amendment to Loan Agreement, dated as of the date hereof, between Borrower and
Lender (such Loan Agreement, as the same has been and may be amended, supplemented,
restated or otherwise modified from time to time, is hereinafter referred to as the "**Loan
Agreement**"). All capitalized terms not defined herein shall have the respective meanings set
forth in the Loan Agreement. This Note is the Note A-1 promissory note referred to in the Loan
Agreement which Note A-1, together with Note A-2 (defined below), evidences the Loan made
by Lender to Borrower pursuant to the Loan Agreement and the other Loan Documents.

### ARTICLE 1 - PAYMENT TERMS

Borrower agrees to pay the principal sum of this Note and interest on the unpaid principal
sum of this Note from time to time outstanding at the rates and at the times specified in the Loan
Agreement and the outstanding balance of the principal sum of this Note and all accrued and
unpaid interest thereon shall be due and payable on the Maturity Date.

### ARTICLE 2 - DEFAULT AND ACCELERATION

The Debt shall without notice become immediately due and payable at the option of
Lender if any payment required in this Note is not paid on or prior to the date when due or if not
paid on the Maturity Date or on the happening of any other Event of Default and in addition,
Lender shall be entitled to receive interest on the entire unpaid principal sum at the Default Rate
pursuant to the terms of the Loan Agreement. This Article 2, however, shall not be construed as
an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any
other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

## ARTICLE 3 - LOAN DOCUMENTS

This Note is secured by the Security Instruments and the other Loan Documents. All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instruments and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. In the event of a conflict or inconsistency between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

## ARTICLE 4 - SAVINGS CLAUSE

This Note and the Loan Agreement are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If, by the terms of this Note, the Loan Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

## ARTICLE 5 - NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## ARTICLE 6 - WAIVERS

Each Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment and all other notices of any kind. No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement or the other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of each Borrower, and any other Person who may become liable for the payment of all or any part of the Debt, under this Note, the Loan

-2-

Agreement or the other Loan Documents. No notice to or demand on either Borrower shall be deemed to be a waiver of the obligation of any Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents. If any Borrower is a partnership, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals or entities comprising the partnership, and the term "Borrower," as used herein, shall include any alternate or successor partnership, but any predecessor partnership and their partners shall not thereby be released from any liability. If any Borrower is a corporation, the agreements contained herein shall remain in full force and be applicable notwithstanding any changes in the shareholders comprising, or the officers and directors relating to, the corporation, and the term "Borrower" as used herein, shall include any alternate or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder. If any Borrower is a limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the members comprising the limited liability company, and the term "Borrower" as used herein, shall include any alternate or successor limited liability company, but any predecessor limited liability company and their members shall not thereby be released from any liability. (Nothing in the foregoing sentence shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, corporation or limited liability company which may be set forth in the Loan Agreement, the Security Instruments or any other Loan Document.) If Borrower consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

## ARTICLE 7 - TRANSFER

Upon the transfer of this Note, Borrower hereby waiving notice of any such transfer, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

## ARTICLE 8 - EXCULPATION

Notwithstanding anything to the contrary contained in this Note, the liability of Borrower to pay the Debt and for the performance of the other agreements, covenants and obligations contained herein and in the Security Instruments, the Loan Agreement and the other Loan Documents shall be limited as set forth in Section 9.4 of the Loan Agreement.

## ARTICLE 9 - GOVERNING LAW

This Note shall be governed in accordance with the terms and provisions of Section 10.3 of the Loan Agreement.

## ARTICLE 10 - NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Section 10.6 of the Loan Agreement.

## ARTICLE 11 – JOINT AND SEVERAL LIABILITY

Each Borrower acknowledges and agrees that it shall be jointly and severally liable for the obligations of all Borrowers under the Loan Documents.

## ARTICLE 12 – REPLACEMENT OF ORIGINAL NOTE

This Note is being delivered simultaneously with that certain Replacement Promissory Note A-2 made by Borrower to Lender, dated as of the date hereof, in the principal amount of $412,701,271 ("**Note A-2**"). This Note and Note A-2 together are intended to replace and supersede that certain Amended, Restated and Consolidated Promissory Note made by Borrower to Lender, dated as of June 29, 2007, in the original principal amount of $825,402,542 (the "**Original Note**"). This Note and Note A-2 together evidence the same indebtedness evidenced by the Original Note. Neither this Note nor Note A-2 is intended to, nor shall be construed to, constitute a novation of the Original Note or the obligations evidenced thereby.

## [NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, Borrower has duly executed this Promissory Note as of the day and year first above written.

**BORROWER:**

**GRAND PRIX BELMONT LLC**
**GRAND PRIX CAMPBELL/SAN JOSE LLC**
**GRAND PRIX EL SEGUNDO LLC**
**GRAND PRIX FREMONT LLC**
**GRAND PRIX MOUNTAIN VIEW LLC**
**GRAND PRIX SAN JOSE LLC**
**GRAND PRIX SAN MATEO LLC**
**GRAND PRIX SILI I LLC**
**GRAND PRIX SILI II LLC**
**GRAND PRIX DENVER LLC**
**GRAND PRIX ENGLEWOOD/DENVER SOUTH LLC**
**GRAND PRIX SHELTON LLC**
**GRAND PRIX WINDSOR LLC**
**GRAND PRIX ALTAMONTE LLC**
**GRAND PRIX FT. LAUDERDALE LLC**
**GRAND PRIX NAPLES LLC**
**GRAND PRIX ATLANTA LLC**
**GRAND PRIX ATLANTA (PEACHTREE CORNERS) LLC**
**GRAND PRIX LOMBARD LLC**
**GRAND PRIX CHICAGO LLC**
**GRAND PRIX SCHAUMBURG LLC**
**GRAND PRIX WESTCHESTER LLC**
**GRAND PRIX LEXINGTON LLC**
**GRAND PRIX LOUISVILLE (RI) LLC**
**GRAND PRIX COLUMBIA LLC**
**GRAND PRIX GAITHERSBURG LLC**
**GRAND PRIX GERMANTOWN LLC**
**GRAND PRIX PORTLAND LLC**
**GRAND PRIX LIVONIA LLC**
**GRAND PRIX CHERRY HILL LLC**
**GRAND PRIX MT. LAUREL LLC**
**GRAND PRIX SADDLE RIVER LLC**
**GRAND PRIX ISLANDIA LLC**
**GRAND PRIX BINGHAMTON LLC**
**GRAND PRIX HORSHAM LLC**
**GRAND PRIX WILLOW GROVE LLC**
**GRAND PRIX ADDISON (RI) LLC**
**GRAND PRIX ARLINGTON LLC**

**GRAND PRIX LAS COLINAS LLC**
**GRAND PRIX RICHMOND LLC**
**GRAND PRIX RICHMOND (NORTHWEST) LLC**
**GRAND PRIX BELLEVUE LLC**
**GRAND PRIX BOTHELL LLC**
**GRAND PRIX LYNNWOOD LLC**
**GRAND PRIX TUKWILA LLC,**
each a Delaware limited liability company

By: _____
Name:     Mark A. Murphy
Title:      Vice President

## SCHEDULE I

## BORROWER

| | |
|---|---|
| Grand Prix Belmont LLC | Grand Prix Louisville (RI) LLC |
| Grand Prix Campbell/San Jose LLC | Grand Prix Columbia LLC |
| Grand Prix El Segundo LLC | Grand Prix Gaithersburg LLC |
| Grand Prix Fremont LLC | Grand Prix Germantown LLC |
| Grand Prix Mountain View LLC | Grand Prix Portland LLC |
| Grand Prix San Jose LLC | Grand Prix Livonia LLC |
| Grand Prix San Mateo LLC | Grand Prix Cherry Hill LLC |
| Grand Prix Sili I LLC | Grand Prix Mt. Laurel LLC |
| Grand Prix Sili II LLC | Grand Prix Saddle River LLC |
| Grand Prix Denver LLC | Grand Prix Islandia LLC |
| Grand Prix Englewood/Denver South LLC | Grand Prix Binghamton LLC |
| Grand Prix Shelton LLC | Grand Prix Horsham LLC |
| Grand Prix Windsor LLC | Grand Prix Willow Grove LLC |
| Grand Prix Altamonte LLC | Grand Prix Addison (RI) LLC |
| Grand Prix Ft. Lauderdale LLC | Grand Prix Arlington LLC |
| Grand Prix Naples LLC | Grand Prix Las Colinas LLC |
| Grand Prix Atlanta LLC | Grand Prix Richmond LLC |
| Grand Prix Atlanta (Peachtree Corners) LLC | Grand Prix Richmond (Northwest) LLC |
| Grand Prix Lombard LLC | Grand Prix Bellevue LLC |
| Grand Prix Chicago LLC | Grand Prix Bothell LLC |
| Grand Prix Schaumburg LLC | Grand Prix Lynnwood LLC |
| Grand Prix Westchester LLC | Grand Prix Tukwila LLC |
| Grand Prix Lexington LLC | |

# EXHIBIT B



(Fixed Portfolio)

## REPLACEMENT PROMISSORY NOTE A-2

$412,701,271

New York, New York
August 9, 2007

**FOR VALUE RECEIVED, EACH OF THE PERSONS SET FORTH ON SCHEDULE I** ATTACHED HERETO, each a Delaware limited liability company, each having its principal place of business at c/o Apollo Investment Corporation, 9 West 57th Street, New York, New York 10019, jointly and severally as maker (each individually and collectively, as the context requires, "**Borrower**"), hereby unconditionally promise to pay to the order of **LEHMAN ALI INC.**, a Delaware corporation, having an address at 399 Park Avenue, New York, New York 10022, as payee, individually as Lender and as Agent for one or more Co-Lenders, ("**Lender**") or at such other place as the holder hereof may from time to time designate in writing, the principal sum of Four Hundred Twelve Million Seven Hundred One Thousand Two Hundred Seventy One and 00/100 Dollars ($412,701,271), in lawful money of the United States of America with interest thereon to be computed from the date of this Note at the Applicable Interest Rate and to be paid in accordance with the terms of this Note and that certain Loan Agreement, dated as of June 29, 2007, between Borrower and Lender, as modified by that certain First Amendment to Loan Agreement, dated as of the date hereof, between Borrower and Lender (such Loan Agreement, as the same has been and may be amended, supplemented, restated or otherwise modified from time to time, is hereinafter referred to as the "**Loan Agreement**"). All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement. This Note is the Note A-2 promissory note referred to in the Loan Agreement which Note A-2, together with Note A-1 (defined below), evidences the Loan made by Lender to Borrower pursuant to the Loan Agreement and the other Loan Documents.

### ARTICLE 1 - PAYMENT TERMS

Borrower agrees to pay the principal sum of this Note and interest on the unpaid principal sum of this Note from time to time outstanding at the rates and at the times specified in the Loan Agreement and the outstanding balance of the principal sum of this Note and all accrued and unpaid interest thereon shall be due and payable on the Maturity Date.

### ARTICLE 2 - DEFAULT AND ACCELERATION

The Debt shall without notice become immediately due and payable at the option of Lender if any payment required in this Note is not paid on or prior to the date when due or if not paid on the Maturity Date or on the happening of any other Event of Default and in addition, Lender shall be entitled to receive interest on the entire unpaid principal sum at the Default Rate pursuant to the terms of the Loan Agreement. This Article 2, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

## ARTICLE 3 - LOAN DOCUMENTS

This Note is secured by the Security Instruments and the other Loan Documents. All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instruments and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. In the event of a conflict or inconsistency between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

## ARTICLE 4 - SAVINGS CLAUSE

This Note and the Loan Agreement are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If, by the terms of this Note, the Loan Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

## ARTICLE 5 - NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## ARTICLE 6 - WAIVERS

Each Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment and all other notices of any kind. No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement or the other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of each Borrower, and any other Person who may become liable for the payment of all or any part of the Debt, under this Note, the Loan

Agreement or the other Loan Documents. No notice to or demand on either Borrower shall be deemed to be a waiver of the obligation of any Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents. If any Borrower is a partnership, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals or entities comprising the partnership, and the term "Borrower," as used herein, shall include any alternate or successor partnership, but any predecessor partnership and their partners shall not thereby be released from any liability. If any Borrower is a corporation, the agreements contained herein shall remain in full force and be applicable notwithstanding any changes in the shareholders comprising, or the officers and directors relating to, the corporation, and the term "Borrower" as used herein, shall include any alternate or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder. If any Borrower is a limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the members comprising the limited liability company, and the term "Borrower" as used herein, shall include any alternate or successor limited liability company, but any predecessor limited liability company and their members shall not thereby be released from any liability. (Nothing in the foregoing sentence shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, corporation or limited liability company which may be set forth in the Loan Agreement, the Security Instruments or any other Loan Document.) If Borrower consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

## ARTICLE 7 - TRANSFER

Upon the transfer of this Note, Borrower hereby waiving notice of any such transfer, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

## ARTICLE 8 - EXCULPATION

Notwithstanding anything to the contrary contained in this Note, the liability of Borrower to pay the Debt and for the performance of the other agreements, covenants and obligations contained herein and in the Security Instruments, the Loan Agreement and the other Loan Documents shall be limited as set forth in Section 9.4 of the Loan Agreement.

## ARTICLE 9 - GOVERNING LAW

This Note shall be governed in accordance with the terms and provisions of Section 10.3 of the Loan Agreement.

## ARTICLE 10 - NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Section 10.6 of the Loan Agreement.

## ARTICLE 11 – JOINT AND SEVERAL LIABILITY

Each Borrower acknowledges and agrees that it shall be jointly and severally liable for the obligations of all Borrowers under the Loan Documents.

## ARTICLE 12 – REPLACEMENT OF ORIGINAL NOTE

This Note is being delivered simultaneously with that certain Replacement Promissory Note A-1 made by Borrower to Lender, dated as of the date hereof, in the principal amount of $412,701,271 ("**Note A-1**"). This Note and Note A-1 together are intended to replace and supersede that certain Amended, Restated and Consolidated Promissory Note made by Borrower to Lender, dated as of June 29, 2007, in the original principal amount of $825,402,542 (the "**Original Note**"). This Note and Note A-1 together evidence the same indebtedness evidenced by the Original Note. Neither this Note nor Note A-1 is intended to, nor shall be construed to, constitute a novation of the Original Note or the obligations evidenced thereby.

## [NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, Borrower has duly executed this Promissory Note as of the day and year first above written.

**BORROWER:**

**GRAND PRIX BELMONT LLC**
**GRAND PRIX CAMPBELL/SAN JOSE LLC**
**GRAND PRIX EL SEGUNDO LLC**
**GRAND PRIX FREMONT LLC**
**GRAND PRIX MOUNTAIN VIEW LLC**
**GRAND PRIX SAN JOSE LLC**
**GRAND PRIX SAN MATEO LLC**
**GRAND PRIX SILI I LLC**
**GRAND PRIX SILI II LLC**
**GRAND PRIX DENVER LLC**
**GRAND PRIX ENGLEWOOD/DENVER SOUTH LLC**
**GRAND PRIX SHELTON LLC**
**GRAND PRIX WINDSOR LLC**
**GRAND PRIX ALTAMONTE LLC**
**GRAND PRIX FT. LAUDERDALE LLC**
**GRAND PRIX NAPLES LLC**
**GRAND PRIX ATLANTA LLC**
**GRAND PRIX ATLANTA (PEACHTREE CORNERS) LLC**
**GRAND PRIX LOMBARD LLC**
**GRAND PRIX CHICAGO LLC**
**GRAND PRIX SCHAUMBURG LLC**
**GRAND PRIX WESTCHESTER LLC**
**GRAND PRIX LEXINGTON LLC**
**GRAND PRIX LOUISVILLE (RI) LLC**
**GRAND PRIX COLUMBIA LLC**
**GRAND PRIX GAITHERSBURG LLC**
**GRAND PRIX GERMANTOWN LLC**
**GRAND PRIX PORTLAND LLC**
**GRAND PRIX LIVONIA LLC**
**GRAND PRIX CHERRY HILL LLC**
**GRAND PRIX MT. LAUREL LLC**
**GRAND PRIX SADDLE RIVER LLC**
**GRAND PRIX ISLANDIA LLC**
**GRAND PRIX BINGHAMTON LLC**
**GRAND PRIX HORSHAM LLC**
**GRAND PRIX WILLOW GROVE LLC**
**GRAND PRIX ADDISON (RI) LLC**
**GRAND PRIX ARLINGTON LLC**

S-1

GRAND PRIX LAS COLINAS LLC
GRAND PRIX RICHMOND LLC
GRAND PRIX RICHMOND (NORTHWEST) LLC
GRAND PRIX BELLEVUE LLC
GRAND PRIX BOTHELL LLC
GRAND PRIX LYNNWOOD LLC
GRAND PRIX TUKWILA LLC,
each a Delaware limited liability company

By: _____
Name:    Mark A. Murphy
Title:    Vice President

## SCHEDULE I

## BORROWER

| | |
|---|---|
| Grand Prix Belmont LLC | Grand Prix Louisville (RI) LLC |
| Grand Prix Campbell/San Jose LLC | Grand Prix Columbia LLC |
| Grand Prix El Segundo LLC | Grand Prix Gaithersburg LLC |
| Grand Prix Fremont LLC | Grand Prix Germantown LLC |
| Grand Prix Mountain View LLC | Grand Prix Portland LLC |
| Grand Prix San Jose LLC | Grand Prix Livonia LLC |
| Grand Prix San Mateo LLC | Grand Prix Cherry Hill LLC |
| Grand Prix Sili I LLC | Grand Prix Mt. Laurel LLC |
| Grand Prix Sili II LLC | Grand Prix Saddle River LLC |
| Grand Prix Denver LLC | Grand Prix Islandia LLC |
| Grand Prix Englewood/Denver South LLC | Grand Prix Binghamton LLC |
| Grand Prix Shelton LLC | Grand Prix Horsham LLC |
| Grand Prix Windsor LLC | Grand Prix Willow Grove LLC |
| Grand Prix Altamonte LLC | Grand Prix Addison (RI) LLC |
| Grand Prix Ft. Lauderdale LLC | Grand Prix Arlington LLC |
| Grand Prix Naples LLC | Grand Prix Las Colinas LLC |
| Grand Prix Atlanta LLC | Grand Prix Richmond LLC |
| Grand Prix Atlanta (Peachtree Corners) LLC | Grand Prix Richmond (Northwest) LLC |
| Grand Prix Lombard LLC | Grand Prix Bellevue LLC |
| Grand Prix Chicago LLC | Grand Prix Bothell LLC |
| Grand Prix Schaumburg LLC | Grand Prix Lynnwood LLC |
| Grand Prix Westchester LLC | Grand Prix Tukwila LLC |
| Grand Prix Lexington LLC | |

# EXHIBIT C

## CO-LENDER AGREEMENT

Dated as of August 13, 2006

by and between

**LEHMAN BROTHERS HOLDINGS INC.**
(Initial Note A-1 Lender)

and

**LEHMAN BROTHERS HOLDINGS INC.**
(Initial Note A-2 Lender)

$825,402,542 Original Principal Amount of
Commercial Mortgage Loans

secured by the Innkeepers Portfolio consisting of
liens on the fee simple interests in
a portfolio of 45 hotels
located in sixteen states across the United States

# TABLE OF CONTENTS

Page

## ARTICLE I

### DEFINITIONS; GENERAL INTERPRETIVE PRINCIPLES

Section 1.01.  Defined Terms. ..................................................................................4
Section 1.02.  General Interpretive Principles. ............................................................15
Section 1.03.  Interpreting this Agreement and the Loan Agreement. ...........................15

## ARTICLE II

### RETENTION OF LOAN DOCUMENTS; REPRESENTATIONS AND WARRANTIES

Section 2.01.  Relative Rights of the Lenders...............................................................17
Section 2.02.  Delivery and Retention of Note A-2; Delivery and Retention of Mortgage
File (Exclusive of Note A-2); Record Title. ..........................................17
Section 2.03.  Delivery of Servicing File, Escrow Payments and Reserve Funds to the
Master Servicer. ..................................................................................18
Section 2.04.  Representations, Warranties and Covenants of the Lenders....................18
Section 2.05.  Independent Analysis of Each Lender. ...................................................20
Section 2.06.  Notes Not Securities. ..........................................................................20

## ARTICLE III

### ADMINISTRATION AND SERVICING OF THE MORTGAGE LOANS

Section 3.01.  General Servicing Matters. ..................................................................21
Section 3.02.  Certain Powers of the Directing Lender. ...............................................25

## ARTICLE IV

### PAYMENTS TO LENDERS

Section 4.01.  Application of Payments; Allocation of Collections; Remittances. .......29
Section 4.02.  [RESERVED] ......................................................................................31
Section 4.03.  Advances............................................................................................31
Section 4.04.  Sharing of Certain Expenses................................................................32

## ARTICLE V

### TERMINATION

Section 5.01.  Termination.........................................................................................33

# TABLE OF CONTENTS
(Continued)

## ARTICLE VI

### MISCELLANEOUS PROVISIONS

Section 6.01.  Modification, Extension, Amendment or Waiver in Writing. ...............................34
Section 6.02.  Recordation of Agreement; Counterparts. .............................................................34
Section 6.03.  Governing Law. ...................................................................................................34
Section 6.04.  Notices. ................................................................................................................34
Section 6.05.  Severability of Provisions. ...................................................................................35
Section 6.06.  Successors and Assigns; Beneficiaries. ................................................................35
Section 6.07.  Specific Performance. ..........................................................................................35
Section 6.08.  Bankruptcy Matters. .............................................................................................35
Section 6.09.  Assignments and Securitizations. .........................................................................36
Section 6.10.  Article and Section Headings. ..............................................................................36
Section 6.11.  Notices to Rating Agencies. .................................................................................36
Section 6.12.  No Joint Venture, Not a Security. .........................................................................36
Section 6.13.  Cooperation. .........................................................................................................37
Section 6.14.  Entire Agreement. .................................................................................................38
Section 6.15.  Bifurcation of Note A-1 or Note A-2. ...................................................................38

## TABLE OF CONTENTS
(Continued)

**EXHIBITS**

Exhibit No.        Exhibit Description

I                  Mortgage Loan Schedule

This Co-Lender Agreement (this "Agreement") is dated and effective as of August 13, 2006, between LEHMAN BROTHERS HOLDINGS INC. as Initial Note A-1 Lender and LEHMAN BROTHERS HOLDINGS INC. as Initial Note A-2 Lender.

PRELIMINARY STATEMENT:

A mortgage loan (the "Original Mortgage Loan") was made by LEHMAN ALI INC. ("Lehman ALI") or an affiliate thereof, as lender (in such capacity, the "Original Lender") to Grand Prix Belmont LLC, Grand Prix Campbell/San Jose LLC, Grand Prix El Segundo LLC, Grand Prix Fremont LLC, Grand Prix Mountain View, LLC, Grand Prix San Jose, LLC, Grand Prix San Mateo, LLC, Grand Prix Sili I LLC, Grand Prix Sili II LLC, Grand Prix Denver LLC, Grand Prix Englewood/Denver South LLC, Grand Prix Shelton LLC, Grand Prix Windsor LLC, Grand Prix Altamonte LLC, Grand Prix Ft. Lauderdale LLC, Grand Prix Naples LLC, Grand Prix Atlanta LLC, Grand Prix Atlanta (Peachtree Corners) LLC, Grand Prix Lombard LLC, Grand Prix Chicago LLC, Grand Prix Schaumburg LLC, Grand Prix Westchester LLC, Grand Prix Lexington LLC, Grand Prix Louisville (RI) LLC, Grand Prix Columbia LLC, Grand Prix Gaithersburg LLC, Grand Prix Germantown LLC, Grand Prix Portland LLC, Grand Prix Livonia LLC, Grand Prix Cherry Hill LLC, Grand Prix Mt. Laurel LLC, Grand Prix Saddle River LLC, Grand Prix Islandia LLC, Grand Prix Binghamton LLC, Grand Prix Horsham LLC, Grand Prix Willow Grove LLC, Grand Prix Addison (RI) LLC, Grand Prix Arlington LLC, Grand Prix Los Colinas LLC, Grand Prix Richmond LLC, Grand Prix Richmond (Northwest) LLC, Grand Prix Bellevue LLC, Grand Prix Bothell LLC, Grand Prix Lynnwood LLC, Grand Prix Tukwila LLC (jointly and severally, together with their successors and permitted assigns as borrower under the Loan Documents (as defined herein), the "Borrower"), on June 29, 2007, and was represented by one (1) promissory note (the "Original Note") in the aggregate principal amount of $825,402,542. On or about the execution and delivery of this Agreement, Lehman ALI restructured the original Mortgage Loan and the Borrower executed and delivered Replacement Promissory Note A-1 and Replacement Promissory Note A-2 (each as defined below), which Replacement Promissory Note A-1 and Replacement Promissory Note A-2 have an aggregate principal balance and possess the aggregate rights (other than as set forth in this Agreement) of the Original Notes.

Replacement Promissory Note A-1 and Replacement Promissory Note A-2 will represent, respectively, two mortgage loans having an aggregate principal balance and possessing the aggregate rights (other than as set forth in this Agreement) of the Original Mortgage Loan. Those two mortgage loans made by Lehman as lender to the Borrower are as follows:

1.      the mortgage loan (the "Note A-1 Mortgage Loan") evidenced by that certain Replacement Promissory Note A-1 dated August 9, 2007 (as such may be extended, renewed, replaced, restated or modified from time to time, "Note A-1"), with a principal amount as of the date hereof of $412,701,271; and

2.      the mortgage loan (the "Note A-2 Mortgage Loan") evidenced by that certain Replacement Promissory Note A-2 dated August 9, 2007 (as such may be extended, renewed, replaced, restated or modified from time to time, "Note A-2"), with a principal amount as of the date hereof of $412,701,271.

The Note A-1 Mortgage Loan and the Note A-2 Mortgage Loan, with an aggregate principal amount as of the date hereof of $825,402,542, are referred to herein, collectively, as the "Mortgage Loans" and each, as a "Mortgage Loan". Each of Note A-1 and Note A-2 are referred to individually herein as a "Note" and together as the "Notes".

The terms and conditions of the Notes are further specified in a loan agreement dated as of June 29, 2007 (as amended by the first amendment to the loan agreement dated August 9, 2007 and as such may have been further amended or restated to the date hereof and may hereafter be further amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), between Lehman ALI as lender and the Borrower. Payment of the Notes is secured by, among other things, that certain collateral assignment of security agreement dated as of June 29, 2007 (as such may have been amended or restated to the date hereof and may hereafter be further amended, restated, supplemented or otherwise modified from time to time, the "Mortgage"), encumbering the Borrower's fee simple interest and leasehold interest in the properties identified in the Series 2007-C6 Pooling and Servicing Agreement as the Innkeepers Portfolio (the "Innkeepers Portfolio"), whereby the Borrower grants a security interest in its interest under the leases at the Mortgaged Property as further collateral.

If the Original Lender is not Lehman Brothers Holdings Inc. ("LBHI"), then prior to the execution and delivery of this Agreement, the Original Lender transferred the Mortgage Loans to LBHI pursuant to one or more agreements and/or instruments between the Original Lender and LBHI. As of the time at which this Agreement is being executed and delivered, LBHI is the sole owner of Note A-1 and Note A-2.

It is anticipated with respect to the Mortgage Loans that, simultaneously with or shortly after the execution and delivery of this Agreement, the Note A-1 Mortgage Loan will be transferred to LaSalle Bank National Association ("LaSalle"), as trustee (in such capacity, the "Series 2007-C6 Trustee") for a securitization involving the issuance of the LB-UBS Commercial Mortgage Trust 2007-C6, Commercial Mortgage Pass-Through Certificates, Series 2007-C6 (such securitization, the "Note A-1 Securitization") and the Series 2007-C6 Trustee, in its capacity as holder of Note A-1, together with its successors and assigns, is referred to in this Agreement as the "Note A-1 Lender". The Note A-2 Mortgage Loan will initially be retained by LBHI.

It is anticipated that, subject to Section 6.15, each Note may be further subdivided and, in such event, will be split and reissued as one or more replacement notes that, in the case of such subdivided Note, have an aggregate principal balance and possess the aggregate rights (other than as set forth in this Agreement) of such subdivided Note on the date of the reissuance.

It is further contemplated that Note A-2, whether in its current form or as multiple replacement promissory notes, will, subsequent to the date hereof, be securitized in one or more transactions (each such securitization transaction, a "Note A-2 Securitization").

Each holder of a Note from time to time (or, whenever there are multiple holders thereof, all such holders collectively) will constitute a "Lender"; and the holders of the Notes from time to time will collectively constitute the "Lenders".

Among other things, the parties hereto desire to define the relative rights and powers of the Lenders with respect to the Mortgage Loans and to provide for servicing and administration of the Mortgage Loans and/or the Mortgaged Property under specific circumstances identified herein.

In consideration of the mutual agreements herein contained, the parties hereto agree as follows:

## ARTICLE I

### DEFINITIONS; GENERAL INTERPRETIVE PRINCIPLES

Section 1.01. Defined Terms.

Whenever used in this Agreement, including in the Preliminary Statement, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Article. Capitalized terms used but not defined in this Agreement have the respective meanings assigned thereto in the Applicable Servicing Agreement.

"Advance" shall mean, from and after the Securitization Date, any P&I Advance or Servicing Advance.

"Advance Interest" shall mean, with respect to any Advance, all interest paid or payable, as the context may require, to any Servicer or any other party under any Servicing Agreement or Securitization Agreement with respect to Advances made by such Servicer or other party.

"Adverse Grantor Trust Event" shall mean, with respect to any Related Grantor Trust, any impairment of the status of such Related Grantor Trust as a Grantor Trust or any imposition of a tax on such Related Grantor Trust or any of its assets or transactions.

"Adverse Rating Event" shall mean the qualification, downgrade or withdrawal of any rating then assigned by any Rating Agency to any class of Related MBS.

"Adverse REMIC Event" shall mean, with respect to any Related REMIC Pool, any endangerment of the status of such Related REMIC Pool as a REMIC under the REMIC Provisions or, except as may be expressly permitted by the Applicable Servicing Agreement, any imposition of a tax on such Related REMIC Pool or any of its assets or transactions (including the tax on prohibited transactions as defined in Section 860F(a)(2) of the Code and the tax on prohibited contributions set forth in Section 860G(d) of the Code).

"Affiliate" shall mean, with respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control," when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agreement" shall mean this Co-Lender Agreement, together with all amendments hereof and supplements hereto.

"Allocable Share" shall mean, with respect to either Mortgage Loan or either Lender, the applicable following percentage: (i) in the case of each of the Note A-1 Mortgage Loan and the Note A-1 Lender, 50%; and (ii) in the case of each of the Note A-2 Mortgage Loan and the Note A-2 Lender, 50%.

"Applicable Interest Rate" shall mean, with respect to either Mortgage Loan or any Note A Portion, the per annum rate at which interest is scheduled (in the absence of default) to accrue on such Mortgage Loan or Note A Portion, as the case may be, from time to time in accordance with (i) the terms of the related Note and the Loan Agreement (as such terms may be modified at any time following the Closing Date) and (ii) applicable law.

"Applicable Servicer" shall mean, with respect to any particular servicing or other relevant action to be taken in respect of either Mortgage Loan or any successor REO Property, the particular Servicer responsible for performing such servicing or other relevant action, pursuant to the Applicable Servicing Agreement.

"Applicable Servicing Agreement" shall mean, with respect to any particular servicing or other relevant action to be taken in respect of either Mortgage Loan or any REO Property, the particular Servicing Agreement governing the performance of such servicing or other relevant action for the benefit of the Lenders, which initially shall be the Series 2007-C6 Pooling and Servicing Agreement.

"Appraisal Reduction Amount" shall have the meaning assigned thereto in the Applicable Servicing Agreement.

"Approved Servicer" shall have the meaning assigned thereto in the definition of "Institutional Lender/Owner."

"Balloon Payment" shall mean, with respect to either Mortgage Loan, as of any date of determination, the payment, other than any regularly scheduled monthly payment, due with respect to such Mortgage Loan at maturity.

"Bankruptcy Code" shall mean the federal Bankruptcy Code, as amended from time to time (Title 11 of the United States Code).

"Borrower" shall have the meaning assigned thereto in the Preliminary Statement.

"Business Day" shall mean any day other than a Saturday, a Sunday or a day on which banking institutions in New York, New York, or in each of the cities in which the corporate trust office of the trustee, if any, under the Applicable Servicing Agreement and the Primary Servicing Offices of the Servicer(s) are located, are authorized or obligated by law or executive order to remain closed.

"CDO" shall have the meaning assigned thereto in the definition of "Institutional Lender/Owner."

"CDO Asset Manager" shall mean, with respect to any Securitization Vehicle that is a CDO, the entity that is responsible for managing or administering the subject Mortgage Loan as an underlying asset of such Securitization Vehicle or, if applicable, as an asset of any Intervening Trust Vehicle (including, without limitation, the right to exercise any consent and control rights available to the Directing Lender).

"Closing Date" shall mean August 30, 2007.

"CMSA" shall mean the Commercial Mortgage Securities Association, or any association or organization that is a successor thereto. If neither such association nor any successor remains in existence, "CMSA" shall be deemed to refer to such other association or organization as may exist whose principal membership consists of servicers, trustees, issuers, placement agents and underwriters generally involved in the commercial mortgage loan securitization industry, which is the principal such association or organization in the commercial mortgage loan securitization industry and one of whose principal purposes is the establishment of industry standards for reporting transaction-specific information relating to commercial mortgage pass-through certificates and commercial mortgage-backed bonds and the commercial mortgage loans and foreclosed properties underlying or backing them to investors holding or owning such certificates or bonds, and any successor to such other association or organization. If an organization or association described in one of the preceding sentences of this definition does not exist, "CMSA" shall be deemed to refer to such other association or organization as shall be selected by the Master Servicer and reasonably acceptable to the Series 2007-C6 Trustee and the Special Servicer or, if Note A-1 is no longer included in the Note A-1 Securitization, reasonably acceptable to the Lenders.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and regulations promulgated thereunder, including temporary regulations and proposed regulations to the extent that, by reason of their proposed effective date, could, as of the date of any determination or opinion as to the tax consequences of any action or proposed action or transaction, be applied to any Related MBS.

"Default Interest" shall mean with respect to either Mortgage Loan, any amounts collected thereon, other than late payment charges and Prepayment Premiums, that represent penalty interest (arising out of a default) in excess of interest accrued on the principal balance of such Mortgage Loan at the related Applicable Interest Rate.

"Depositor" shall mean Structured Asset Securities Corporation II and its successors.

"Determination Date" shall mean the Due Date or, if the Due Date is not a Business Day, the Business Day immediately succeeding the Due Date.

"Directing Lender" shall mean the Lenders (or their designees appointed in accordance with Section 3.02) acting jointly.

"Due Date" shall mean the 9th day of each calendar month or, if such 9th day is not a business day (within the meaning of the Loan Documents), the immediately succeeding business day.

"Enforcement Action" shall mean the commencement of the exercise of any remedies against the Borrower or the Mortgaged Property by reason of a default under the Loan Documents, including the commencement of any litigation or proceeding, including the commencement of any foreclosure proceeding, the exercise of any power of sale, the sale by advertisement, the taking of a deed or assignment in lieu of foreclosure, the obtaining of a

receiver or the taking of any other enforcement action against, or the taking possession or control of, any of the Mortgaged Property.

"Escrow Payment" shall mean any payment received by the Applicable Servicer for the account of the Borrower for application toward the payment of real estate taxes, assessments, insurance premiums, ground rents (if applicable) and other items for which an escrow has been created in respect of the Mortgaged Property.

"Excess Interest" means, as of any date of determination: (i) with respect to the Replacement A-1 Notes, any interest accrued on the aggregate unpaid principal balance of the Replacement A-1 Notes at the Excess Interest Rate; and (ii) with respect to the Replacement A-2 Notes, any interest accrued on the aggregate unpaid principal balance of the Replacement A-2 Notes at the Excess Interest Rate.

"Excess Interest Rate" means, as of any date of determination: (i) with respect to the Replacement A-1 Notes, the excess (if any) of (x) the then weighted average interest rate on the Replacement A-1 Notes over (y) the Applicable Interest Rate of Note A-1 immediately prior to the reissuance of any Replacement A-1 Notes; and (ii) with respect to the Replacement A-2 Notes, the excess (if any) of (x) the then weighted average interest rate on the Replacement A-2 Notes over (y) the Applicable Interest Rate of Note A-2 immediately prior to the reissuance of any Replacement A-2 Notes. Any determination in this definition of a weighted average interest rate shall be calculated based on the relative principal balances of the subject Replacement Notes.

"Exchange Act" shall have the meaning assigned to such term in Section 6.12.

"Grantor Trust" shall mean any "grantor trust" within the meaning of Subpart E of Subchapter J of the Code, including Treasury regulations section 301.7701-4(c)(2).

"Hazardous Materials" shall mean petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; toxic mold and fungi; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Mortgaged Property is prohibited by any environmental law; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," "pollutant" or other words of similar import within the meaning of any environmental law.

"Insolvency Proceeding" shall mean any proceeding under the Bankruptcy Code or any other insolvency, liquidation, reorganization or other similar proceeding concerning the Borrower, any action for the dissolution of the Borrower, any proceeding (judicial or otherwise) concerning the application of the assets of the Borrower, for the benefit of its creditors, the appointment of or any proceeding seeking the appointment of a trustee, receiver or other similar custodian for all or any substantial part of the assets of the Borrower or any other action concerning the adjustment of the debts of the Borrower, the cessation of business by the

Borrower, except following a sale, transfer or other disposition of all or substantially all of the assets of the Borrower in a transaction permitted under the Loan Documents.

"Institutional Lender/Owner" shall mean any of the following: (a) (i) a bank, banking association, savings and loan association, investment bank, insurance company, real estate investment trust, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan that (A) has total assets (in name or under management) in excess of $600,000,000 and (except with respect to a pension advisory firm or similar fiduciary) capital surplus, statutory surplus or shareholder's equity of at least $200,000,000, and (B) is regularly engaged in the business of making or owning commercial loans, (ii) an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, that (A) has total assets in excess of $600,000,000 and capital surplus, statutory surplus or shareholders' equity of at least $200,000,000 and (B) is regularly engaged in the business of making or owning loans of similar types to the Mortgage Loans, (iii) a Qualified Trustee (or in the case of a CDO (as defined below), a single purpose bankruptcy-remote entity which contemporaneously pledges its interest in the subject Mortgage Loan to a Qualified Trustee) in connection with (A) a securitization of, (B) the creation of collateralized debt obligations ("CDO") secured by, or (C) a financing through an "owner trust" of, any Mortgage Loan (any of the foregoing, a "Securitization Vehicle"), provided that (1) one or more classes of securities issued by such Securitization Vehicle is initially rated at least investment grade by either Moody's and Fitch or by S&P and one other nationally-recognized statistical rating agency (which may include Moody's or Fitch), (2) in the case of a Securitization Vehicle that is not a CDO, the special servicer for the Securitization Vehicle has the Required Special Servicer Rating (such entity, an "Approved Servicer") and such Approved Servicer is required to service and administer such Mortgage Loan in accordance with servicing arrangements for the assets held by the Securitization Vehicle which require that such Approved Servicer act in accordance with a servicing standard notwithstanding any contrary direction or instruction from any other Person, or (3) in the case of a Securitization Vehicle that is a CDO, the CDO Asset Manager and, if applicable, each Intervening Trust Vehicle that is not administered and managed by a CDO Asset Manager which is an Institutional Lender/Owner, are each an Institutional Lender/Owner under clauses (a)(i), (a)(ii) or (c) of this definition; or (iv) an institution substantially similar to any of the foregoing described in clauses (a)(i) or (a)(ii) of this definition which has total assets (in name or under management) in excess of $600,000,000 and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity of $200,000,000; or (b) any entity controlled by any of the entities described in clause (a)(i) above; clause (c) below; or (c) LBHI or Structured Asset Securities Corporation II. For purposes of this definition only, "control" means the ownership, directly or indirectly, in the aggregate of more than 50% of the beneficial ownership interests of an entity and the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such entity, whether through the ability to exercise voting power, by contract or otherwise. "Controlled" has the meaning correlative thereto.

"Intervening Trust Vehicle" shall mean, with respect to any Securitization Vehicle that is a CDO, a trust vehicle or entity that holds a Mortgage Loan or any Note A Portion as collateral securing (in whole or in part) any obligation or security held by such Securitization Vehicle as collateral for the CDO.

"LaSalle" shall have the meaning assigned thereto in the Preliminary Statement.

"LBHI" shall have the meaning assigned thereto in the Preliminary Statement.

"Lehman ALI" shall have the meaning assigned thereto in the Preliminary Statement.

"Lender" and "Lenders" shall have the respective meanings assigned thereto in the Preliminary Statement.

"Loan Agreement" shall have the meaning assigned thereto in the Preliminary Statement.

"Loan Documents" shall mean, collectively, the Notes, the Loan Agreement, the Mortgage and all other documents evidencing or securing any or all of the Mortgage Loans.

"Master Servicer" shall mean: (a) for so long as the Mortgage Loans or any REO Property are serviced and administered in accordance with the Series 2007-C6 Pooling and Servicing Agreement, the Series 2007-C6 Master Servicer; and (b) if and for so long as the Mortgage Loans or any REO Property are serviced and administered in accordance with any successor Servicing Agreement, the master servicer under such successor Servicing Agreement.

"Master Servicing Fee" shall mean, with respect to each Mortgage Loan, the monthly fee payable to (a) the Master Servicer pursuant to the Servicing Agreement(s) then in effect and (b) if so provided under the Securitization Agreement for the Related Securitization Trust, the master servicer for such trust.

"Maturity Date" shall have the meaning assigned thereto in the Loan Agreement.

"Monthly Payment" shall mean, as of any Due Date, the scheduled payment of principal and/or interest due on the Mortgage Loans or a particular Mortgage Loan, as the context may require, in accordance with the Loan Documents (as such amount may be changed or modified in connection with a bankruptcy or similar proceeding involving the Borrower or by reason of a modification, extension, waiver or amendment granted or agreed to by the Applicable Servicer pursuant to the Servicing Agreement then in effect and in accordance with the terms and provisions this Agreement), including the Balloon Payment payable on such Due Date; provided that the Monthly Payment shall not include Default Interest.

"Mortgage" shall have the meaning assigned thereto in the Preliminary Statement.

"Mortgage File" shall have the meaning assigned thereto in the Series 2007-C6 Pooling and Servicing Agreement (as in effect on the Closing Date).

"Mortgage Loan" and "Mortgage Loans" shall have the respective meanings assigned thereto in the Preliminary Statement and are further identified on the Mortgage Loan Schedule. As used herein, the term "Mortgage Loan" includes the Loan Documents.

"Mortgage Loan Schedule" shall mean the list attached hereto as Exhibit I, which sets forth the following information with respect to the Mortgage Loans as of the date hereof (unless another date is referenced):

        (i)      the Borrower's name;

        (ii)     the principal balance of each Mortgage Loan as of the date hereof;

        (iv)    the Applicable Interest Rate for each Mortgage Loan; and

        (v)     the Maturity Date.

"Mortgaged Property" shall mean the real property (together with all improvements and fixtures thereon) subject to the lien of the Mortgage.

"Note" and "Notes" shall have the meaning assigned thereto in the Preliminary Statement.

"Note A Portion" shall mean a Note A-1 Portion or a Note A-2 Portion.

"Note A-1" shall have the meaning assigned thereto in the Preliminary Statement.

"Note A-1 Interest Rate" shall mean the interest rate set forth in the Mortgage Loan Schedule for the Note A-1 Mortgage Loan.

"Note A-1 Lender" shall mean the holder of Note A-1.

"Note A-1 Mortgage Loan" shall have the meaning assigned thereto in the Preliminary Statement.

"Note A-1 Portion" shall have the meaning assigned thereto in Section 6.15.

"Note A-1 Principal Balance" shall mean, at any time of determination, the initial Note A-1 Principal Balance as set forth in the Mortgage Loan Schedule, less (i) any payments of principal thereon received by the Note A-1 Lender and (ii) any reductions in such amount subsequent to the Closing Date in accordance with Section 3.01(c).

"Note A-1 Securitization" shall have the meaning assigned to such term in the Preliminary Statement.

"Note A-2" shall have the meaning assigned thereto in the Preliminary Statement.

"Note A-2 Lender" shall mean the holder of Note A-2.

"Note A-2 Mortgage Loan" shall have the meaning assigned thereto in the Preliminary Statement.

"Note A-2 Portion" shall have the meaning assigned thereto in Section 6.15.

"Note A-2 Securitization" shall have the meaning assigned thereto in the Preliminary Statement.

"Original Lender" shall have the meaning assigned thereto in the Preliminary Statement.

"Original Mortgage Loan" shall have the meaning assigned thereto in the Preliminary Statement.

"Original Note" shall have the meaning assigned thereto in the Preliminary Statement.

"P&I Advance" shall mean any advance of delinquent payments of principal and/or interest made with respect to either Mortgage Loan or any REO Property by, and reimbursable to, any Servicer or any other party under a Servicing Agreement or a Securitization Agreement.

"Person" shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, limited liability company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Prepayment Premium" shall mean any premium, fee or charge paid or payable, as the context requires, by the Borrower under the Loan Documents in connection with a voluntary or involuntary principal prepayment.

"Pro Rata and Pari Passu Basis" shall mean, with respect to the Mortgage Loans and the Lenders, the allocation of any particular payment, collection, cost, expense, liability or other amount among such Mortgage Loans or such Lenders, as the case may be, without any priority of either such Mortgage Loan or either such Lender over the other Mortgage Loan or the other Lender, as the case may be, and in any event such that each of the Mortgage Loans or the Lenders, as the case may be, is allocated its Allocable Share of such particular payment, collection, cost, expense, liability or other amount.

"Primary Servicing Office" shall mean the offices of any Servicer that are primarily responsible for such party's servicing obligations under the Servicing Agreement then in effect.

"Qualified Trustee" shall mean either (i) a corporation, national bank, national banking association or a trust company, organized and doing business under the laws of any state or the United States of America, authorized under such laws to exercise corporate trust powers and to accept the trust conferred, having a combined capital and surplus of at least $100,000,000 and subject to supervision or examination by federal or state authority, (ii) an institution insured by the Federal Deposit Insurance Corporation or (iii) an institution whose long-term senior unsecured debt is rated in either of the then in effect top two rating categories of each of the Rating Agencies.

"Rating Agency" shall mean S&P or any other nationally recognized statistical rating organization that has assigned a rating to any Related MBS.

"Regulation AB" shall mean Subpart 229.1100 – Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Securities and Exchange Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506-1,631 (Jan. 7, 2005)) or by the staff of the Securities and Exchange Commission, or as may be provided by the Securities and Exchange Commission or its staff from time to time.

"Reinstatement Distribution" shall have the meaning assigned thereto in Section 6.08.

"Related Grantor Trust" shall mean any Grantor Trust that holds either Mortgage Loan (or any portion thereof or any specified collections thereon) or, after it has become REO Property, the Mortgaged Property or any interest therein.

"Related MBS" shall mean any mortgage-backed securities that are backed or secured, in whole or in part, by either Mortgage Loan or any Note A Portion or by the Mortgaged Property or any interest therein after the Mortgaged Property has become REO Property.

"Related REMIC Pool" shall mean any REMIC that holds either Mortgage Loan (or any portion thereof or any specific collections thereon) or, after it has become REO Property, the Mortgaged Property or any interest therein, as an asset.

"Related Securitization Trust" shall mean any trust (including a common law trust or a statutory trust) that holds either Mortgage Loan (or any portion thereof or any specified collections thereon) or, after it has become REO Property, the Mortgaged Property or any interest therein, as an asset in connection with the issuance of a series of Related MBS.

"REMIC" shall mean a "real estate mortgage investment conduit" as defined in Section 860D of the Code.

"REMIC Provisions" shall mean the provisions of the federal income tax law relating to real estate mortgage investment conduits, which appear at Sections 860A through 860G of Subchapter M of Chapter 1 of the Code, and related provisions, and proposed, temporary and final Treasury regulations and any published rulings, notices and announcements promulgated thereunder, as the foregoing may be in effect from time to time.

"Remittance Date" shall mean, with respect to each Mortgage Loan, the date during each calendar month, commencing in September 2007, on which, among other things, the Master Servicer is required to make remittances to or at the direction of the related Lender, pursuant to Section 4.01, which date shall be the first Business Day following the Determination Date in such calendar month.

"REO Property" shall mean a status attributed to the Mortgaged Property if it is acquired on behalf and in the name of the Lenders or their designee through foreclosure, acceptance of a deed-in-lieu of foreclosure or otherwise in accordance with applicable law in connection with the default or imminent default of the Mortgage Loans.

"Reorganization Proceeding" shall have the meaning assigned thereto in Section 6.08.

"Replacement A-1 Notes" shall have the meaning assigned thereto in Section 6.15.

"Replacement A-2 Notes" shall have the meaning assigned thereto in Section 6.15.

"Replacement Note" shall mean any Replacement A-1 Note or Replacement A-2 Note.

"Required Special Servicer Rating" shall mean (i) in the case of Fitch, Inc., a rating of "CSS3", (ii) in the case of S&P, such special servicer is on S&P's Select Servicer List as a U.S. commercial mortgage special servicer, and (iii) in the case of Moody's, such special servicer is acting as special servicer in a commercial mortgage loan securitization that was rated by Moody's within the twelve (12) month period prior to the date of determination, and Moody's has not downgraded or withdrawn the then-current rating on any class of commercial mortgage securities or placed any class of commercial mortgage securities on watch citing the continuation of such special servicer as special servicer of such commercial mortgage securities.

"Reserve Funds" shall mean any amounts delivered by the Borrower to be held by or on behalf of the Lenders representing reserves for repairs, capital improvements and/or environmental remediation in respect of the Mortgaged Property.

"S&P" shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and its successors.

"Securitization" shall mean a Note A-1 Securitization or a Note A-2 Securitization, as applicable.

"Securitization Agreement" shall mean the agreement or, collectively, the agreements pursuant to which either or both of the Mortgage Loans are included as part of a Securitization.

"Securitization Date" shall mean the date on which a Securitization is consummated.

"Securities Act" shall have the meaning assigned to such term in Section 6.13.

"Series 2007-C6 Master Servicer" shall mean Wachovia Bank, National Association or any successor master servicer appointed as provided in the Series 2007-C6 Pooling and Servicing Agreement.

"Series 2007-C6 Pooling and Servicing Agreement" shall mean that certain Pooling and Servicing Agreement dated as of August 13, 2007, between the Depositor, the Series 2007-C6 Trustee, the Series 2007-C6 Master Servicer and the Series 2007-C6 Special

Servicer, relating to the LB-UBS Commercial Mortgage Trust 2007-C6, Commercial Mortgage Pass-Through Certificates, Series 2007-C6.

"Series 2007-C6 Special Servicer" shall mean Midland Loan Services Inc., or any successor special servicer appointed with respect to the Mortgage Loans or the Mortgaged Property if it becomes an REO Property as provided in the Series 2007-C6 Pooling and Servicing Agreement.

"Series 2007-C6 Trustee" shall have the meaning assigned thereto in the Preliminary Statement, and shall included any successor trustee appointed as provided in the Series 2007-C6 Pooling and Servicing Agreement.

"Servicer" shall mean, as of any date of determination, any Master Servicer or Special Servicer then responsible for the servicing and administration of the Mortgage Loans or any REO Property, for the benefit of the Lenders, pursuant to the Applicable Servicing Agreement.

"Servicing Advances" shall mean any servicing advance or property protection advance with respect to either Mortgage Loan or any successor REO Property by, and reimbursable to, any Servicer or any other party under the Applicable Servicing Agreement or hereunder, including, without limitation, any "Servicing Advance", as such term is defined under any Applicable Servicing Agreement.

"Servicing Agreement" shall mean, as of any date of determination, any agreement then governing the servicing and administration of the Mortgage Loans and any REO Property for the benefit of the Lenders.

"Servicing File" shall mean, collectively, any and all documents (other than documents required to be part of the Mortgage File, except as provided in this definition) in the possession of the Servicer(s) and relating to the origination and servicing of the Mortgage Loans, including, without limitation, any original letter of credit (together with any transfer or assignment documents related thereto), appraisals, surveys, engineering reports, environmental reports, opinions of counsel to the Borrower, escrow agreements, property management agreements and copies of either Note that does not constitute part of the Mortgage File.

"Servicing Standard" shall mean the standard of care that is to be applied by any Applicable Servicer in servicing and administering the Mortgage Loans, the Mortgaged Property and any REO Property, as set forth in the Applicable Servicing Agreement.

"Special Servicer" shall mean: (a) for so long as the Mortgage Loans or any REO Property are serviced and administered in accordance with the Series 2007-C6 Pooling and Servicing Agreement, the Series 2007-C6 Special Servicer; and (b) if and for so long as the Mortgage Loans or any REO Property are serviced and administered in accordance with any successor Servicing Agreement, the special servicer under such successor Servicing Agreement, which servicer shall be the party responsible under the Applicable Servicing Agreement for servicing and administering the Mortgage Loans following, among other things, the occurrence of a material default and for administering the Mortgaged Property if it becomes an REO Property.

"Specially Serviced Mortgage Loan" shall mean a status attributed to each Mortgage Loan when, in accordance with the Applicable Servicing Agreement, it is to be serviced and administered by the Special Servicer instead of the Master Servicer.

"Trustee" shall mean: (a) for so long as the Mortgage Loans or any REO Property are serviced and administered in accordance with the Series 2007-C6 Pooling and Servicing Agreement, the Series 2007-C6 Trustee; and (b) if and for so long as the Mortgage Loans or any REO Property are serviced and administered in accordance with any successor Servicing Agreement, the trustee, if any, under such successor Servicing Agreement.

"Workout Action" shall mean any amendment, waiver, modification or forbearance granted or agreed to, or other action taken, by or on behalf of a Lender with a view towards recovering delinquent amounts due in respect of, or otherwise resolving a default under, either Mortgage Loan, exclusive of an Enforcement Action.

Section 1.02. General Interpretive Principles.

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(i) the terms defined in this Agreement include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(ii) accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(iii) references herein to "Articles", "Sections", "Subsections", "Paragraphs" and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(iv) a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(v) the words "herein", "hereof", "hereunder", "hereto", "hereby" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(vi) the terms "include" or "including" shall mean without limitation by reason of enumeration.

Section 1.03. Interpreting this Agreement and the Loan Agreement.

(a) The Mortgage Loans shall collectively constitute the "Loan" under the Loan Agreement.

(b)     Note A-1 and Note A-2 shall collectively constitute the "Note" under Section 2.1.3 of the Loan Agreement.

## ARTICLE II

## RETENTION OF LOAN DOCUMENTS; REPRESENTATIONS AND WARRANTIES

### Section 2.01.  Relative Rights of the Lenders

This Agreement shall govern the relative rights of the Lenders to receive payments and otherwise take action with respect to their respective Mortgage Loans. Neither Lender shall in any way be responsible or liable to the other Lender with respect to any amounts received by such Lender in respect of its Mortgage Loan in accordance with this Agreement.

### Section 2.02.  Delivery and Retention of Note A-2; Delivery and Retention of Mortgage File (Exclusive of Note A-2); Record Title.

(a)     The Note A-2 Lender hereby acknowledges possession of an original of its related Note A-2.  The Note A-2 Lender shall retain its Note, but such Lender shall make its Note available to the Applicable Servicer, upon request, for purposes of servicing the related Mortgage Loan.

(b)     The Note A-1 Lender hereby acknowledges possession of the Mortgage File (exclusive of the original of Note A-2).  The Note A-1 Lender shall, subject to the terms of this Agreement and the Applicable Servicing Agreement, segregate and maintain continuous custody of all documents with respect to the Mortgage Loans constituting the Mortgage File (exclusive of the original of Note A-2); provided that the Note A-1 Lender may make any or all such documents with respect to the Mortgage Loans available to the Applicable Servicer, upon request, for purposes of servicing the Mortgage Loans; and provided, further, that the Note A-1 Lender may otherwise release custody of the Mortgage File and any such documents with respect to the Mortgage Loan to the extent that it deems it necessary or appropriate to do so in order to protect the rights or interests of either Lender; and provided, further, that the Note A-1 Lender may, at its expense, appoint a third-party custodian to retain, on behalf of and in trust for the Lenders, the Mortgage File and any such documents with respect to the Mortgage Loans.  Any such custodian so appointed by the Note A-1 Lender shall be a depository institution supervised and regulated by a federal or state banking authority and shall have combined capital and surplus of at least $10,000,000.  The Note A-1 Lender shall ensure that the related custodial agreement prohibits the release of any documents held by a custodian appointed by it with respect to the Mortgage Loans, except:  (i) in accordance with, or consistent with, the Applicable Servicing Agreement; (ii) with the consent of each Lender; (iii) under the same circumstances that the Note A-1 Lender would be permitted to release custody of such documents; (iv) to the Note A-1 Lender following the resignation or termination of such custodian; and (v) in connection with the Note A-1 Securitization.

(c)     The Note A-1 Lender will not, except as and to the extent contemplated by the agreements governing the Note A-1 Securitization, be under any duty or obligation to inspect, review or examine any of the documents, instruments, certificates or other papers relating to the Mortgage Loans delivered to it to determine that the same are valid, legal, effective, genuine, binding, enforceable, sufficient or appropriate for the represented purpose or that they are other than what they purport to be on their face.  Furthermore, the Note A-1 Lender

will not, except as and to the extent contemplated by the agreements governing the Note A-1 Securitization, have any responsibility for determining whether the text of any assignment or endorsement is in proper or recordable form, whether the requisite recording of any document is in accordance with the requirements of any applicable jurisdiction, or whether a blanket assignment is permitted in any applicable jurisdiction.

(d) Upon the transfer of the Note A-1 Mortgage Loan (or the applicable Note A-1 Portion) in connection with the Note A-1 Securitization, the Series 2007-C6 Trustee shall be vested with all of the specific rights and obligations of "Note A-1 Lender" hereunder. Lehman, as original lender, shall execute and deliver any and all assignments and other transfer documents (in recordable form, if applicable) that are necessary to transfer the Loan Documents (exclusive of the original of Note A-2) to the Series 2007-C6 Trustee or that are otherwise required under the related mortgage loan purchase agreement, the Servicing Agreement(s) and/or the Securitization Agreement for the Note A-1 Securitization. Thereafter, the Note A-1 Lender shall be the mortgagee of record on behalf of the Lenders and shall not, in its capacity as mortgagee of record, take any action not expressly permitted hereunder that would impair the rights of the other Lender. Each successor Note A-1 Lender may, at its option: (i) complete any and all assignments and other transfer documents delivered to it by the predecessor Note A-1 Lender in such manner as to reflect that it is the mortgagee/beneficiary under the Loan Documents (exclusive of the Notes) on behalf of the Lenders; and (ii) record or file, as applicable, any such assignments and/or transfer documents that are appropriate to be recorded or filed, as the case may be, in the appropriate public office for such purposes.

Section 2.03. Delivery of Servicing File, Escrow Payments and Reserve Funds to the Master Servicer.

Each Lender shall deliver to the Master Servicer or such other Person as may be directed by the Master Servicer (at each Lender's own expense) on or before the date hereof, to be held by the Master Servicer in trust for the benefit of the Lenders, such other relevant documents and records that: (A) relate to the administration or servicing of such Mortgage Loan, (B) are reasonably necessary for the ongoing administration and/or servicing of the Mortgage Loans by the Master Servicer in connection with its duties under the Applicable Servicing Agreement, and (C) are in the possession or under the control of such Lender, together with all unapplied Escrow Payments and Reserve Funds in the possession of such Lender that relate to the Mortgage Loans; provided that neither Lender shall be required to deliver any draft documents, privileged or other communications, credit underwriting or due diligence analyses, credit committee briefs or memoranda or other internal approval documents or data or internal worksheets, memoranda, communications or evaluations.

Section 2.04. Representations, Warranties and Covenants of the Lenders.

(a) Each Lender hereby represents, warrants and covenants to the other party hereto, as of the date hereof, that:

(i) Such Lender is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.

(ii)     The execution and delivery of this Agreement by such Lender, and the performance and compliance with the terms of this Agreement by such Lender, will not violate such Lender's organizational documents or constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, or result in the breach of, any material agreement or other instrument to which such Lender is a party or which is applicable to it or any of its assets.

(iii)     Such Lender has the full power and authority to enter into and consummate all transactions contemplated by this Agreement, has duly authorized the execution, delivery and performance of this Agreement, and has duly executed and delivered this Agreement.

(iv)     This Agreement, assuming due authorization, execution and delivery by the other parties hereto, constitutes a valid, legal and binding obligation of such Lender, enforceable against such Lender in accordance with the terms hereof, subject to (A) applicable bankruptcy, insolvency, reorganization, moratorium and other laws affecting the enforcement of creditors' rights generally, and (B) general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law.

(v)     Such Lender is not in violation of, and its execution and delivery of this Agreement and its performance and compliance with the terms of this Agreement will not constitute a violation of, any law, any order or decree of any court or arbiter, or, to such Lender's knowledge, any order, regulation or demand of any federal, state or local governmental or regulatory authority, which violation, in such Lender's good faith and reasonable judgment, is likely to affect materially and adversely either the ability of such Lender to perform its obligations under this Agreement or the financial condition of such Lender.

(vi)     No litigation is pending or, to the best of such Lender's knowledge, threatened against such Lender that, if determined adversely to such Lender, would prohibit such Lender from entering into this Agreement or that, in such Lender's good faith and reasonable judgment, is likely to materially and adversely affect either the ability of such Lender to perform its obligations under this Agreement or the financial condition of such Lender.

(vii)     Any consent, approval, authorization or order of any court or governmental agency or body required under federal or state law for the execution, delivery and performance by such Lender of or compliance by such Lender with this Agreement or the consummation of the transactions contemplated by this Agreement has been obtained and is effective except where the lack of consent, approval, authorization or order would not have a material adverse effect on the performance by such Lender under this Agreement.

(viii)     Such Lender is not an Affiliate of the Borrower.

(ix)     Such Lender has not dealt with any broker, investment banker, agent or other Person that may be entitled to any commission or compensation in connection with the purchase of its Note from Lehman.

(b)     The representations, warranties and covenants of each Lender set forth in Section 2.04(a) shall survive the execution and delivery of this Agreement and shall inure to the benefit of the other Lender for so long as this Agreement remains in effect. Each successor Lender, upon becoming a Lender, shall be deemed to have made the representations, warranties and covenants set forth in Section 2.04(a). Upon discovery by either Lender of any breach of any of such representations, warranties and covenants, the Lender discovering such breach shall give prompt written notice thereof to the other Lender.

Section 2.05.  Independent Analysis of Each Lender.

Each Lender acknowledges that it has, independently and without reliance upon representations made or information furnished by the other Lender, and based on such documents and information as such Lender has deemed appropriate, made its own credit analysis and decision to make or purchase its Mortgage Loan. Each Lender acknowledges that the other Lender has not made any representations or warranties with respect to the Mortgage Loans, the Mortgaged Property or the Borrower, and that neither of the Lenders shall have any responsibility for (i) the collectability of the Mortgage Loans, (ii) the validity, enforceability or legal effect of any of the Loan Documents or the title insurance policy or policies or any survey furnished or to be furnished to the originators in connection with the origination of the Mortgage Loans, (iii) the validity, sufficiency or effectiveness of the lien created or to be created by the Loan Documents, or (iv) the financial condition of the Borrower. Subject to the provisions of Article IV, each Lender assumes all risk of loss in connection with its Mortgage Loan from the failure or refusal of the Borrower to pay interest, principal or other amounts due under the Mortgage Loans, defaults by the Borrower under the Loan Documents or the unenforceability of any of the Loan Documents, for reasons other than negligence, willful misconduct or breach of this Agreement by the other Lender.

Section 2.06.  Notes Not Securities.

Each Lender acknowledges and agrees that the Notes are not securities for purposes of federal and state securities laws.

## ARTICLE III

## ADMINISTRATION AND SERVICING OF THE MORTGAGE LOANS

Section 3.01. General Servicing Matters.

(a)     The Note A-1 Lender, on behalf of both Lenders, is authorized to, and shall, engage one or more Servicers, pursuant to one or more Servicing Agreements, for purposes of servicing and administering the Mortgage Loans and any REO Property from time to time; provided, that (1) the Series 2007-C6 Pooling and Servicing Agreement shall be the initial Applicable Servicing Agreement and (2) the Series 2007-C6 Master Servicer and the Series 2007-C6 Special Servicer shall be the initial Servicers with respect to the Mortgage Loans; and provided, further, that, if the Series 2007-C6 Pooling and Servicing Agreement is terminated and no longer constitutes the Applicable Servicing Agreement (including because neither any portion of the Note A-1 Mortgage Loan nor any REO Property is an asset of a Related Securitization Trust in respect of a Note A-1 Securitization), then, unless the Note A-2 Lender otherwise consents in writing, which consent shall not be unreasonably withheld, any new Servicing Agreement(s) negotiated by the Note A-1 Lender shall:  (i) not be materially inconsistent with this Agreement, (ii) require the Servicer(s) thereunder to service and administer the Mortgage Loans and any REO Property in accordance with (A) any and all applicable laws, (B) the express terms of this Agreement (and any other related intercreditor agreement), the Applicable Servicing Agreement and the respective Mortgage Loans, and (C) to the extent consistent with the foregoing, a Servicing Standard that (x) is substantially the same as the "Servicing Standard" under the Series 2007-C6 Pooling and Servicing Agreement and (y) provides that, following default, such servicing and administration of the Mortgage Loans shall be with a view to the maximization of recovery on the Mortgage Loans to the Lenders (as a collective whole) of principal and interest, including the Balloon Payment, on a present value basis, (iii) provide for the establishment of accounts in respect of the Mortgage Loans and the Mortgaged Property substantially the same as those provided for in the Series 2007-C6 Pooling and Servicing Agreement and for the making of deposits to and withdrawals from such accounts consistent with the provisions of the Series 2007-C6 Pooling and Servicing Agreement, (iv) provide for standard CMSA reporting, (v) provide for "events of default" on the part of the subject Servicer(s), and for rights on the part of the Lenders in respect thereof, substantially similar to those provided for in the Series 2007-C6 Pooling and Servicing Agreement, (vi) contain requirements regarding when and what type of appraisals are to be obtained with respect to the Mortgaged Property and provisions regarding the calculation of Appraisal Reduction Amounts that are substantially similar to the corresponding requirements and provisions in the Series 2007-C6 Pooling and Servicing Agreement, (vii) provide for the making and reimbursement (with interest) of Advances with respect to the Mortgage Loans and/or any REO Property in a manner substantially similar to the making and reimbursement (with interest) of Advances with respect thereto in the Series 2007-C6 Pooling and Servicing Agreement so long as either Mortgage Loan is included in a securitization, (viii) provide for the Mortgage Loans to be Specially Serviced Mortgage Loans under circumstances substantially similar to those set forth in the Series 2007-C6 Pooling and Servicing Agreement, (ix) otherwise recognize the respective rights and obligations of the Lenders hereunder, including with respect to the making of payments to the Lenders in accordance with Article IV, the rights of the Directing Lender pursuant to Section 3.02(a), (x) if any of the Mortgage Loans or any REO Property is

held by a REMIC, provide for the servicing and administration of the Mortgage Loans and any REO Property in a manner, and contain such prohibitions on the Master Servicer's and Special Servicer's respective actions, as would avoid an Adverse REMIC Event, and (xi) designate the Note A-2 Lender as a third-party beneficiary thereunder; and provided, further, that, prior to entering into any Servicing Agreement(s) (other than the Series 2007-C6 Pooling and Servicing Agreement) with respect to the Mortgage Loans and/or any REO Property, the Note A-1 Lender shall obtain and provide to the Note A-2 Lender written confirmation from each applicable Rating Agency that the servicing and administration of the Mortgage Loans and/or any REO Property under such new Servicing Agreement(s) will not result in an Adverse Rating Event with respect to any Related MBS, except that such confirmation shall not be required from any particular Rating Agency with respect to a new Servicing Agreement entered into with respect to the Note A-1 Securitization if one or more classes of the securities issued in connection with such Note A-1 Securitization is (are) rated by such Rating Agency.

The servicing agreement(s) for the Note A-1 Securitization shall provide that, if at any time neither any portion of the Note A-1 Mortgage Loan nor any REO Property or interest therein is an asset of a Related Securitization Trust in respect of such Note A-1 Securitization, and if a separate Servicing Agreement with respect to the Mortgage Loans or any REO Property, as applicable, has not been entered into in accordance with the preceding paragraph (including by reason of the Note A-1 Lender's failure to obtain any rating confirmation required pursuant to the third proviso of the second preceding paragraph), then, until such time as a separate Servicing Agreement is entered into in accordance with the second preceding paragraph, and notwithstanding that neither the Note A-1 Mortgage Loan (in whole or in part) nor any REO Property or interest therein is an asset of such Related Securitization Trust, the Lenders hereby acknowledge and agree that the master servicer and, if applicable, the special servicer for such Note A-1 Securitization shall continue to service and administer the Mortgage Loans and/or any REO Property, for the benefit of the Lenders, under the servicing agreement(s) for such Note A-1 Securitization as if the Mortgage Loans or any REO Property were the sole assets subject thereto, with any references in such servicing agreement(s) to (i) the Related Securitization Trust in respect of such Note A-1 Securitization, (ii) the trustee for such Related Securitization Trust, (iii) the Related MBS in respect of such Note A-1 Securitization, (iv) the holders of such Related MBS (or any sub-group thereof), or (v) any representative of such holders (or any sub-group thereof), all being construed to refer to the Note A-1 Lender. Notwithstanding anything herein to the contrary, if at any time neither the Note A-1 Mortgage Loan (in whole or in part) nor any REO Property or interest therein is an asset of the Related Securitization Trust for the Note A-1 Securitization, the Note A-1 Lender will not be obligated to make backup Servicing Advances if any Servicer fails to make such Servicing Advances under the Applicable Servicing Agreement.

(b)     The Lenders hereby acknowledge that all servicing rights and responsibilities with respect to the Mortgage Loans and any REO Property shall be governed by the Servicing Agreement(s) in effect from time to time. Neither Lender may directly service and administer the Mortgage Loans or any REO Property, including the taking of any Enforcement Action or Workout Action or exercising rights in any Insolvency Proceeding, unless (consistent with this Agreement) it is acting as the Applicable Servicer under the Applicable Servicing Agreement then in effect, or unless such Lender has obtained the written consent of the other Lender. Neither Lender shall take or institute any action that would, directly or indirectly,

interfere with or delay the performance of any Servicer of its duties and obligations with respect to the Mortgage Loans and/or any REO Property under a Servicing Agreement. Without limiting the generality of the foregoing, in the event of a bankruptcy or insolvency of the Borrower, neither Lender shall object to or oppose any efforts by the Applicable Servicer to obtain relief from the automatic stay under Section 362 of the Bankruptcy Code or to seek to cause the Borrower's bankruptcy estate to abandon the Mortgaged Property (or any portion thereof) that is subject to the Mortgage.

(c)     The Lenders hereby agree that neither Lender shall cause or permit, except as provided in the Applicable Servicing Agreement, any Servicer to modify or amend any of the Loan Documents if the effect of such modification or amendment would:

(i)     increase the interest rate payable on amounts due pursuant to either Mortgage Loan;

(ii)    increase the original principal amount of either Mortgage Loan; or

(iii)   change the maturity of either Mortgage Loan, without a corresponding change in maturity of the other Mortgage Loans;

provided that, (x) where there is more than one Note A-1 Portion representing in the aggregate Note A-1, the reference to "interest rate" in clause (i) of this sentence shall mean, with respect to the Note A-1 Mortgage Loan, a weighted average interest rate equal to the weighted average of the interest rates on all of the Note A-1 Portions, and the reference to "maturity" in clause (iii) of this sentence means the latest maturity on the Note A-1 Portions, and (y) where there is more than one Note A-2 Portion representing in the aggregate Note A-2, the reference to "interest rate" in clause (i) of this sentence shall mean, with respect to the Note A-2 Mortgage Loan, a weighted average interest rate equal to the weighted average of the interest rates on all of the Note A-2 Portions, and the reference to "maturity" in clause (iii) of this sentence means the latest maturity on the Note A-2 Portions.

Furthermore, the Lenders agree that neither Lender shall cause or permit, and no Servicing Agreement shall allow, any Servicer to modify, amend or waive any of the payment terms of the Mortgage Loans unless such modification, waiver or amendment is structured so as to be consistent with the allocation and payment priorities set forth in the Loan Documents and this Agreement, such that neither Lender shall gain a priority over the other Lender with respect to any payment which priority is not, as of the date of this Agreement, reflected in the Loan Documents and this Agreement. In connection with the foregoing, the Lenders agree that, to the extent consistent with the Servicing Standard, any waiver, reduction, deferral or other change of any particular amounts due under the Mortgage Loans, any reduction or other change of the Applicable Interest Rate, shall be effected as between the Lenders on a Pro Rata and Pari Passu Basis as regards the economic effects thereto. Notwithstanding anything to the contrary contained herein, in the event that, consistent with the foregoing, there is a modification, extension, waiver or amendment of the payment terms of either Mortgage Loan (in accordance with the Applicable Servicing Agreement and this Agreement and in connection with a default or a reasonably foreseeable default) such that: (i) the principal balance of such Mortgage Loan is reduced, (ii) the Applicable Interest Rate of the Notes is reduced, (iii) payments of interest or

principal on the Notes are waived, reduced or deferred, or (iv) any other adjustment is made to any of the payment terms of either such Mortgage Loan, all payments (reflecting the terms of any such reduction, waiver, deferral or other adjustment referred to in clauses (i) through (iv) above) to the Lenders, constituting principal of, interest at the Applicable Interest Rate on, or Prepayment Premiums on, the Mortgage Loans shall continue to be made in accordance with the allocation and payment priorities set forth in the Loan Documents and this Agreement as in effect on the date hereof. Notwithstanding anything contained herein to the contrary, any of the actions referred to in the immediately preceding clauses (i) through (iv) shall be effected as between the Lenders on a Pro Rata and Pari Passu Basis as regards the economic effects thereto.

(d)     The Lenders further acknowledge that, in any Insolvency Proceeding, the Applicable Servicer shall (i) file a proof of claim in respect of the Lenders' claims against the Borrower, (ii) have the exclusive right to exercise any voting rights in respect of the claims of the Lenders against the Borrower and (iii) otherwise represent the Lenders in such Insolvency Proceeding. Neither Lender shall (except through the Applicable Servicer and pursuant to the Applicable Servicing Agreement) acquiesce, petition or otherwise invoke or cause any other Person to invoke an Insolvency Proceeding with respect to the Borrower or seek to appoint a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official with respect to the Borrower or all or any part of its property or assets or ordering the winding-up or liquidation of the affairs of the Borrower. In addition, neither Lender shall (except through the Applicable Servicer and pursuant to the Applicable Servicing Agreement) make any election, give any consent, commence any action or file any motion or take any other action in any case by or against the Borrower under the Bankruptcy Code. The Lenders shall jointly appoint the Special Servicer as their agent, and grant to the Special Servicer an irrevocable power of attorney coupled with an interest, and their proxy, for the purpose of exercising any and all rights and taking any and all actions available to the Lenders in connection with any case by or against the Borrower under the Bankruptcy Code, including the right to vote to accept or reject a plan, to make any election under Section 1111(b) of the Bankruptcy Code with respect to the Mortgage Loans and to file a motion to modify the automatic stay with respect to the Mortgage Loans.

(e)     Notwithstanding anything contained herein to the contrary, neither Lender shall cause the Applicable Servicer to, without the other applicable Lender's written consent: (i) initiate any action, suit or proceeding solely under such other Lender's name without indicating the Applicable Servicer's representative capacity; or (ii) take any action with the intent to cause, and that actually causes, such other Lender to be registered to do business in any state. The Lenders shall execute, acknowledge and deliver to the Applicable Servicer all such further deeds, conveyances and instruments as may be reasonably necessary for the better assuring and evidencing of the foregoing appointment and grant.

(f)     If either Mortgage Loan or any portion thereof or any particular payments thereon are included in a REMIC or a Grantor Trust, then neither Lender shall knowingly cause or permit any Servicer to take any action that would result in an Adverse REMIC Event or an Adverse Grantor Trust Event, as the case may be.

(g)     The Lenders hereby agree to furnish to each Applicable Servicer such reports, certifications and information as are reasonably requested by such Applicable Servicer to enable it to perform its duties under the Applicable Servicing Agreement.

(h)     Each Lender agrees that any Securitization Agreement related to a Securitization involving a Mortgage Loan and/or a Note A Portion shall provide that the Master Servicer and Special Servicer shall have the right to be reimbursed from general collections of the Related Securitization Trust for any Servicing Advance and related Advance Interest made with respect to the Mortgage Loans or the Mortgaged Property that is determined to be nonrecoverable out of collections on the Mortgage Loans and/or any REO Property. Furthermore, each such Securitization Agreement shall provide that the Master Servicer and the Special Servicer are each a third-party beneficiary.

Section 3.02.   Certain Powers of the Directing Lender.

(a)     Subject to Section 3.01(b), Section 3.01(c) and Section 3.02(b), the Directing Lender will be entitled to advise the Applicable Servicer with respect to the following actions of the Applicable Servicer; and, further subject to Section 3.02(b), the Applicable Servicing Agreement shall not permit the Applicable Servicer to take (or, in the case of the Special Servicer, if and when appropriate under the Applicable Servicing Agreement, to consent to the Master Servicer's taking) any of the following actions unless and until it has notified each Lender in writing and the Directing Lender has not objected in writing within 30 days of the Lenders having been notified thereof and having been provided with all reasonably requested information with respect thereto (it being understood and agreed that if such written objection has not been received by the Applicable Servicer within such 30 day period, then the Directing Lender's approval will be deemed to have been given):

(i)     any foreclosure upon or comparable conversion (which may include acquisition as REO Property) of the ownership of the Mortgaged Property securing a Specially Serviced Mortgage Loan;

(ii)     any modification, extension, amendment or waiver of a monetary term (including the timing of payments, but excluding the waiver of default charges) or any material non-monetary term (including any material term relating to insurance) of a Specially Serviced Mortgage Loan;

(iii)     any proposed sale of a Mortgaged Property after it becomes an REO Property for less than the then unpaid principal balance of the Mortgage Loans, together with all accrued and unpaid interest thereon, plus any other amounts then due and owing under the Mortgage Loan and the Applicable Servicing Agreement;

(iv)     any acceptance of a discounted payoff with respect to a Specially Serviced Mortgage Loan;

(v)     any determination to bring the Mortgaged Property if it secures a Specially Serviced Mortgage Loan or the Mortgaged Property after it becomes an REO Property into compliance with applicable environmental laws or to otherwise address Hazardous Materials located at such Mortgaged Property;

(vi)     any release of collateral for a Specially Serviced Mortgage Loan other than in accordance with the terms of, or upon satisfaction of, such Mortgage Loan;

(vii)    any acceptance of substitute or additional collateral for a Specially Serviced Mortgage Loan (other than in accordance with the terms of such Specially Serviced Mortgage Loan);

(viii)    any waiver of a "due-on-sale" or "due-on-encumbrance" clause with respect to a Mortgage Loan;

(ix)    any acceptance of an assumption agreement releasing a Borrower from liability under a Mortgage Loan, and

(x)    acceptance of a change in the property management company with respect to a Mortgage Loan;

provided that, in the event that the Applicable Servicer determines that immediate action is necessary to protect the interests of the Lenders (as a collective whole), the Applicable Servicer may take (or, in the case of the Special Servicer, if and when appropriate under the Applicable Servicing Agreement, may consent to the Master Servicer's taking) any such action without waiting for the Directing Lender's response.

The Lenders hereby acknowledge that, if the Directing Lenders (or their designees) have not executed a mutual written consent to a course of action that satisfies Section 3.01(b), Section 3.01(c) and Section 3.02(b) of this Agreement with respect to one of the foregoing servicing actions within 30 days (or such shorter period as may be required by the Loan Documents to the extent the lender's approval is required) of the Lenders having been notified of the proposed action or inaction and having been provided with all reasonably requested information with respect thereto, then the Master Servicer or the Special Servicer, as applicable, shall implement such servicing action or inaction (subject to Section 3.01(c) and Section 3.02(b) of this Agreement) that it deems to be in accordance with the Servicing Standard and, in such event, the decision of the Master Servicer or the Special Servicer, as applicable, shall be binding on all of the Lenders. Each Lender further agrees that each other Lender may consult separately with the Master Servicer or the Special Servicer, as applicable, with regard to one of the foregoing servicing actions in this Section 3.02(a). The Lenders further acknowledge that any agreement, consent or advice by or from the Directing Lenders pursuant to this Section 3.02 shall be evidenced solely by a written instrument executed by a responsible officer of each Lender that constitutes one of the Directing Lenders, and the Master Servicer or Special Servicer, as applicable, shall be entitled to rely on such written instrument and, in the absence of such written consent or agreement (regarding a course of action that satisfies Section 3.01(b), Section 3.01(c) and Section 3.02(b)) within the time period specified therefor, shall be permitted to implement such servicing action or inaction (subject to Section 3.01(c) and Section 3.02(b) of this Agreement) that it deems to be in accordance with the Servicing Standard.

The Lenders further acknowledge that pursuant to the Applicable Servicing Agreement, the Note A-1 Lender or its designee shall have the right to appoint and replace the Special Servicer; provided, that the Applicable Servicing Agreement shall provide that, prior to the replacement of the Special Servicer by the Note A-1 Lender or its designee pursuant to the Applicable Servicing Agreement, the Note A-1 Lender or its designee desiring to effect such replacement shall obtain written confirmation from each applicable Rating Agency that the

replacement of the Special Servicer with the applicable proposed special servicer will not result in an Adverse Rating Event with respect to any Related MBS backed or secured by a Mortgage Loan.

The Lenders further acknowledge that, in addition to the Note A-1 Lender's rights set forth in the preceding paragraph of this Section 3.02(a): (1) the Note A-2 Lender may terminate the existing Special Servicer, with respect to and solely with respect to the Mortgage Loans, with or without cause, and appoint a successor to any Special Servicer, with respect to and solely with respect to, the Mortgage Loans, that has resigned or been terminated, and (2) the Note A-1 Lender or its designee cannot terminate a Special Servicer appointed by the Note A-2 Lender with respect to the Mortgage Loans, without cause; provided that any such replacement of the Special Servicer by the Note A-2 Lender or its designee shall be subject to the terms and conditions of the Applicable Servicing Agreement, including, without limitation, the requirement that the Note A-2 Lender or its designee desiring to effect such replacement deliver to the Trustee (i) written confirmation from each applicable Rating Agency that the replacement of the Special Servicer with the applicable proposed Special Servicer will not result in an Adverse Rating Event with respect to any Related MBS backed or secured by a Mortgage Loan, (ii) the written agreement of the proposed Special Servicer to be bound by the terms and conditions of the Applicable Servicing Agreement, and (iii) an opinion of counsel regarding, among other things, the enforceability of the Applicable Servicing Agreement against the proposed Special Servicer.

In addition, subject to Section 3.01(b), Section 3.01(c) and Section 3.02(b), upon notice to the other Lender, the Directing Lender may direct the Applicable Servicer to take, or to refrain from taking, such actions as the Directing Lender may deem consistent with this Agreement or as to which provision is otherwise made herein. The Applicable Servicer shall be required to provide the Directing Lender, upon reasonable request, with any information in the Applicable Servicer's possession with respect to such matters, including, without limitation, its reasons for determining to take a proposed action.

(b)     Notwithstanding anything herein to the contrary, no advice, direction or objection from or by the Directing Lender, as contemplated by Section 3.02(a), may (and the Applicable Servicer shall ignore and act without regard to any such advice, direction or objection that the Applicable Servicer has determined, in its reasonable, good faith judgment, will) require, cause or permit the Applicable Servicer to violate any provision of this Agreement or the Applicable Servicing Agreement (including the Applicable Servicer's obligation to act in accordance with the Servicing Standard), the Loan Documents or applicable law or result in an Adverse REMIC Event or an Adverse Grantor Trust Event. Furthermore, the Applicable Servicer shall not be obligated to seek approval from the Directing Lender for any actions to be taken by the Applicable Servicer with respect to the workout or liquidation of the Mortgage Loans if:

(i)     the Applicable Servicer has, as provided in Section 3.02(a), notified the Directing Lender in writing of various actions that the Applicable Servicer proposes to take with respect to the workout or liquidation of the Directing Lender's Mortgage Loan; and

(ii)    for 60 days following the first such notice, the Directing Lender has objected to all of those proposed actions and has failed to suggest any alternative actions that the Applicable Servicer considers to be consistent with the Servicing Standard.

(c)    The Directing Lender will have no liability to the other Lender(s) for any action taken, or for refraining from the taking of any action, in good faith pursuant to this Agreement and the Applicable Servicing Agreement, or for errors in judgment; provided, however, that the Directing Lender will not be protected against any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or negligence in the performance of duties or by reason of negligent disregard of obligations or duties.

(d)    Each Lender may designate, in writing, a representative, including itself, to exercise its rights and powers under this Section 3.02 or otherwise under this Agreement and the Applicable Servicing Agreement (copies of such writing to be delivered to the other party hereto and each of the parties to the Applicable Servicing Agreement). Such designation shall remain in effect until it is revoked by the applicable Lender by a writing delivered to the other Lender and each of the parties to the Applicable Servicing Agreement.

(e)    The Note A-1 Lender shall be deemed to have satisfied its obligations under Section 3.02(a) if: (i) the Special Servicer and the Master Servicer are each obligated to take the actions on the part of such Servicer contemplated by such sections under the Applicable Servicing Agreement (regardless of whether such Servicer complies with such obligations); and (ii) the other Lender is a third-party beneficiary of the Applicable Servicing Agreement.

## ARTICLE IV

## PAYMENTS TO LENDERS

Section 4.01. Application of Payments; Allocation of Collections; Remittances.

(a)     The Lenders hereby acknowledge and agree that each Lender's Note and related Mortgage Loan shall be of equal priority with each other Lender's Note and related Mortgage Loan, and no portion of either Mortgage Loan shall have priority or preference over any portion of any other Mortgage Loan or security therefor.

Any payment (whether principal or interest) or prepayment under the Notes (including reimbursement of expenses from the Borrower and proceeds from sales of collateral) shall be applied to the Mortgage Loans on a Pro Rata and Pari Passu Basis. In addition, the net proceeds of the collateral securing the Mortgage Loans, the net proceeds of casualty and title insurance policies and awards from condemnation shall be applied to the Mortgage Loans on a Pro Rata and Pari Passu Basis. If a Lender, the Master Servicer, the Special Servicer, the Trustee or any nominee thereof acquires title to the Mortgaged Property, then all amounts derived from the operation and disposition of the Mortgaged Property shall be allocable between the Lenders on a Pro Rata and Pari Passu Basis. Notwithstanding the foregoing, the rights of each Lender to distributions of any nature with respect to its Mortgage Loan under the Applicable Servicing Agreement shall be subject to the rights of the Master Servicer, the Special Servicer, the Depositor, the Trustee and any related sub-servicer to payments and reimbursements pursuant to and in accordance with the terms of the Applicable Servicing Agreement and this Agreement, and shall be further subject to Section 4.01(i). Amounts applied to any particular Mortgage Loan or allocated to any particular Lender in accordance with this Section 4.01(a) will be applied to interest, principal and other amounts due in respect of the subject Mortgage Loan in accordance with the Applicable Servicing Agreement.

(b)     All Servicing Advances made, and all liquidation expenses and other servicing-type expenses incurred, by the Master Servicer, the Special Servicer, the Trustee and/or the Depositor under the Applicable Servicing Agreement with respect to the Mortgage Loans and/or any related REO Property shall be deemed made or incurred, as applicable, on behalf of both Lenders and shall be deemed allocated between the Lenders on a Pro Rata and Pari Passu Basis. To the extent so allocable to any particular Lender, at the time any such Servicing Advances or Advance Interest thereon is to be reimbursed pursuant to the Applicable Servicing Agreement such Servicing Advances shall first be reimbursed (together with interest thereon pursuant to the Applicable Servicing Agreement), and such liquidation expenses and other servicing-type expenses shall first be paid, out of amounts allocable to such Lender or its Mortgage Loan in accordance with Section 4.01(a) hereof prior to any distribution being made to such Lender.

(c)     If the Master Servicer, the Special Servicer, the Trustee, the Depositor or any related person or entity is entitled to indemnification under the Applicable Servicing Agreement for any loss, liability, damages, cost or expense that is attributable to the Mortgage Loans and/or any related REO Property, then the obligation to make any such indemnity payment shall be allocated between the Lenders on a Pro Rata and Pari Passu Basis. To the

extent so allocable to any particular Lender, such indemnity payment shall first be made out of amounts allocable to such Lender on its Mortgage Loan in accordance with Section 4.01(a) hereof prior to any distribution being made to such Lender.

(d)     Any extraordinary expense incurred by the Master Servicer, the Special Servicer, the Trustee, the Depositor or any related person or entity under the Applicable Servicing Agreement in relation to the Mortgage Loans and/or any related REO Property, which is not otherwise covered by this Article IV, shall be deemed made or incurred, as applicable, on behalf of both Lenders and shall be deemed allocated between the Lenders on a Pro Rata and Pari Passu Basis. To the extent so allocable to any particular Lender, such extraordinary expense shall first be reimbursed (together with interest thereon if so provided pursuant to the Applicable Servicing Agreement) out of amounts allocable to such Lender or its Mortgage Loan in accordance with Section 4.01(a) hereof prior to any distribution being made to such Lender.

(e)     Any compensation payable to the Master Servicer with respect to each Mortgage Loan under the Pooling and Servicing Agreement shall be calculated and payable on a loan-by-loan basis, with the master servicing compensation in respect of either Mortgage Loan to be paid solely out of amounts allocable to that Mortgage Loan or the related Lender. No Lender shall be responsible for the payment of master servicing compensation in respect of the other Lender's Mortgage Loan. Any compensation payable to the Special Servicer under the Applicable Servicing Agreement (including, without limitation, special servicing fees, liquidation fees and workout fees) with respect to the Mortgage Loans and/or any related REO Property shall be deemed made or incurred, as applicable, on behalf both Lenders and shall be deemed allocated between the Lenders on a Pro Rata and Pari Passu Basis. To the extent so allocable to any particular Lender, at the time any such compensation described in the foregoing two sentences (including, without limitation, special servicing fees, liquidation fees and workout fees) is to be paid to the Master Servicer or the Special Servicer pursuant to the Applicable Servicing Agreement, such compensation shall first be paid, out of amounts allocable to such Lender or its Mortgage Loan in accordance with Section 4.01(a) hereof prior to any distribution being made to such Lender.

(f)     Notwithstanding anything to the contrary in this Section 4.01, Default Interest and late payment charges shall be allocated between the Mortgage Loans and between the Lenders in accordance with the Applicable Servicing Agreement.

(g)     P&I Advances and Advance Interest with respect to P&I Advances payable with respect to either Mortgage Loan shall not be reimbursed or paid, as the case may be, out of the amounts payable in respect of the other Mortgage Loan pursuant to Section 4.01(a). P&I Advances made by the Master Servicer or the Trustee with respect to the Note A-1 Mortgage Loan under the Applicable Servicing Agreement shall be reimbursed, and Advance Interest shall be paid thereon, solely out of amounts allocable to the Note A-1 Mortgage Loan or the Note A-1 Lender and/or, to the extent permitted by the Applicable Servicing Agreement, out of other amounts in the securitization trust for the Series 2007-C6 Securitization, and the Note A-2 Lender shall not be responsible for the payment or reimbursement thereof. P&I Advances made by a master servicer, trustee or other party under a Securitization Agreement related to the Note A-2 Mortgage Loan shall be reimbursed, and interest shall be paid thereon, solely out of amounts allocable to the Note A-2 Mortgage Loan or the Note A-2 Lender

and/or, to the extent permitted by such Securitization Agreement, out of other amounts in the securitization trust for the related Note A-2 Securitization, and the Note A-1 Lender shall not be responsible for the payment or reimbursement thereof.

(h)     The rights of the Lenders to receive payments in respect of their respective Mortgage Loans, and all rights and interests of the Lenders in and to such payments, shall be as set forth in this Agreement, and neither Lender shall challenge, by legal action or otherwise, such rights and interests of the other Lender. Neither Lender nor any other party shall in any way be responsible or liable to the other Lender in respect of amounts properly previously paid to the Lenders in accordance with this Section 4.01.

(i)     Notwithstanding anything herein to the contrary, if any Replacement Notes are reissued with respect to either Mortgage Loan, and if any Excess Interest accrues on such Replacement Notes, then: (i) the related Lender shall be entitled to receive payment of such Excess Interest only after the Lenders have received all principal, interest (other than Default Interest and Excess Interest) and prepayment premiums payable thereto under their respective Notes, but before the Lenders receive any other amounts due under their respective Notes; (ii) where Excess Interest has accrued with respect to both Mortgage Loans, it shall be payable to the respective Lenders on a *pro rata* basis, in accordance with the respective amounts of such Excess Interest; and (iii) except as otherwise contemplated by clauses (i) and (ii) above, collections on the Mortgage Loans or any related REO Property shall be allocated between the Lenders as provided in Section 4.01(a).

(j)     On each Remittance Date, the Applicable Servicer shall remit to each Lender (by such method of payment as such Lender reasonably requests, including, without limitation, wire transfer of immediately available funds) all payments, prepayments and other collections received by the Applicable Servicer as of the close of business on the related Determination Date and allocable to such Lender and/or its Mortgage Loan in accordance with this Section 4.01, net of any amounts payable therefrom pursuant to this Section 4.01; provided that each such Lender provide the Master Servicer with written instructions detailing the information necessary to make such remittances (other than the amounts thereof).

Section 4.02.   [RESERVED]

Section 4.03.   Advances.

(a)     From and after the Securitization Date, the Applicable Servicer and/or the Trustee under the Applicable Servicing Agreement may be obligated to make a Servicing Advance to the extent that such Applicable Servicer or Trustee, as applicable, has determined that such Servicing Advance, together with Advance Interest thereon, would not constitute a Nonrecoverable Advance (as defined in the Applicable Servicing Agreement) if made. The right of such Applicable Servicer and Trustee to reimbursement for either Lender's allocable share of such Servicing Advances and Advance Interest thereon (such Servicing Advances and Advance Interest thereon to be allocated between the Lenders on a Pro Rata and Pari Passu Basis) is prior to the right of each such Lender to receive any distributions or amounts recovered with respect to such Lender's Mortgage Loan or the Mortgaged Property to the extent provided in this

Agreement and the Applicable Servicing Agreement. Servicing Advances shall be made in accordance with the Applicable Servicing Agreement.

(b) Each Lender shall arrange for the making of P&I Advances with respect to its respective Mortgage Loan (and, if applicable, with respect to any portion thereof), pursuant to any applicable Securitization Agreement relating to the subject Mortgage Loan. Notwithstanding any other provisions contained herein or in the Applicable Servicing Agreement, neither Lender shall have any obligation to make P&I Advances with respect to the other Lender's Mortgage Loan.

(c) The Master Servicer and any comparable party with respect to the securitization of a Mortgage Loan shall each independently make its own decision as to whether P&I Advances made by it with respect to such Mortgage Loan will ultimately be recoverable out of amounts allocable as interest (at the Applicable Interest Rate) and/or principal on the subject Mortgage Loan. Each Lender shall cause any Securitization Agreement relating to a Related Securitization Trust that holds its Mortgage Loan to provide that the primary party responsible for making P&I Advances with respect to such Mortgage Loan shall promptly notify the other Lender in writing of any determination that a P&I Advance made or to be made with respect to such Mortgage Loan will not ultimately be recoverable out of amounts allocable as interest (at the Applicable Interest Rate) and/or principal on the subject Mortgage Loan, which writing shall be accompanied by the supporting evidence for such determination, and shall further provide for the primary party responsible for making P&I Advances with respect to such Mortgage Loan to promptly notify the other Lender in writing of any change in such determination.

Section 4.04.  Sharing of Certain Expenses.

If and to the extent that any servicer, trustee, fiscal agent or any other third party to a Securitization is, pursuant to the Applicable Servicing Agreement, reimbursed for any Servicing Advance, or paid Advance Interest with respect to any Servicing Advance, relating to the Mortgage Loans and/or the Mortgaged Property out of amounts otherwise payable to the Lenders or out of any other funds of the Lenders (including, if either Lender is a Related Securitization Trust, out of amounts received on other loans in that trust), the Lenders shall be required to bear their respective Allocable Shares of such reimbursement or payment. In connection with the foregoing, if either Lender bears more than its Allocable Share of any such reimbursement or payment, then such Lender shall be entitled to contribution from the other Lender (promptly upon demand), until the contributing Lender has borne its Allocable Share of such reimbursement or payment. If either Mortgage Loan or portion thereof is subject to a Securitization, then the related Securitization Agreement shall provide for payments to be made out of the assets of the Related Securitization Trust.

## ARTICLE V

## TERMINATION

Section 5.01. Termination.

This Agreement and the respective obligations and responsibilities under this Agreement of the parties hereto shall terminate upon: (a) mutual agreement by the parties hereto, evidenced in writing; (b) 90 days after the Mortgage Loans are paid in full; or (c) 90 days after payment (or provision for payment) to the Lenders of all amounts held by or on behalf of the Applicable Servicer and required under the Servicing Agreement then in effect, to be so paid on the last Remittance Date following the final payment or other liquidation (or any advance with respect thereto) of the Mortgage Loans or the Mortgaged Property; provided, however, that in no event shall the arrangement created hereby continue beyond the expiration of 21 years from the death of the last survivor of the descendants of Joseph P. Kennedy, the late Ambassador of the United States to the Court of St. James, living on the date hereof.

## ARTICLE VI

## MISCELLANEOUS PROVISIONS

Section 6.01.  Modification, Extension, Amendment or Waiver in Writing.

This Agreement may be amended by the mutual consent of the parties hereto; provided that the parties hereto have obtained written confirmation from each Rating Agency then rating any class of Related MBS that such amendment will not result in an Adverse Rating Event with respect to any class of Related MBS. The costs incurred in connection with obtaining the written confirmation in the preceding sentence shall be borne by the party requesting such amendment. Notwithstanding the foregoing, no modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement shall in any event be effective unless the same shall be in writing signed by the party against whom enforcement is sought.

Section 6.02.  Recordation of Agreement; Counterparts.

(a)    To the extent permitted by applicable law, this Agreement is subject to recordation in all appropriate public offices for real property records in the county or other jurisdiction in which the Mortgaged Property is situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected only at the direction of the Note A-1 Lender. The cost of any such recordation shall be borne by the Lenders on a *pro rata* basis in accordance with the relative outstanding principal balances of their respective Mortgage Loans; provided, however, that the Note A-1 Lender shall have no obligation or responsibility to determine whether any such recordation of this Agreement is required.

(b)    For the purpose of facilitating the recordation of this Agreement as herein provided and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

Section 6.03.  Governing Law.

This Agreement shall be construed in accordance with the laws of the State of New York applicable to agreements negotiated, made and to be performed entirely in said state, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

Section 6.04.  Notices.

Any communications provided for or permitted hereunder shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given when delivered to, in the case of each Lender, Lehman Brothers Holdings Inc., 399 Park Avenue, New York, New York 10022 Attention: Charles Manna, Facsimile No.: (646) 758-5366, with a copy to Lehman Brothers Holdings Inc., 399 Park Avenue, New York, New York 10022 Attention: Scott Lechner, Facsimile No.: (646) 758-4203; after the Note A-1 Securitization, in the case of the Series 2007-C6 Trustee, LaSalle Bank National Association, 135 South LaSalle Street, Suite 1625, Chicago, Illinois 60603 Attention: Global Securities and Trust Services—LB-UBS

Commercial Mortgage Trust 2007-C6, facsimile number: (312) 904-2084; or, as to each Lender, such other address as may hereafter be furnished by such Person to the parties hereto in writing.

Section 6.05. Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or the rights of the parties hereto.

Section 6.06. Successors and Assigns; Beneficiaries.

The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective successors and permitted assigns. No other person, including, without limitation, the Borrower, shall be entitled to any benefit or equitable right, remedy or claim under this Agreement.

Section 6.07. Specific Performance.

Each Lender is hereby authorized to demand specific performance of this Agreement on the part of the other Lender, and each Lender hereby irrevocably waives any defense based on the adequacy of a remedy at law, which might be asserted as a bar to such remedy or specific performance.

Section 6.08. Bankruptcy Matters.

(a) In any case commenced by or against the Borrower under the Bankruptcy Code or any similar provision thereof or any similar federal or state statute (a "Reorganization Proceeding"), the Lenders hereby agree to grant the Special Servicer, subject to the Servicing Standard, the right to (i) file a proof of claim in respect of the Lenders' claims against the Borrower, (ii) have the exclusive right to exercise any voting rights in respect of the claims of the Lenders against the Borrower and (iii) otherwise represent the Lenders in such Reorganization Proceeding.

(b) In the event that either Lender is required under any bankruptcy or other law to return to the Borrower, the estate in bankruptcy thereof, any third party or any trustee, receiver or other similar representative of the Borrower, any payment or distribution of assets, whether in cash, property or securities, including the Mortgaged Property or any proceeds of the Mortgaged Property previously received by such Lender on account of such Lender's Mortgage Loan (a "Reinstatement Distribution"), then to the maximum extent permitted by law, this Agreement and the payment priorities established hereby shall be reinstated with respect to any such Reinstatement Distribution. The affected Lender shall not be required to contest its obligation to return such Reinstatement Distribution.

Section 6.09.  Assignments and Securitizations.

Upon notice to the other Lender, each Lender may at any time or from time to time assign its interests in its Mortgage Loan and shall, in connection with any such assignment, also assign all of its right, title and interest in, to and under this Agreement to the new holder of the transferred Mortgage Loan; provided that neither Lender may assign its Mortgage Loan to the Borrower or any Affiliate of the Borrower; and provided, further, that, if any assignee of a Mortgage Loan (other than with respect to the Note A-1 Securitization) is not an Institutional Lender/Owner, then the Lender desiring to effect such transfer shall obtain (i) the consent of the other Lender (which consent may be given or withheld by such other Lender in its sole discretion) and (ii) written confirmation from any Rating Agency that has assigned a rating to any Related MBS backed or secured by the other Mortgage Loan to the effect that such assignment will not result in an Adverse Rating Event with respect to such Related MBS (the costs incurred in connection with obtaining such written confirmation from any Rating Agency to be borne by the party desiring to effect such transfer).  Subject to the prior sentence, each Lender shall be entitled to cause its Mortgage Loan to be securitized, and nothing contained herein shall limit its ability to do so, provided that any Person to whom it endorses its Note in connection with the subject securitization shall succeed to its right, title and interest hereunder; provided, further, that the costs incurred by either Lender in connection with the securitization of its Mortgage Loan shall be borne solely by such Lender (except that this proviso shall not apply to any costs and expenses to be borne by the Lenders pursuant to this Agreement and/or the Applicable Servicing Agreement (without taking into account this proviso) that relate to the servicing and administration of the Mortgage Loans and any REO Property from time to time).  Each Lender shall require any assignee of its Mortgage Loan to execute a written instrument whereby such assignee, for the benefit of the other Lender, assumes all of such Lender's obligations hereunder and agrees to be bound by the terms hereof, and such Lender shall deliver a copy of such executed instrument to the other Lender.  Any transfer of a Mortgage Loan by a Lender, including in connection with a securitization thereof, must be made subject to the terms hereof.

Section 6.10.  Article and Section Headings.

The article and section headings herein are for convenience of reference only, and shall not limit or otherwise affect the meaning hereof.

Section 6.11.  Notices to Rating Agencies.

The Note A-1 Lender shall promptly provide notice to each Rating Agency with respect to each of the following of which it has actual knowledge:

(i)    any material change or amendment to this Agreement; and

(ii)   any sale or disposition of either Mortgage Loan by a Lender.

Section 6.12.  No Joint Venture, Not a Security.

Neither the execution of this Agreement or (in the case of the Note A-1 Lender) the Applicable Servicing Agreement, nor any of the arrangements provided for herein including

any agreement to engage a joint master servicer and special servicer or to share in payments or losses as provided herein, is intended to be, nor shall it be construed to be, the formation of a partnership or joint venture between the parties to this Agreement.

The Notes shall not be deemed to be securities within the meaning of the Securities Act, or the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Each Note represents a separate debt obligation of the Borrower.

Section 6.13.  Cooperation.

Each of the Lenders agrees to take such other reasonable actions, and furnish (or cause to be furnished) such certificates and other documents, as may be reasonably requested by any other Lender in order to effectuate the purposes of this Agreement and to facilitate compliance with applicable laws and regulations and the terms of this Agreement. Further, each Lender agrees that it shall use reasonable efforts to cooperate with the other in effectuating any changes required by the Rating Agencies to this Agreement or to the Applicable Servicing Agreement; provided that such Lender shall not be required to consent to any such changes if such change would have a material adverse effect on (x) any of the rights, remedies or protections granted to it hereunder or thereunder or (y) the obligations to be incurred by such Lender as holder of its respective Note.

In connection with any Securitization, each party agrees to provide for inclusion in any disclosure document relating to the related Securitization such information concerning itself as the Note A-1 Lender or Note A-2 Lender, as applicable, reasonably determines to be necessary or appropriate; provided that no such Person shall be responsible for providing information as to any such other Person. Each party covenants and agrees that in the event either Note or any Note A Portion is to be included as an asset of a Securitization, each party hereto shall, at the requesting party's sole expense, (a) gather any information reasonably required by the Rating Agencies in connection with such Securitization and (b) cooperate with the reasonable requests of each Rating Agency and such requesting party in connection with all of the foregoing, as well as in connection with all other matters and the preparation of any offering documents thereof. Notwithstanding the foregoing, after the Securitization of either Note, the related Lender shall not be obligated to provide any information pursuant to this Section 6.13. Each party acknowledges that the information provided by such party to the Note A-1 Lender or the Note A-2 Lender, as applicable, may be incorporated into the offering documents for a Securitization. The Note A-1 Lender or the Note A-2 Lender, as applicable, and each Rating Agency shall be entitled to rely on the information supplied by, or on behalf of, such party.

In addition, in the event that Note A-2 becomes subject to a Securitization, on or before March 15th of each year during which a Form 10-K is required to be filed by the trustee of the Securitization related to Note A-2, the Series 2007-C6 Pooling and Servicing Agreement shall require each of the Master Servicer, Special Servicer and Trustee to, upon 30 days' written request, provide (and to cause any applicable sub-servicers, sub-contractors, agents and vendors to timely provide) to the Person who executes the Sarbanes-Oxley certification with respect to the Securitization of Note A-2, in each case upon which such Person can rely, (i) any Sarbanes-Oxley backup certification as is reasonably required in the market and pursuant to the Series 2007-C6 Pooling and Servicing Agreement, (ii) all disclosure information required to be

included in any offering document under Items 1108, 1109, 1117, 1119 of Regulation AB and any other applicable Items of Regulation AB under the Securities Act, and required to be included in any report required under the Exchange Act related to the Note A-2 Securitization and (iii) the assessment and attestation of servicing compliance as required under Item 1122 and the servicer compliance statement as required under Item 1123 of Regulation AB. Notwithstanding the foregoing each of the Master Servicer, Special Servicer and Trustee (and any applicable primary servicer) shall be required to provide (a) all necessary information, certificates, attestations, letters and other materials and/or (b) all reasonable cooperation necessary to enable the Lender with respect to Note A-2 to comply with the reporting requirements relating to servicing disclosure under the Exchange Act and/or the Securities Act (including without limitation, if applicable Regulation AB), as the case may be, at such times as the Related Securitization Trust is subject to such requirements.

Section 6.14.  Entire Agreement.

This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter contained in this Agreement and supersedes all prior agreements, understandings and negotiations between the parties.

Section 6.15.  Bifurcation of Note A-1 or Note A-2.

(a)      The Note A-1 Lender may at any time cause Note A-1 to be split and reissued as no more than five replacement notes (each, a "Replacement A-1 Note" and, collectively, the "Replacement A-1 Notes") that have an aggregate principal balance equal to that of Note A-1 on the date of reissuance and entitle the respective holders thereof to the same aggregate rights as the Note A-1 Lender. Any Replacement A-1 Notes may have different amortization terms, different principal balances and different interest rates; provided that, unless the Note A-2 Lender otherwise consents in writing, (x) the Replacement A-1 Notes must in the aggregate provide for no more than the same total payments over time as Note A-1 (except for any Excess Interest resulting from or arising out of the application of payments in accordance with any senior/subordinate payment priority in connection with a default or reasonably foreseeable default under the Note A-1 Mortgage Loan, including any such Excess Interest accruing after any remediation of the default), (y) the weighted average interest rate for the Replacement A-1 Notes (without regard to the default rate of interest) may not exceed the Applicable Interest Rate with respect to Note A-1 immediately prior to the creation of such Replacement A-1 Notes, and (z) the terms and provisions of the Replacement A-1 Notes shall otherwise comply with the terms and conditions of the Loan Agreement; and provided, further, that, if and to the extent that the Note A-2 Mortgage Loan has been included in a Securitization, the Note A-2 Lender's consent shall be deemed given for purposes of the foregoing proviso if each applicable Rating Agency provides written confirmation that the failure to comply with the requirements of clauses (x), (y) and (z) of the preceding proviso would not result in an Adverse Rating Event with respect to the Related MBS. If any Replacement A-1 Notes are issued, then (unless the context otherwise clearly requires) the term "Note A-1" shall be deemed to refer to the Replacement A-1 Notes in the aggregate, the term "Note A-1 Mortgage Loan" shall be deemed to refer to the respective debt obligations (each, a "Note A-1 Portion" and, collectively, the "Note A-1 Portions") evidenced by the various Replacement A-1 Notes in the aggregate, and the term "Note A-1 Lender" shall be deemed to refer to the respective holders of the

Replacement A-1 Notes in the aggregate; provided that any and all rights of the Note A-1 Lender acting (together with the Note A-2 Lender) as Directing Lender shall be exercised by the holders of Replacement A-1 Notes representing more than 50% of the aggregate unpaid principal balance of all the Replacement A-1 Notes or a designee thereof.

The Note A-2 Lender may at any time cause Note A-2 to be split and reissued as no more than five replacement notes (each, a "Replacement A-2 Note" and, collectively, the "Replacement A-2 Notes") that have an aggregate principal balance equal to that of Note A-2 on the date of reissuance and entitle the respective holders thereof to the same aggregate rights as the Note A-2 Lender. Any Replacement A-2 Notes may have different amortization terms, different principal balances and different interest rates; provided that, unless the Note A-1 Lender otherwise consents in writing, (x) the Replacement A-2 Notes must in the aggregate provide for no more than the same total payments over time as Note A-2 (except for any Excess Interest resulting from or arising out of the application of payments in accordance with any senior/subordinate payment priority in connection with a default or reasonably foreseeable default under the Note A-2 Mortgage Loan, including any such Excess Interest accruing after any remediation of the default), (y) the weighted average interest rate for the Replacement A-2 Notes (without regard to the default rate of interest) may not exceed the Applicable Interest Rate with respect to Note A-2 immediately prior to the creation of such Replacement A-2 Notes, and (z) the terms and provisions of the Replacement A-2 Notes shall otherwise comply with the terms and conditions of the Loan Agreement; and provided, further, that, if and to the extent that the Note A-1 Mortgage Loan has been included in a Securitization, the Note A-1 Lender's consent shall be deemed given for purposes of the foregoing proviso if each applicable Rating Agency provides written confirmation that the failure to comply with the requirements of clauses (x), (y) and (z) of the preceding proviso would not result in an Adverse Rating Event with respect to the Related MBS. If any Replacement A-2 Notes are issued, then (unless the context otherwise clearly requires) the term "Note A-2" shall be deemed to refer to the Replacement A-2 Notes in the aggregate, the term "Note A-2 Mortgage Loan" shall be deemed to refer to the respective debt obligations (each, a "Note A-2 Portion" and, collectively, the "Note A-2 Portions") evidenced by the various Replacement A-2 Notes in the aggregate, and the term "Note A-2 Lender" shall be deemed to refer to the respective holders of the Replacement A-2 Notes in the aggregate; provided that any and all rights of the Note A-2 Lender acting (together with the Note A-1 Lender) as Directing Lender shall be exercised by the holders of Replacement A-2 Notes representing more than 50% of the aggregate unpaid principal balance of all the Replacement A-2 Notes or a designee thereof.

(b)    If any Replacement A-1 Notes are issued, then (unless 100% of the holders thereof provide contrary written instructions to the Note A-2 Lender and the Master Servicer) any and all payments, collections, costs, expenses, losses, liabilities or other amounts allocated to Note A-1 or the Note A-1 Lender pursuant to any other provisions of this Agreement shall, in turn, be allocated to the related Replacement A-1 Notes, the holders thereof or the related Note A-1 Portions, as the case may be, on a *pro rata* basis (in accordance with the respective unpaid principal balances thereof or of the Note A-1 Portions held thereby, as the case may be). Furthermore, if any Replacement A-1 Notes are issued, then (unless 100% of the holders thereof provide contrary written instructions to the Note A-2 Lender and the Master Servicer) any matters having a negative economic effect with respect to the holders of such Replacement A-1 Notes shall be addressed such that each such holder shall bear a *pro rata* share

of such negative economic effect based upon the unpaid principal balance of its Note A-1 Portion relative to the aggregate unpaid principal balance of all the Note A-1 Portions. However, 100% of the holders of the Replacement A-1 Notes may, pursuant to a separate written agreement among themselves and written instructions to the Note A-2 Lender and the Master Servicer, provide for alternative allocations to those set forth in the preceding two sentences provided that, except as provided in Section 4.01(j) with respect to Excess Interest, no such alternative allocation may materially and adversely affect payments with respect to Note A-2 without the consent of the Note A-2 Lender (or, if Note A-2 or any Replacement A-2 Note is included in a commercial mortgage securitization, without written confirmation from each applicable Rating Agency that such alternative allocation will not result in an Adverse Rating Event with respect to the Related MBS backed by Note A-2 or such Replacement A-2 Note, as the case may be).

If any Replacement A-2 Notes are issued, then (unless 100% of the holders thereof provide contrary written instructions to the Note A-1 Lender and the Master Servicer) any and all payments, collections, costs, expenses, losses, liabilities or other amounts allocated to Note A-2 or the Note A-2 Lender pursuant to any other provisions of this Agreement shall, in turn, be allocated to the Replacement A-2 Notes, the holders thereof or the Note A-2 Portions, as the case may be, on a *pro rata* basis (in accordance with the respective unpaid principal balances thereof or of the Note A-2 Portions held thereby, as the case may be). Furthermore, if any Replacement A-2 Notes are issued, then (unless 100% of the holders thereof provide contrary written instructions to the Note A-1 Lender and the Master Servicer) any matters having a negative economic effect with respect to the holders of such Replacement A-2 Notes shall be addressed such that each such holder shall bear a *pro rata* share of such negative economic effect based upon the unpaid principal balance of its Note A-2 Portion relative to the aggregate unpaid principal balance of all the Note A-2 Portions. However, 100% of the holders of the Replacement A-2 Notes may, pursuant to a separate written agreement among themselves and written instructions to the Note A-1 Lender and the Master Servicer, provide for alternative allocations to those set forth in the preceding two sentences provided that, except as provided in Section 4.01(j) with respect to Excess Interest, no such alternative allocation may materially and adversely affect payments with respect to Note A-1 without the consent of the Note A-1 Lender (or, if Note A-1 or any Replacement A-1 Note is included in a commercial mortgage securitization, without written confirmation from each applicable Rating Agency that such alternative allocation will not result in an Adverse Rating Event with respect to the Related MBS backed by Note A-1 or such Replacement A-1 Note, as the case may be).

(c)     Notwithstanding anything to the contrary in the immediately preceding subsections (a) and (b), a Replacement A-1 Note and/or Replacement A-2 Note may be designated as and executed by the Borrower in the form of a B note or, if and to the extent permitted under the Loan Documents, a mezzanine debt note and, notwithstanding any such designation, the provisions under this Agreement relating to a Replacement A-1 Note or a Replacement A-2 Note, as the case may be, shall also refer to and apply with equal force and effect to any such B note; provided that no mezzanine lender shall have any rights hereunder; and provided, further, that, if any mezzanine debt is created and if and to the extent that any Mortgage Loan is included in a Securitization, then the Lenders and the related mezzanine lender must enter into an intercreditor agreement that would not, as evidenced by written confirmation from each applicable Rating Agency, result in an Adverse Rating Event with respect to any

Related MBS. Further notwithstanding anything to the contrary in the immediately preceding subsections (a) and (b), then (except as provided in Section 4.01(i)) the issuance of Replacement A-1 Notes and/or Replacement A-2 Notes shall in no event change the relative rights, liabilities and other obligations of the holders of Note A-1 or any Replacement A-1 Notes in the aggregate, on the one hand, and the holders of Note A-2 or any Replacement A-2 Notes in the aggregate, on the other hand. If the Note A-1 Lender has any affirmative obligations hereunder (other than the payment of money, which will be allocated among the respective holders of any Replacement A-1 Notes in accordance with the immediately preceding subsection (b)), then such obligations shall apply to each and every holder of a Replacement A-1 Note. If the Note A-2 Lender has any affirmative obligations hereunder (other than the payment of money, which will be allocated among the respective holders of any Replacement A-2 Notes in accordance with the immediately preceding subsection (b)), then such obligations shall apply to each and every holder of a Replacement A-2 Note. Likewise, any prohibitions herein with respect to the Note A-1 Lender shall apply to each and every holder of a Replacement A-1 Note and any prohibitions herein with respect to the Note A-2 Lender shall apply to each and every holder of a Replacement A-2 Note.

IN WITNESS WHEREOF, Initial A-1 Lender and Initial A-2 Lender have caused this Agreement to be duly executed as of the day and year first above written.

**LEHMAN BROTHERS HOLDINGS INC.,**
doing business as LEHMAN CAPITAL, a
division of LEHMAN BROTHERS HOLDINGS
INC., as Initial A-1 Lender

By:_____

Name: Charlene Thomas
Title: Authorized Signatory

**LEHMAN BROTHERS HOLDINGS INC.,**
doing business as LEHMAN CAPITAL, a
division of LEHMAN BROTHERS HOLDINGS
INC., as Initial A-2 Lender

By:_____

Name: Charlene Thomas
Title: Authorized Signatory

# EXHIBIT I
## MORTGAGE LOAN SCHEDULE

| Borrower Name | Closing Date Principal Balance (Note A-1 Mortgage Loan) | Closing Date Principal Balance (Note A-2 Mortgage Loan) | Maturity Date | Original Applicable Interest Rate for Note A-1 Mortgage Loan | Original Applicable Interest Rate for Note A-2 Mortgage Loan |
|---|---|---|---|---|---|
| Grand Prix Belmont LLC, Grand Prix Campbell/San Jose LLC, Grand Prix El Segundo LLC, Grand Prix Fremont LLC, Grand Prix Mountain View, LLC, Grand Prix San Jose, LLC, Grand Prix San Mateo, LLC, Grand Prix Sili I LLC, Grand Prix Sili II LLC, Grand Prix Denver LLC, Grand Prix Englewood/Denver South LLC, Grand Prix Shelton LLC, Grand Prix Windsor LLC, Grand Prix Altamonte LLC, Grand Prix Ft. Lauderdale LLC, Grand Prix Naples LLC, Grand Prix Atlanta LLC, Grand Prix Atlanta (Peachtree Corners) LLC, Grand Prix Lombard LLC, Grand Prix Chicago LLC, Grand Prix Schaumburg LLC, Grand Prix Westchester LLC, Grand Prix Lexington LLC, Grand Prix Louisville (RI) LLC, Grand Prix Columbia LLC, Grand Prix Gaithersburg LLC, Grand Prix Germantown LLC, Grand Prix Portland LLC, Grand Prix Livonia LLC, Grand Prix Cherry Hill LLC, Grand Prix Mt. Laurel LLC, Grand Prix Saddle River LLC, Grand Prix Islandia LLC, Grand Prix Binghamton LLC, Grand Prix Horsham LLC, Grand Prix Willow Grove LLC, Grand Prix Addison (RI) LLC, Grand Prix Arlington LLC, Grand Prix Los Colinas LLC, Grand Prix Richmond LLC, Grand Prix Richmond (Northwest) LLC, Grand Prix Bellevue LLC, Grand Prix Bothell LLC, Grand Prix Lynnwood LLC, Grand Prix Tukwila LLC | $412,701,271 | $412,701,271 | July 9, 2017 | 6.7125% | 6.7125% |

Exh. I-1

# EXHIBIT D

STRUCTURED ASSET SECURITIES CORPORATION II,
Depositor

and

WACHOVIA BANK, NATIONAL ASSOCIATION
as Master Servicer

and

MIDLAND LOAN SERVICES, INC.,
as Special Servicer

and

LASALLE BANK NATIONAL ASSOCIATION,
as Trustee

POOLING AND SERVICING AGREEMENT

Dated as of August 13, 2007

_____ _____

$2,978,936,714

LB-UBS Commercial Mortgage Trust 2007-C6
Commercial Mortgage Pass-Through Certificates,
Series 2007-C6

# TABLE OF CONTENTS

## ARTICLE I

### DEFINITIONS; GENERAL INTERPRETIVE PRINCIPLES; CERTAIN ADJUSTMENTS TO THE PRINCIPAL DISTRIBUTIONS ON THE CERTIFICATES

| | | |
|---|---|---|
| SECTION 1.01. | Defined Terms. | .....7 |
| SECTION 1.02. | General Interpretive Principles. | ...117 |
| SECTION 1.03. | Certain Adjustments to the Principal Distributions on the Certificates. | ...117 |
| SECTION 1.04. | Calculation of LIBOR. | ...120 |

## ARTICLE II

### CONVEYANCE OF TRUST MORTGAGE LOANS; REPRESENTATIONS AND WARRANTIES; ORIGINAL ISSUANCE OF CERTIFICATES

| | | |
|---|---|---|
| SECTION 2.01. | Creation of Trust; Conveyance of Trust Mortgage Loans. | ...121 |
| SECTION 2.02. | Acceptance of Trust Fund by Trustee. | ...125 |
| SECTION 2.03. | Repurchase of Trust Mortgage Loans for Document Defects and Breaches of Representations and Warranties. | ...127 |
| SECTION 2.04. | Representations, Warranties and Covenants of the Depositor. | ...139 |
| SECTION 2.05. | Acceptance of Grantor Trust Assets by Trustee; Issuance of the Class V Certificates and the Floating Rate Certificates. | ...141 |
| SECTION 2.06. | Acceptance of Loan REMICs by Trustee; Execution, Authentication and Delivery of Class R-LR Certificates; Creation of Loan REMIC Regular Interests. | ...142 |
| SECTION 2.07. | Conveyance of Loan REMIC Regular Interests. | ...142 |
| SECTION 2.08. | Execution, Authentication and Delivery of Class R-I Certificates; Creation of REMIC I Regular Interests. | ...142 |
| SECTION 2.09. | Conveyance of REMIC I Regular Interests; Acceptance of REMIC II by Trustee. | ...143 |
| SECTION 2.10. | Execution, Authentication and Delivery of Class R-II Certificates; Creation of REMIC II Regular Interests. | ...143 |
| SECTION 2.11. | Conveyance of REMIC II Regular Interests; Acceptance of REMIC III by Trustee. | ...143 |
| SECTION 2.12. | Execution, Authentication and Delivery of REMIC III Certificates. | ...144 |
| SECTION 2.13. | Acceptance of Loss of Value Reserve Fund by Trustee. | ...144 |

## ARTICLE III

### ADMINISTRATION AND SERVICING OF THE TRUST FUND

| | | |
|---|---|---|
| SECTION 3.01. | Administration of the Mortgage Loans. | ...145 |
| SECTION 3.02. | Collection of Mortgage Loan Payments. | ...148 |

| | | |
|---|---|---|
| SECTION 3.03. | Collection of Taxes, Assessments and Similar Items; Servicing Accounts; Reserve Accounts.............................................................................................151 | |
| SECTION 3.04. | Pool Custodial Account, Defeasance Deposit Account, Collection Account, Interest Reserve Account, Excess Liquidation Proceeds Account, Loss of Value Reserve Fund, Floating Rate Accounts and Swap Collateral Accounts.................................................................................153 | |
| SECTION 3.05. | Permitted Withdrawals From the Pool Custodial Account, the Collection Account, the Interest Reserve Account and the Excess Liquidation Proceeds Account.............................................................................................163 | |
| SECTION 3.06. | Investment of Funds in the Collection Account, the Servicing Accounts, the Reserve Accounts, the Defeasance Deposit Account, the Custodial Accounts, the REO Accounts, the Interest Reserve Account, the Excess Liquidation Proceeds Account and the Floating Rate Accounts. .....................181 | |
| SECTION 3.07. | Maintenance of Insurance Policies; Errors and Omissions and Fidelity Coverage; Environmental Insurance...............................................................183 | |
| SECTION 3.08. | Enforcement of Alienation Clauses. ...............................................................188 | |
| SECTION 3.09. | Realization Upon Defaulted Mortgage Loans; Required Appraisals; Appraisal Reduction Calculation. ....................................................................194 | |
| SECTION 3.10. | Trustee and Custodian to Cooperate; Release of Mortgage Files........................199 | |
| SECTION 3.11. | Servicing Compensation; Payment of Expenses; Certain Matters Regarding Servicing Advances.......................................................................201 | |
| SECTION 3.12. | Property Inspections; Collection of Financial Statements; Delivery of Certain Reports. ..............................................................................................208 | |
| SECTION 3.13. | Annual Statement as to Compliance. ..............................................................213 | |
| SECTION 3.14. | Reports on Assessment of Compliance with Servicing Criteria; Registered Public Accounting Firm Attestation Reports....................................................215 | |
| SECTION 3.15. | Access to Certain Information. .......................................................................218 | |
| SECTION 3.16. | Title to REO Property; REO Accounts.............................................................220 | |
| SECTION 3.17. | Management of REO Property.........................................................................222 | |
| SECTION 3.18. | Sale of Trust Mortgage Loans and Administered REO Properties.....................225 | |
| SECTION 3.19. | Additional Obligations of the Master Servicer and Special Servicer; Obligations to Notify Ground Lessors and Hospitality Franchisors; the Special Servicer's Right to Request the Master Servicer to Make Servicing Advance. ......................................................................................230 | |
| SECTION 3.20. | Modifications, Waivers, Amendments and Consents; Defeasance. ....................234 | |
| SECTION 3.21. | Transfer of Servicing Between Master Servicer and Special Servicer; Record Keeping. ..........................................................................................246 | |
| SECTION 3.22. | Sub-Servicing Agreements. ............................................................................247 | |
| SECTION 3.23. | Representations and Warranties of the Master Servicer. ......................................251 | |
| SECTION 3.24. | Representations and Warranties of the Special Servicer. .....................................252 | |
| SECTION 3.25. | Certain Matters Regarding the Purchase of the Trust Mortgage Loan in a Loan Combination. ........................................................................................254 | |
| SECTION 3.26. | Application of Default Charges. .........................................................................254 | |
| SECTION 3.27. | Certain Matters Regarding Serviced Loan Combinations. ...................................258 | |
| SECTION 3.28. | Deliveries in Connection with Securitization of a Serviced Non-Trust Mortgage Loan...............................................................................................260 | |
| SECTION 3.29. | The Swap Agreements. ......................................................................................260 | |

[TPW: NYLEGAL:707059.11] 20995-00020  10/02/2007 05:00 PM

## ARTICLE IV

### PAYMENTS TO CERTIFICATEHOLDERS; REPORTS TO CERTIFICATEHOLDERS

| SECTION 4.01. | Distributions. | 264 |
| SECTION 4.02. | Statements to Certificateholders and Others. | 275 |
| SECTION 4.03. | P&I Advances With Respect to the Mortgage Pool. | 284 |
| SECTION 4.04. | Allocations of Realized Losses and Additional Trust Fund Expenses | 290 |
| SECTION 4.05. | Various Reinstatement Amounts. | 292 |
| SECTION 4.06. | Calculations. | 294 |

### ARTICLE V

### THE CERTIFICATES

| SECTION 5.01. | The Certificates. | 295 |
| SECTION 5.02. | Registration of Transfer and Exchange of Certificates. | 295 |
| SECTION 5.03. | Book-Entry Certificates. | 303 |
| SECTION 5.04. | Mutilated, Destroyed, Lost or Stolen Certificates. | 305 |
| SECTION 5.05. | Persons Deemed Owners. | 305 |

### ARTICLE VI

### THE DEPOSITOR, THE MASTER SERVICER, THE SPECIAL SERVICER AND THE CONTROLLING CLASS REPRESENTATIVE

| SECTION 6.01. | Liability of Depositor, Master Servicer and Special Servicer. | 306 |
| SECTION 6.02. | Continued Qualification and Compliance of Master Servicer; Merger, Consolidation or Conversion of Depositor, Master Servicer or Special Servicer. | 306 |
| SECTION 6.03. | Limitation on Liability of Depositor, Master Servicer and Special Servicer. | 307 |
| SECTION 6.04. | Resignation of Master Servicer and the Special Servicer. | 308 |
| SECTION 6.05. | Rights of Depositor, Trustee and Serviced Non-Trust Mortgage Loan Noteholders in Respect of the Master Servicer and the Special Servicer. | 309 |
| SECTION 6.06. | Depositor, Master Servicer and Special Servicer to Cooperate with Trustee. | 309 |
| SECTION 6.07. | Depositor, Special Servicer and Trustee to Cooperate with Master Servicer. | 309 |
| SECTION 6.08. | Depositor, Master Servicer and Trustee to Cooperate with Special Servicer. | 310 |
| SECTION 6.09. | Designation of Special Servicer and Controlling Class Representative; Replacement of Special Servicer by the Controlling Class and Others. | 310 |
| SECTION 6.10. | Master Servicer or Special Servicer as Owner of a Certificate. | 314 |
| SECTION 6.11. | Certain Powers of the Controlling Class Representative. | 315 |
| SECTION 6.12. | Certain Matters Regarding the Serviced Loan Combinations. | 318 |

## ARTICLE VII

### DEFAULT

| | | |
|---|---|---|
| SECTION 7.01. | Events of Default and Outside Servicer Defaults. | 323 |
| SECTION 7.02. | Trustee to Act; Appointment of Successor. | 331 |
| SECTION 7.03. | Notification to Certificateholders and Others. | 332 |
| SECTION 7.04. | Waiver of Events of Default and Outside Servicer Defaults. | 333 |
| SECTION 7.05. | Additional Remedies of Trustee Upon Event of Default or Outside Servicer Default. | 333 |

## ARTICLE VIII

### CONCERNING THE TRUSTEE

| | | |
|---|---|---|
| SECTION 8.01. | Duties of Trustee. | 335 |
| SECTION 8.02. | Certain Matters Affecting Trustee. | 336 |
| SECTION 8.03. | Trustee and Fiscal Agent Not Liable for Validity or Sufficiency of Certificates or Mortgage Loans. | 337 |
| SECTION 8.04. | Trustee and Fiscal Agent May Own Certificates. | 337 |
| SECTION 8.05. | Fees and Expenses of Trustee; Indemnification of and by Trustee. | 338 |
| SECTION 8.06. | Eligibility Requirements for Trustee. | 339 |
| SECTION 8.07. | Resignation and Removal of Trustee. | 339 |
| SECTION 8.08. | Successor Trustee. | 341 |
| SECTION 8.09. | Merger or Consolidation of Trustee and Fiscal Agent. | 342 |
| SECTION 8.10. | Appointment of Co-Trustee or Separate Trustee. | 342 |
| SECTION 8.11. | Appointment of Custodians. | 343 |
| SECTION 8.12. | Appointment of Authenticating Agents. | 344 |
| SECTION 8.13. | Appointment of Tax Administrators. | 344 |
| SECTION 8.14. | Access to Certain Information. | 345 |
| SECTION 8.15. | Reports to the Securities and Exchange Commission and Related Reports. | 347 |
| SECTION 8.16. | Representations and Warranties of Trustee. | 357 |
| SECTION 8.17. | Appointment of a Fiscal Agent. | 359 |
| SECTION 8.18. | Representations and Warranties of Fiscal Agent. | 360 |

## ARTICLE IX

### TERMINATION

| | | |
|---|---|---|
| SECTION 9.01. | Termination Upon Repurchase or Liquidation of All Trust Mortgage Loans. | 362 |
| SECTION 9.02. | Additional Termination Requirements. | 365 |
| SECTION 9.03. | Outside Administered REO Properties. | 366 |

[TPW: NYLEGAL:707059.11] 20995-00020 10/02/2007 05:00 PM

# ARTICLE X

## ADDITIONAL TAX PROVISIONS

SECTION 10.01.    REMIC Administration.......................................................................................367
SECTION 10.02.    Grantor Trust Administration. ............................................................................370

# ARTICLE XI

## MISCELLANEOUS PROVISIONS

SECTION 11.01.    Amendment.......................................................................................................373
SECTION 11.02.    Recordation of Agreement; Counterparts. ..........................................................375
SECTION 11.03.    Limitation on Rights of Certificateholders. ........................................................375
SECTION 11.04.    Governing Law; Consent to Jurisdiction. ...........................................................376
SECTION 11.05.    Notices. .............................................................................................................377
SECTION 11.06.    Severability of Provisions. .................................................................................377
SECTION 11.07.    Grant of a Security Interest. ...............................................................................378
SECTION 11.08.    Streit Act. ..........................................................................................................378
SECTION 11.09.    Successors and Assigns; Beneficiaries. ..............................................................379
SECTION 11.10.    Article and Section Headings..............................................................................379
SECTION 11.11.    Notices to Rating Agencies.................................................................................379
SECTION 11.12.    Complete Agreement. .........................................................................................381

# SCHEDULES AND EXHIBITS

Schedule No.   Schedule Description

| | |
|---|---|
| I | Trust Mortgage Loan Schedule |
| II | Representations and Warranties of the Depositor |
| III | Exceptions to the Representations and Warranties of the Depositor |
| IV | Schedule of Environmentally Insured Mortgage Loans |
| V | Schedule of Initial Deposit Mortgage Loans |
| VI | Schedule of Mortgage Loans Secured by a Hospitality Property or Nursing Facility |
| VII | Schedule of Early Defeasance Mortgage Loans |
| VIII | Schedule of Additional Mortgage Loan Origination Documents |
| IX | Schedule of Additional Section 2.03 Documents |
| X | [RESERVED] |
| XI | Schedule of Class A-AB Planned Principal Balances |
| XII | Schedule of Significant Obligor Financial Statement Recipients |

Exhibit No.   Exhibit Description

| | |
|---|---|
| A-1 | Form of Class [A-1] [A-2] [A-3] [A-AB] [A-4] [A-1A] Certificate |
| A-2 | Form of Class X Certificate |
| A-3 | Form of Class [A-M] [A-J] [B] [C] [D] [E] [F] Certificate |
| A-4 | Form of Class [A-2FL] [A-MFL] [G] [H] [J] [K] [L] [M] [N] [P] [Q] [S] [T] Certificate |
| A-5 | Form of Class [R-I] [R-II] [R-III] [R-LR] Certificate |
| A-6 | Form of Class V Certificate |
| B | Form of Distribution Date Statement |
| C | Form of Custodial Certification |
| D-1 | Form of Master Servicer Request for Release |
| D-2 | Form of Special Servicer Request for Release |
| E | Form of Loan Payoff Notification Report |
| F-1 | Form of Transferor Certificate for Transfers of Definitive Non-Registered Certificates |
| F-2A | Form I of Transferee Certificate for Transfers of Definitive Non-Registered Certificates |
| F-2B | Form II of Transferee Certificate for Transfers of Definitive Non-Registered Certificates |
| F-2C | Form of Transferee Certificate for Transfers of Interests in Rule 144A Global Certificates |
| F-2D | Form of Transferee Certificate for Transfers of Interests in Regulation S Global Certificates |
| G-1 | Form I of Transferee Certificate in Connection with ERISA (Definitive Non-Registered Certificates) |
| G-2 | Form II of Transferee Certificate in Connection with ERISA (Book-Entry Non-Registered Certificates) |
| H-1 | Form of Transfer Affidavit and Agreement regarding Residual Interest Certificates |
| H-2 | Form of Transferor Certificate regarding Residual Interest Certificates |
| I-1 | Form of Notice and Acknowledgment |
| I-2 | Form of Acknowledgment of Proposed Special Servicer |
| J | Form of UCC-1 Financing Statement Schedule |
| K | Sub-Servicers in respect of which Sub-Servicing Agreements are in effect or being negotiated as of the Closing Date |
| L-1 | Form of Information Request/Investor Certification for Website Access from Certificate [Holder] [Owner] |

[TPW: NYLEGAL:707059.11] 20995-00020  10/02/2007 05:00 PM

Exhibit No.   Exhibit Description

L-2   Form of Information Request/Investor Certification for Website Access from Prospective Investor
M     Form of Defeasance Certification
N     Form of Seller/Depositor Notification
O     Form of Controlling Class Representative Confidentiality Agreement
P     Form of Trustee Backup Certification
Q     Form of Master Servicer Backup Certification
R     Form of Special Servicer Backup Certification
S     Form of Outside Master Servicer/Outside Trustee Notice
T     Relevant Servicing Criteria Matrix
U     Form of Exchange Act Reportable Event Notification
V     Form of Master Servicer Certification

[TPW: NYLEGAL:707059.11] 20995-00020 10/02/2007 05:00 PM

This Pooling and Servicing Agreement (this "Agreement") is dated and effective as of August 13, 2007, among STRUCTURED ASSET SECURITIES CORPORATION II, as Depositor, WACHOVIA BANK, NATIONAL ASSOCIATION, as Master Servicer, MIDLAND LOAN SERVICES, INC., as Special Servicer, and LASALLE BANK NATIONAL ASSOCIATION, as Trustee.

## PRELIMINARY STATEMENT:

The Depositor intends to sell the Certificates, which are to be issued hereunder in multiple Classes and which in the aggregate will evidence the entire beneficial ownership interest in the Trust Fund.

As provided herein, the Trustee will elect to treat each Early Defeasance Trust Mortgage Loan, if any, as the primary asset of a separate REMIC for federal income tax purposes, and each such REMIC will be designated as a "Loan REMIC". The Class R-LR Certificates (if issued in accordance with Section 2.06) will represent the sole class of "residual interests" in each and every Loan REMIC, if any, for purposes of the REMIC Provisions under federal income tax law. A separate Loan REMIC Regular Interest will, on the Closing Date, be issued with respect to, and will thereafter relate to, each Early Defeasance Trust Mortgage Loan, if any, included in a Loan REMIC. Each Loan REMIC Regular Interest, if any, issued with respect to, and relating to, an Early Defeasance Trust Mortgage Loan in a Loan REMIC, shall also relate to any successor REO Trust Mortgage Loan with respect to such Early Defeasance Trust Mortgage Loan. Each Loan REMIC Regular Interest, if any, shall: (i) bear a numeric designation that is the same as the loan number for the related Early Defeasance Trust Mortgage Loan set forth on the Trust Mortgage Loan Schedule; (ii) accrue interest at the related per annum rate described in the definition of "Loan REMIC Remittance Rate"; and (iii) have an initial Uncertificated Principal Balance equal to the Cut-off Date Balance of the related Early Defeasance Trust Mortgage Loan. The Legal Final Distribution Date of each Loan REMIC Regular Interest, if any, is the Distribution Date immediately following the third anniversary of the end of the remaining amortization term (as determined as of the Closing Date) of the related Early Defeasance Trust Mortgage Loan. None of the Loan REMIC Regular Interests (if issued in accordance with Section 2.06) will be certificated. Notwithstanding the foregoing, however, if the Trust Fund does not include Early Defeasance Trust Mortgage Loans, then (i) there will be no Loan REMICs, (ii) neither the Class R-LR Certificates nor any Loan REMIC Regular Interests will be issued and (iii) the provisions of Section 2.06(b) will apply.

As provided herein, the Trustee will elect to treat the segregated pool of assets consisting of the Trust Mortgage Loans (exclusive of the Early Defeasance Trust Mortgage Loans, if any, and exclusive of any collections of Additional Interest on the ARD Trust Mortgage Loans, if any, after their respective Anticipated Repayment Dates), any Loan REMIC Regular Interests and certain other related assets subject to this Agreement as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC I". The Class R-I Certificates will represent the sole class of "residual interests" in REMIC I for purposes of the REMIC Provisions under federal income tax law. A separate REMIC I Regular Interest will, on the Closing Date, be issued with respect to, and will thereafter relate to, each other Trust Mortgage Loan included in REMIC I and each Loan REMIC Regular Interest, if any, included in REMIC I. Each REMIC I Regular Interest issued with respect to, and relating to, a Trust Mortgage Loan in REMIC I, shall also relate to any successor REO Trust Mortgage Loan with respect to such Trust Mortgage Loan. Each REMIC I Regular Interest issued with respect to, and relating to, any Loan REMIC Regular Interest, shall also relate to the Early Defeasance Trust Mortgage Loan and any successor REO Trust Mortgage Loan corresponding to such Loan REMIC

Regular Interest. Each REMIC I Regular Interest shall: (i) bear a numeric designation that is the same as the loan number for the related Trust Mortgage Loan set forth on the Trust Mortgage Loan Schedule; (ii) accrue interest at a per annum rate described in the definition of "REMIC I Remittance Rate"; and (iii) have an initial Uncertificated Principal Balance equal to the Cut-off Date Balance of the related Trust Mortgage Loan. The Legal Final Distribution Date of each of the REMIC I Regular Interests is the Distribution Date immediately following the third anniversary of the end of the remaining amortization term (as determined as of the Closing Date) of the related Trust Mortgage Loan. None of the REMIC I Regular Interests will be certificated.

As provided herein, the Trustee will elect to treat the segregated pool of assets consisting of the REMIC I Regular Interests as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC II". The Class R-II Certificates will represent the sole class of "residual interests" in REMIC II for purposes of the REMIC Provisions under federal income tax law. The Legal Final Distribution Date for each REMIC II Regular Interest is the latest Rated Final Distribution Date. None of the REMIC II Regular Interests will be certificated. Each REMIC II Regular Interest shall accrue interest at a per annum rate described in the definition of "REMIC II Remittance Rate." The following table sets forth the designation, the initial Uncertificated Principal Balance and the Corresponding Class of Principal Balance Certificates for each of the REMIC II Regular Interests.

### REMIC II Regular Interests

| Designation | Initial Uncertificated Principal Balance | Corresponding Class of Principal Balance Certificates |
|---|---|---|
| A-1 | $ 21,000,000 | A-1 |
| A-2 | $ 455,000,000 | A-2 |
| A-2FL | $ 40,000,000 | A-2FL |
| A-3 | $ 169,000,000 | A-3 |
| A-AB | $ 67,000,000 | A-AB |
| A-4 | $ 910,408,000 | A-4 |
| A-1A | $ 422,847,000 | A-1A |
| A-M | $ 227,893,000 | A-M |
| A-MFL | $ 70,000,000 | A-MFL |
| A-J | $ 156,395,000 | A-J |
| B | $ 33,513,000 | B |
| C | $ 37,237,000 | C |
| D | $ 33,513,000 | D |
| E | $ 29,789,000 | E |
| F | $ 29,790,000 | F |
| G | $ 33,513,000 | G |
| H | $ 37,236,000 | H |
| J | $ 40,961,000 | J |
| K | $ 29,789,000 | K |
| L | $ 44,684,000 | L |
| M | $ 14,895,000 | M |
| N | $ 11,171,000 | N |
| P | $ 3,723,000 | P |
| Q | $ 7,448,000 | Q |
| S | $ 7,447,000 | S |
| T | $ 44,684,714 | T |

[TPW: NYLEGAL:707059.11] 20995-00020 10/02/2007 05:00 PM

As provided herein, the Trustee will elect to treat the segregated pool of assets consisting of the REMIC II Regular Interests as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC III". The Class R-III Certificates will evidence the sole class of "residual interests" in REMIC III for purposes of the REMIC Provisions under federal income tax law. For federal income tax purposes, each Class of the Regular Interest Certificates (exclusive of the Class X Certificates), each Class X REMIC III Component and each Group FL REMIC III Regular Interest will be designated as a separate "regular interest" in REMIC III. The Legal Final Distribution Date for each Class of Regular Interest Certificates (exclusive of the Class X Certificates), for each Class X REMIC III Component and for each Group FL REMIC III Regular Interest is the latest Rated Final Distribution Date. Each Class of Regular Interest Certificates, each Class X REMIC III Component and each Group FL REMIC III Regular Interest will accrue interest at the per annum rate described in the definition of "Pass-Through Rate." The following table sets forth the Class designation and original Class Principal Balance for each Class of the Regular Interest Certificates and each Group FL REMIC III Regular Interest.

### Regular Interest Certificates

| Class Designation | Original Class Principal Balance |
|---|---|
| Class A-1 | $ 21,000,000 |
| Class A-2 | $ 455,000,000 |
| Class A-2FL[(1)] | $ 40,000,000 |
| Class A-3 | $ 169,000,000 |
| Class A-AB | $ 67,000,000 |
| Class A-4 | $ 910,408,000 |
| Class A-1A | $ 422,847,000 |
| Class A-M | $ 227,893,000 |
| Class A-MFL[(2)] | $ 70,000,000 |
| Class A-J | $ 156,395,000 |
| Class B | $ 33,513,000 |
| Class C | $ 37,237,000 |
| Class D | $ 33,513,000 |
| Class E | $ 29,789,000 |
| Class F | $ 29,790,000 |
| Class G | $ 33,513,000 |
| Class H | $ 37,236,000 |
| Class J | $ 40,961,000 |
| Class K | $ 29,789,000 |
| Class L | $ 44,684,000 |
| Class M | $ 14,895,000 |
| Class N | $ 11,171,000 |
| Class P | $ 3,723,000 |
| Class Q | $ 7,448,000 |
| Class S | $ 7,447,000 |
| Class T | $ 44,684,714 |

-3-

| Class<br>Designation | Original Class<br>Principal Balance |
|:---:|:---:|
| Class X | (3) |

(1)     Refers to the Class A-2FL REMIC III Regular Interest and not to the Class A-2FL Certificates.

(2)     Refers to the Class A-MFL REMIC III Regular Interest and not to the Class A-MFL Certificates.

(3)     The Class X Certificates will not have a Class Principal Balance and will not entitle their Holders to receive distributions of principal. The Class X Certificates will have a Class Notional Amount which will be equal to the aggregate of the Component Notional Amounts of the Class X REMIC III Components from time to time. As more specifically provided herein, interest in respect of the Class X Certificates will consist of the aggregate amount of interest accrued on the respective Class X Certificates will consist of the aggregate amount of interest accrued on the respective Component Notional Amounts of the Class X REMIC III Components from time to time.

The portion of the Trust Fund consisting of (i) the Class A-2FL REMIC III Regular Interest (and distributions thereon), the Class A-2FL Swap Agreement (and payments by the Class A-2FL Swap Counterparty thereunder) and the Class A-2FL Floating Rate Account and (ii) amounts held from time to time in the Class A-2FL Floating Rate Account that represent distributions on the Class A-2FL REMIC III Regular Interest and payments by the Class A-2FL Swap Counterparty under the Class A-2FL Swap Agreement, shall be treated as a grantor trust for federal income tax purposes and shall be designated as "Grantor Trust A-2FL." The portion of the Trust Fund consisting of (i) the Class A-MFL REMIC III Regular Interest (and distributions thereon), the Class A-MFL Swap Agreement (and payments by the Class A-MFL Swap Counterparty thereunder) and the Class A-MFL Floating Rate Account and (ii) amounts held from time to time in the Class A-MFL Floating Rate Account that represent distributions on the Class A-MFL REMIC III Regular Interest and payments by the Class A-MFL Swap Counterparty under the Class A-MFL Swap Agreement, shall be treated as a grantor trust for federal income tax purposes and shall be designated as "Grantor Trust A-MFL." As provided herein, the Trustee shall take all actions required hereunder to ensure that the portions of the Trust Fund consisting of the Grantor Trust A-2FL Assets and the Grantor Trust A-MFL Assets, respectively, maintain their status as multiple grantor trusts under federal income tax law and not be treated as part of any REMIC Pool. The Class A-2FL Certificates shall represent undivided beneficial interests in Grantor Trust A-2FL as described herein and the Class A-MFL Certificates shall represent undivided beneficial interests in Grantor Trust A-MFL as described herein.

The Class V Certificates (if issued in accordance with Section 2.05) will represent the entire beneficial ownership of the Class V Grantor Trust Assets. Notwithstanding the foregoing, however, if the Trust Fund does not include ARD Trust Mortgage Loans, then there will be no Grantor Trust V, the Class V Certificates will not be issued and the provisions of Section 2.05(b) will apply.

The Initial Pool Balance will be $2,978,936,714.

The Trust Fund will include multiple Trust Mortgage Loans (each, a "Combination Trust Mortgage Loan") that are, in each such case, together with one (1) or more other mortgage loans that will not be part of the Trust Fund (each such other mortgage loan, a "Non-Trust Mortgage Loan"), secured on a collective basis by the same Mortgage(s) encumbering the related Mortgaged Property or group of Mortgaged Properties. The Combination Trust Mortgage Loan and related Non-Trust

-4-

Mortgage Loan(s) that are secured by the same Mortgage(s) on a particular Mortgaged Property or group of Mortgaged Properties will, together, constitute a "Loan Combination" (which term shall include any pair or group of successor REO Mortgage Loans with respect to those two (2) or more mortgage loans or any other corresponding mortgage loans deemed to exist with respect to a related REO Property). Each Trust Mortgage Loan and Non-Trust Mortgage Loan comprising a Loan Combination is evidenced by a separate Mortgage Note. The relative rights of the respective lenders in respect of each Loan Combination are set forth in a related co-lender agreement or intercreditor agreement (each such co-lender agreement or intercreditor agreement, as amended, restated, supplemented or otherwise modified from time to time, a "Co-Lender Agreement"), between the holder of the Mortgage Note for the Combination Trust Mortgage Loan included in such Loan Combination and the holder(s) of the Mortgage Note(s) for the Non-Trust Mortgage Loan(s) included in such Loan Combination. As and to the extent provided in the related Co-Lender Agreement and the related loan documents, a Non-Trust Mortgage Loan may, under various material default scenarios, be senior in right of payment to the related Combination Trust Mortgage Loan (any such Non-Trust Mortgage Loan, a "Senior Non-Trust Mortgage Loan"), *pari passu* in right of payment with the related Combination Trust Mortgage Loan (any such Non-Trust Mortgage Loan, a "Pari Passu Non-Trust Mortgage Loan") or subordinate in right of payment to the related Combination Trust Mortgage Loan (any such Non-Trust Mortgage Loan, a "Subordinate Non-Trust Mortgage Loan").

Some or all of the Combination Trust Mortgage Loans (each, a "Serviced Combination Trust Mortgage Loan") will be serviced and administered in accordance with (and, accordingly, most material servicing functions with respect to the related Non-Trust Mortgage Loans and any related REO Property will be performed pursuant to) this Agreement, in which case the Loan Combination that includes such Serviced Combination Trust Mortgage Loan will constitute a "Serviced Loan Combination". The table below identifies each Serviced Combination Trust Mortgage Loan that will be included in the Trust Fund by name of the related Mortgaged Property or group of Mortgaged Properties, the Cut-off Date Balance of such Serviced Combination Trust Mortgage Loan, the original principal balance of any related Pari Passu Non-Trust Mortgage Loan(s) included in the applicable Serviced Loan Combination and the holder(s) (as of the Closing Date) of the related Mortgage Note(s) and the original principal balance of any related Subordinate Non-Trust Mortgage Loan(s) included in the applicable Serviced Loan Combination and the holder(s) (as of the Closing Date) of the related Mortgage Note(s). None of the Serviced Loan Combinations will include any Senior Non-Trust Mortgage Loans.

[TPW: NYLEGAL:707059.11] 20995-00020 10/02/2007 05:00 PM

## Serviced Combination Trust Mortgage Loans

| Name of Mortgaged Property or Group of Mortgaged Properties(1) | Cut-off Date Balance of Serviced Combination Trust Mortgage Loan | Original Principal Balance of Related Pari Passu Non-Trust Mortgage Loan(s) | Holder(s) of Related Pari Passu Non-Trust Mortgage Loan(s)(2) | Original Principal Balance of Related Subordinate Non-Trust Mortgage Loan(s) | Holder(s) of Related Subordinate Non-Trust Mortgage Loan(s)(2) |
|---|---|---|---|---|---|
| 1. Innkeepers Portfolio | $ 412,701,271 | $ 412,701,271 | LBHI | NAP(3) | NAP(3) |
| 2. Bear Canyon | $ 22,500,000 | NAP(3) | NAP(3) | $ 5,600,000 | LBHI |
| 3. Addison Tower | $ 11,100,000 | NAP(3) | NAP(3) | $ 700,000 | LBHI |

(1)   Reflects property identified by that name on the Trust Mortgage Loan Schedule.

(2)   As of Closing Date.

(3)   "NAP" means not applicable.

       The Trust Fund may also include one (1) or more Combination Trust Mortgage Loans (each, an "<u>Outside Serviced Trust Mortgage Loan</u>") that will, in each such case, be part of a Loan Combination (an "<u>Outside Serviced Loan Combination</u>") as to which most material servicing functions with respect thereto and any related REO Property will be performed pursuant to an Outside Servicing Agreement. The table below identifies, among other things, each Outside Serviced Trust Mortgage Loan, if any, that will be included in the Trust Fund by name of the related Mortgaged Property or group of Mortgaged Properties, the Cut-off Date Balance of such Outside Serviced Trust Mortgage Loan, the original principal balance of any related Pari Passu Non-Trust Mortgage Loan(s) included in the applicable Outside Serviced Loan Combination and the holder(s) (as of the Closing Date) of the related Mortgage Note(s) for such Pari Passu Non-Trust Mortgage Loan(s). None of the Outside Serviced Loan Combinations will include any Senior Non-Trust Mortgage Loans or Subordinate Non-Trust Mortgage Loans.

## Outside Serviced Loan Combinations

| Name of Mortgaged Property or Group of Mortgaged Properties(1) | Cut-off Date Balance of Outside Serviced Trust Mortgage Loan | Original Principal Balance of Related Pari Passu Non-Trust Mortgage Loan(s) | Holder(s) of Related Pari Passu Non-Trust Mortgage Loan(s)(2) |
|---|---|---|---|
| 1. Potomac Mills | $ 246,000,000 | $ 164,000,000 | Trustee under the Potomac Mills Servicing Agreement |
| 2. Och-Ziff Retail Portfolio | $ 144,000,000 | $ 140,000,000 | Trustee under the Och-Ziff Retail Portfolio Servicing Agreement |

(1)   Reflects property identified by that name on the Trust Mortgage Loan Schedule.

(2)   As of Closing Date.

       Capitalized terms used but not otherwise defined in this Preliminary Statement have the respective meanings assigned thereto in <u>Section 1.01</u> of this Agreement.

       In consideration of the mutual agreements herein contained, the Depositor, the Master Servicer, the Special Servicer and the Trustee hereby agree, in each case, as follows:

[TPW: NYLEGAL:707059.11] 20995-00020  10/02/2007 05:00 PM

## ARTICLE I

## DEFINITIONS; GENERAL INTERPRETIVE PRINCIPLES;
## CERTAIN ADJUSTMENTS TO THE PRINCIPAL DISTRIBUTIONS ON THE CERTIFICATES

SECTION 1.01.    Defined Terms.

Whenever used in this Agreement, including in the Preliminary Statement, unless the context otherwise requires:

"30/360 Basis" shall mean the accrual of interest calculated on the basis of a 360-day year consisting of twelve 30-day months.

"AAA" shall have the meaning assigned thereto in Section 2.03(i).

"AAA Rules" shall have the meaning assigned thereto in Section 2.03(i).

"Acceptable Insurance Default" shall mean, with respect to any Serviced Mortgage Loan, any default under the related loan documents resulting from (a) the exclusion of acts of terrorism from coverage under the related all risk casualty insurance policy maintained on the subject Mortgaged Property and (b) the related Mortgagor's failure to obtain insurance that specifically covers acts of terrorism, but only if the Special Servicer has determined, in its reasonable judgment in accordance with the Servicing Standard (subject to Section 6.11 and/or Section 6.12, in each case if and as applicable), that (i) such insurance is not available at commercially reasonable rates and the subject hazards are not commonly insured against at the time for real properties similar to the subject Mortgaged Property and located in and around the region in which the subject Mortgaged Property is located, or (ii) such insurance is not available at any rate. Subject to the Servicing Standard, in making any of the determinations under and in accordance with subclause (i) or (ii) of this definition, the Special Servicer shall be entitled to reasonably rely on the opinion of an insurance consultant.

"Accrued Certificate Interest" shall mean the interest accrued from time to time with respect to any Class of Regular Interest Certificates and any Group FL REMIC III Regular Interest, the amount of which interest shall equal: (a) in the case of a Class of Principal Balance Certificates or a Group FL REMIC III Regular Interest, for any Interest Accrual Period, one-twelfth of the product of (i) the annual Pass-Through Rate applicable to such Class of Certificates or such Group FL REMIC III Regular Interest, as the case may be, for such Interest Accrual Period, multiplied by (ii) the Class Principal Balance of such Class of Certificates or such Group FL REMIC III Regular Interest, as the case may be, outstanding immediately prior to the related Distribution Date; and (b) in the case of the Class X Certificates, for any Interest Accrual Period, the aggregate amount of Accrued Component Interest with respect to all of the Class X REMIC III Components for such Interest Accrual Period. The Regular Interest Certificates and the Group FL REMIC III Regular Interests shall accrue interest on a 30/360 Basis.

"Accrued Component Interest" shall mean the interest accrued from time to time with respect to any Class X REMIC III Component, the amount of which interest shall equal, for any Interest Accrual Period, one-twelfth of the product of (i) the annual Pass-Through Rate applicable to such Class X REMIC III Component for such Interest Accrual Period, multiplied by (ii) the Component Notional

related matters, and (ii) the Trust Collection Period with respect to the Mortgage Pool (exclusive of those Trust Mortgage Loans and any REO Trust Mortgage Loans that are part of a Loan Combination) and all related matters.

"Combination Trust Mortgage Loan" shall have the meaning assigned thereto in the Preliminary Statement.

"Commission" shall mean the United States Securities and Exchange Commission or any successor agency.

"Component Notional Amount" shall mean the notional amount on which any Class X REMIC III Component accrues interest, which, as of any date of determination, is equal to the then current Uncertificated Principal Balance of its Corresponding REMIC II Regular Interest outstanding from time to time.

"Condemnation Proceeds" shall mean all cash amounts Received by the Trust in connection with the taking of all or a part of a Mortgaged Property or REO Property by exercise of the power of eminent domain or condemnation, subject, however, to the rights of any tenants and ground lessors, as the case may be, and the terms of the related Mortgage.

"Controlling Class" shall mean, as of any date of determination, the then most subordinate (based on the payment priorities set forth in Sections 4.01(a) and 4.01(b)) outstanding Class of Principal Balance Certificates that has a Class Principal Balance that is at least equal to 25% of the Original Class Principal Balance of such Class; provided that if no Class of Principal Balance Certificates has as of such date of determination a Class Principal Balance that is at least equal to 25% of its Original Class Principal Balance, then the Controlling Class shall be the then most subordinate (based on the payment priorities set forth in Sections 4.01(a) and 4.01(b)) outstanding Class of Principal Balance Certificates that has a Class Principal Balance greater than zero; and provided, further, that, for purposes of determining, and exercising the rights of, the Controlling Class, all of the Senior Class A Certificates shall be deemed to constitute a single Class of Certificates. The Trustee shall notify the other parties hereto of any change of which it has knowledge in the Class of Certificates that constitutes the Controlling Class pursuant to this definition.

"Controlling Class Certificateholder" shall mean any Holder of a Certificate of the Controlling Class.

"Controlling Class Representative" shall have the meaning assigned thereto in Section 6.09(b).

"Controlling Class Representative Confirmation" shall have the meaning assigned thereto in Section 6.09(b).

"Corporate Trust Office" shall mean the principal corporate trust office of the Trustee at which at any particular time its corporate trust business with respect to this Agreement shall be administered, which office at the date of the execution of this Agreement is located at 135 South LaSalle Street, Suite 1625, Chicago, Illinois 60603, Attention: Global Securities and Trust Services — LB-UBS Commercial Mortgage Trust 2007-C6.

-31-

"Innkeepers Portfolio Co-Lender Agreement" shall meaning the Co-Lender Agreement relating to the Innkeepers Portfolio Loan Combination.

"Innkeepers Portfolio Loan Combination" shall mean the Loan Combination that is secured by the Mortgaged Property identified on the Trust Mortgage Loan Schedule as Innkeepers Portfolio.

"Innkeepers Portfolio Non-Trust Mortgage Loan" shall mean the Non-Trust Mortgage Loan included in the Innkeepers Portfolio Loan Combination.

"Innkeepers Portfolio Non-Trust Mortgage Loan Noteholder" shall mean the holder of the Mortgage Note for the Innkeepers Portfolio Non-Trust Mortgage Loan.

"Innkeepers Portfolio Trust Mortgage Loan" shall mean the Trust Mortgage Loan included in the Innkeepers Portfolio Loan Combination.

"Institutional Accredited Investor" or "IAI" shall mean an "accredited investor" as defined in any of paragraphs (1), (2), (3) and (7) of Rule 501(a) under the Securities Act or any entity in which all of the equity owners come within such paragraphs.

"Insurance Policy" shall mean, with respect to any Mortgage Loan, any hazard insurance policy, flood insurance policy, title policy, Environmental Insurance Policy or other insurance policy that is maintained from time to time in respect of such Mortgage Loan or the related Mortgaged Property.

"Insurance Proceeds" shall mean the proceeds paid under any Insurance Policy, to the extent such proceeds are not applied to the restoration of the related Mortgaged Property, released to the Mortgagor, or any tenants or ground lessors, as the case may be, pursuant to the terms of the related Mortgage or lease, in accordance with the Servicing Standard.

"Insured Environmental Event" shall have the meaning assigned thereto in Section 3.07(d).

"Interest Accrual Basis" shall mean the basis on which interest accrues in respect of any Mortgage Loan, any REO Mortgage Loan, any Loan REMIC Regular Interest, any REMIC I Regular Interest, any REMIC II Regular Interest, any Class of Regular Interest Certificates, any Class of Floating Rate Certificates, any Group FL REMIC III Regular Interest or any Class X REMIC III Component, in each case consisting of one of the following: (i) a 360-day year consisting of twelve 30-day months; (ii) actual number of days elapsed in a 360-day year; (iii) actual number of days elapsed in a 365-day year; or (iv) actual number of days elapsed in an actual calendar year (taking account of leap years).

"Interest Accrual Period" shall mean, with respect to any Distribution Date, the period commencing on the 11th calendar day of the month immediately preceding the month in which such Distribution Date occurs and ending on the 10th calendar day of the month in which such Distribution Date occurs.

"Interested Person" shall mean the Depositor, the Master Servicer, the Special Servicer, the Trustee, any Fiscal Agent, any Certificateholder, or any Affiliate of any such Person.

-44-

"Liquidation Proceeds" shall mean all cash amounts (other than Insurance Proceeds, Condemnation Proceeds and REO Revenues) Received by the Trust (or, in the case of a Serviced Loan Combination or any related Administered REO Property, collected on behalf of the Trust and/or the related Serviced Non-Trust Mortgage Loan Noteholder(s)) in connection with: (i) the full or partial liquidation of a Mortgaged Property or other collateral constituting security for a defaulted Mortgage Loan, through trustee's sale, foreclosure sale, REO Disposition or otherwise, exclusive of any portion thereof required to be released to the related Mortgagor in accordance with applicable law and the terms and conditions of the related Mortgage Note and Mortgage; (ii) the realization upon any deficiency judgment obtained against a Mortgagor; (iii) a Permitted Purchase; or (iv) except for purposes of <u>Section 3.11(c)</u>, the transfer of any Reserve Collateral or proceeds thereof to the Pool Custodial Account, subject to and in accordance with the terms of <u>Section 6.12</u>, the transfer of any Loss of Value Payments from the Loss of Value Reserve Fund, or the deposit of any other payments contemplated by <u>Section 2.03(d)</u>, in any event to the Pool Custodial Account.

"Loan Combination" shall have the meaning assigned thereto in the Preliminary Statement.

"Loan Combination Change of Control Event" shall mean, with respect to any Serviced Senior/Subordinate Loan Combination, any event that would result in the "Note A Lender", the "Note A Lenders", the "Senior Lender" or the "Senior Lenders", as applicable, under the related Co-Lender Agreement becoming the applicable Loan Combination Directing Lender in accordance with the related Co-Lender Agreement.

"Loan Combination Collection Period" shall mean, with respect to any Loan Combination for any Distribution Date or related Loan Combination Master Servicer Remittance Date, the period commencing on the day immediately following the related Loan Combination Determination Date in the calendar month preceding the month in which such Distribution Date or such Loan Combination Master Servicer Remittance Date, as the case may be, occurs (or, in the case of each of the initial Distribution Date and the initial related Loan Combination Master Servicer Remittance Date, commencing immediately following the Cut-off Date) and ending on and including the related Loan Combination Determination Date in the calendar month in which such Distribution Date or such Loan Combination Master Servicer Remittance Date, as the case may be, occurs.

"Loan Combination Controlling Party" shall mean, with respect to any Loan Combination, the related Loan Combination Directing Lender (or, if applicable, any representative(s) appointed thereby consistent with the related Co-Lender Agreement, to exercise the rights and powers of the related Loan Combination Directing Lender under the related Co-Lender Agreement or this Agreement).

"Loan Combination Custodial Account" shall mean, with respect to each Serviced Loan Combination, the segregated account or accounts (which may, subject to the last paragraph of <u>Section 3.04A(a)</u>, be a sub-account of the Pool Custodial Account) created and maintained by the Master Servicer pursuant to <u>Section 3.04A</u> on behalf of the holders of the Mortgage Loans included in such Serviced Loan Combination, which shall be entitled substantially as follows: "[NAME OF MASTER SERVICER], as Master Servicer, in trust for [NAMES OF RELATED MORTGAGE NOTEHOLDERS], as their interests may appear".

-48-

"Loan Combination Determination Date" shall mean: (a) with respect to any Serviced Loan Combination, the "Determination Date" as defined in the related Co-Lender Agreement; and (b) with respect to any Outside Serviced Loan Combination, the monthly remittance date for the subject Outside Serviced Trust Mortgage Loan (or any successor REO Trust Mortgage Loan with respect thereto) under the related Co-Lender Agreement and Outside Servicing Agreement.

"Loan Combination Directing Lender" shall mean, with respect to any Loan Combination and (if applicable) any particular matter, as of any date of determination, the "Directing Lender" or an analogous term, as applicable, under the related Co-Lender Agreement.

"Loan Combination Master Servicer Remittance Date" shall mean, with respect to any Serviced Loan Combination, the "Remittance Date" as defined in the related Co-Lender Agreement.

"Loan Combination REO Account" shall mean, with respect to each Serviced Loan Combination, the segregated account or accounts created and maintained by the Special Servicer pursuant to Section 3.16 on behalf of the holders of the Mortgage Loans included in such Serviced Loan Combination, which shall be entitled "[NAME OF SPECIAL SERVICER], as Special Servicer, in trust for [NAMES OF RELATED MORTGAGE NOTEHOLDERS], as their interests may appear".

"Loan Combination Servicing Reports" shall mean, with respect to each Serviced Loan Combination, (a) each of the files identified under clauses (a)(ii) through (iv) of the definition of "CMSA Investor Reporting Package", (b) each of the supplemental reports identified under clause (b) of the definition of "CMSA Investor Reporting Package", and (c) each of the templates identified under clause (c)(i) and clause (c)(ii) of the definition of "CMSA Investor Reporting Package", each as may be modified to reflect the fact that only the subject Serviced Loan Combination, the related Mortgaged Property or Properties and/or any related REO Property or Properties, as the case may be, shall be the subject of such report.

"Loan Combination Special Servicer" shall mean, with respect to any Serviced Loan Combination, any special servicer hereunder responsible for special servicing such Loan Combination or any related REO Property; provided that, if such special servicer has special servicing responsibilities with respect to other Serviced Mortgage Loans and/or Administered REO Properties, then the term "Loan Combination Special Servicer" shall refer to such party only to the extent of its rights, duties and obligations in respect of a Serviced Loan Combination or any related REO Property.

"Loan Group" shall mean either of Loan Group No. 1 or Loan Group No. 2.

"Loan Group No. 1" shall mean, collectively, all of the Trust Mortgage Loans that are Group 1 Trust Mortgage Loans and any successor REO Trust Mortgage Loans with respect thereto.

"Loan Group No. 2" shall mean, collectively, all of the Trust Mortgage Loans that are Group 2 Trust Mortgage Loans and any successor REO Trust Mortgage Loans with respect thereto.

"Loan Payoff Notification Report" shall mean a report containing substantially the information described in Exhibit E attached hereto, and setting forth for each Serviced Mortgage Loan as to which written notice of anticipated payoff has been received by the Master Servicer as of the related Determination Date preceding the delivery of such report (and as to which the Master Servicer reasonably believes a payoff is actually anticipated by the related Mortgagor), among other things, the

-49-

to the Class Principal Balance of such Class of Certificates or such Group FL REMIC III Regular Interest, as the case may be, on all prior Distribution Dates, if any, pursuant to Section 4.05(a).

"LUBS" shall mean LUBS, Inc.

"LUBS/Depositor Mortgage Loan Purchase Agreement" shall mean any Mortgage Loan Purchase Agreement between LUBS as mortgage loan seller, LBHI as an additional party and the Depositor, pursuant to which LUBS transfers one or more Trust Mortgage Loans to the Depositor, and which will only be executed and delivered if there is a LUBS Trust Mortgage Loan.

"LUBS Trust Mortgage Loan" shall mean any Trust Mortgage Loan transferred by LUBS to the Depositor, pursuant to any LUBS/Depositor Mortgage Loan Purchase Agreement. There are no LUBS Trust Mortgage Loans.

"Majority Controlling Class Certificateholder(s)" shall mean any single Holder or group of Holders (or any single Certificate Owner or group of Certificate Owners) of Certificates evidencing a majority of the Voting Rights allocated to the Controlling Class.

"Master Servicer" shall mean Wachovia, in its capacity as master servicer hereunder, or any successor master servicer appointed as herein provided.

"Master Servicer Account" shall have the meaning assigned thereto in Section 3.06(a).

"Master Servicer Backup Certification" shall have the meaning assigned thereto in Section 8.15(h).

"Master Servicer Certification" shall have the meaning assigned thereto in Section 2.01(d).

"Master Servicer Indemnification Agreement" shall mean the Master Servicer Indemnification Agreement dated as of August 24, 2007, between the initial Master Servicer, the Depositor and the Underwriters.

"Master Servicer Remittance Amount" shall mean, with respect to any Trust Master Servicer Remittance Date, an amount equal to: (a) the aggregate amount of (i) all payments and other collections on or with respect to the Trust Mortgage Loans and any related REO Properties (including Loss of Value Payments and, in the case of the initial Distribution Date, any Initial Deposits) that (A) were Received by the Trust as of the close of business on the applicable Determination Date in the same calendar month as such Trust Master Servicer Remittance Date and (B) are on deposit or are required to be on deposit in the Pool Custodial Account as of 12:00 noon (New York City time) on such Trust Master Servicer Remittance Date, including any such payments and other collections transferred or required to be transferred to the Pool Custodial Account from the Pool REO Account (if established) and/or a Loan Combination Custodial Account, and (ii) to the extent not already included among the amounts described in clause (a)(i) above, any remittance received with respect to the Och-Ziff Retail Portfolio Trust Mortgage Loan or any successor REO Trust Mortgage Loan on such Trust Master Servicer Remittance Date, net of (b) the portion of the aggregate amount described in clause (a) of this definition that represents one or more of the following—(i) scheduled Monthly Payments that are due on a Due Date following the end of the related Collection Period (or, in the case of a scheduled Monthly

provided that whenever the term "Mortgage File" is used to refer to documents actually received by the Trustee or by a Custodian on its behalf, such term shall not be deemed to include such documents required to be included therein unless they are actually so received, and with respect to any receipt or certification by the Trustee or a Custodian on its behalf for documents described in clauses (a)(vii) through (a)(xx) of this definition, shall be deemed to include such documents only to the extent the Trustee or a Custodian on its behalf has actual knowledge of their existence.

"Mortgage Loan" shall mean any Trust Mortgage Loan or Non-Trust Mortgage Loan. As used herein, the term "Mortgage Loan" includes the related Mortgage Note, Mortgage and other security documents contained in the related Mortgage File or otherwise held on behalf of the Trust and/or any affected Non-Trust Mortgage Loan Noteholder(s), as applicable, including, in the case of an Outside Serviced Loan Combination, any such documents held by or on behalf of a related Non-Trust Mortgage Loan Noteholder.

"Mortgage Loan Origination Documents" shall mean, with respect to any Serviced Trust Mortgage Loan, any of the following documents (other than any document that constitutes part of the Mortgage File for such Serviced Trust Mortgage Loan), if applicable with respect to such Serviced Trust Mortgage Loan: copies of any final appraisal, final survey, final engineering report, final environmental report, opinion letters of counsel to the related mortgagor delivered in connection with the closing of such Serviced Trust Mortgage Loan, escrow agreements, reserve agreements, organizational documentation for the related mortgagor, organizational documentation for any related guarantor or indemnitor (if the related guarantor or indemnitor is an entity), insurance certificates or insurance review reports, leases for tenants representing 10% or more of the annual income with respect to the related Mortgaged Property, final seismic report and property management agreements, rent roll, property operating statement and financial statements for the related guarantor or indemnitor, cash management or lockbox agreement, zoning letters or zoning reports and the documents, if any, specifically set forth on Schedule VIII hereto, but, in each case, only if the subject document (a) was in fact obtained in connection with the origination of such Serviced Trust Mortgage Loan, (b) is reasonably necessary for the ongoing administration and/or servicing of such Serviced Trust Mortgage Loan by the Master Servicer or Special Servicer in connection with its duties under this Agreement, and (c) is in the possession or under the control of the Depositor (if such Serviced Trust Mortgage Loan is a Lehman Trust Mortgage Loan) or the related Unaffiliated Mortgage Loan Seller (if such Serviced Trust Mortgage Loan is a Non-Lehman Trust Mortgage Loan), as applicable; provided that neither the Depositor nor any Unaffiliated Mortgage Loan Seller shall be required to deliver any draft documents, privileged or other communications or correspondence, credit underwriting or due diligence analyses or information, credit committee briefs or memoranda or other internal approval documents or data or internal worksheets, memoranda, communications or evaluations.

"Mortgage Loan Purchase Agreement" shall mean the LBHI/Depositor Mortgage Loan Purchase Agreement, the LUBS/Depositor Mortgage Loan Purchase Agreement (if any) or a UMLS/Depositor Mortgage Loan Purchase Agreement, as applicable.

"Mortgage Loan Seller" shall mean a Lehman Mortgage Loan Seller or any Unaffiliated Mortgage Loan Seller, as applicable.

"Mortgage Note" shall mean the original executed note (or, if applicable, notes collectively) evidencing the indebtedness of a Mortgagor under a Mortgage Loan, together with any

rider(s), addendum(s) or amendment(s) thereto, or any renewal, substitution or replacement of such note(s).

"Mortgage Pool" shall mean all of the Trust Mortgage Loans and any REO Trust Mortgage Loans, collectively.

"Mortgage Pool Data Update Report" shall mean, with respect to any Distribution Date, a report (which may be included as part of the Distribution Date Statement), prepared by the Trustee, containing information regarding the Trust Mortgage Loans as of the end of the related Collection Period, which report shall contain substantially the categories of information regarding the Trust Mortgage Loans set forth on Annexes A-1 through A-6 to the Prospectus Supplement (calculated, where applicable, on the basis of the most recent relevant information provided by the Mortgagors to the Master Servicer or the Special Servicer, as the case may be, and by the Master Servicer or the Special Servicer, as the case may be, to the Trustee), and which information shall be presented in tabular format substantially similar to the format utilized on such annexes and shall also include a loan-by-loan listing (in descending balance order) showing loan number, property type, location, unpaid principal balance, Mortgage Rate, paid-through date, maturity date, gross interest portion of the Monthly Payment, principal portion of the Monthly Payment, and any Prepayment Consideration received.

"Mortgage Rate" shall mean, with respect to each Mortgage Loan (and any successor REO Mortgage Loan with respect thereto), the related annualized rate at which interest is scheduled (in the absence of a default) to accrue on such Mortgage Loan from time to time in accordance with the related Mortgage Note, any related loan agreement and applicable law, as such rate may be modified in accordance with Section 3.20 (or, in the case of an Outside Serviced Mortgage Loan, by the applicable Outside Servicer in accordance with the related Outside Servicing Agreement) or in connection with a bankruptcy, insolvency or similar proceeding involving the related Mortgagor. In the case of any ARD Mortgage Loan, the related Mortgage Rate shall increase in accordance with the related Mortgage Note if the particular loan is not paid in full by its Anticipated Repayment Date.

"Mortgage Trust" shall mean the primary common law trust created hereunder, the assets of which consist of the assets included in the REMIC Pools, Grantor Trust V and any Loss of Value Reserve Fund.

"Mortgaged Property" shall mean the real property subject to the lien of a Mortgage.

"Mortgagor" shall mean, individually and collectively, as the context may require, (i) the primary obligor or obligors under a Mortgage Note, including any Person that has acquired the related Mortgaged Property and assumed the obligations of the original obligor under the Mortgage Note, and (ii) the owner of the related Mortgaged Property, if such owner has executed the related Mortgage with respect to the subject Mortgage Loan in addition to a guaranty of the obligations of the named obligor on the related Mortgage Note, and such guaranty is secured by such Mortgage; provided that the foregoing definition of "Mortgagor" shall not include any guarantors except to the extent described in clause (ii) above.

"Net Aggregate Prepayment Interest Shortfall" shall mean, with respect to any Distribution Date, the amount, if any, by which (a) the aggregate of all Prepayment Interest Shortfalls incurred with respect to the Mortgage Pool in connection with Principal Prepayments and/or, insofar as they result from the application of Insurance Proceeds and/or Condemnation Proceeds, other early

-62-

"Non-Registered Certificate" shall mean any Certificate that has not been the subject of registration under the Securities Act. As of the Closing Date, the Class A-2FL, Class A-MFL, Class G, Class H, Class J, Class K, Class L, Class M, Class N, Class P, Class Q, Class S, Class T, Class R-I, Class R-II and Class R-III Certificates, the Class R-LR Certificates (if issued in accordance with Section 2.06) and the Class V Certificates (if issued in accordance with Section 2.05) are Non-Registered Certificates.

"Non-Trust Mortgage Loan" shall have the meaning assigned thereto in the Preliminary Statement.

"Non-Trust Mortgage Loan Noteholder" shall mean the holder of the Mortgage Note for a Non-Trust Mortgage Loan.

"Non-Trust Mortgage Loan Securities" shall mean any securities evidencing an interest in, or secured by, a Non-Trust Mortgage Loan or any successor REO Mortgage Loan with respect thereto.

"Non-Trust Mortgage Loan Securitization Agreement" shall mean any agreement governing the securitization of a Non-Trust Mortgage Loan or any successor REO Mortgage Loan with respect thereto.

"Non-Trust Mortgage Loan Securitization Trust" shall mean any commercial mortgage securitization trust that is similar to the Trust and holds a Non-Trust Mortgage Loan or any successor REO Mortgage Loan with respect thereto.

"Non-United States Securities Person" shall mean a Person that is not a United States Securities Person.

"Non-United States Tax Person" shall mean a Person that is not a United States Tax Person.

"Och-Ziff Retail Portfolio Co-Lender Agreement" shall mean the Co-Lender Agreement with respect to the Och-Ziff Retail Portfolio Loan Combination.

"Och-Ziff Retail Portfolio Loan Combination" shall mean the Loan Combination that is secured by the Och-Ziff Retail Portfolio Mortgaged Property.

"Och-Ziff Retail Portfolio Mortgaged Property" shall mean, collectively, the portfolio of real properties identified on the Trust Mortgage Loan Schedule as Och-Ziff Retail Portfolio.

"Och-Ziff Retail Portfolio Non-Trust Mortgage Loan" shall mean the Non-Trust Mortgage Loan included in the Och-Ziff Retail Portfolio Loan Combination.

"Och-Ziff Retail Portfolio Servicing Agreement" shall mean the pooling and servicing agreement dated as of August 1, 2007, among Merrill Lynch Mortgage Investors, Inc., as depositor, KeyCorp Real Estate Capital Markets, Inc. and Wells Fargo Bank, National Association, as master servicers, Centerline Servicing Inc., as special servicer, U.S. Bank National Association, as trustee, Wells Fargo Bank, National Association, as certificate administrator, and LaSalle Bank National

[TPW: NYLEGAL:707059.11] 20995-00020 10/02/2007 05:00 PM

(taking into account the applications pursuant to clauses (i) and (ii) of this proviso); and provided, further, that if the Mortgage Loans comprising any Serviced Loan Combination become REO Mortgage Loans, amounts (other than Loss of Value Payments and Reserve Collateral deemed to constitute Liquidation Proceeds with respect to the REO Trust Mortgage Loan in such Serviced Loan Combination and other than Liquidation Proceeds resulting from the purchase of the Trust's interest in any related REO Property pursuant to or as contemplated by Section 2.03) received with respect to such REO Mortgage Loans shall be applied to amounts due and owing in respect of such REO Mortgage Loans as provided in the related Co-Lender Agreement; and provided, further, that Reserve Collateral (or any proceeds thereof) and Loss of Value Payments shall not be applied in accordance with the foregoing provisions of this definition unless and until such amounts are transferred to the Pool Custodial Account, and deemed to constitute Liquidation Proceeds in respect of a particular REO Trust Mortgage Loan, in accordance with Section 6.12(g) and Section 3.05(e), respectively. Notwithstanding the foregoing, all amounts payable or reimbursable to the Master Servicer, the Special Servicer, the Trustee or any Fiscal Agent in respect of the predecessor Mortgage Loan as of the date of the related REO Acquisition, including any unpaid Servicing Fees and any unreimbursed Servicing Advances and P&I Advances, together with any interest accrued and payable to the Master Servicer, the Special Servicer, the Trustee or any Fiscal Agent in respect of such Servicing Advances and P&I Advances in accordance with Sections 3.11(g) and 4.03(d), respectively, shall continue to be payable or reimbursable to the Master Servicer, the Special Servicer, the Trustee or such Fiscal Agent, as the case may be, in respect of an REO Mortgage Loan. The foregoing allocations are not intended to limit the rights of the parties hereunder to reimbursements or indemnities to which they are otherwise entitled hereunder.

"REO Property" shall mean a Mortgaged Property acquired on behalf and in the name of the Trustee for the benefit of the Certificateholders (or, in the case of a Mortgaged Property related to a Serviced Loan Combination, for the benefit of the Certificateholders and the related Non-Trust Mortgage Loan Noteholder(s), as their interests may appear), through foreclosure, acceptance of a deed-in-lieu of foreclosure or otherwise in accordance with applicable law in connection with the default or imminent default of a Mortgage Loan (or a Loan Combination); provided that the Mortgaged Property securing an Outside Serviced Loan Combination (if acquired under the related Outside Servicing Agreement) shall constitute an REO Property if such Mortgaged Property is so acquired for the benefit of the related Non-Trust Mortgage Loan Noteholder(s) and the Trust, as their interests may appear, through foreclosure, acceptance of a deed-in-lieu of foreclosure or otherwise in accordance with applicable law in connection with a default or imminent default of the subject Outside Serviced Loan Combination.

"REO Revenues" shall mean all income, rents, profits and proceeds derived from the ownership, operation or leasing of any REO Property.

"REO Tax" shall have the meaning assigned thereto in Section 3.17(a).

"REO Trust Mortgage Loan" shall mean the successor REO Mortgage Loan with respect to any Trust Mortgage Loan as to which the related Mortgaged Property has become an REO Property.

"Request for Release" shall mean a request signed by a Servicing Officer of, as applicable, the Master Servicer in the form of Exhibit D-1 attached hereto or the Special Servicer in the form of Exhibit D-2 attached hereto.

-86-

"Senior Class A Certificates" shall mean the Class A-1, Class A-2, Class A-2FL, Class A-3, Class A-AB, Class A-4 and Class A-1A Certificates.

"Senior Class A Principal Distribution Cross-Over Date" shall mean the first Distribution Date as of the commencement of business on which (i) any two or more Classes of the Senior Class A Certificates remain outstanding and (ii) the aggregate of the Class Principal Balances of the Class A-M, Class A-MFL, Class A-J, Class B, Class C, Class D, Class E, Class F, Class G, Class H, Class J, Class K, Class L, Class M, Class N, Class P, Class Q, Class S and Class T Certificates has been reduced to zero as a result of the allocation of Realized Losses and Additional Trust Fund Expenses pursuant to Section 4.04(a).

"Senior Non-Trust Mortgage Loan" shall have the meaning assigned thereto in the Preliminary Statement.

"Senior/Subordinate Co-Lender Agreement" shall mean the Co-Lender Agreement with respect to a Serviced Senior/Subordinate Loan Combination.

"Serviced A/B Loan Combination" shall mean a Serviced Loan Combination that consists of only a Trust Mortgage Loan (or any successor REO Mortgage Loan with respect thereto) and one (1) or more Subordinate Non-Trust Mortgage Loans (or any successor REO Mortgage Loan(s) with respect thereto.

"Serviced Combination Trust Mortgage Loan" shall have the meaning assigned thereto in the Preliminary Statement.

"Serviced Loan Combination" shall have the meaning assigned thereto in the Preliminary Statement.

"Serviced Loan Combination Change of Control Event" shall mean the Loan Combination Change of Control Event for any Serviced Senior/Subordinate Loan Combination.

"Serviced Loan Combination Controlling Party" shall mean the Loan Combination Controlling Party for any Serviced Loan Combination.

"Serviced Loan Combination Directing Lender" shall mean the Loan Combination Directing Lender for any Serviced Loan Combination.

"Serviced Mortgage Loan" shall mean each Mortgage Loan (including a Specially Serviced Mortgage Loan), other than any Outside Serviced Mortgage Loan.

"Serviced Non-Trust Mortgage Loan" shall mean each Non-Trust Mortgage Loan that is part of a Serviced Loan Combination.

"Serviced Non-Trust Mortgage Loan Noteholder" shall mean the holder of the Mortgage Note for a Serviced Non-Trust Mortgage Loan.

"Serviced Note A Trust Mortgage Loan" shall mean the Combination Trust Mortgage Loan that is included in a Serviced A/B Loan Combination.

"Special Release Mortgaged Property" shall mean any of the Mortgaged Properties identified on the Trust Mortgage Loan Schedule as Cedar Springs Crossings, Henrietta Plaza, Kessler Hills Shopping Center, Lake Olympia Square, South Elm Plaza, Thunderbird Square and Tops Plaza – Cortland Staples.

"Special Release Trust Mortgage Loan" shall mean any Trust Mortgage Loan that is secured by a Special Release Mortgaged Property.

"Special Servicer" shall mean, subject to Section 6.09(d) and Section 7.01(e) (insofar as such sections contemplate multiple parties acting as Special Servicer), Midland, in its capacity as special servicer hereunder, or any successor special servicer appointed as herein provided.

"Special Servicer Backup Certification" shall have the meaning assigned thereto in Section 8.15(i).

"Special Servicer Indemnification Agreement" shall mean the Special Servicer Indemnification Agreement dated as of August 24, 2007, between the initial Special Servicer, the Depositor and the Underwriters.

"Special Servicer Reportable Event" shall mean any of the following events, conditions, circumstances and/or matters:

(i) the entry into or amendment to a definitive agreement that is material to the Subject Securitization Transaction, including, for example, a servicing agreement with a Servicer contemplated by Item 1108(a)(3) of Regulation AB, but only if the Special Servicer or any Servicing Representative of the Special Servicer is a party to such agreement or has entered into such agreement on behalf of the Trust (ITEM 1.01 ON FORM 8-K);

(ii) the termination of a definitive agreement that is material to the Subject Securitization Transaction (otherwise than by expiration of the agreement on its stated termination date or as a result of all parties completing their obligations under such agreement), but only if the Special Servicer or any Servicing Representative of the Special Servicer is a party to such agreement or has entered into such agreement on behalf of the Trust (ITEM 1.02 ON FORM 8-K);

(iii) the appointment of a receiver, fiscal agent or similar officer for any Material Debtor in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of any Material Debtor, including where such jurisdiction has been assumed by leaving the existing directors and officers in possession but subject to the supervision and orders of a court or governmental authority, but only if the subject Material Debtor is (A) the Special Servicer, (B) any Servicing Representative of the Special Servicer that constitutes a Servicer contemplated by Item 1108(a)(3) of Regulation AB or (C) any Significant Obligor with respect to a Specially Serviced Mortgage Loan (ITEM 1.03(a) ON FORM 8-K);

(iv) the entry of an order confirming a plan of reorganization, arrangement or liquidation of a Material Debtor by a court or governmental authority having supervision or

-97-

Loan Seller, (C) the Trustee, (D) the Master Servicer, (E) any Outside Servicer or Outside Trustee that constitutes a Servicer contemplated by Item 1108(a)(3) of Regulation AB, (F) any Servicing Representative of the Special Servicer that constitutes a Servicer contemplated by Item 1108(a)(3) of Regulation AB or (G) any Significant Obligor (GENERAL INSTRUCTION J TO FORM 10-K);

(xii)    to the extent not otherwise disclosed in the Prospectus Supplement, any business relationship, agreement, arrangement, transaction or understanding contemplated by Item 1119(b) of Regulation AB between an Unaffiliated Mortgage Loan Seller or the Trust, on the one hand, and the Special Servicer or any Servicing Representative of the Special Servicer, on the other hand (GENERAL INSTRUCTION J TO FORM 10-K); and

(xiii)    to the extent not otherwise disclosed in the Prospectus Supplement, any specific relationship involving or relating to the Subject Securitization Transaction or the Mortgage Loans contemplated by Item 1119(c) of Regulation AB between an Unaffiliated Mortgage Loan Seller or the Trust, on the one hand, and the Special Servicer or any Servicing Representative of the Special Servicer, on the other hand (GENERAL INSTRUCTION J TO FORM 10-K).

"Special Servicing Fee" shall mean, with respect to each Specially Serviced Mortgage Loan and each REO Mortgage Loan that relates to an Administered REO Property, the fee designated as such in, and payable to the Special Servicer pursuant to, Section 3.11(c).

"Special Servicing Fee Rate" shall mean, with respect to each Specially Serviced Mortgage Loan and each REO Mortgage Loan that relates to an Administered REO Property, as of any date of determination: (i) 0.25% per annum, if, as of such date of determination, the outstanding principal balance of such Specially Serviced Mortgage Loan or REO Mortgage Loan, as the case may be, is less than $25,000,000; and (ii) 0.15% per annum, if, as of such date of determination, the outstanding principal balance of such Specially Serviced Mortgage Loan or REO Mortgage Loan, as the case may be, is greater than or equal to $25,000,000; provided that the Special Servicing Fee for any Specially Serviced Mortgage Loan or REO Mortgage Loan that is part of a Serviced Loan Combination will be based upon the outstanding principal balance of the entire such Serviced Loan Combination.

"Specially Designated Mortgage Loan Documents" shall mean, with respect to any Trust Mortgage Loan, the following documents collectively:

(i)    the original executed Mortgage Note for such Trust Mortgage Loan (or, alternatively, if the original executed Mortgage Note has been lost, a lost note affidavit and indemnity with a copy of such Mortgage Note);

(ii)    an original or copy of the Mortgage (with or without recording information);

(iii)    the original or a copy of the policy or certificate of lender's title insurance issued in connection with such Trust Mortgage Loan (or, if such policy has not been issued, a "marked-up" *pro forma* title policy, or an irrevocable, binding commitment to issue such title insurance policy);

-99-

(xiii)　　any acceptance of an assumption agreement releasing a borrower from liability under any Serviced Mortgage Loan;

provided that, as used in clauses (b)(vii) through (b)(x) above, the term "material discretion" shall mean that the relevant decision is in the discretion of the mortgagee, and such decision is not based upon the satisfaction of specified objective conditions, the satisfactory delivery of certain factual evidence or opinions or the satisfaction of any other specified objective criteria that is set forth in the related Mortgage Loan documents.

"Specially Serviced Mortgage Loan" shall mean, subject to the last paragraph of this definition, any Serviced Mortgage Loan as to which any of the following events has occurred:

(a)　　the related Mortgagor (or any related guarantor) has failed to make when due any Monthly Payment (including a Balloon Payment), which failure continues, or which failure the Master Servicer or (with the consent of the Controlling Class Representative) the Special Servicer determines, in each case in accordance with the Servicing Standard, will continue, unremedied (without regard to any grace period) by the related Mortgagor, any related guarantor or otherwise (including, in the case of a Serviced Combination Trust Mortgage Loan, by a related Serviced Non-Trust Mortgage Loan Noteholder exercising any cure rights under the related Co-Lender Agreement) (i) except in the case of a Balloon Mortgage Loan delinquent in respect of its Balloon Payment, for 60 days beyond the date on which the subject payment was due, or (ii) solely in the case of a delinquent Balloon Payment, (A) for one (1) Business Day beyond the date on which the subject Balloon Payment was due (unless clause (B) below applies) or (B) in the case of a Balloon Mortgage Loan as to which the related Mortgagor shall have delivered a refinancing commitment acceptable to the Special Servicer prior to the date on which the subject Balloon Payment was due, for 30 days beyond the date on which the subject Balloon Payment was due (or for such shorter period ending on the date on which it is determined that the refinancing could not reasonably be expected to occur); or

(b)　　there shall have occurred a default (other than as described in clause (a) above and other than an Acceptable Insurance Default) that the Master Servicer or the Special Servicer has determined, in each case in accordance with the Servicing Standard, (i) materially impairs the value of the related Mortgaged Property as security for such Serviced Mortgage Loan or otherwise materially adversely affects the interests of Certificateholders (or, in the case of a Serviced Non-Trust Mortgage Loan, the interests of the related Serviced Non-Trust Mortgage Loan Noteholder) (it being acknowledged and agreed that any default requiring a Servicing Advance shall be deemed to materially and adversely affect the interests of Certificateholders or, in the case of a Serviced Non-Trust Mortgage Loan, the interests of the related Serviced Non-Trust Mortgage Loan Noteholder), and (ii) continues unremedied by the related Mortgagor, any related guarantor or otherwise (including, in the case of a Serviced Combination Trust Mortgage Loan, by a related Serviced Non-Trust Mortgage Loan Noteholder exercising any cure rights under the related Co-Lender Agreement) for either (A) one Business Day (but only if, pursuant to the related loan documents, the subject default gives rise to immediate acceleration without application of a cure period under such Serviced Mortgage Loan) or (B) otherwise, the greater of (1) the applicable grace period under the terms of such Serviced Mortgage Loan and (2) 30 days; or

(c)     the Master Servicer or, with the consent of the Controlling Class Representative, the Special Servicer shall have determined, in accordance with the Servicing Standard, that (i) a default in the making of a Monthly Payment on such Serviced Mortgage Loan, including a Balloon Payment, is likely to occur and is likely to remain unremedied (without regard to any grace period) by the related Mortgagor, any related guarantor or otherwise (including, in the case of a Serviced Combination Trust Mortgage Loan, by a related Serviced Non-Trust Mortgage Loan Noteholder exercising any cure rights under the related Co-Lender Agreement) for at least the applicable period contemplated by clause (a) of this definition or (ii) a default (other than as described in clause (a) of this definition and other than an Acceptable Insurance Default) is likely to occur under such Mortgage Loan that will materially impair the value of the related Mortgaged Property as security for such Serviced Mortgage Loan or otherwise materially adversely affect the interests of Certificateholders (or, in the case of a Serviced Non-Trust Mortgage Loan, the related Serviced Non-Trust Mortgage Loan Noteholder) and such default is likely to remain unremedied for at least the applicable period contemplated by clause (b) of this definition; or

(d)     a decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law or the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the related Mortgagor and such decree or order shall have remained in force and not dismissed for a period of 60 days; or

(e)     the related Mortgagor shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to such Mortgagor or of or relating to all or substantially all of its property; or

(f)     the related Mortgagor shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

(g)     the Master Servicer shall have received notice of the commencement of foreclosure or similar proceedings with respect to the related Mortgaged Property;

provided, however, that a Serviced Mortgage Loan will cease to be a Specially Serviced Mortgage Loan when a Liquidation Event has occurred with respect to such Serviced Mortgage Loan, when the related Mortgaged Property has become an REO Property or, so long as at such time no circumstance identified in clauses (a) through (g) above exists that would cause such Serviced Mortgage Loan to continue to be characterized as a Specially Serviced Mortgage Loan, when:

(w)     with respect to the circumstances described in clause (a) of this definition, the related Mortgagor has made three consecutive full and timely Monthly Payments under the terms of such Mortgage Loan (as such terms may be changed or modified in connection with a bankruptcy or similar proceeding involving the related Mortgagor or by reason of a modification, extension, waiver or

-103-

amendment granted or agreed to by the Master Servicer or the Special Servicer pursuant to Section 3.20);

(x)    with respect to the circumstances described in clause (b) of this definition, the default is cured in the good faith, reasonable judgment of the Special Servicer;

(y)    with respect to the circumstances described in clauses (c), (d), (e) and (f) of this definition, such circumstances cease to exist in the good faith, reasonable judgment of the Special Servicer, but, with respect to any bankruptcy or insolvency proceedings described in clauses (d), (e) and (f), no later than the entry of an order or decree dismissing such proceeding;

(z)    with respect to the circumstances described in clause (g) of this definition, such proceedings are terminated.

The Special Servicer may conclusively rely on the Master Servicer's determination as to whether a Servicing Transfer Event has occurred giving rise to a Serviced Mortgage Loan's becoming a Specially Serviced Mortgage Loan.

Except as provided below in this sentence, if any Mortgage Loan that is part of a Serviced Loan Combination becomes a Specially Serviced Mortgage Loan, then the other Mortgage Loan or each of the other Mortgage Loans, as the case may be, in such Loan Combination shall also become a Specially Serviced Mortgage Loan; provided that if, subject to the terms, conditions and limitations of the related Co-Lender Agreement, a Serviced Non-Trust Mortgage Loan Noteholder prevents the occurrence of a Servicing Transfer Event with respect to the related Serviced Combination Trust Mortgage Loan through the exercise of any cure rights granted under the related Co-Lender Agreement with respect to such Serviced Combination Trust Mortgage Loan, then the existence of such Servicing Transfer Event with respect to the related Serviced Non-Trust Mortgage Loan (because any such cure rights do not include the cure of defaults under the related Serviced Non-Trust Mortgage Loan) will not, in and of itself, result in any Mortgage Loan that is part of the subject Serviced Loan Combination becoming a Specially Serviced Mortgage Loan (provided that a separate Servicing Transfer Event may occur with respect to the subject Serviced Loan Combination causing the Mortgage Loans comprising such Loan Combination to become Specially Serviced Mortgage Loans).

None of the Outside Serviced Mortgage Loans shall constitute a Specially Serviced Mortgage Loan hereunder.

"Specially Serviced Trust Mortgage Loan" shall mean any Trust Mortgage Loan that is a Specially Serviced Mortgage Loan.

"Startup Day" shall mean, with respect to each REMIC Pool, the day designated as such in Section 10.01(c).

"Stated Maturity Date" shall mean, with respect to any Mortgage Loan, the Due Date specified in the related Mortgage Note (as in effect on the Closing Date) on which the last payment of principal is due and payable under the terms of such Mortgage Note (as in effect on the Closing Date), without regard to any change in or modification of such terms in connection with a bankruptcy or similar proceeding involving the related Mortgagor or a modification, extension, waiver or amendment

-104-

ARTICLE II

CONVEYANCE OF TRUST MORTGAGE LOANS; REPRESENTATIONS AND WARRANTIES;
ORIGINAL ISSUANCE OF CERTIFICATES

SECTION 2.01.    Creation of Trust; Conveyance of Trust Mortgage Loans.

(a)    It is the intention of the parties hereto that multiple common law trusts be established pursuant to this Agreement and the laws of the State of New York and that such trusts be designated as: "LB-UBS Commercial Mortgage Trust 2007-C6", in the case of the Mortgage Trust individually or all the subject trusts collectively, as the context may require; "Class A-2FL Grantor Trust", in the case of Grantor Trust A-2FL; and "Class A-MFL Grantor Trust", in the case of Grantor Trust A-MFL. LaSalle is hereby appointed, and does hereby agree, to act as Trustee hereunder and, in such capacity, to hold the Trust Fund in trust for the exclusive use and benefit of all present and future Certificateholders.

The Depositor, concurrently with the execution and delivery hereof, does hereby assign, sell, transfer, set over and otherwise convey to the Trustee in trust, without recourse, for the benefit of the Certificateholders, all the right, title and interest of the Depositor in, to and under (i) the Trust Mortgage Loans, (ii) the UMLS/Depositor Mortgage Loan Purchase Agreement(s), (iii) any Co-Lender Agreement(s), and (iv) all other assets included or to be included in the Trust Fund. Such assignment includes all interest and principal received or receivable on or with respect to the Trust Mortgage Loans and due after the Cut-off Date and, in the case of each Trust Mortgage Loan that is part of a Loan Combination, is subject to the provisions of the related Co-Lender Agreement. With respect to each Trust Mortgage Loan that is part of a Loan Combination, the Trustee, on behalf of the Trust, assumes the obligations of the holder of such Trust Mortgage Loan and the related Mortgage Note under, and agrees to be bound by, the related Co-Lender Agreement.

The parties hereto acknowledge and agree that, notwithstanding Section 11.07, the transfer of the Trust Mortgage Loans and the related rights and property accomplished hereby is absolute and is intended by them to constitute a sale.

The Trust Fund shall constitute the sole assets of the Trust. Except as expressly provided herein, the Trust may not issue or invest in additional securities, borrow money or make loans to other Persons. The fiscal year end of the Trust shall be December 31.

(b)    In connection with the Depositor's assignment pursuant to Section 2.01(a) above, the Depositor shall (in the case of each Lehman Trust Mortgage Loan) deliver to and deposit with (or cause to be delivered to and deposited with), and the related Unaffiliated Mortgage Loan Seller has agreed pursuant to the related UMLS/Depositor Mortgage Loan Purchase Agreement (in the case of each Non-Lehman Trust Mortgage Loan) to deliver to and deposit with (or cause to be delivered to and deposited with), on or before the Closing Date: (i) the Trustee or a Custodian appointed thereby, the Mortgage File for such Trust Mortgage Loan with copies of each Mortgage File to be delivered by the Trustee to, upon request, the Master Servicer (and at the expense of the Trustee and not at the expense of the Trust Fund), within 10 Business Days of such request; and (ii) the Master Servicer (or, at the direction of the Master Servicer, to the appropriate Sub-Servicer), all unapplied Escrow Payments and Reserve Funds in the possession or under the control of the Depositor or the related Unaffiliated

-121-

# ARTICLE IV

## PAYMENTS TO CERTIFICATEHOLDERS; REPORTS TO CERTIFICATEHOLDERS

SECTION 4.01.    Distributions.

(a)    On each Distribution Date, through and including the Final Distribution Date, the Trustee shall, based on, among other things, information provided by the Master Servicer and, if applicable, the Special Servicer, withdraw from the Collection Account and apply the Available Distribution Amount for such Distribution Date, such application to be made for the following purposes and in the following order of priority, in each case to the extent of remaining available funds:

*first*, concurrently, (i) from that portion, if any, of the Available Distribution Amount for such Distribution Date attributable to Loan Group No. 1, to make distributions of interest to the Holders of the Class A-1, Class A-2, Class A-3, Class A-AB and Class A-4 Certificates, and to the Class A-2FL Floating Rate Account with respect to the Class A-2FL REMIC III Regular Interest, in an amount equal to, and *pro rata* as among such Classes of Certificates and such Group FL REMIC III Regular Interest, in accordance with, all Distributable Certificate Interest in respect of such Class of Certificates and each such Group FL REMIC III Regular Interest for such Distribution Date and, to the extent not previously paid, for all prior Distribution Dates, if any, (ii) from that portion, if any, of the Available Distribution Amount for such Distribution Date that is attributable to Loan Group No. 2, to make distributions of interest to the Holders of the Class A-1A Certificates, in an amount equal to all Distributable Certificate Interest in respect of such Class of Certificates for such Distribution Date and, to the extent not previously paid, for all prior Distribution Dates, if any, and (iii) from the entire Available Distribution Amount for such Distribution Date, distributions of interest to the Holders of the Class X Certificates, in an amount equal to all Distributable Certificate Interest in respect of the Class X Certificates for such Distribution Date and, to the extent not previously paid, for all prior Distribution Dates, if any; provided, however, that if the Available Distribution Amount for the subject Distribution Date or the applicable portion thereof attributable to either Loan Group is insufficient to pay in full the total amount of Distributable Certificate Interest, as provided above, payable in respect of any Class of Senior Certificates or Group FL REMIC III Regular Interest referred to above in this clause *first* on such Distribution Date, then the entire Available Distribution Amount shall be applied to make distributions of interest with respect to the respective Classes of Senior Certificates referred to above in this clause *first* and the Class A-2FL REMIC III Regular Interest, up to an amount equal to, and *pro rata* as among such Classes of Certificates and such Group FL REMIC III Regular Interest in accordance with, all Distributable Certificate Interest in respect of each such Class of Certificates and such Group FL REMIC III Regular Interest for such Distribution Date and, to the extent not previously paid, for all prior Distribution Dates, if any;

*second*, to make distributions of principal to the Holders of the respective Classes of the Senior Class A Certificates (exclusive of the Class A-2FL Certificates) and to the Class A-2FL Floating Rate Account, in the following amounts and order of priority:

(i)    to the Holders of the Class A-1A Certificates, up to an amount (not to exceed the Class Principal Balance of the Class A-1A Certificates outstanding

-264-

immediately prior to such Distribution Date) equal to that portion of the entire Adjusted Principal Distribution Amount for such Distribution Date attributable to Loan Group No. 2;

(ii)     to the Holders of the Class A-AB Certificates, up to an amount equal to the lesser of (A) the excess, if any, of the Class Principal Balance of the Class A-AB Certificates outstanding immediately prior to such Distribution Date, over the Class A-AB Planned Principal Balance for such Distribution Date, and (B) the entire Adjusted Principal Distribution Amount for such Distribution Date (net of any portion thereof distributed on such Distribution Date to the Holders of the Class A-1A Certificates pursuant to subclause (i) of this clause *second*);

(iii)    to the Holders of the Class A-1 Certificates, up to an amount (not to exceed the Class Principal Balance of the Class A-1 Certificates outstanding immediately prior to such Distribution Date) equal to the entire Adjusted Principal Distribution Amount for such Distribution Date (net of any portion thereof distributed on such Distribution Date to the Holders of any other Class of Senior Class A Certificates pursuant to a prior subclause of this clause *second*);

(iv)    to the Holders of the Class A-2 Certificates and to the Class A-2FL Floating Rate Account with respect to the Class A-2FL REMIC III Regular Interest, on a *pro rata* basis by Class Principal Balance, up to an amount (not to exceed the aggregate of the Class Principal Balances of the Class A-2 Certificates and the Class A-2FL REMIC III Regular Interest outstanding immediately prior to such Distribution Date) equal to the entire Adjusted Principal Distribution Amount for such Distribution Date (net of any portion thereof distributed on such Distribution Date to the Holders of any other Class of Senior Class A Certificates pursuant to a prior subclause of this clause *second*);

(v)     to the Holders of the Class A-3 Certificates, up to an amount (not to exceed the Class Principal Balance of the Class A-3 Certificates outstanding immediately prior to such Distribution Date) equal to the entire Adjusted Principal Distribution Amount for such Distribution Date (net of any portion thereof distributed on such Distribution Date to the Holders of any other Class of Senior Class A Certificates and/or to the Class A-2FL Floating Rate Account with respect to the Class A-2FL REMIC III Regular Interest pursuant to a prior subclause of this clause *second*);

(vi)    to the Holders of the Class A-AB Certificates, up to an amount (not to exceed the Class Principal Balance of the Class A-AB Certificates outstanding immediately prior to such Distribution Date, net of any distributions of principal made with respect to the Class A-AB Certificates on such Distribution Date pursuant to subclause (ii) of this clause *second*) equal to the entire Adjusted Principal Distribution Amount for such Distribution Date (net of any portion thereof distributed on such Distribution Date to the Holders of the Class A-AB Certificates, to the Holders of any other Class of Senior Class A Certificates and/or to the Class A-2FL Floating Rate Account with respect to the Class A-2FL REMIC III Regular Interest pursuant to a prior subclause of this clause *second*);

-265-

(vii)    to the Holders of the Class A-4 Certificates, up to an amount (not to exceed the Class Principal Balance of the Class A-4 Certificates outstanding immediately prior to such Distribution Date) equal to the entire Adjusted Principal Distribution Amount for such Distribution Date (net of any portion thereof distributed on such Distribution Date to the Holders of any other Class of Senior Class A Certificates and/or to the Class A-2FL Floating Rate Account with respect to the Class A-2FL REMIC III Regular Interest pursuant to a prior subclause of this clause *second*); and

(viii)    to the Holders of the Class A-1A Certificates, up to an amount (not to exceed the Class Principal Balance of the Class A-1A Certificates outstanding immediately prior to such Distribution Date, net of any distributions of principal made with respect to the Class A-1A Certificates on such Distribution Date pursuant to subclause (i) of this clause *second*) equal to the entire Adjusted Principal Distribution Amount for such Distribution Date (net of any portion thereof distributed on such Distribution Date to the Holders of the Class A-1A Certificates, to the Holders of any other Class of Senior Class A Certificates and/or to the Class A-2FL Floating Rate Account with respect to the Class A-2FL REMIC III Regular Interest pursuant to a prior subclause of this clause *second*);

provided, however, that, notwithstanding the immediately preceding clauses (i) through (viii) of this clause *second*, on each Distribution Date coinciding with or following the Senior Class A Principal Distribution Cross-Over Date, and in any event on the Final Distribution Date, the Trustee shall, pursuant to this clause *second*, subject to remaining available funds, make distributions of principal to the Holders of the respective Classes of the Senior Class A Certificates (exclusive of the Class A-2FL Certificates) and to the Class A-2FL Floating Rate Account with respect to the Class A-2FL REMIC III Regular Interest, on a *pro rata* basis, in accordance with the respective Class Principal Balances of those Classes of Certificates and such Group FL REMIC III Regular Interest outstanding immediately prior to such Distribution Date, until the Class Principal Balance of each such Class of Certificates and such Group FL REMIC III Regular Interest has been reduced to zero (such distributions of principal to be made without regard to the Adjusted Principal Distribution Amount for such Distribution Date);

*third*, to reimburse the Holders of the respective Classes of the Senior Class A Certificates (exclusive of the Class A-2FL Certificates) and the Class A-2FL Grantor Trust with respect to the Class A-2FL REMIC III Regular Interest, up to an amount equal to, and on a *pro rata* basis as among such Classes of Certificates and such Group FL REMIC III Regular Interest in accordance with, the Loss Reimbursement Amount with respect to each such Class of Certificates and such Group FL REMIC III Regular Interest for such Distribution Date;

*fourth*, to make distributions of interest to the Holders of the Class A-M Certificates and to the Class A-MFL Floating Rate Account with respect to the Class A-MFL REMIC III Regular Interest, up to an amount equal to, and on a *pro rata* basis as among such Class of Certificates and such Group FL REMIC III Regular Interest in accordance with, all Distributable Certificate Interest in respect of such Class of Certificates and such Group FL REMIC III Regular Interest for such Distribution Date and, to the extent not previously paid, for all prior Distribution Dates, if any;

*fifth*, after the Class Principal Balances of the respective Classes of the Senior Class A Certificates (exclusive of the Class A-2FL Certificates) and the Class A-2FL REMIC III Regular Interest

-266-

have been reduced to zero, to make distributions of principal to the Holders of the Class A-M Certificates and to the Class A-MFL Floating Rate Account with respect to the Class A-MFL REMIC III Regular Interest, on a *pro rata* basis by Class Principal Balance, up to an amount (not to exceed the aggregate of the Class Principal Balances of the Class A-M Certificates and the Class A-MFL REMIC III Regular Interest outstanding immediately prior to such Distribution Date) equal to the entire Adjusted Principal Distribution Amount for such Distribution Date (net of any portion thereof distributed on such Distribution Date to the Holders of the respective Classes of the Senior Class A Certificates (exclusive of the Class A-2FL Certificates) and/or to the Class A-2FL Floating Rate Account with respect to the Class A-2FL REMIC III Regular Interest pursuant to clause *second* of this Section 4.01(a)); provided, however, that, on the Final Distribution Date, the Trustee shall, pursuant to this clause *fifth*, subject to remaining available funds, make distributions of principal to the Holders of the Class A-M Certificates and to the Class A-MFL Floating Rate Account with respect to the Class A-MFL REMIC III Regular Interest on a *pro rata* basis in accordance with the Class Principal Balance of each of the Class A-M Certificates and the Class A-MFL REMIC III Regular Interest outstanding immediately prior to such Distribution Date, until the Class Principal Balance of such Class of Certificates and such Group FL REMIC III Regular Interest is reduced to zero;

*sixth*, to reimburse the Holders of the Class A-M Certificates and Grantor Trust A-MFL with respect to the Class A-MFL REMIC III Regular Interest, up to an amount equal to, and on a *pro rata* basis as among such Class of Certificates and such Group FL REMIC III Regular Interest in accordance with, the Loss Reimbursement Amount with respect to such Class of Certificates and such Group FL REMIC III Regular Interest for such Distribution Date;

*seventh*, to make distributions of interest to the Holders of the Class A-J Certificates, up to an amount equal to all Distributable Certificate Interest in respect of such Class of Certificates for such Distribution Date and, to the extent not previously paid, for all prior Distribution Dates, if any;

*eighth*, after the Class Principal Balances of the Class A-M Certificates and the Class A-MFL REMIC III Regular Interest have been reduced to zero, to make distributions of principal to the Holders of the Class A-J Certificates, up to an amount (not to exceed the Class Principal Balances of the Class A-J Certificates outstanding immediately prior to such Distribution Date) equal to the entire Adjusted Principal Distribution Amount for such Distribution Date (net of any portion thereof distributed on such Distribution Date to the Holders of the respective Classes of the Senior Class A Certificates (exclusive of the Class A-2FL Certificates) and/or to the Class A-2FL Floating Rate Account with respect to the Class A-2FL REMIC III Regular Interest pursuant to clause *second* of this Section 4.01(a) and/or to the Holders of the Class A-M Certificates and to the Class A-MFL Floating Rate Account with respect to the Class A-MFL REMIC III Regular Interest pursuant to clause *fifth* of this Section 4.01(a)); provided, however, that, on the Final Distribution Date, the Trustee shall, pursuant to this clause *eighth*, subject to remaining available funds, make distributions of principal to the Holders of the Class A-J Certificates until the Class Principal Balance of such Class of Certificates is reduced to zero;

*ninth*, to reimburse the Holders of the Class A-J Certificates, up to an amount equal to the Loss Reimbursement Amount with respect to such Class of Certificates for such Distribution Date; and

*tenth*, to make distributions to the Holders of the remaining Classes of the Regular Interest Certificates as provided in Section 4.01(b).

All distributions of interest, if any, made with respect to the Class X Certificates on any Distribution Date, pursuant to this Section 4.01(a), shall be made, and shall be deemed to have been made, in respect of the various Class X REMIC III Components, *pro rata* in accordance with the respective amounts of Distributable Component Interest in respect of such Class X REMIC III Components for such Distribution Date and, to the extent not previously deemed paid pursuant to this paragraph, for all prior Distribution Dates, if any.

(b)     On each Distribution Date, through and including the Final Distribution Date, after making the distributions with respect to the Senior Certificates (exclusive of the Class A-2FL Certificates), the Class A-M Certificates, the Class A-J Certificates and the Group FL REMIC III Regular Interests provided for in Section 4.01(a), the Trustee shall, based on, among other things, information provided by the Master Servicer and, if applicable, the Special Servicer, apply the remaining portion, if any, of the Available Distribution Amount for such Distribution Date to make the distributions described in the next paragraph to the Holders of the various Classes of the Class B Through T Certificates, such distributions to be made sequentially among such Classes of Certificateholders in the alphabetic order of the Class designations of their respective Certificates (beginning with the Class B Certificates and ending with the Class T Certificates), in each case to the extent of the Remaining Available Distribution Amount with respect to the subject Class of Certificates for such Distribution Date.

On each Distribution Date, through and including the Final Distribution Date, the Holders of each Class of the Class B Through T Certificates will be entitled to receive, subject to the Remaining Available Distribution Amount with respect to the subject Class of Certificates for such Distribution Date, the following distributions in the following order of priority, in each case to the extent of the remaining available funds:

*first*, distributions of interest, up to an amount equal to all Distributable Certificate Interest with respect to the subject Class of Certificates for such Distribution Date and, to the extent not previously received, for all prior Distribution Dates, if any;

*second*, distributions of principal, up to an amount (not to exceed the Class Principal Balance of the subject Class of Certificates outstanding immediately prior to such Distribution Date) equal to the Remaining Adjusted Principal Distribution Amount with respect to the subject Class of Certificates for such Distribution Date (or, if such Distribution Date is the Final Distribution Date, then up to an amount equal to the entire Class Principal Balance of the subject Class of Certificates immediately prior to, and without regard to the Remaining Adjusted Principal Distribution Amount with respect to the subject Class of Certificates for, such Distribution Date); and

*third*, reimbursements of any and all reductions made in the Class Principal Balance of the subject Class of Certificates pursuant to Section 4.04(a), up to an amount equal to the Loss Reimbursement Amount with respect to the subject Class of Certificates for such Distribution Date;

provided that no distributions of principal will be made with respect to any Class of the Class B Through T Certificates until the reduction to zero of the Class Principal Balance of each Class of the Class A Certificates, as well as the Class Principal Balance of each other Class of the Class B Through T Certificates, if any, that has an earlier alphabetic Class designation (that is, "Class B" comes before "Class C", "Class C" comes before "Class D", and so forth) than does the subject Class of Certificates.

-268-

Any portion of the Available Distribution Amount that remains after the distributions with respect to the Regular Interest Certificates and the Group FL REMIC III Regular Interests in accordance with Section 4.01(a) and this Section 4.01(b) shall be applied to make distributions to the Holders of the Residual Interest Certificates in accordance with Section 4.01(c).

(c)    On each Distribution Date, through and including the Final Distribution Date, after making the distributions with respect to the Regular Interest Certificates and the Group FL REMIC III Regular Interests provided for in Sections 4.01(a) and 4.01(b), the Trustee shall apply the remaining portion, if any, of the Available Distribution Amount for such Distribution Date for the following purposes and in the following order of priority, in each case to the extent of remaining available funds:

(i)    to make distributions to the Holders of the Class R-III Certificates, up to an amount equal to the excess, if any, of (A) the aggregate distributions (other than distributions of Net Prepayment Consideration) deemed made with respect to the REMIC II Regular Interests on such Distribution Date pursuant to Section 4.01(m), over (B) the aggregate distributions made with respect to the Regular Interest Certificates and the Group FL REMIC III Regular Interests on such Distribution Date pursuant to Section 4.01(a) and/or Section 4.01(b);

(ii)    to make distributions to the Holders of the Class R-II Certificates, up to an amount equal to the excess, if any, of (A) the aggregate distributions (other than distributions of Net Prepayment Consideration) deemed made with respect to the REMIC I Regular Interests on such Distribution Date pursuant to Section 4.01(n), over (B) the aggregate distributions (other than distributions of Net Prepayment Consideration) deemed made with respect to the REMIC II Regular Interests on such Distribution Date pursuant to Section 4.01(m);

(iii)    subject to Section 2.06(b), to make distributions to the Holders of the Class R-LR Certificates, up to an amount equal to the excess, if any, of (A) that portion of the Available Distribution Amount for such Distribution Date that is allocable to the Early Defeasance Trust Mortgage Loans and/or any related REO Properties, over (B) the aggregate distributions (other than distributions of Net Prepayment Consideration) deemed made with respect to the Loan REMIC Regular Interests on such Distribution Date pursuant to Section 4.01(o); and

(iv)    to distribute to the Holders of the Class R-I Certificates the remaining portion, if any, of the Available Distribution Amount.

(d)    On each Distribution Date, through and including the Final Distribution Date, the Trustee shall withdraw from the Collection Account any amount Received by the Trust with respect to any Trust Mortgage Loan or REO Trust Mortgage Loan during the related Collection Period that represents Net Prepayment Consideration and shall distribute such Net Prepayment Consideration: *first*, to the Holders of the respective Classes of YM Principal Balance Certificates and to the applicable Floating Rate Account(s) with respect to the Group FL REMIC III Regular Interests that are entitled to distributions of principal on such Distribution Date, pursuant to Section 4.01(a) or Section 4.01(b), as applicable, with respect to the Loan Group that includes the prepaid Trust Mortgage Loan or REO Trust Mortgage Loan, as applicable, up to an amount equal to, and *pro rata* based on, the respective Prepayment Consideration Entitlements for such Classes of Certificates and such Group FL REMIC III Regular Interests for such Distribution Date in connection with such Net Prepayment Consideration; and *second*, to the Holders of the Class X Certificates, in an amount equal to any remaining portion of such Net Prepayment Consideration. For purposes of the foregoing, to the extent that amounts available to

-269-

SECTION 6.08.    Depositor, Master Servicer and Trustee to Cooperate with Special Servicer.

The Depositor, the Master Servicer and the Trustee shall each furnish such reports, certifications and information as are reasonably requested by the Special Servicer in order to enable it to perform its duties hereunder.

SECTION 6.09.    Designation of Special Servicer and Controlling Class Representative; Replacement of Special Servicer by the Controlling Class and Others.

(a)    Subject to Section 6.09(d), the Majority Controlling Class Certificateholder(s) may at any time and from time to time designate a Person to serve as Special Servicer hereunder and to replace any existing Special Servicer without cause or any Special Servicer that has resigned or otherwise ceased to serve (including in connection with a termination pursuant to Section 7.01) as Special Servicer; provided that the Majority Controlling Class Certificateholder(s) may not designate any Person to act as successor Special Servicer with respect to any Serviced Loan Combination (without the consent of the related Serviced Non-Trust Noteholder(s), such consent not to be unreasonably withheld) if such Person was previously terminated as Special Servicer with respect to such Serviced Loan Combination due to an Event of Default under any of clauses (i) through (v) of Section 7.01(a). Such Holder or Holders shall so designate a Person to serve as replacement Special Servicer by the delivery to the Trustee, the Depositor, the Master Servicer, each Serviced Non-Trust Mortgage Loan Noteholder and the existing Special Servicer of a written notice stating such designation. The Trustee shall, promptly after receiving any such notice, deliver to the Rating Agencies an executed Notice and Acknowledgment in the form attached hereto as Exhibit I-1. If such Holders have not replaced the Special Servicer within 30 days of such Special Servicer's resignation or the date such Special Servicer has ceased to serve in such capacity, and subject to the prior rights of any particular party to appoint a special servicer with respect to any Serviced Senior/Subordinate Loan Combination or related REO Property in accordance with Section 6.09(d), the Trustee shall designate a successor Special Servicer, subject to removal by the Majority Controlling Class Certificateholder(s) or as and to the extent otherwise provided in Section 6.09(d) and appointment of a successor thereto pursuant to the terms of this Section 6.09. Subject to Section 6.09(d) and the proviso to the first sentence of this Section 6.09(a), any designated Person (whether designated by Holders of the Controlling Class or by the Trustee) shall become the Special Servicer on the date as of which the Trustee shall have received all of the following: (1) written confirmation from each Rating Agency (obtained at the expense of the outgoing Special Servicer, in connection with a resignation or a termination for cause, including pursuant to Section 7.01, and otherwise at the expense of the Controlling Class Certificateholders contemplated by the next paragraph) that the appointment of such Person will not result in an Adverse Rating Event with respect to any Class of Certificates or any outstanding class of Specially Designated Non-Trust Mortgage Loan Securities rated by such rating agency; (2) an Acknowledgment of Proposed Special Servicer in the form attached hereto as Exhibit I-2, executed by the designated Person; and (3) an Opinion of Counsel (at the expense of the Person designated to become the Special Servicer) to the effect that, upon the execution and delivery of the Acknowledgment of Proposed Special Servicer, the designated Person shall be bound by the terms of this Agreement and, subject to customary limitations, that this Agreement shall be enforceable against the designated Person in accordance with its terms. Subject to Section 6.09(d) and the proviso to the first sentence of this Section 6.09(a), any existing Special Servicer shall be deemed to have resigned simultaneously with such designated Person's becoming the Special Servicer hereunder;

-310-

provided, however, that (i) the outgoing Special Servicer shall continue to be entitled to receive all amounts accrued or owing to it under this Agreement on or prior to the effective date of such resignation, whether in respect of Servicing Advances or otherwise, (ii) if the outgoing Special Servicer was terminated without cause, it shall be entitled to a portion of certain Workout Fees thereafter payable with respect to the Corrected Mortgage Loans or otherwise (but only if and to the extent permitted by Section 3.11(c)) and (iii) the outgoing Special Servicer shall continue to be entitled to the benefits of Section 6.03 notwithstanding any such resignation. The outgoing Special Servicer shall cooperate with the Trustee and the replacement Special Servicer in effecting the termination of the outgoing Special Servicer's responsibilities and rights hereunder, including the transfer within two (2) Business Days to the replacement Special Servicer for administration by it of all cash amounts that shall at the time be or should have been credited by the outgoing Special Servicer to a Custodial Account, a Servicing Account, a Reserve Account or an REO Account or should have been delivered to the Master Servicer or that are thereafter received with respect to Specially Serviced Mortgage Loans and Administered REO Properties. The Trustee shall notify the other parties hereto, the Certificateholders and the Serviced Non-Trust Mortgage Loan Noteholders of any termination of the Special Servicer and appointment of a new Special Servicer in accordance with this Section 6.09(a).

Any out-of-pocket costs and expenses incurred in connection with the removal (without cause) of a Special Servicer pursuant to this Section 6.09(a) and its replacement by a Person designated by the Majority Controlling Class Certificateholder(s), that are not paid by the replacement Special Servicer shall be paid by such Holder or Holders. The rights of the Majority Controlling Class Certificateholders to replace the Special Servicer under this Section 6.09(a) shall be subject to Section 6.09(d), as well as to the provisions of the respective Co-Lender Agreement for each Serviced Loan Combination if and to the extent that such Co-Lender Agreement entitles one or more of the related Non-Trust Mortgage Loan Noteholders to be consulted in connection with such replacement; and it shall be an additional condition to any such replacement that the Majority Controlling Class Certificateholder(s) shall have fulfilled, or caused the fulfillment of, any conditions precedent to such replacement that are set forth in such Co-Lender Agreements.

(b) The Majority Controlling Class Certificateholder(s) may also select a representative, which shall not be required to be a Certificateholder (the "Controlling Class Representative"), from whom the Special Servicer will seek advice and approval and take direction under certain circumstances, as described herein, and shall promptly notify the Trustee, the Master Servicer and the Special Servicer of that selection. Notwithstanding the foregoing, until a Controlling Class Representative is so selected in accordance with the preceding sentence, or after receipt of a notice from the Majority Controlling Class Certificateholder(s) that a Controlling Class Representative is no longer designated, the Certificateholder (or, if the Certificates of the Controlling Class are Book-Entry Certificates, the Certificate Owner), if any, that beneficially owns more than 50% of the Class Principal Balance of the Controlling Class of Certificates will be deemed to be the Controlling Class Representative. The Controlling Class Representative shall be required to keep all non-public information received by it in such capacity pursuant to this Agreement confidential and, upon its designation as such, the Controlling Class Representative (except with respect to the initial Controlling Class Representative as provided in the following sentence) shall deliver to the Trustee, the Master Servicer and the Special Servicer a written confirmation to such effect, in the form of Exhibit O attached hereto (the "Controlling Class Representative Confirmation"). The Controlling Class Representative Confirmation shall also include confirmation of its acceptance of its appointment as Controlling Class Representative, an address and facsimile number for the delivery of notices and other correspondence

-311-

and a list of officers or employees of such Person with whom the parties to this Agreement may deal (including their names, titles, work addresses and facsimile numbers)). No appointment of any Person as a Controlling Class Representative shall be effective until such Person provides the Trustee and the Master Servicer with a Controlling Class Representative Confirmation; provided that, upon its acquisition of all the Class T Certificates, Five Mile Capital II CMBS Pooling International LLC shall be the initial Controlling Class Representative without the need for delivery of a Controlling Class Representative Confirmation, and by its acceptance of such designation, shall be deemed to have agreed to keep all non-public information received by it in such capacity from time to time pursuant to this Agreement confidential, subject to applicable law.

(c)     Notwithstanding the foregoing, if the Controlling Class of Certificates consists or consist, as applicable, of Book-Entry Certificates, then the rights of the Holders of the Certificates of the Controlling Class set forth in Section 6.09(a) or Section 6.09(b) above may be exercised directly by the relevant Certificate Owner(s), provided that the identity of such Certificate Owner(s) has been confirmed to the Trustee to its reasonable satisfaction. If the Certificates of the Controlling Class consist of Book-Entry Certificates, then any costs or expenses incurred in connection with determining the identity of the Controlling Class Representative shall be paid by the Trust or, if paid by the Trustee, reimbursed to the Trustee out of the Trust Fund (in any event, out of amounts otherwise payable with respect to the Controlling Class of Certificates).

(d)     In the case of each of the Innkeepers Portfolio Loan Combination and, for so long as no Serviced Loan Combination Change of Control Event has occurred and is continuing with respect thereto, the Bear Canyon Loan Combination, the related Non-Trust Mortgage Loan Noteholder (or its designee appointed in accordance with Section 3.02 of the related Co-Lender Agreement) shall be entitled, solely with respect to such Loan Combination, to exercise any and all rights to terminate, appoint and/or replace the Special Servicer that are granted to the Majority Controlling Class Certificateholder(s) pursuant to the first paragraph of Section 6.09(a), in all cases subject to the same terms, conditions and limitations as are applicable to any such termination, appointment and/or replacement by the Majority Controlling Class Certificateholder(s). Notwithstanding anything herein to the contrary, in the case of each such Serviced Loan Combination, the related Non-Trust Mortgage Loan Noteholder (or its designee appointed in accordance with Section 3.02 of the related Co-Lender Agreement) shall not have any right under such circumstances to terminate, replace or appoint any party as Special Servicer in respect of any Mortgage Loan or REO Property other than the subject Serviced Loan Combination and any related REO Property, and such right shall exist with respect to the Bear Canyon Loan Combination only if and for so long as no Serviced Loan Combination Change of Control Event has occurred and is continuing with respect to the Bear Canyon Loan Combination. Further notwithstanding anything herein to the contrary, the related Non-Trust Mortgage Loan Noteholder shall not under any circumstances have any right to terminate the Special Servicer in respect of the Addison Tower Loan Combination.

Notwithstanding the foregoing, the Majority Controlling Class Certificateholder(s) shall continue to have all rights to terminate, appoint and/or replace a Special Servicer in accordance with Section 6.09; provided that: (i) for so long as no Serviced Loan Combination Change of Control Event has occurred and is continuing with respect to the Bear Canyon Loan Combination, the Majority Controlling Class Certificateholder(s) may not terminate or replace, without cause, any Special Servicer appointed by the related Serviced Non-Trust Mortgage Loan Noteholder or its designee with respect to the Bear Canyon Loan Combination or any related REO Property pursuant to this Section 6.09(d); and

-312-

(ii) the Majority Controlling Class Certificateholder(s) may not at any time terminate or replace, without cause, any Special Servicer appointed by the related Serviced Non-Trust Mortgage Loan Noteholder or its designee with respect to the Innkeepers Portfolio Loan Combination or any related REO Property pursuant to this Section 6.09(d);

If a replacement special servicer is appointed with respect to a Serviced Loan Combination or any related REO Property at the request of a related Serviced Non-Trust Mortgage Loan Noteholder in accordance with Section 7.01(d) or with respect to a Serviced Loan Combination or any related REO Property at the request of any appropriate party in accordance with this Section 6.09(d), and if the Person acting as Loan Combination Special Servicer with respect to a Serviced Loan Combination or any related REO Property is different from the Person acting as Special Servicer with respect to the Mortgage Pool (exclusive of the Serviced Loan Combinations), then the provisions of Section 7.01(e) shall apply to such Loan Combination Special Servicer in respect of such circumstances.

Pursuant to Section 2(l) of the Potomac Mills Co-Lender Agreement, the Majority Controlling Class Certificateholder(s) are entitled to remove and replace the Outside Special Servicer with respect to the Potomac Mills Loan Combination; provided that the appointment of a successor Special Servicer is subject to any applicable requirements set forth in the Potomac Mills Servicing Agreement and to written confirmation by each Rating Agency that such appointment will not result in an Adverse Rating Event with respect to any Class of Certificates or any class of Specially Designated Non-Trust Mortgage Loan Securities backed by the Potomac Mills Non-Trust Mortgage Loan.

Pursuant to Section 2(k) of the Och-Ziff Retail Portfolio Co-Lender Agreement, the Majority Controlling Class Certificateholder(s) are entitled to remove and replace the Outside Special Servicer with respect to the Och-Ziff Retail Portfolio Loan Combination, subject to consultation on a non-binding basis with the majority holder(s) of the controlling class under the securitization(s) relating to the Och-Ziff Retail Portfolio Non-Trust Mortgage Loan; provided that the Majority Controlling Class Certificateholder(s) are not obligated to follow the advice of such other majority holder(s); and provided further that the appointment of a successor Special Servicer is subject to any applicable requirements set forth in the Och-Ziff Retail Portfolio Servicing Agreement and to written confirmation by each Rating Agency that such appointment will not result in an Adverse Rating Event with respect to any Class of Certificates or any class of Specially Designated Non-Trust Mortgage Loan Securities backed by the Och-Ziff Retail Portfolio Non-Trust Mortgage Loan.

(e)     Any Loan Combination Special Servicer removed pursuant to Section 6.09(d) shall be deemed to have resigned simultaneously with its replacement becoming the new Loan Combination Special Servicer hereunder with respect to the subject Loan Combination or any related REO Property; provided, however, that (i) the outgoing Loan Combination Special Servicer shall continue to be entitled to receive all amounts accrued or owing to it under this Agreement on or prior to the effective date of such resignation, whether in respect of Servicing Advances or otherwise, in respect of the subject Loan Combination or any related REO Property, (ii) if the outgoing Loan Combination Special Servicer was terminated without cause, it shall be entitled to a portion of certain Workout Fees thereafter payable with respect to any Corrected Mortgage Loan(s) constituting the subject Loan Combination, but only if and to the extent permitted by Section 3.11(c), and (iii) the outgoing Loan Combination Special Servicer shall continue to be entitled to the benefits of Section 6.03 notwithstanding any such resignation. The outgoing Loan Combination Special Servicer shall cooperate with the Trustee and its replacement in effecting the termination of the responsibilities and rights

hereunder of the outgoing Loan Combination Special Servicer, including the transfer within two (2) Business Days to the replacement Loan Combination Special Servicer for administration by it of all cash amounts relating to the subject Loan Combination or any related REO Property that shall at the time be or should have been credited by the outgoing Loan Combination Special Servicer to a Custodial Account, a Servicing Account, a Reserve Account or an REO Account or should have been delivered to the Master Servicer or that are thereafter received with respect to the subject Loan Combination and/or any related REO Property. The Trustee shall notify the other parties hereto and the Certificateholders of any termination of a Loan Combination Special Servicer and/or appointment of a new Loan Combination Special Servicer in accordance with Section 6.09(d).

Any out-of-pocket costs and expenses incurred in connection with the removal (without cause) of a Loan Combination Special Servicer, and the appointment of its replacement, pursuant to Section 6.09(d), that are not paid by the replacement Loan Combination Special Servicer, shall be paid by the Person(s) effecting the removal in accordance with Section 6.09(d). The rights of any Serviced Loan Combination Controlling Party with respect to a Serviced Loan Combination to replace the related Loan Combination Special Servicer under Section 6.09(d) shall be subject to the provisions of the related Co-Lender Agreement; and it shall be an additional condition to any such replacement that such Serviced Loan Combination Controlling Party shall have fulfilled, or caused the fulfillment of, any conditions precedent to such replacement that are set forth in the related Co-Lender Agreement.

SECTION 6.10.      Master Servicer or Special Servicer as Owner of a Certificate.

The Master Servicer, the Special Servicer or any Affiliate of either of them may become the Holder of (or, in the case of a Book-Entry Certificate, Certificate Owner with respect to) any Certificate with (except as otherwise set forth in the definition of "Certificateholder") the same rights it would have if it were not the Master Servicer or the Special Servicer or an Affiliate thereof. If, at any time during which the Master Servicer or the Special Servicer or an Affiliate of the Master Servicer or the Special Servicer is the Holder of (or, in the case of a Book-Entry Certificate, Certificate Owner with respect to) any Certificate, the Master Servicer or the Special Servicer proposes to take action (including for this purpose, omitting to take action) that is not expressly prohibited by the terms hereof and would not, in the Master Servicer's or the Special Servicer's reasonable, good faith judgment, violate the Servicing Standard, but that, if taken, might nonetheless, in the Master Servicer's or the Special Servicer's good faith judgment, be considered by other Persons to violate the Servicing Standard, then the Master Servicer or the Special Servicer may (but need not) seek the approval of the Certificateholders to such action by delivering to the Trustee a written notice that (a) states that it is delivered pursuant to this Section 6.10, (b) identifies the Percentage Interest in each Class of Certificates beneficially owned by the Master Servicer or an Affiliate thereof or the Special Servicer or an Affiliate thereof, as appropriate, and (c) describes in reasonable detail the action that the Master Servicer or the Special Servicer proposes to take. The Trustee, upon receipt of such notice, shall forward it to the Certificateholders (other than the Master Servicer and its Affiliates or the Special Servicer and its Affiliates, as appropriate), together with such instructions for response as the Trustee shall reasonably determine. If at any time Certificateholders holding greater than 50% of the Voting Rights of all Certificateholders (calculated without regard to the Certificates beneficially owned by the Master Servicer or its Affiliates or the Special Servicer or its Affiliates, as appropriate) shall have failed to object in writing (with a copy to the related Serviced Non-Trust Mortgage Loan Noteholder(s), if a Serviced Loan Combination is involved) to the proposal described in the written notice, and if the Master Servicer or the Special Servicer shall act as proposed in the written notice within 30 days, such

[TPW: NYLEGAL:707059.11] 20995-00020 10/02/2007 05:00 PM

action shall be deemed to comply with, but not modify, the Servicing Standard. The Trustee shall be entitled to reimbursement from the Master Servicer or the Special Servicer, as applicable, for the reasonable expenses of the Trustee incurred pursuant to this paragraph. It is not the intent of the foregoing provision that the Master Servicer or the Special Servicer be permitted to invoke the procedure set forth herein with respect to routine servicing matters arising hereunder, but rather only in the case of unusual circumstances.

SECTION 6.11.    Certain Powers of the Controlling Class Representative.

(a)     Each of the Master Servicer and the Special Servicer shall notify (in writing) the Controlling Class Representative of its intention to take any Specially Designated Servicing Action with respect to any Serviced Mortgage Loan and shall provide the Controlling Class Representative with all reasonably requested information with respect thereto. Subject to Section 6.11(b) and any restrictions imposed by any related Co-Lender Agreement, the Controlling Class Representative will be entitled to advise the Special Servicer (in the event the Special Servicer is authorized under this Agreement to take the subject action) or the Master Servicer (in the event the Master Servicer is authorized under this Agreement to take the subject action), as applicable, with respect to any and all Specially Designated Servicing Actions relating to the Serviced Mortgage Loans and any Administered REO Properties; and, further subject to Section 6.11(b) and the penultimate paragraph of this Section 6.11(a), neither the Master Servicer nor the Special Servicer will be permitted to take (or, in the case of the Special Servicer, if and to the extent applicable, consent to the Master Servicer's taking) any Specially Designated Servicing Action with respect to any Serviced Mortgage Loan or Administered REO Property if the Controlling Class Representative has objected in writing within ten (10) Business Days (or, in the case of the Specially Designated Servicing Actions set forth in clause (b)(iii), clause (b)(viii), clause (b)(x) and, in the case of Performing Serviced Mortgage Loans, clause (b)(ix), of the definition of "Specially Designated Servicing Action," within five (5) Business Days) of having been notified in writing thereof and having been provided with all information that the Controlling Class Representative has reasonably requested with respect thereto promptly following its receipt of the subject notice (it being understood and agreed that if such written objection has not been received by the Special Servicer or the Master Servicer, as applicable, within such ten (10) Business Day (or five (5) Business Day, as applicable) period, then the Controlling Class Representative will be deemed to have approved the taking of the subject action); provided that, if the Special Servicer or the Master Servicer, as applicable, determines that failure to take such action would violate the Servicing Standard, then the Master Servicer or the Special Servicer, as the case may be, may take (or, in the case of the Special Servicer, if and to the extent applicable, consent to the Master Servicer's taking) any such action without waiting for the Controlling Class Representative's response; and provided, further, that the foregoing rights of the Controlling Class Representative shall not relate to any Serviced Mortgage Loan that is part of, or any Administered REO Property that relates to, a Serviced Loan Combination, regarding which the rights and powers of the specified Persons set forth under Section 6.12 are instead applicable. Any right to take any action, grant or withhold any consent or otherwise exercise any right, election or remedy afforded the Controlling Class Representative under this Agreement may, unless otherwise expressly provided herein to the contrary, be affirmatively waived by the Controlling Class Representative by written notice given to the Trustee, Special Servicer or Master Servicer, as applicable. Upon delivery of any such notice of waiver given by the Controlling Class Representative, any time period (exclusive or otherwise) afforded the Controlling Class Representative to exercise any such right, make any such election or grant or withhold any such consent shall thereupon be deemed to have expired with the same

-315-

force and effect as if the specific time period set forth in this Agreement applicable thereto had itself expired.

In addition, subject to Section 6.11(b) and any restrictions imposed by any related Co-Lender Agreement, the Controlling Class Representative may direct the Special Servicer to take, or to refrain from taking, any actions with respect to the servicing and/or administration of a Specially Serviced Mortgage Loan or an Administered REO Property as the Controlling Class Representative may deem advisable or as to which provision is otherwise made herein; provided that the foregoing rights of the Controlling Class Representative shall not relate to any Specially Serviced Mortgage Loan that is part of, or any Administered REO Property that relates to, a Serviced Loan Combination. Upon reasonable request, the Special Servicer shall provide the Controlling Class Representative with any information in such servicer's possession with respect to such matters, including its reasons for determining to take a proposed action; provided that such information shall also be provided, in a written format, to the Trustee, who shall make it available for review pursuant to Section 8.14(b).

The Master Servicer (with respect to Performing Serviced Mortgage Loans) or the Special Servicer (with respect to Specially Serviced Mortgage Loans), as applicable, shall notify the Controlling Class Representative of any release or substitution of collateral for a Serviced Mortgage Loan that is not part of a Loan Combination even if such release or substitution is required by the terms of such Serviced Mortgage Loan.

(b)     Notwithstanding anything herein to the contrary, no advice, direction or objection from or by the Controlling Class Representative with respect to any Serviced Mortgage Loan or Administered REO Property, as contemplated by Section 6.11(a) or any other provision of this Agreement, may (and the Special Servicer and the Master Servicer shall each ignore and act without regard to any such advice, direction or objection that such servicer has determined, in its reasonable, good faith judgment, would) require or cause the Master Servicer or the Special Servicer, as applicable, to violate any provision of this Agreement (exclusive of Section 6.11(a)) (including such servicer's obligation to act in accordance with the Servicing Standard), the related loan documents (including any applicable co-lender and/or intercreditor agreements) or applicable law (including the REMIC Provisions), subject it to liability or materially expand the scope of its obligations under this Agreement. Furthermore, the Special Servicer shall not be obligated to seek approval from the Controlling Class Representative, pursuant to Section 6.11(a), for any actions to be taken by the Special Servicer with respect to the workout or liquidation of any particular Specially Serviced Trust Mortgage Loan if:

(i)     the Special Servicer has, as provided in Section 6.11(a), notified the Controlling Class Representative in writing of various actions that the Special Servicer proposes to take with respect to the workout or liquidation of such Specially Serviced Trust Mortgage Loan; and

(ii)     for 60 days following the first such notice, the Controlling Class Representative has objected to all of those proposed actions and has failed to suggest any alternative actions that are consistent with the Servicing Standard.

Also notwithstanding anything herein to the contrary, the provisions of Section 6.11(a), and the rights and powers of the Controlling Class Representative provided for in Section 6.11(a), shall not apply to any Serviced Loan Combination or any related Administered REO Property; provided that this paragraph is not intended to limit any rights or powers that the Controlling Class Representative may have under Section 6.12.

-316-

(c)     Except as otherwise contemplated by <u>Section 6.09(d)</u>, the Controlling Class Representative is hereby authorized to exercise the rights and powers of the Trustee, as holder of the Mortgage Note for each Outside Serviced Trust Mortgage Loan, that would be applicable to it as a Loan Combination Directing Lender, or that relate to cure or purchase options, under the related Co-Lender Agreement (and any corresponding provisions of the related Outside Servicing Agreement), including for purposes of exercising, (i) either individually or together with related Non-Trust Mortgage Loan Noteholder(s), as the case may be, consent rights, consultation rights, rights to direct servicing and rights to replace the related Outside Special Servicer and (ii) any related purchase option and cure rights; <u>provided</u> that any purchase option or cure rights may be exercised by the Controlling Class Representative only in its individual capacity with its own funds.  Promptly following the initial such appointment of a Controlling Class Representative and any subsequent such appointment of a successor Controlling Class Representative, with respect to each Outside Serviced Trust Mortgage Loan, the Trustee shall inform the related Outside Master Servicer, the related Outside Special Servicer and the related Non-Trust Mortgage Loan Noteholder(s) (and from time to time shall ensure that such parties remain similarly informed) that the Controlling Class Representative is entitled, to the fullest extent permitted under the related Co-Lender Agreement, to exercise such rights and powers of the Trustee, in its capacity as holder of the Mortgage Note for the subject Outside Serviced Trust Mortgage Loan, that would be applicable to it as a Loan Combination Directing Lender, or that relate to cure or purchase options, under the related Co-Lender Agreement (and any corresponding provisions of the related Outside Servicing Agreement), and, further, the Trustee shall take such other actions as may be required under the related Co-Lender Agreement in order to permit the Controlling Class Representative to exercise such rights and powers.  The Controlling Class Representative shall be subject to the same limitations, constraints, restrictions and conditions in exercising such rights and powers as would be applicable to the Trustee, in its capacity as holder of the Mortgage Note for the subject Outside Serviced Trust Mortgage Loan.  In addition, subject to <u>Section 7.01(f)</u> and each other section hereof that specifically addresses a particular matter with respect to any Outside Serviced Trust Mortgage Loan, if the Trustee is requested to take any action in its capacity as holder of the Mortgage Note for such Outside Serviced Trust Mortgage Loan, pursuant to the related Co-Lender Agreement and/or the related Outside Servicing Agreement, then the Trustee will notify (in writing), and act in accordance with the instructions of, the Controlling Class Representative; <u>provided</u> that, if such instructions are not provided within the prescribed time period, then the Trustee, subject to <u>Sections 8.01</u> and <u>8.02</u>, shall take such action or inaction as it deems to be in the best interests of the Certificateholders (as a collective whole) and shall have all rights and powers incident thereto; and <u>provided, further,</u> that the Trustee, with respect to any Outside Serviced Trust Mortgage Loan or Outside Administered REO Property, (i) shall not be required to take any action that relates to directing or approving any servicing related action under the related Outside Servicing Agreement or the related Outside Co-Lender Agreement, to the extent that the Controlling Class Representative has been notified thereof and has failed to provide instructions with respect to such action within the prescribed time period, and (ii) shall not take any action that is not permitted under applicable law or the terms of the related Co-Lender Agreement or the related Outside Servicing Agreement or any action that is, in the good faith, reasonable discretion of the Trustee, materially adverse to the interests of the Certificateholders (as a collective whole).

In connection with the foregoing: (i) pursuant to  Section 2(l) of the Potomac Mills Co-Lender Agreement, any decision to be made with respect to the Potomac Mills Loan Combination which requires the approval of the controlling class representative of the securitization relating to the Potomac Mills Non-Trust Mortgage Loan must be made by the Controlling Class Representative, on behalf of the Majority Controlling Class Certificateholder(s), after consultation with such Person(s) as may be

[TPW: NYLEGAL:707059.11] 20995-00020  10/02/2007 05:00 PM

required by the Potomac Mills Co-Lender Agreement; and (ii) pursuant to Section 2(k) of the Och-Ziff Retail Portfolio Co-Lender Agreement, any decision to be made with respect to the Och-Ziff Retail Portfolio Loan Combination which requires the approval of the controlling class of the securitization relating to the Och-Ziff Retail Portfolio Non-Trust Mortgage Loan must be made by the Controlling Class Representative, on behalf of Majority Controlling Class Certificateholder(s), after consultation with such Person(s) as may be required by the Och-Ziff Retail Portfolio Co-Lender Agreement.

(d)     The Controlling Class Representative will have no liability to the Certificateholders for any action taken, or for refraining from the taking of any action, pursuant to this Agreement (whether pursuant to this Section 6.11 or otherwise), or for errors in judgment; provided, however, that the Controlling Class Representative will not be protected against any liability to any Controlling Class Certificateholder that would otherwise be imposed by reason of willful misfeasance or bad faith in the performance of duties or by reason of reckless disregard of obligations or duties. Each Certificateholder acknowledges and agrees, by its acceptance of its Certificates, that: (i) the Controlling Class Representative may, and is permitted hereunder to, have special relationships and interests that conflict with those of Holders of one or more Classes of Certificates; (ii) the Controlling Class Representative may, and is permitted hereunder to, act solely in the interests of the Holders of the Controlling Class of Certificates; (iii) the Controlling Class Representative does not have any duties or liability to the Holders of any Class of Certificates other than the Controlling Class of Certificates; (iv) the Controlling Class Representative may, and is permitted hereunder to, take actions that favor interests of the Holders of the Controlling Class of Certificates over the interests of the Holders of one or more other Classes of Certificates; (v) the Controlling Class Representative shall not be deemed to have been negligent or reckless, or to have acted in bad faith or engaged in willful misconduct, by reason of its having acted solely in the interests of the Holders of the Controlling Class of Certificates; and (vi) the Controlling Class Representative shall have no liability whatsoever for having acted solely in the interests of the Holders of the Controlling Class of Certificates, and no Certificateholder may take any action whatsoever against the Controlling Class Representative, any Holder of the Controlling Class of Certificates or any director, officer, employee, agent or principal thereof for having so acted.

SECTION 6.12.     Certain Matters Regarding the Serviced Loan Combinations.

(a)     Each of the Master Servicer and the Special Servicer, as applicable, shall notify (in writing and, if applicable, in accordance with the related Co-Lender Agreement) the Controlling Class Representative, the related Non-Trust Mortgage Loan Noteholder(s) and, if different, the related Serviced Loan Combination Controlling Party of its intention to take any Specially Designated Servicing Action with respect to any Serviced Loan Combination or related REO Property and shall provide each such party with all reasonably requested information with respect thereto. Subject to Section 6.12(b), and further subject to Section 3.01(b), Section 3.01(c) and Section 3.02(b) of the related Co-Lender Agreement, the applicable Serviced Loan Combination Controlling Party will be entitled to advise the Special Servicer (in the event the Special Servicer is authorized under this Agreement to take the subject action) or the Master Servicer (in the event the Master Servicer is authorized under this Agreement to take the subject action), as applicable, with respect to any and all Specially Designated Servicing Actions with respect to a Serviced Loan Combination or any related REO Property; and, further subject to Section 6.12(b) of this Agreement and Section 3.02(b) of the related Co-Lender Agreement, neither the Master Servicer nor the Special Servicer shall be permitted to take (or, in the case of the Special Servicer, if and when appropriate hereunder, to consent to the Master Servicer's taking) any of the related Specially Designated Servicing Actions with respect to a Serviced Loan

-318-

## ARTICLE VII

## DEFAULT

SECTION 7.01. Events of Default and Outside Servicer Defaults.

(a) "Event of Default", wherever used herein, means any one of the following events:

(i) any failure by the Master Servicer to deposit into a Custodial Account, any amount required to be so deposited by it under this Agreement, which failure continues unremedied for one (1) Business Day following the date on which a deposit was first required to be made; or

(ii) any failure by the Special Servicer to deposit into an REO Account or to deposit into, or to remit to the Master Servicer for deposit into, a Custodial Account, any amount required to be so deposited or remitted under this Agreement, which failure continues unremedied for one (1) Business Day following the date on which a deposit or remittance was first required to be made; or

(iii) any failure by the Master Servicer to deposit into, or remit to the Trustee for deposit into, the Collection Account, any amount (including any P&I Advances and any amounts to cover Prepayment Interest Shortfalls) required to be so deposited or remitted by it under this Agreement, which failure continues unremedied until 11:00 a.m. (New York City time) on the applicable Distribution Date, or any failure by the Master Servicer to make, on a timely basis, any required payment to any Serviced Non-Trust Mortgage Loan Noteholder, which failure continues unremedied until 11:00 a.m. (New York City time) on the Business Day next following the date on which such payment was first required to be made; or

(iv) any failure by the Master Servicer or the Special Servicer to timely make any Servicing Advance required to be made by it hereunder, which Servicing Advance remains unmade for a period of three (3) Business Days following the date on which notice of such failure shall have been given to the Master Servicer or the Special Servicer, as the case may be, by any other party hereto; or

(v) any failure on the part of the Master Servicer or the Special Servicer duly to observe or perform in any material respect any other covenants or agreements on the part of the Master Servicer or the Special Servicer, as the case may be, contained in this Agreement, which failure either (A) in the case of any such failure other than a failure referred to in clause (v)(B) below, continues unremedied for a period of 30 days (or 15 days in the case of payment of insurance premiums) after the date on which written notice of the subject failure, requiring the same to be remedied, shall have been given to the Master Servicer or the Special Servicer, as the case may be, by any other party hereto or to the Master Servicer or the Special Servicer, as the case may be (with a copy to each other party hereto), by a Serviced Non-Trust Mortgage Loan Noteholder (if affected thereby) or by the Holders of Certificates entitled to at least 25% of the Voting Rights, provided, however, that with respect to any such failure (other than a failure referred to in clause (v)(B) below) which is not curable within such 30-day (or, if applicable, 15-day) period, the Master Servicer or the Special Servicer, as the case may be, shall have an

-323-

additional cure period of 30 days to effect such cure so long as the Master Servicer or the Special Servicer, as the case may be, has commenced to cure the subject failure within the initial 30-day (or, if applicable, 15-day) period and has provided the Trustee and any affected Serviced Non-Trust Mortgage Loan Noteholder with an Officer's Certificate certifying that it has diligently pursued, and is diligently continuing to pursue, a full cure, or (B) in the case of the failure to deliver to the Trustee, the Depositor and each affected Serviced Non-Trust Mortgage Loan Noteholder, or cause delivery thereto of, the Annual Statement of Compliance, the Annual Assessment Report and the Annual Attestation Report (together with, if required to be filed with the Commission under applicable law, the related accountants' consent to filing thereof with the Commission) with respect to the Master Servicer (or any Additional Item 1123 Servicer or Sub-Servicing Function Participant, as applicable, retained or engaged thereby that is not identified on Exhibit K hereto) or the Special Servicer (or any Additional Item 1123 Servicer or Sub-Servicing Function Participant, as applicable, retained or engaged thereby), as applicable, pursuant to Section 3.13 or Section 3.14, as applicable, which is required to be part of or incorporated in a Subsequent Exchange Act Report required to be filed with respect to the Trust pursuant to the Exchange Act and this Agreement, continues unremedied beyond 5:00 p.m. (New York City time) on the second Business Day after the date on which Servicer Notice of the subject failure has been given to the Master Servicer or the Special Servicer, as the case may be, by or on behalf of any other party hereto in accordance with Section 3.13 or Section 3.14, as applicable, or (C) in the case of a failure to notify the Trustee and the Depositor that an Additional Item 1123 Servicer or a Sub-Servicing Function Participant has been retained or engaged, which Additional Item 1123 Servicer or Sub-Servicing Function Participant was performing duties with respect to all or any part of the Trust Fund during an Exchange Act Reporting Year, continues unremedied for 30 days; or

(vi)    any breach on the part of the Master Servicer or the Special Servicer of any of its representations or warranties contained in this Agreement that materially and adversely affects the interests of any Class of Certificateholders or any Serviced Non-Trust Mortgage Loan Noteholder and which breach continues unremedied for a period of 30 days after the date on which written notice of such breach, requiring the same to be remedied, shall have been given to the Master Servicer or the Special Servicer, as the case may be, by any other party hereto or to the Master Servicer or the Special Servicer, as the case may be (with a copy to each other party hereto), by a Serviced Non-Trust Mortgage Loan Noteholder (if affected thereby) or by the Holders of Certificates entitled to at least 25% of the Voting Rights, provided, however, that with respect to any such breach which is not curable within such 30-day period, the Master Servicer or the Special Servicer, as the case may be, shall have an additional cure period of 30 days so long as the Master Servicer or the Special Servicer, as the case may be, has commenced to cure such breach within the initial 30-day period and has provided the Trustee and any affected Serviced Non-Trust Mortgage Loan Noteholder with an Officer's Certificate certifying that it has diligently pursued, and is diligently continuing to pursue, a full cure; or

(vii)    a decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law for the appointment of a conservator, receiver, liquidator, trustee or similar official in any bankruptcy, insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have

-324-

been entered against the Master Servicer or the Special Servicer and such decree or order shall have remained in force undischarged, undismissed or unstayed for a period of 60 days; or

(viii)   the Master Servicer or the Special Servicer shall consent to the appointment of a conservator, receiver, liquidator, trustee or similar official in any bankruptcy, insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to it or of or relating to all or substantially all of its property; or

(ix)   the Master Servicer or the Special Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable bankruptcy, insolvency or reorganization statute, make an assignment for the benefit of its creditors, voluntarily suspend payment of its obligations, or take any corporate action in furtherance of the foregoing; or

(x)   the Master Servicer or the Special Servicer is removed from S&P's Select Servicer List as a U.S. Commercial Mortgage Master Servicer or a U.S. Commercial Mortgage Special Servicer, as the case may be, and is not reinstated within 60 days, and the ratings of one or more Classes of Certificates or one or more classes of Specially Designated Non-Trust Mortgage Loan Securities by S&P are qualified, downgraded or withdrawn in connection with the removal; or

(xi)   a Servicing Officer of the Master Servicer or the Special Servicer, as the case may be, obtains actual knowledge that one or more ratings assigned by Fitch or Moody's to the Certificates have been qualified, downgraded or withdrawn, or otherwise made the subject of a "negative" credit watch that remains in effect for at least 60 days, which action by Fitch or Moody's, as the case may be, has determined, and provided notification in writing or electronically, including by public announcement, is solely or in material part a result of the Master Servicer or Special Servicer, as the case may be, acting in such capacity;

(xii)   the Master Servicer fails to be rated at least "CMS3" by Fitch as a master servicer or the Special Servicer fails to be rated at least "CSS3" by Fitch as a special servicer, as the case may be, and in either case that rating is not restored within 60 days after the subject downgrade or withdrawal; or

(xiii)   one or more ratings assigned by any Other Rating Agency to one or more classes of Specially Designated Non-Trust Mortgage Loan Securities have been qualified, downgraded or withdrawn, or otherwise made the subject of a "negative" credit watch that remains in effect for at least 60 days, which action such Other Rating Agency has determined, and provided notification in writing or electronically, including by public announcement, is solely or in material part a result of the Master Servicer or Special Servicer, as the case may be, acting in such capacity.

When a single entity acts as the Master Servicer and the Special Servicer, an Event of Default in one capacity shall constitute an Event of Default in the other capacity.

(b)   If any Event of Default shall occur with respect to the Master Servicer or the Special Servicer (in either case, for purposes of this Section 7.01(b), the "Defaulting Party") and shall be continuing, then, and in each and every such case, so long as such Event of Default shall not have been

-325-

remedied, the Trustee may, and at the written direction of the Holders of Certificates entitled to at least 25% of the Voting Rights, the Trustee shall, by notice in writing to the Defaulting Party (with a copy of such notice to each other party hereto and the Rating Agencies) terminate all of the rights and obligations (but not the liabilities for actions and omissions occurring prior thereto) of the Defaulting Party under this Agreement and in and to the Trust Fund and the Serviced Non-Trust Mortgage Loans, other than its rights, if any, as a Certificateholder hereunder or as the holder of any Serviced Non-Trust Mortgage Loan or any interest therein; provided that the Master Servicer may not be terminated solely for an Event of Default that affects only a Serviced Non-Trust Mortgage Loan Noteholder or any class of Specially Designated Non-Trust Mortgage Loan Securities (except that a Sub-Servicer may be appointed in accordance with Section 7.01(d)); and provided, further, that, except as provided in Section 7.01(d), the Special Servicer may not be terminated solely for an Event of Default that affects only a Serviced Non-Trust Mortgage Loan Noteholder or any class of Specially Designated Non-Trust Mortgage Loan Securities. From and after the receipt by the Defaulting Party of such written notice of termination, subject to Section 7.01(c), all authority and power of the Defaulting Party under this Agreement, whether with respect to the Certificates (other than as a holder of any Certificate), the Trust Fund, the Serviced Non-Trust Mortgage Loans (other than as a holder thereof or any interest therein) or otherwise, shall pass to and be vested in the Trustee pursuant to and under this section, and, without limitation, the Trustee is hereby authorized and empowered to execute and deliver, on behalf of and at the expense of the Defaulting Party, as attorney-in-fact or otherwise, any and all documents and other instruments, and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Trust Mortgage Loans, the Serviced Non-Trust Mortgage Loans and related documents, or otherwise. The Master Servicer and the Special Servicer each agree that, if it is terminated pursuant to this Section 7.01(b), it shall promptly (and in any event no later than ten (10) Business Days subsequent to its receipt of the notice of termination) provide the Trustee with all documents and records, including those in electronic form, requested thereby to enable the Trustee to assume the Master Servicer's or Special Servicer's, as the case may be, functions hereunder, and shall cooperate with the Trustee in effecting the termination of the Master Servicer's or Special Servicer's, as the case may be, responsibilities and rights hereunder, including (i) if the Master Servicer is the Defaulting Party, the prompt transfer to the Trustee or a successor Master Servicer for administration by it of all cash amounts that shall at the time be or should have been credited by the Master Servicer to a Custodial Account, the Collection Account, the Defeasance Deposit Account, a Servicing Account or a Reserve Account or that are thereafter received by or on behalf of it with respect to any Trust Mortgage Loan, any Serviced Non-Trust Mortgage Loan or, to the extent it relates to the foregoing, any REO Property or (ii) if the Special Servicer is the Defaulting Party, the transfer within two (2) Business Days to the Trustee or a successor Special Servicer for administration by it of all cash amounts that shall at the time be or should have been credited by the Special Servicer to an REO Account, a Custodial Account, a Servicing Account or a Reserve Account or should have been delivered to the Master Servicer or that are thereafter received by or on behalf of it with respect to any Trust Mortgage Loan, any Serviced Non-Trust Mortgage Loan or, to the extent it relates to the foregoing, any REO Property; provided, however, that the Master Servicer and the Special Servicer each shall, if terminated pursuant to this Section 7.01(b), continue to be entitled to receive all amounts accrued or owing to it under this Agreement on or prior to the date of such termination, whether in respect of Advances or otherwise, and it shall continue to be entitled to the benefits of Section 6.03 notwithstanding any such termination. Any costs or expenses in connection with any actions to be taken by any party hereto pursuant to this paragraph shall be borne by the Defaulting Party and if not paid by the Defaulting Party within 90 days after the presentation of reasonable documentation of such costs and expenses, such expense shall be

[TPW: NYLEGAL:707059.11] 20995-00020 10/02/2007 05:00 PM

reimbursed by the Trust Fund; provided, however, that the Defaulting Party shall not thereby be relieved of its liability for such expenses. For purposes of this Section 7.01 and also for purposes of Section 7.03(b), the Trustee shall not be deemed to have knowledge of an event which constitutes, or which with the passage of time or notice, or both, would constitute an Event of Default unless a Responsible Officer of the Trustee assigned to and working in the Trustee's Corporate Trust Office has actual knowledge thereof or unless notice of any event which is in fact such an Event of Default is received by the Trustee and such notice references the Certificates, the Trust Fund or this Agreement.

(c)     In the case of an Adverse Rating Event or prospective Adverse Rating Event that has resulted in or may give rise to an Event of Default under Section 7.01(a)(x), (xi), (xii) or (xiii) in respect of the Master Servicer or the Special Servicer and of which the Trustee has notice, the Trustee shall, promptly following its receipt of notice thereof, provide written notice thereof to the Master Servicer or the Special Servicer, as applicable. Notwithstanding Section 7.01(b), if the Master Servicer receives a notice of termination under Section 7.01(b) solely due to an Event of Default under Section 7.01(a)(x), (xi) or (xii), and if the terminated Master Servicer provides the Trustee with the appropriate "request for proposal" materials within five (5) Business Days following such termination, then the Master Servicer shall continue to serve in such capacity hereunder until a successor thereto is selected in accordance with this Section 7.01(c) or the expiration of 45 days from the Master Servicer's receipt of the notice of termination, whichever occurs first. Upon receipt of such "request for proposal" materials from the terminated Master Servicer, the Trustee shall promptly thereafter (using such "request for proposal" materials) solicit good faith bids for the rights to master service the Serviced Mortgage Loans and, to the extent applicable, the Outside Serviced Trust Mortgage Loans under this Agreement from at least three (3) Persons qualified to act as a successor Master Servicer hereunder in accordance with Section 6.02 and Section 7.02 (any such Person so qualified, a "Qualified Bidder") or, if three (3) Qualified Bidders cannot be located, then from as many Persons as the Trustee can determine are Qualified Bidders; provided that at the Trustee's request, the terminated Master Servicer shall supply the Trustee with the names of Persons from whom to solicit such bids; and provided, further, that the Trustee shall not be responsible if less than three (3) or no Qualified Bidders submit bids for the right to master service the Serviced Mortgage Loans and, to the extent applicable, the Outside Serviced Trust Mortgage Loans under this Agreement. The bid proposal shall require any Successful Bidder (as defined below), as a condition of such bid, to enter into this Agreement as successor Master Servicer, and to agree to be bound by the terms hereof, within 45 days after the receipt of notice of termination by the terminated Master Servicer. The Trustee shall solicit bids on the basis of both: (i) such successor Master Servicer (x) retaining all existing Sub-Servicers to continue the primary servicing of the Serviced Mortgage Loans pursuant to the terms of the respective Sub-Servicing Agreements and (y) entering into a Sub-Servicing Agreement with the terminated Master Servicer under which the terminated Master Servicer would sub-service each of the Serviced Mortgage Loans not then subject to a Sub-Servicing Agreement at a sub-servicing fee rate per annum equal to the related Master Servicing Fee Rate minus, in the case of each Trust Mortgage Loan serviced, 0.01% per annum (each, a "Servicing-Retained Bid"); and (ii) terminating each existing Sub-Servicing Agreement and Sub-Servicer that it is permitted to terminate in accordance with Section 3.22 (each, a "Servicing-Released Bid"). The Trustee shall select the Qualified Bidder with the highest cash Servicing-Retained Bid (or, if none, the highest cash Servicing Released Bid) (the "Successful Bidder") to act as successor Master Servicer hereunder. The Trustee shall direct the Successful Bidder to enter into this Agreement as successor Master Servicer pursuant to the terms hereof (and, if the successful bid was a Servicing-Retained Bid, to enter into a Sub-Servicing Agreement with the terminated Master Servicer as contemplated above) no later than 45 days after the receipt of notice of termination by the terminated Master Servicer.

-327-

Upon the assignment and acceptance of the master servicing rights hereunder to and by the Successful Bidder, the Trustee shall remit or cause to be remitted (i) if the successful bid was a Servicing-Retained Bid, to the terminated Master Servicer the amount of such cash bid received from the Successful Bidder (net of "out-of-pocket" expenses incurred in connection with obtaining such bid and transferring servicing) and (ii) if the successful bid was a Servicing-Released Bid, to the Master Servicer and each terminated Sub-Servicer its respective Bid Allocation.

The terminated Master Servicer shall be responsible for all out-of-pocket expenses incurred in connection with the attempt to sell its rights to master service the Serviced Mortgage Loans and, to the extent applicable, the Outside Serviced Trust Mortgage Loans, which expenses are not reimbursed to the party that incurred such expenses pursuant to the preceding paragraph.

If the Successful Bidder has not entered into this Agreement as successor Master Servicer within 45 days after the terminated Master Servicer received written notice of termination or no Successful Bidder was identified within such 45-day period, then the terminated Master Servicer shall reimburse the Trustee for all reasonable "out-of-pocket" expenses incurred by the Trustee in connection with such bid process and the Trustee shall have no further obligations under this Section 7.01(c). The Trustee thereafter may act or may select a successor to act as Master Servicer hereunder in accordance with Section 7.02.

(d)     Notwithstanding Section 7.01(b) and Section 7.04: (1) if any Event of Default on the part of the Master Servicer occurs that affects a Serviced Non-Trust Mortgage Loan Noteholder or any class of Specially Designated Non-Trust Mortgage Loan Securities, and if the Master Servicer is not otherwise terminated in accordance with Section 7.01(b), then the Master Servicer may not be terminated by or at the direction of the related Serviced Non-Trust Mortgage Loan Noteholder; and (2) if any Event of Default on the part of the Master Servicer occurs that affects solely a Serviced Non-Trust Mortgage Loan Noteholder or any class of Specially Designated Non-Trust Mortgage Loan Securities (including, without limitation, an Event of Default under Section 7.01(a)(xiii)), then the Master Servicer may not be terminated by the Trustee; provided, however, in the case of (1) or (2), at the request of an affected Serviced Non-Trust Mortgage Loan Noteholder in respect of a Serviced Loan Combination, subject to the terms of the related Co-Lender Agreement, the Trustee shall require the Master Servicer to appoint, within 30 days of the Trustee's request, a Sub-Servicer (or, if the related Serviced Loan Combination is currently being sub-serviced, to replace, within 30 days of the Trustee's request, the then-current Sub-Servicer with a new Sub-Servicer) with respect to the related Serviced Loan Combination. In connection with the appointment of a Sub-Servicer in accordance with this Section 7.01(d), the Master Servicer shall obtain, at its own expense, written confirmation from each Rating Agency (and, if applicable, any appropriate Other Rating Agency) that such appointment will not result in an Adverse Rating Event with respect to any Class of Certificates or, if the subject Serviced Loan Combination includes a Specially Designated Securitized Non-Trust Mortgage Loan (or any successor REO Mortgage Loan with respect thereto), any related class of Specially Designated Non-Trust Mortgage Loan Securities rated by such rating agency. The related Sub-Servicing Agreement shall provide that any Sub-Servicer appointed in accordance with this Section 7.01(d) shall be responsible for all duties, and shall be entitled to all compensation, of the Master Servicer under this Agreement with respect to the subject Serviced Loan Combination, except that the Master Servicer shall be entitled to retain that portion of the Master Servicing Fee for the Trust Mortgage Loan or REO Trust Mortgage Loan included in the subject Serviced Loan Combination that accrues at a rate equal to 0.01% per annum. Such Sub-Servicing Agreement shall also provide that such Sub-Servicer shall agree to become

-328-

the master servicer under a separate servicing agreement (as contemplated by the related Co-Lender Agreement) in the event that the subject Serviced Loan Combination is no longer to be serviced and administered hereunder, which separate servicing agreement shall contain servicing and administration, limitation of liability, indemnification and servicing compensation provisions substantially similar to the corresponding provisions of this Agreement, except for the fact that the subject Serviced Loan Combination and the related Mortgaged Property shall be the sole assets serviced and administered thereunder and the sole source of funds thereunder. If any Sub-Servicer appointed in accordance with this Section 7.01(d) shall at any time resign or be terminated, then (subject to the related Co-Lender Agreement) the Master Servicer shall be required to promptly appoint a substitute Sub-Servicer, which appointment shall not result in an Adverse Rating Event with respect to any Class of Certificates or, if the subject Serviced Loan Combination includes a Specially Designated Securitized Non-Trust Mortgage Loan (or any successor REO Mortgage Loan with respect thereto), any related class of Specially Designated Non-Trust Mortgage Loan Securities rated by any Rating Agency or, if applicable, any Other Rating Agency (as evidenced in a writing obtained by the Master Servicer, at its own expense, from each applicable rating agency). In the event that a successor Master Servicer is acting hereunder and such successor Master Servicer desires to terminate the Sub-Servicer appointed under this Section 7.01(d), the terminated Master Servicer that was responsible for the Event of Default that led to the appointment of such Sub-Servicer shall be responsible for all costs incurred in connection with such termination, including the payment of any termination fee.

Further notwithstanding Section 7.01(b) and Section 7.04, if any Event of Default on the part of the Special Servicer occurs that affects a Serviced Non-Trust Mortgage Loan Noteholder in respect of a Serviced Loan Combination, and the Special Servicer is not otherwise terminated in accordance with Section 7.01(b), then such Serviced Non-Trust Mortgage Loan Noteholder may require the Trustee to terminate the duties and obligations of the Special Servicer with respect to the related Serviced Loan Combination only, but as to no other Serviced Mortgage Loan; and, in such event, subject to any applicable consultation rights of any particular related Serviced Non-Trust Mortgage Loan Noteholder under the related Co-Lender Agreement, the appropriate party shall appoint in accordance with Section 6.09 (or, in the event of the failure of such party to so appoint, the Trustee shall appoint in accordance with Section 7.02), within 30 days of such Serviced Non-Trust Mortgage Loan Noteholder's request, a replacement special servicer with respect to the subject Serviced Loan Combination. In connection with the appointment of a replacement special servicer with respect to the subject Serviced Loan Combination at the request of a related Serviced Non-Trust Mortgage Loan Noteholder in accordance with this Section 7.01(d), the Trustee shall obtain written confirmation from each Rating Agency (and, if applicable, each Other Rating Agency) that such appointment will not result in an Adverse Rating Event with respect to any Class of Certificates or, if the subject Serviced Loan Combination includes a Specially Designated Securitized Non-Trust Mortgage Loan (or any successor REO Mortgage Loan with respect thereto), any related class of Specially Designated Non-Trust Mortgage Loan Securities rated by such rating agency (such rating confirmation to be an expense of the terminated Special Servicer or, if not paid thereby, an expense of the requesting Serviced Non-Trust Mortgage Loan Noteholder). Any replacement special servicer appointed at the request of a Serviced Non-Trust Mortgage Loan Noteholder in accordance with this Section 7.01(d) shall be responsible for all duties, and shall be entitled to all compensation, of the Special Servicer under this Agreement with respect to the subject Serviced Loan Combination. Any replacement special servicer appointed at the request of a Serviced Non-Trust Mortgage Loan Noteholder in accordance with this Section 7.01(d) hereby agrees to become, upon request, the special servicer under a separate servicing agreement (as contemplated by the related Co-Lender Agreement) in the event that the subject Serviced Loan

-329-