David M. Friedman
Howard W. Schub
Adam L. Shiff
Daniel A. Fliman
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile:  (212) 506-1800

*Attorneys for CRES Investment No. II, LP*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| In re: | Chapter 11 |
| INNKEEPERS USA TRUST, *et al.*, | Case No. 10-13800 (SCC) |
| Debtors. | (Jointly Administered) |
| LNR PARTNERS, LLC AND LNR SECURITIES HOLDINGS, LLC, | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 10-04237 (SCC) |
| CRES INVESTMENT NO. II, LP, | |
| Defendant. | |

**<u>MOTION OF CRES INVESTMENT NO. II, LP TO DISMISS COMPLAINT</u>**[1]

---

[1]     On November 17, 2010, LNR and CRES (both as defined below) entered into a stipulation extending CRES's time to answer, move, or otherwise respond to the Complaint (as defined below) until November 24, 2010. [Docket No. 2].

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................ 1

JURISDICTION ............................................................................................... 2

BACKGROUND ............................................................................................... 3

    A.    The Debtors............................................................................... 3

    B.    Procedural Background.............................................................. 3

    C.    Relevant Facts.......................................................................... 4

ARGUMENT .................................................................................................. 10

I.    THE COMPLAINT FAILS TO STATE A CLAIM FOR BREACH OF
CONTRACT ............................................................................................ 12

    A.    CRES Has Not Breached Any Promise Or Obligation........................ 12

        1.    The C6 Special Servicer, Not the C7 Special Servicer, Services
the Fixed Rate Mortgage................................................... 13

        2.    The Side Letter Relied Upon by LNR Relates Solely to the C7
Special Servicer. .............................................................. 13

    B.    Even If CRES Did Breach The Side Letter, LNR Suffered No Damages. ............ 14

II.    THE COMPLAINT FAILS TO STATE A CLAIM FOR DECLARATORY
RELIEF .................................................................................................. 16

    A.    LNR Has An Adequate Available Legal Remedy. .............................. 17

    B.    The Declaratory Judgment Count Falls With The Rest Of The Complaint.......... 18

III.    THE COMPLAINT FAILS TO STATE A CLAIM FOR INJUNCTIVE RELIEF ......... 19

    A.    LNR Will Suffer No Irreparable Harm And Has An Adequate Available
Legal Remedy. ..................................................................... 20

    B.    An Injunction Is A Remedy, Not A Cause Of Action. ......................... 21

CONCLUSION................................................................................................ 22

# TABLE OF AUTHORITIES

Page

CASES

*Apple Records, Inc. v. Capitol Records, Inc.*,
    529 N.Y.S.2d 279 (N.Y. App. Div. 1st Dep't 1988) ...............................................................17

*Ashcroft v. Iqbal*,
    129 S.Ct. 1937 (2009) .................................................................................................10, 11, 14

*Beacon Theatres, Inc. v. Westover*,
    359 U.S. 500 (1959) ..............................................................................................................18

*Bear Stearns Inv. Prods. v. Hitachi Auto. Prods. (USA)*,
    401 B.R. 598 (S.D.N.Y. 2009) ..............................................................................................14

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .........................................................................................................10, 14

*BGW Dev. Corp. v. Mount Kisco Lodge No. 1552 of the Benevolent & Protective Order
of Elks of the United States*,
    669 N.Y.S.2d 56 (N.Y. App. Div. 2d Dep't 1998), *leave to appeal denied*, 92 N.Y.2d
    813 (1998) ..............................................................................................................................17

*Birnbaum v. Bank of Am.*,
    No. 06 Civ. 8218 (LTS)(KNF), 2009 U.S. Dist. LEXIS 59730 (S.D.N.Y. Feb. 17,
    2009) ......................................................................................................................................11

*Compania Financiera Ecuatoriana de Desarollo, S.A. v. The Chase Manhattan Bank*,
    No. 97 Civ. 5724, 1998 U.S. Dist. LEXIS 1918 (S.D.N.Y. Feb. 19, 1998), *aff'd*, 165
    F.3d 13 (2d Cir. 1998) ...........................................................................................................11

*Cramer v. Spada*,
    610 N.Y.S.2d 662 (N.Y. App. Div. 3d Dep't 1994) ..............................................................14

*Dana Distribs. Inc. v. Crown Imports, LLC*,
    853 N.Y.S.2d 111 (N.Y. App. Div. 2d Dep't 2007) ..............................................................20

*EdCia Corp. v. McCormack*,
    845 N.Y.S.2d 104 (N.Y. App. Div. 2d Dep't 2007) ..............................................................20

*Fishoff v. Coty Inc.*,
    No. 09 Civ. 628 (SAS), 2009 U.S. Dist. LEXIS 61427 (S.D.N.Y. July 17, 2009).................12

*Health Ins. Plan v. Calvary Hosp.*,
    2004 NY Slip Op 51382U (N.Y. Sup. Ct. 2004) ...................................................................17

*In re Extended Stay Hotels Inc.*,
418 B.R. 49 (Bankr. S.D.N.Y. 2009) (Oct. 7, 2009) ...........................................2, 3

*In re First Republic Group Realty, LLC*,
421 B.R. 659 (Bankr. S.D.N.Y. 1996)....................................................................20

*Jofen v. Epoch Biosciences, Inc.*,
01 Civ. 4129 (JGK), 2002 U.S. Dist. LEXIS 12189 (S.D.N.Y. June 26, 2002)......................11

*Joremi Enters. v. Herskowitz (In re New 118th LLC)*,
396 B.R. 885 (Bankr. S.D.N.Y. 2008) ................................................................2, 3

*JSG Trading Corp. v. Tray-Wrap, Inc.*,
917 F.2d 75 (2d Cir. 1990)....................................................................................20

*Levey v. A. Leventhal & Sons*,
647 N.Y.S.2d 597 (N.Y. App. Div. 4th Dep't 1996) ...........................................17

*LNC Invs. v. First Fid. Bank, N.A.*,
173 F.3d 454 (2d Cir. N.Y. 1999)........................................................................14

*Main Evaluations, Inc. v. State*,
745 N.Y.S.2d 355 (N.Y. App. Div. 4th Dep't 2002) ...........................................17

*Maniolos v. United States*,
10 Civ. 3383 (AJP), 10 Civ. 4467 (AJP), 2010 U.S. Dist. LEXIS 105522 (S.D.N.Y.
Oct. 4, 2010) .......................................................................................................11

*Mastercard Int'l Inc. v. Federal Internationale De Football Assoc.*,
464 F. Supp. 2d 246 (S.D.N.Y. 2006)..............................................................18, 19

*Moore v. Liberty Power Corp., LLC*,
897 N.Y.S.2d 723,725 (N.Y. App. Div. 2d Dep't 2010) ......................................18

*New York State NOW v. Terry*,
886 F.2d 1339 (2d Cir. 1989)...............................................................................18

*Ovitz v. Bloomberg L.P.*,
2010 NY Slip Op 7484 (N.Y. App. Div. 1st Dep't Oct. 21, 2010)........................18

*Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.*,
893 F. Supp. 285 (S.D.N.Y. 1995) ..................................................................19, 21

*SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*,
642 F. Supp. 2d 167 (S.D.N.Y. 2009)...................................................................14

*Sports Channel Am. Assoc. v. National Hockey League*,
589 N.Y.S.2d 2 (N.Y. App. Div. 1st Dep't 1992) ...............................................20

*Sunnen v. New York*,
  10 Civ. 372 (PCK), 2010 U.S. Dist. LEXIS 98240 (S.D.N.Y. Sept. 10, 2010)................10, 11

*The American Medical Assoc., et al. v. United Healthcare Corp., et al.*,
  No. 00 Civ. 2800 (LMM), 2007 U.S. Dist. LEXIS 18729 (S.D.N.Y. Mar. 5, 2007) ..............19

*Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*,
  60 F.3d 27 (2d Cir. 1995)........................................................................................19

*Travellers Int'l AG v. Trans World Airlines, Inc.*,
  722 F. Supp. 1087 (S.D.N.Y. 1989)........................................................................20

*U.S., et al. v. Vazquez, et al.*,
  145 F.3d 74 (2d Cir. 1988)......................................................................................19

*U.S. Re Cos. v. Scheerer*,
  838 N.Y.S.2d 37 (N.Y. App. Div. 1st Dep't 2007) ................................................20

*Vasilas v. Subaru of Am., Inc.*,
  No. 07 CV 2374 (GBD), 2009 U.S. Dist. LEXIS 71615 (S.D.N.Y. Aug. 5, 2009) ..........10, 11

*Yak v. Bank Brussels Lambert*,
  252 F.3d 127 (2d Cir. 2001)....................................................................................11

## STATUTES

11 U.S.C. § 1107(a) ................................................................................................3

11 U.S.C. § 1108....................................................................................................3

28 U.S.C. § 157......................................................................................................2

28 U.S.C. § 1334....................................................................................................2

28 U.S.C. § 1408....................................................................................................2

28 U.S.C. § 1409....................................................................................................2

C.P.L.R. § 3001 (CONSOL. 2010)............................................................................17

## OTHER AUTHORITIES

Fed. R. Bankr. P. 7012............................................................................................1

Fed. R. Civ. P. 12(b)(6)................................................................................1, 10, 11, 19

Defendant CRES Investment No. II, LP ("CRES"), by and through its undersigned counsel, respectfully submits this motion (the "Motion") for entry of an order pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to this adversary proceeding by Rule 7012 of the Federal Rules of Bankruptcy Procedure, dismissing the complaint (the "Complaint") filed by LNR Partners, LLC and LNR Securities Holdings, LLC (together, "LNR," or the "Plaintiffs") against CRES in the Supreme Court of the State of New York, County of New York, on October 27, 2010 [Index No. 651850/2010] (the "State Court Action"), which was removed and transferred to this Court on November 17, 2010. In support of this Motion, CRES respectfully represents as follows:

## PRELIMINARY STATEMENT[2]

LNR improperly seeks to compel CRES to remove Midland from its rightful position as Special Servicer for Innkeepers' $825 million Fixed Rate Mortgage -- far and away the Debtors' largest obligation -- and to install LNR in Midland's place. LNR, however, is entitled to no relief, and the Complaint should be dismissed, because the Complaint relies exclusively on a misreading of the clear and unambiguous language in the underlying agreement upon which the Complaint is based.[3]

The Complaint, in seeking injunctive relief, a declaratory judgment and monetary damages for breach of contract, wrongly alleges that CRES is contractually obligated to remove Midland and retain LNR in its place. In making that flawed argument, LNR relies on the Side Letter wherein CRES committed to make LNR Special Servicer for *other* loans, but *not* the

---

[2]      Capitalized terms used in this Preliminary Statement and not otherwise defined shall have the meanings ascribed to them in the body of this Motion.

[3]      Because this Motion seeks dismissal of the Complaint as a matter of law based upon the plain language of the relevant documents, LNR's conduct and apparent bad faith need not be established. However, CRES reserves all rights to assert any and all claims or defenses arising from LNR's misconduct in bringing this action and otherwise.

Fixed Rate Mortgage. The Complaint thus is fatally flawed because, under the plain language of the Side Letter, CRES is not obligated to substitute LNR for Midland as the special servicer for the Fixed Rate Mortgage. That alone, causes the entire Complaint to fail, and mandates dismissal.

The Complaint also fails because of other glaring errors. *First*, the Complaint fails to state a claim for breach of contract for a second, independent reason -- LNR does not (and cannot) allege damages of any kind. *Second*, the Complaint fails to state a claim for declaratory or injunctive relief because LNR has no viable claims against CRES and because, even if it did, LNR has adequate available remedies at law. *Third*, LNR is not entitled to injunctive relief because it does not (and cannot) allege irreparable harm or lack of an adequate legal remedy.

The Complaint should be dismissed in its entirety.

## <u>JURISDICTION</u>

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). *See In re Extended Stay Hotels Inc.*, 418 B.R. 49, 57 (Bankr. S.D.N.Y. 2009) (Oct. 7, 2009) (finding that "the close interconnection between the issues raised by the [state court] action and the bankruptcy process overwhelmingly renders th[e] dispute core" and that "[t]he inability of such significant stakeholders to meaningfully participate in the plan process presents an issue that very clearly is unique to and uniquely affected by the Debtors' bankruptcy cases."). "A proceeding is related to a case under title 11 … if the outcome might have a conceivable effect on the estate." *Id*. at 55 (citing *Joremi Enters. v. Herskowitz* (*In re New 118th LLC*), 396 B.R. 885, 890 (Bankr. S.D.N.Y. 2008)) (additional citations and internal quotation marks omitted). "An action is related to bankruptcy if

the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Id*. at 55 (quoting *New 118th*, 396 B.R. at 890) (additional citations and internal quotation marks omitted).

## BACKGROUND

### A.   The Debtors.

2.      On July 19, 2010 (the "Petition Date"), Innkeepers USA Trust and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") filed petitions with this Court under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") commencing the above-captioned, jointly-administered, bankruptcy cases (the "Bankruptcy Cases").

3.      The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      Innkeepers USA Trust ("Innkeepers") is a self-administered real estate investment trust organized under the laws of the State of Maryland and the direct subsidiary of debtor Grand Prix Holdings LLC.  Innkeepers is also the direct or indirect parent of each of the other Debtors. The Debtors own and operate a portfolio of 72 upscale and mid-priced extended-stay and select-service hotels, consisting of approximately 10,000 rooms, located in 20 states across the United States.  The Debtors operate their hotels under well-recognized brands such as Marriott, Hyatt, Hilton, and others.

### B.   Procedural Background.

5.      On October 27, 2010, LNR filed the State Court Action in the Supreme Court of the State of New York, County of New York.  The State Court Action alleges causes of action for injunctive relief, declaratory relief, and breach of contract based on LNR's theory that CRES

is required to displace Midland Loan Services, Inc. ("Midland") as the special servicer for the

Fixed Rate Mortgage (the "Special Servicer"), and appoint LNR as Special Servicer instead.

Upon commencing the State Court Action, LNR filed a motion for a temporary restraining order

and for a preliminary injunction affirmatively enjoining CRES to replace Midland with LNR (the

LNR Injunction Motion").

6.     On October 29, 2010, New York State Supreme Court Justice Ira Gammerman

denied LNR's request for a temporary restraining order and scheduled a hearing on the

preliminary injunction request for November 12, 2010.  On November 10, 2010, CRES timely

removed the State Court Action to the United States District Court for the Southern District of

New York with a request for reference to this Court.  Also on November 10, 2010, CRES timely

served LNR with its opposition to the LNR Injunction Motion (the "CRES Injunction

Opposition").  On November 24, 2010, CRES filed a copy of the CRES Injunction Opposition on

this Court's docket.  *See* [Docket Nos. 6, 7].[4]

7.     The State Court Action was referred to this Court on November 17, 2010.

**C.     Relevant Facts.**

8.     The facts here are undisputed.  Prior to the Petition Date, the Debtors incurred

approximately $1.29 billion of secured debt consisting of the following obligations:

**The $238 Million Lehman Mortgage Pool**

9.     Certain of the Debtors are borrowers under a floating rate senior mortgage loan of

approximately $238 million (the "Floating Rate Mortgage" or the "Lehman Mortgage Pool") for

which Lehman ALI, Inc. ("Lehman") is the sole lender.  The Floating Rate Mortgage is

collateralized by 20 of the Debtors' hotel properties.  Additionally, certain of the Debtors are

---

[4]     For the foregoing reasons and for the reasons stated in the CRES Injunction Opposition, LNR's baseless
request for a preliminary injunction should also be dismissed.  CRES hereby expressly incorporates the CRES
Injunction Opposition herein, as if set forth fully.

borrowers under a junior mezzanine loan of approximately $121 million secured by pledges of equity interests in the Debtor entities that own the 20 hotels securing the Lehman Mortgage Pool (the "Lehman Mortgage Pool Mezzanine Loan"), which is specially serviced by Trimont Real Estate Advisors, Inc. ("Trimont").

### The Seven Individual Mortgages

10.     Certain of the Debtors are borrowers under seven separate mortgage loans (the "Individual Mortgages"), each secured by one of seven hotel properties, which mortgage loans range in amounts from approximately $13 million to $48 million.  Each Individual Mortgage is securitized in a commercial mortgage-backed security ("CMBS") trust and serviced by a special servicer.  Plaintiff LNR Partners, LLC is special servicer for five of the seven Individual Mortgages (the "LNR Serviced Individual Mortgages"), with the other two specially serviced by CWCapital Asset Management, LLC and C-III Asset Management, LLC.  Additionally, certain of the Debtors are borrowers under a junior mezzanine loan, specially serviced by Trimont, of approximately $21.3 million secured by a pledge of equity interests in the Debtor entity that owns the hotel securing the CWCapital Asset Management, LLC serviced Individual Mortgage.

### The $825 Million Fixed Rate Mortgage

11.     Certain of the Debtors are borrowers under a fixed rate senior mortgage loan of approximately $825 million (the "Fixed Rate Mortgage").  The Fixed Rate Mortgage is evidenced by two separate promissory notes (the "Note A-1" and the "Note A-2"), each in the amount of $412,701,271.  Note A-1 and Note A-2 are secured on a *pari passu* basis by mortgages on approximately 45 hotels in 16 states across the United States, including New York.

12.     Note A-1 is securitized and held by a trust called LB-UBS Commercial Mortgage Trust 2007-C6 (the "C6 Trust") which is governed by a Pooling and Servicing Agreement dated

August 13, 2007 (the "C6 PSA").  A copy of the C6 PSA is annexed as Ex. A to the Declaration

of Daniel A. Fliman (the "Fliman Decl.") filed herewith.  The Note A-2 also is securitized and

held by a trust, formed a few months later, called LB-UBS Commercial Mortgage Trust 2007-C7

(the "C7 Trust").  That trust is governed by a Pooling and Servicing Agreement dated November

12, 2007 (the "C7 PSA").  A copy of the C7 PSA is annexed as Ex. B to the Fliman Decl.  The

Note A-1 was placed into the C6 Trust when it was created on August 13, 2007, and the Note A-

2 was placed into the C7 Trust when the C7 Trust was later created on November 12, 2007.

13.     The two separate notes that comprise the Fixed Rate Mortgage are subject to a

Co-Lender Agreement dated August 13, 2006 (the "Co-Lender Agreement") between Lehman

Brothers Holdings Inc., in its capacity as initial Note A-1 holder and Lehman Brothers Holdings

Inc., in its capacity as initial Note A-2 holder.  A copy of the Co-Lender Agreement is annexed

as Ex. C to the Fliman Decl.  The Co-Lender Agreement sets forth the relative rights of the

owner of the Note A-1 (currently, the C6 Trust) and the owner of the Note A-2 (currently, the C7

Trust).

14.     The Fixed Rate Mortgage has since gone into default and, on or about April 2010,

the Fixed Rate Mortgage was transferred to the C6 Special Servicer for special servicing

pursuant to and in accordance with the terms of the C6 PSA.

**Servicing of the Innkeepers Fixed Rate Loan**

15.     As evidenced by the applicable documents and as described below, the entire

Fixed Rate Mortgage (*i.e.*, both Note A-1 and Note A-2) is specially serviced by Midland, under

only one agreement -- the C6 PSA.  This is evidenced by the terms of the various agreements:

16.     *The C7 PSA*.  The C7 PSA unequivocally confirms that the entire Fixed Rate

Mortgage is serviced under the C6 PSA.  As specified therein, and as identified on Schedule XV

of the C7 PSA -- which LNR chose to omit from the exhibits to its moving papers in the State Court Action -- the Fixed Rate Mortgage is defined as an "Outside Serviced Loan Combination" under the C7 PSA. *See* (Fliman Decl., Ex. B, at Schedule XV). As an "Outside Serviced Loan Combination," the Fixed Rate Mortgage consists of (a) Note A-1 (an "Outside Serviced Non-Trust Mortgage Loan" because it is held by the C6 Trust (a "Non-Trust Mortgage Loan") and is part of an "Outside Serviced Loan Combination") and (b) Note A-2 (an "Outside Serviced Trust Mortgage Loan"). *See* (*id.* at 5-6, 62). The C7 PSA further provides that, with respect to Outside Serviced Trust Mortgage Loans (*i.e.*, loans held by the C7 Trust serviced under another agreement), "most material servicing functions with respect thereto . . . will be performed pursuant to an Outside Servicing Agreement." (*Id.* at 6). The C7 PSA expressly designates the C6 PSA as an Outside Servicing Agreement. (*Id.* at 62-63). Accordingly, the C7 PSA clearly and unambiguously provides the entire Fixed Rate Mortgage (*i.e.,* both notes) is serviced under the C6 PSA even though Note A-2 is held by the C7 Trust.

17.     *The C6 PSA*. That the entire Fixed Rate Mortgage is to be serviced under the C6 PSA is also evidenced from that document's clear, unambiguous words. As specified therein, the Fixed Rate Mortgage is known as a "Serviced Loan Combination," as that term is defined under the C6 PSA. *See* (Fliman Decl., Ex. A at 5-6). The C6 PSA provides that the Fixed Rate Mortgage consists of separate notes: the Note A-1 (defined in the C6 PSA as a "Serviced Combination Trust Mortgage Loan") which is held by the C6 Trust and serviced under the C6 PSA, and the Note A-2 (defined in the C6 PSA as the related "Serviced Non-Trust Mortgage Loan") which is *not* held by the C6 Trust, but *is* serviced under the C6 PSA. (*Id.* at 4-6) (providing that "most material servicing functions with respect" to Serviced Non-Trust Mortgage Loans (*e.g.*, the Note A-2) are performed under the C6 PSA).

18.    *The Co-Lender Agreement.*  Consistent with the above, Section 3.01(a) of the Co-Lender Agreement provides, in pertinent part, that, "(1) the Series 2007-C6 Pooling and Servicing Agreement shall be the initial Applicable Servicing Agreement and (2) the Series 2007-C6 Master Servicer and **the Series 2007-C6 Special Servicer shall be the initial Servicers with respect to the Mortgage Loan**."  (Fliman Decl., Ex. C § 3.01) (emphasis added).  The Mortgage Loan is defined as both parts of the Fixed Rate Mortgage.  *See* (*Id.*, Preliminary Statement).  Thus, the Co-Lender Agreement also unambiguously confirms that the Fixed Rate Mortgage is to be serviced under the C6 PSA and that Midland, as the C6 Special Servicer, is the Special Servicer for the entire Fixed Rate Mortgage.  *See* (*Id.*, § 1.01 (definitions of "Special Servicer" and "Series 2007-C6 Special Servicer")).

**The Side Letter**

19.    The document upon which this lawsuit is based is a November 30, 2007 letter agreement among JPMorgan Capital Corporation ("JPMCC"), LNR Securities Holdings, Inc. or its affiliates ("LNRSH") and CRES concerning the "[p]urchase of certain non-investment grade certificates in the LB-UBS Commercial Mortgage Trust 2007-C7 . . . ." (the "Side Letter").  A copy of the Side Letter is annexed as Ex. D to the Fliman Decl.  The parties thereto entered into the Side Letter in connection with their purchase of certificates (the "C7 Purchased Certificates") in several different classes of the C7 Trust.  Among the C7 Purchased Certificates were those of the "Controlling Class" for the C7 Trust.

20.    In the Side Letter, "JPMCC and CRES agree[d] that so long as either owns Certificates of the Controlling Class, it shall vote such Certificates in such manner as is necessary to select, and retain, LNR, as Special Servicer."  (*Id.* at 2).  The capitalized term "Special Servicer" as used in the Side Letter means the "Special Servicer" as that term is defined

under the C7 PSA.[5]  As discussed above, and entirely consistent with the other transaction documents discussed herein, the C7 PSA defines the term "Special Servicer" as the C7 Special Servicer.  Accordingly, the reference to "Special Servicer" in the Side Letter is solely to whoever services loans under the C7 PSA.  Thus, the Side Letter governs only special servicer appointment for loans serviced under the C7 PSA; yet, the Fixed Rate Mortgage, as discussed above, is unequivocally serviced by the C6 PSA.

21.     Moreover, the subject matter of the Side Letter is clearly and unambiguously the C7 Trust and the C7 PSA, not the C6 Trust or C6 PSA.  The "Re:" line of the Side Letter identifies the subject matter as the "Purchase of certain non-investment grade certificates in the LB-UBS Commercial Mortgage Trust 2007-C7 (the "Transaction") . . ."  (*Id.* at 1).  The "Transaction" is specifically defined as the C7 Trust.  *See* (*id.*).  The Side Letter contains no reference whatsoever to (i) the C6 PSA, (ii) the C6 Trust, or (iii) the C6 Special Servicer.

22.     The clear and unambiguous language of the Side Letter is further confirmed by the timing of its execution.  The C6 Trust, created in August 2007, was already servicing the Fixed Rate Mortgage before the C7 Trust was created in November 2007, and before the Side Letter was finalized on November 30, 2007.  If the parties had wanted to provide in the Side Letter that LNR must be the Special Servicer for the Fixed Rate Mortgage, they could have -- rather then referring only to the C7 Special Servicer -- referenced the C6 PSA, the "C6 Special Servicer", or the "Outside Special Servicer" under the C7 PSA (and, in fact, the definitions in the

---

[5]      The introductory paragraph of the Side Letter specifically states that, "All other capitalized terms herein shall have the definitions set forth in the pooling and servicing agreement (the "PSA") with respect to the Transaction".  *See* (Fliman Decl., Ex. D at 1.).  Because, as noted above, the Transaction is the purchase of certificates in the C7 Trust, the "PSA" with respect to the Transaction is thus the C7 PSA.

C7 PSA were incorporated into the Side Letter).[6]  They did not, indicating that the parties

intended to maintain the existing arrangement whereby the Fixed Rate Mortgage was serviced by

the C6 Special Servicer, which is Midland.[7]  LNR, a highly sophisticated party and the nation's

largest special servicer, surely understood the clear wording of the Side Letter and would have

sought such rights in the Side Letter.

23.     On or around July 2008, JPMCC decided to sell its interests in a number of

classes of the C7 Purchased Certificates, including those of the "Controlling Class" for the C7

Trust.  Subsequently, CRES purchased enough of JPMCC's C7 Purchased Certificates to retain

its position as the "Controlling Class Representative" for the C7 Trust.

## ARGUMENT

24.     In accordance with recent, seminal Supreme Court opinions which have clarified

and heightened the pleading standards plaintiffs must satisfy to avoid Federal Rule 12(b)(6)

dismissal,[8] "[t]o survive a Rule 12(b)(6) motion to dismiss, the complaint must plead 'enough

facts to state a claim to relief that is plausible on its face.'"  *Vasilas v. Subaru of Am., Inc.*, No.

07 CV 2374 (GBD), 2009 U.S. Dist. LEXIS 71615, at *5 (S.D.N.Y. Aug. 5, 2009) (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "'The plausibility standard . . . asks for more

than a sheer possibility that a defendant has acted unlawfully.'"  *Sunnen v. New York*, 10 Civ.

---

[6]     Even if the parties intended that CRES would be obligated to appoint LNR as special servicer for the Fixed Rate Mortgage, LNR has not established, and indeed cannot establish, that CRES can even do so under the applicable documents.  While this provides additional grounds for dismissal of the Complaint, it need not be decided for purposes of the Motion, which can be decided as a matter of law.

[7]     The C7 PSA defines an Outside Servicing Agreement as "a servicing agreement (other than this Agreement, a Sub-Servicing Agreement or an agreement whereby any Person acts as agent, sub-contractor or vendor on behalf of the Master Servicer, the Special Servicer or the Trust) that governs most material servicing functions with respect to any Trust Mortgage Loan" and specifically includes the "Innkeepers Portfolio Servicing Agreement."  *See* (Ex. B at 62-63).  The C7 PSA defines the Innkeepers Portfolio Servicing Agreement as, "the pooling and servicing agreement dated as of August 13, 2007," *i.e.*, the C6 PSA.  *See* (*id.* at 40).

[8]     *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).

372 (PCK), 2010 U.S. Dist. LEXIS 98240, at *2-3 (S.D.N.Y. Sept. 10, 2010) (quoting *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)). "Legal conclusions and '[t]hreadbare recitals of the elements of a cause of action' do not suffice to state a claim, as '[Federal] Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.'" *Shunnen v. New York*, 2010 U.S. Dist. LEXIS 98240, at *3 (quoting *Iqbal*, 129 S.Ct. 1937 at 1949-50).

25.     "Where . . . it is clear as a matter of contractual interpretation that there has been no breach of contract under New York law, a breach of contract claim is properly dismissed on a motion to dismiss." *Jofen v. Epoch Biosciences, Inc.*, 01 Civ. 4129 (JGK), 2002 U.S. Dist. LEXIS 12189, at *12 n.1 (S.D.N.Y. June 26, 2002) (citing *Compania Financiera Ecuatoriana de Desarollo, S.A. v. The Chase Manhattan Bank*, No. 97 Civ. 5724, 1998 U.S. Dist. LEXIS 1918, at *3 (S.D.N.Y. Feb. 19, 1998), *aff'd*, 165 F.3d 13 (2d Cir. 1998)). *See also Maniolos v. United States*, 10 Civ. 3383 (AJP), 10 Civ. 4467 (AJP), 2010 U.S. Dist. LEXIS 105522, at * 33 (S.D.N.Y. Oct. 4, 2010) ("Where a contract's language is clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss."); *Birnbaum v. Bank of Am.*, No. 06 Civ. 8218 (LTS)(KNF), 2009 U.S. Dist. LEXIS 59730, at *11 (S.D.N.Y. Feb. 17, 2009) ("Issues of contract interpretation are generally matters of law and therefore suitable for disposition on a motion to dismiss when the contract provision at issue is unambiguous.") (internal quotation and marks omitted).

26.     When ruling on a motion to dismiss, "[i]n addition to the factual allegations pled in the complaint, the Court should also consider documents attached to the complaint as exhibits or incorporated into the complaint by reference." *Versilas v. Subaru*, 2009 U.S. Dist. LEXIS 71615, at *5 (citation omitted). Moreover, the Court may consider documents referenced in, and

integral to, a plaintiff's complaint, even if the documents are neither attached to the complaint nor incorporated by reference therein. *Yak v. Bank Brussels Lambert*, 252 F.3d 127, 130 (2d Cir. 2001). "When a written agreement is clear and unambiguous on its face, extrinsic and parol evidence is not admissible to create an ambiguity." *Fishoff v. Coty Inc.*, No. 09 Civ. 628 (SAS), 2009 U.S. Dist. LEXIS 61427, at *5 (S.D.N.Y. July 17, 2009) (quotation and marks omitted).

27.     LNR has not come even close to satisfying this standard.

## I.     THE COMPLAINT FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT

28.     The Complaint fails to state a claim for breach of contract because (i) the relevant agreements demonstrate conclusively that CRES has not breached any promises or obligations, and (ii) even assuming *arguendo* that CRES has breached a contract, LNR has not (nor does the Complaint allege that LNR has) suffered any damages as a result thereof. Accordingly, LNR's breach of contract cause of action must be dismissed.

### A.     CRES Has Not Breached Any Promise Or Obligation.

29.     Here, although LNR carefully omitted from its papers crucial portions of the relevant agreements that categorically undercut its position, the Court should not be misled. The Court can and should consider all relevant portions of the agreements relied upon by LNR in their entirety. Because the language of the relevant agreements is clear, unambiguous, and open to no other possible interpretation other than that LNR is *not* entitled to be appointed Special Servicer for the Fixed Rate Mortgage, LNR's breach of contract cause of action must be dismissed.

### 1. The C6 Special Servicer, Not the C7 Special Servicer, Services the Fixed Rate Mortgage.

30.     The C7 Special Servicer only services loans designated to be serviced under the C7 PSA.  Not all loans held by the C7 Trust are serviced under the C7 PSA.  Rather, each of certain loans held by the C7 Trust is labeled an "Outside Serviced Trust Mortgage Loan," which means that while they are held by the C7 Trust, they are serviced pursuant to an "Outside Servicing Agreement."  (Fliman Decl., Ex. B at 6, 62-63).  Note A-2 is an "Outside Serviced Trust Mortgage Loan" as confirmed by Schedule XV of the C7 PSA.  (*Id.* at Schedule XV).  The C6 PSA is the "Outside Servicing Agreement" under which the Note A-2 is serviced.  (*Id.* at 62-63).  The C6 PSA likewise provides that the Fixed Rate Mortgage is a "Serviced Combination Trust Mortgage Loan" serviced under the C6 PSA.  (Fliman Decl., Ex. A at 6).  The Co-Lender Agreement similarly provides, with respect to the Fixed Rate Mortgage, that "(1) the [C6 PSA] shall be the initial Applicable Servicing Agreement and (2) **the Series 2007-C6 Master Servicer and the Series 2007-C6 Special Servicer shall be the initial Servicers** . . ."  (Fliman Decl., Ex. C, at § 3.01(a)) (emphasis added).  Thus, the C7 PSA, the C6 PSA, and the Co-Lender Agreement all make perfectly clear that the C6 Special Servicer, not the C7 Special Servicer, is the Special Servicer for the Fixed Rate Mortgage.

### 2. The Side Letter Relied Upon by LNR Relates Solely to the C7 Special Servicer.

31.     The fact that the C6 PSA, C7 PSA and Co-Lender Agreement all clearly provide that the Fixed Rate Mortgage is serviced exclusively under the C6 PSA is fatal to LNR's Complaint.  LNR relies on the Side Letter to try to argue that LNR must be designated the Special Servicer for the Fixed Rate Mortgage, but the Side Letter *only* governs special servicer appointment for loans serviced under the C7 PSA (which the Fixed Rate Mortgage is *not*).

32.     LNR's argument is based entirely on Paragraph 2 of the Side Letter, which requires CRES to vote its certificates "in such manner as is necessary to select, and retain, LNR, as Special Servicer." *See* (Fliman Decl., Ex. D at 2). As discussed above, "Special Servicer" in the Side Letter means LNR, as special servicer under the C7 PSA. CRES *never* promised in the Side Letter to place LNR as servicer for the Fixed Rate Mortgage because that loan is unequivocally serviced under the C6 PSA, not the C7 PSA. CRES is in full compliance with the Side Letter insofar as LNR is and remains the C7 Special Servicer. But that status is simply irrelevant to the Fixed Rate Mortgage which, as summarized above, is serviced by the "Outside Special Servicer" – a position to which LNR holds no claim.

**B.      Even If CRES Did Breach The Side Letter, LNR Suffered No Damages.**

33.     "To establish a breach of contract under New York law a plaintiff must prove the following elements: (i) the existence of a contract; (ii) breach by the other party; and (iii) *damages suffered as a result of the breach*." *Bear Stearns Inv. Prods. v. Hitachi Auto. Prods. (USA)*, 401 B.R. 598, 615 (S.D.N.Y. 2009) (emphasis added). "Under New York law, in fact, the failure to prove damages is . . . fatal to [a] plaintiff's breach of contract cause of action." *LNC Invs. v. First Fid. Bank, N.A.*, 173 F.3d 454, 465 (2d Cir. N.Y. 1999) (internal citation and quotation omitted). *See SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*, 642 F. Supp. 2d 167, 205, 206 (S.D.N.Y. 2009) (dismissing breach of contract claim "because of its complete failure to establish any damages attributable to [seller's] conduct, which is an essential element of the claim."); *Cramer v. Spada*, 610 N.Y.S.2d 662, 664 (N.Y. App. Div. 3d Dep't 1994) (affirming dismissal of complaint due to lack of damages).

34.     Here, the Complaint merely alleges in a boilerplate, conclusory fashion, in derogation of *Twombly* and *Iqbal*, that "Plaintiffs have suffered damages and will continue to

suffer damages so long as LNR is not appointed Special Servicer of the Fixed Rate Mortgage." *See* (Complaint, at ¶ 47). There is no indication in the Complaint of what these purported damages are. The LNR Injunction Motion, similarly deficient, indicates that LNR believes its supposed harm arises from its purported inability to "control" the workout of the Fixed Rate Mortgage and otherwise participate in the bankruptcy proceedings. (Pages 9-10). This contention is clearly meritless. As an initial matter, LNR has no right to control the workout of the Fixed Rate Mortgage, and is not entitled to be the special servicer thereof, for the reasons discussed above. LNR could not possibly have been damaged by the loss of a purported "right" it did not actually possess.

35. In any event, LNR has not and will not suffer damages as a result of its purported inability to participate in the bankruptcy proceedings, as it has actually been an active participant as the Special Servicer for the LNR Serviced Individual Mortgages. Indeed, LNR made a motion to terminate exclusivity on September 14, 2010 and joined in Midland's motion to terminate exclusivity in this Court.

36. There is no evidence nor allegations that LNR even disagrees with Midland regarding any actions Midland has taken in Innkeepers' bankruptcy proceedings. LNR and Midland have agreed on the only issue identified by LNR, terminating exclusivity, and then agreed to extend the same until January 14, 2011. Indeed, LNR has on various occasions literally sat next to Midland in Court. LNR certainly did not allege that Midland has breached its fiduciary duties, nor did LNR identify any improper actions by Midland or anything that it would or even could do differently as Special Servicer under the C6 PSA for the Fixed Rate Mortgage. *See* (Fliman Decl., Ex. A at 94-96, 146) (providing that the C6 Special Servicer has a duty to service and administer the loans serviced under the C6 PSA according to "Servicing Standard",

which includes a duty to maximize recovery for holders of certificates in the C6 Trust and, in respect of the Note A-2, certificate holders of the C7 Trust).

37.     Moreover, LNR does not identify anything that Midland has done wrong in plan negotiations; it does not identify any other wrongdoing by Midland in the bankruptcy proceedings; it does not allege that Midland violated any duty to certificate holders such as LNR; and any plan proposed by any party is necessarily subject to approval by the Court and the protections set forth by the Bankruptcy Code.  Midland has been the Special Servicer of the C6 Trust since August 2007 and LNR has not identified *any* harm arising from Midland's performance of this role.  Indeed, there is no harm in a fiduciary acting as a fiduciary. Furthermore, if Midland were not complying with its fiduciary duties, LNR would be free to bring suit against Midland alleging the same.

38.     LNR presents no evidence nor allegations to demonstrate that it would perform differently than Midland.  LNR does not assert that it would change any of Midland's positions, or even that it has the ability to do so.  LNR would be subject to the same obligations and "servicing standards" as Midland.  Moreover, it would be restricted just as Midland is by the obligation to act at the consent of the relevant certificate holders, not just the wishes of LNR as a minority certificate holder.  *See* (Fliman Decl., Ex. C § 3.02).  LNR's argument that it "possesses unique skills that it would use in the workout of the [Fixed Rate Mortgage]" is unsupported and conclusory, and not entitled to any weight.  *See* (LNR Injunction Motion, at 11).

## II.     THE COMPLAINT FAILS TO STATE A CLAIM FOR DECLARATORY RELIEF

39.     LNR's cause of action for declaratory relief must likewise be dismissed.  First, it is black-letter New York law that declaratory relief is not available when breach of contract damages are also sought and would adequately compensate the plaintiff.  Second, because, as

discussed above and below, both of LNR's other causes of action are subject to dismissal, no actual controversy remains to support the declaratory relief.

### A.       LNR Has An Adequate Available Legal Remedy.

40.       Under New York state law, "[t]he supreme court may render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy whether or not further relief is or could be claimed." N.Y. C.P.L.R. § 3001 (CONSOL. 2010). However, "it is well established that '[a] cause of action for a declaratory judgment is unnecessary and inappropriate when the plaintiff has an adequate, alternative remedy in another form of action, *such as breach of contract*.'" *Main Evaluations, Inc. v. State*, 745 N.Y.S.2d 355, 356 (N.Y. App. Div. 4th Dep't 2002) (citing *Apple Records, Inc. v. Capitol Records, Inc.*, 529 N.Y.S.2d 279, 281 (N.Y. App. Div. 1st Dep't 1988); *BGW Dev. Corp. v. Mount Kisco Lodge No. 1552 of the Benevolent & Protective Order of Elks of the United States*, 669 N.Y.S.2d 56, 59 (N.Y. App. Div. 2d Dep't 1998), *leave to appeal denied*, 92 N.Y.2d 813 (1998); *Levey v. A. Leventhal & Sons*, 647 N.Y.S.2d 597, 598 (N.Y. App. Div. 4th Dep't 1996)) (emphasis added). *See also Apple Records*, 529 N.Y.S.2d at 281 (affirming dismissal of declaratory judgment causes of action where they "parallel the breach of contract claims and merely seek a declaration of the same rights and obligations as will be determined under the [contract] causes of action.").

41.       LNR expressly sets forth a claim for breach of contract regarding the same exact contracts and purported breach underlying its declaratory relief count. Any damages for breach of contract would adequately compensate LNR if there even was a breach (which there was not, see *supra* Section I.A.), and LNR does not allege otherwise in its declaratory judgment count.

*See* (Complaint, at ¶¶ 38-42). Thus, LNR's request for declaratory relief is deficient and must be dismissed.

### B. The Declaratory Judgment Count Falls With The Rest Of The Complaint.

42. "A justiciable controversy exists only where there is an actual controversy affecting the parties' rights. . . . In other words, there must be a real dispute between adverse parties, involving substantial legal interests, for which a declaration of rights will have some practical effect." *Health Ins. Plan v. Calvary Hosp.*, 2004 NY Slip Op 51382U, at *3 (N.Y. Sup. Ct. 2004) (internal citations and quotations omitted). When a complaint seeking declaratory as well as other forms of relief is dismissed for substantive reasons pertaining to the non-declaratory counts, no actual controversy remains, and the declaratory count must thus be dismissed or judgment entered against the plaintiff. *See Moore v. Liberty Power Corp., LLC*, 897 N.Y.S.2d 723,725 (N.Y. App. Div. 2d Dep't 2010) (where "the documentary evidence established" the relevant price, court found that "[i]n the absence of an actual controversy over the rate . . . the plaintiff is not entitled to declaratory relief," and remitted the matter to the Supreme Court for entry of a judgment declaring that the defendant did not engage in inappropriate conduct); *see Ovitz v. Bloomberg L.P.*, 2010 NY Slip Op 7484, at *1-2 (N.Y. App. Div. 1st Dep't Oct. 21, 2010) (dismissing complaint and finding accordingly that "declaratory . . . relief is unwarranted in this case, since no justiciable controversy remains to support the claim for declaratory relief") (citation omitted).

43. As set forth above, LNR has no viable breach of contract claim and no valid basis exists for injunctive relief. Because no justiciable controversy remains between LNR and CRES, the Complaint fails to state a claim for a declaratory judgment.

### III.  THE COMPLAINT FAILS TO STATE
###       A CLAIM FOR INJUNCTIVE RELIEF

44.  In the Complaint, LNR seeks a permanent injunction requiring CRES to displace

the rightful Special Servicer for the Fixed Rate Mortgage, and hire LNR instead.

45.  "It is well-settled that '[t]he basis of injunctive relief in the federal courts has

always been irreparable harm and inadequacy of legal remedies.'"  *Mastercard Int'l Inc. v.*

*Federal Internationale De Football Assoc.*, 464 F. Supp. 2d 246, 300 (S.D.N.Y. 2006) (*quoting*

*Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959)); *see also New York State NOW*

*v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989) ("Generally, to obtain a permanent injunction a

party must show the absence of an adequate remedy at law and irreparable harm if the relief is

not granted.").  "Irreparable harm has been defined as 'an injury that is not remote or speculative

but actual and imminent, and 'for which a monetary award cannot be adequate compensation.'"

*The American Medical Assoc., et al. v. United Healthcare Corp., et al.*, No. 00 Civ. 2800

(LMM), 2007 U.S. Dist. LEXIS 18729 at *27-28 (S.D.N.Y. Mar. 5, 2007) *quoting Tom Doherty*

*Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995).  "At a trial on the

merits for a permanent injunction, the party seeking relief is required to prove by a

preponderance of the evidence that a violation of some legal right will result in irreparable injury

to it."  *Mastercard Int'l.*, 464 F. Supp. 2d at 300; *see also U.S., et al. v. Vazquez, et al.*, 145 F.3d

74, 81 (2d Cir. 1988) ("[I]t is clear that Vazquez is not entitled to injunctive relief at the present

time, for she has not demonstrated the requisite probability of irreparable harm.").

46.  LNR's request for injunctive relief fails because LNR will not suffer irreparable

harm (and has not even pleaded that it will) since LNR has an adequate remedy at law in breach

of contract for its (nonexistent) harm.  Moreover, LNR's "claim" for an injunction is

procedurally defective because an injunction is merely a form of relief, and not a cause of action in and of itself. LNR's count for injunctive relief must be dismissed.

### A. LNR Will Suffer No Irreparable Harm And Has An Adequate Available Legal Remedy.

47. The harm alleged by a plaintiff seeking injunctive relief must be one requiring a remedy of more than mere monetary damages. Rather, the movant must provide evidence of damage that cannot be rectified by financial compensation. *See Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.*, 893 F. Supp. 285, 293 (S.D.N.Y. 1995) (dismissing counterclaim for permanent injunction under Federal Rule 12(b)(6); movants "must allege that they will suffer irreparable harm because of the conduct, *e.g.*, that they have no adequate remedy at law") (citing *Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F. Supp. 1087, 1096 (S.D.N.Y. 1989)).

48. Irreparable harm necessarily cannot exist where a damaged party can be compensated through monetary damages, even if there is some difficulty calculating such damages. *See JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990) (there is no irreparable harm when an injury is compensable through money damages); *In re First Republic Group Realty, LLC*, 421 B.R. 659, 678 (Bankr. S.D.N.Y. 1996) (when a party has alternate, monetary remedies for harm suffered, such harm is not irreparable); *Sports Channel Am. Assoc. v. National Hockey League*, 589 N.Y.S.2d 2, 3 (N.Y. App. Div. 1st Dep't 1992); *Dana Distribs. Inc. v. Crown Imports, LLC*, 853 N.Y.S.2d 111, 112 (N.Y. App. Div. 2d Dep't 2007); *U.S. Re Cos. v. Scheerer*, 838 N.Y.S.2d 37, 40 (N.Y. App. Div. 1st Dep't 2007) (denying injunction where "money damages equal to the value of the transactions lost" were a "quantifiable remedy" for defendant's alleged breach). Accordingly, economic loss, compensable by money damages, does not constitute irreparable harm. *See EdCia Corp. v. McCormack*, 845 N.Y.S.2d 104, 107 (N.Y. App. Div. 2d Dep't 2007) (citations omitted).

49.     At its heart, this is a contract dispute about money.  Even if LNR suffers an injury resulting from CRES's refusal to displace Midland and retain LNR (which, as discussed above in connection with LNR's inability to plead damages, it does not), any such financial damages would be quantifiable and thus easily addressed with monetary compensation.  If the value of LNR's certificates is somehow injured through Midland's actions as the Special Servicer for the Fixed Rate Mortgage under the C6 PSA, LNR can be adequately and appropriately compensated for its economic loss with a claim for monetary damages as well.  And, as is likely the case, if this action is just an attempted shakedown for servicing fees, those fees would be easy enough to calculate.  Injunctive relief is thus not available, and the count must be dismissed.

### B.     An Injunction Is A Remedy, Not A Cause Of Action.

50.     Finally, LNR's "claim" for injunctive relief must be dismissed because procedurally, no such cause of action even exists.  "There is no 'injunctive' cause of action under New York or federal law."  *Reuben H. Donnelley v. Mark I Mktg.*, 893 F. Supp. at 293.  "Instead, [parties] must allege some wrongful conduct . . . for which their requested injunction is an appropriate remedy."  *Id.* (citation omitted).

51.     LNR has failed to allege any wrongful conduct.  LNR's underlying breach of contract cause of action fails because the relevant agreements unequivocally establish that CRES has not committed any breach, and because, even if CRES had breached a contract, LNR has not pleaded any damages that it has suffered or will suffer.  LNR's "claim" for "injunctive relief" must be dismissed.

## <u>CONCLUSION</u>

WHEREFORE, for the above stated reasons, CRES respectfully requests that the Court

dismiss the Complaint.

Dated: November 24, 2010
      New York, New York

                             KASOWITZ, BENSON, TORRES
                               & FRIEDMAN LLP

                             By:   /s/ David M. Friedman
                             David M. Friedman
                             Howard W. Schub
                             Adam L. Shiff
                             Daniel A. Fliman
                             1633 Broadway
                             New York, New York 10019
                             Telephone: (212) 506-1700
                             Facsimile:  (212) 506-1800

                             *Attorneys for CRES Investment No. II, LP*